# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

        Plaintiff,

vs.                                                 No. CR 13-1876 JB

JASON LOERA,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Reconsider Court's Memorandum Opinion and Order [Doc. 62] on Defendant's Motion to Suppress Evidence [Doc. 35], filed March 8, 2016 (Doc. 109)("Motion to Reconsider").  The Court held a hearing on April 8, 2016.  The primary issues are: (i) whether the Court should reconsider its rulings, set forth in the last forty pages of its Memorandum Opinion and Order, filed October 20, 2014 (Doc. 62)("Motion to Suppress MOO"), 59 F. Supp. 1089 (D.N.M. 2014)(Browning, J.), that: (a) Special Agent Aaron Cravens and Special Agent Brian Nishida acted in good faith when they continued to search Defendant Jason Loera's CDs after discovering child pornography on November 20, 2012, (b) probable cause still existed for issuance of the second search warrant even though Cravens illegally opened files on Loera's CDs on November 27, 2012, to provide a description of images on the CDs in the second search warrant affidavit, (c) even if the second search warrant suffered from an incurable defect, Nishida relied on the warrant in good faith when he searched Loera's CDs and laptop for child pornography, and (d) even if the second search warrant contained an incurable defect and Nishida did not execute the second search warrant in good faith, the agents inevitably would have discovered child pornography; and (ii)

whether suppression is warranted on the grounds that the United States violated rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.  The Court will deny the Motion to Reconsider. First, the Court concludes that its legal conclusions set forth in the last forty pages of its Motion to Suppress MOO are not good candidates for reconsideration.  Even if the Court agreed that its legal conclusions set forth in the last forty pages of its Motion to Suppress MOO were good candidates for reconsideration, however, the Court would not modify its rulings or conclude that suppression is warranted in this case.  Second, the Court has considered Loera's argument that the Court should suppress the evidence on the grounds that the agents violated rule 41(e)(2)(B) -- an assertion he makes for the first time in his Motion to Reconsider -- but concludes that suppression is not warranted in this case, because there is no evidence that the agents violated rule 41(e)(2)(B).  Accordingly, the Court will deny the Motion to Reconsider.

## FACTUAL BACKGROUND

In its Memorandum Opinion and Order, filed October 20, 2014 (Doc. 62)("Motion to Suppress MOO"), 59 F. Supp. 1089 (D.N.M. 2014)(Browning, J.), the Court made, on pages five through twenty-five, one-hundred and twenty findings of fact.  See Motion to Suppress MOO at 5-25, 59 F. Supp. at 1096-1108.  Loera has stated that he does not challenge any of the Court's findings of fact.  See Transcript of Hearing at 21:18-25 (Court, Walz)(taken April 8, 2016)("Tr.").[1]  The Court will therefore integrate those findings of fact herein by reference, and not repeat them.  The Court will restate only some facts that are needed to evaluate the Motion to Reconsider.

---

[1]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may contain slightly different page and/or line numbers.

Loera's apartment and electronic media were subject to a search (the first search), made pursuant to a search warrant (the first search warrant), on November 20, 2012, to search for evidence of computer fraud and electronic mail hijacking.  <u>See</u> Motion to Suppress MOO at 5-12; 59 F. Supp. at 1096-1100.   While Cravens and Nishida conducted the search, they found evidence of child pornography within Loera's electronic medium.  <u>See</u> Motion to Suppress MOO at 12-19; 59 F. Supp. at 1100-04.   The agents seized and took as evidence the material, which was outside the first search warrant's scope.  <u>See</u> Motion to Suppress MOO at 12-19; 59 F. Supp. at 1100-04.   Cravens conducted a second search of the material seized during the execution of the first search warrant, which contained child pornography, on November 27, 2012 (the second search) to obtain a better description of the material found and develop probable cause to search for evidence of child pornography.  <u>See</u> Motion to Suppress MOO at 19-21; 59 F. Supp. at 1104-05.  Subsequently, agents applied for a received a second search warrant on November 29, 2012 (the second search warrant).  <u>See</u> Motion to Suppress MOO at 21; 59 F. Supp. at 1105.  Based on both the first and second search warrants, Nishida conducted searches of Loera's Dell laptop computer and hard drive in December of 2012 and CDs in April, 2013.  <u>See</u> Motion to Suppress MOO at 23-25; 59 F. Supp. at 1106-08.  As a result of the searches, Nishida discovered evidence of child pornography.  <u>See</u> Motion to Suppress MOO at 23-25; 59 F. Supp. at 1106-08.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Loera on two counts of receipt of visual depictions of minors engaged in sexually explicit conduct, allegedly occurring on September 9, 2009, and one count of possession of a visual depiction of a minor engaged in sexually explicit conduct, allegedly occurring on February 20, 2010.  <u>See</u> Indictment at 1-2, filed May 29, 2013 (Doc. 2).

Early in 2014, a federal grand jury filed a superseding indictment that charged Loera with three counts of possession of material containing any visual depiction of a minor engaged in sexually explicit conduct, each allegedly occurring on November 20, 2012.  See Superseding Indictment at 1-2, filed January 9, 2014 (Doc. 25)("Superseding Indictment").[2]

The Court issued the 166-page Motion to Suppress MOO on October 20, 2014.  In its Motion to Suppress MOO, the Court denied Loera's Motion to Suppress Evidence, filed March 7, 2014 (Doc. 35)("Motion to Suppress").  See Motion to Suppress MOO at 1-2; 59 F. Supp. at 1094-95.  The Court explained:

> The Court heard the parties' arguments on the Motion on August 19, 2014.  The primary issues are: (i) whether Defendant Jason Loera may seek suppression of the child pornography found on Loera's laptop computer and compact discs ("CDs"); (ii) whether the Search and Seizure Warrant, issued November 19, 2012, submitted to the Court at the May 20, 2014, evidentiary hearing as Government's Hearing Exhibit 9 ("First Warrant"), satisfies the particularity requirement in the Fourth Amendment to the Constitution of the United States of America; (iii) whether Federal Bureau of Investigation ("FBI") Special Agent Aaron Cravens' and Special Agent Brian Nishida's on-site preview of Loera's CDs during the execution of the First Warrant on November 20, 2012, was within the First Warrant's scope; (iv) whether the agents conducted an unlawful search when they continued searching Loera's CDs for evidence of computer fraud and electronic mail hijacking after they discovered child pornography; (v) whether the agents acted in good faith when they continued to search for evidence of computer fraud and electronic mail hijacking after discovering child pornography; (vi) whether Cravens was permitted to open files on Loera's CDs on November 27, 2012, for the limited purpose of providing a United States Magistrate Judge a description of four images depicting the sexual abuse of a child; (vii) whether, even if Cravens was not permitted to open the files on November 27, 2012, and even if those descriptions are excised from the affidavit in support of the Second Warrant, probable cause to issue the Search and Seizure Warrant (issued November 29,

---

[2]On the same day that Loera filed this Motion to Reconsider, a federal grand jury filed a second superseding indictment that charged Loera with three counts of possession of material containing any visual depiction of a minor engaged in sexually explicit conduct, each allegedly occurring on November 20, 2012, and three counts of knowingly receiving a depiction which involved the use of a minor engaging in sexually explicit conduct.  See Second Superseding Indictment, filed March 8, 2016 (Doc. 113).

2012), submitted to the Court at the May 20, 2014, evidentiary hearing as Government's Hearing Exhibit 10 ("Second Warrant") still exists; (viii) whether, even if the Second Warrant suffered from an incurable defect, Nishida relied on that warrant in good faith when he searched Loera's CDs and laptop for child pornography; and (ix) whether, even if the Second Warrant contained an incurable defect and Nishida did not execute the Second Warrant in good faith, the agents inevitably would have discovered child pornography.

The Court will deny the Motion. The Court concludes that Loera may seek suppression of the child pornography evidence, because he admitted that the CDs and laptop on which the agents discovered child pornography were within his control and possession when the agents seized them. The Court holds that the First Warrant satisfies the particularity requirement in the Fourth Amendment, because it limited the agents' search to evidence of computer fraud and electronic mail hijacking. The Court concludes that the agents' on-site preview of Loera's CDs during the execution of the First Warrant on November 20, 2012, was within the warrant's scope, because the warrant authorized the agents to open image and video files, and files with lastmodified and created dates before July 29, 2011. The Court further holds that, while the Court is concerned with the soundness of the United States Court of Appeals for the Tenth Circuit's law related to computer searches, under that law, which the Court, as a district court, must faithfully apply, the agents conducted an unlawful search when they continued searching for evidence of electronic mail hijacking and computer fraud on Loera's CDs after they discovered child pornography. The Court concludes, however, that the agents acted in good faith when they did so. The Court holds that Cravens was not permitted to open files on Loera's CDs on November 27, 2012, for the limited purpose of providing a United States Magistrate Judge a description of four images depicting the sexual abuse of a child. The Court concludes, however, that, even if Cravens was not permitted to open the files on November 27, 2012, and even if those descriptions are excised from the Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize (issued November 29, 2014), submitted to the Court at the May 20, 2014, evidentiary hearing as Government's Hearing Exhibit 9 ("Second Affidavit"), probable cause to issue the Second Warrant still existed. The Court holds that, even if the Second Warrant suffered from an incurable defect, Nishida relied on that warrant in good faith when he searched Loera's CDs and laptop for child pornography. Finally, the Court holds that, even if the Second Warrant contained an incurable defect and Nishida did not execute the second warrant in good faith, the agents inevitably would have discovered child pornography on Loera's CDs and laptop. Accordingly, the Court will deny the Motion, and not exclude the child pornography evidence from the trial.

Motion to Suppress MOO at 1-2; 59 F. Supp. at 1094-95.

1.     __The Motion to Reconsider__.

Loera filed the Motion to Reconsider on March 8, 2016.  See Motion to Reconsider at 1. Loera first argues that, because there was a clear violation of Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the Court must suppress all evidence.  See Motion to Reconsider at 3-5.  Loera contends that rule 41(e)(2)(B) instructs agents that, if they seize any electronically stored media through the warrant process, later reviews are permitted only if those reviews are consistent with the warrant.  See Motion to Reconsider at 4.  Loera asserts that here, the Court deemed the agents November 27 search unconstitutional, because "Cravens' November 27, 2012, searches of Loera's CDs violated the Fourth Amendment" of the Constitution of the United States of America.  According to Loera, the Court reasoned that Cravens was not searching for evidence of electronic fraud and computer hijacking as the first warrant authorized, but instead hoped to find child pornography, so that he could provide a description of the child pornography in his affidavit for the second search warrant.  See Motion to Reconsider at 4. Loera maintains that this violation "supports a motion to suppress for a Rule 41 violation that automatically excludes the 4 contraband CDs and the fruits and instrumentalities of that search (i.e. computer hard drives)."  Motion to Reconsider at 4.  Loera further asserts that, because the rule 41 violation occurred before the issuance of the second search warrant to search for child pornography, the Court should not entertain "good faith" arguments.  See Motion to Reconsider at 4.

Loera explains that, under the framework that the Tenth Circuit set forth in United States v. Krueger, 809 F.3d 1109 (10th Cir. 2015), suppression of evidence is required when a Rule 41 violation has taken place:

> [O]ur review is guided by the analytical framework this Court adopted in *United States v. Pennington,* 635 F.2d 1387 (10th Cir. 1980) [. . . .]   Under this framework, we begin by considering whether Rule 41 was in fact violated. [. . .] If we determine that the Rule 41 violation is *not* of constitutional import, we then consider whether the defendant can establish that, as a result of the Rule violation, "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Pennington,* 635 F.2d at 1390. Unless the defendant can establish prejudice or intentional disregard of the Rule, a non-constitutional violation of Rule 41 will not, by itself, justify suppression.

Motion to Reconsider at 4-5 (quoting United States v. Krueger, 809 F.3d at 1113-14 (emphasis in United States v. Krueger).   Loera insists that the Court need not look at whether suppression should occur based on prejudice, or intentional or deliberate disregard for the rule, because the clear constitutional violation of rule 41 requires suppression of all evidence obtained.   See Motion to Reconsider at 5.   Further, Loera maintains that, as the Tenth Circuit has noted, "Rule 41 is not coextensive with the Fourth Amendment because Rule 41 incorporates standards that are in some respects 'more specific and more stringent.'"   Motion to Reconsider at 5 (quoting United States v. Krueger, 809 F.3d at 1114).

Loera quotes United States v. Vasser, 648 F.2d 507 (9th Cir. 1980), for the proposition that:

> Suppression is not required in all cases where the issuance of a search warrant fails to conform to the dictates of Rule 41.  Only a "fundamental" violation of Rule 41 requires automatic suppression, and a violation is "fundamental" where it, in effect, renders the search unconstitutional under traditional Fourth Amendment standards.

Motion to Reconsider at 5 (quoting United States v. Vasser, 648 F.2d at 510).  Loera contends that Cravens' search was a "fundamental" violation of rule 41(e)(2)(B) and all four contraband CDs along with any other evidence obtained should be suppressed.  Motion to Reconsider at 5.

Loera further asserts that the Court should suppress the Dell laptop computer and hard drive, because the probable cause that was developed through Cravens' unconstitutional search extended to the laptop.  See Motion to Reconsider at 5.  According to Loera, Cravens committed an impermissible error in his search of the CDs to obtain the warrant for the two computers.  See Motion to Reconsider at 5.  Loera therefore contends that the computers and all other electronic media are the warrantless search's fruits and instrumentalities and the Court should therefore suppress them.  See Motion to Reconsider at 5-6.  Although Loera maintains that there was a "fundamental" violation of rule 41, requiring automatic suppression, he argues that the evidence demonstrates that: (i) there was prejudice in that the search might not have occurred or would not have been so abrasive if the agents had followed the rule; and (ii) there is evidence of intentional and deliberate disregard of the rule's provision.  Motion to Reconsider at 6.  Loera explains:

> The Government Agents' testimony and records demonstrate evidence of intentional and deliberate disregard of Rule 41 by their actions for the November 27 search. Since the majority of the evidence for the 2nd search warrant affidavit was from the November 27 unconstitutional search, all fruits and instrumentalities of the second search warrant must be suppressed.  There can be a strong showing of prejudice as the search would not have occurred if the rule had been followed. If the rule had been followed, the search on November 27 would never have occurred, and no descriptions for the warrant would have been made available for a warrant seeking additional authority to search the media seized at Defendant's home for evidence of CP.

Motion to Reconsider at 6.

Finally, on this point, Loera maintains that, "because the warrant did not authorize a further search of the media past what Agent Cravens and Agent Nishida initially found, the Agents acted contrary to the Supreme Court instructions in *United States v. Leon*, 468 U.S. 897 (1984)."  Motion to Reconsider at 6.  Loera argues that the agents had authorization pursuant to Rule 41 from the warrant to seize or image copy all remaining CDs if they concluded that it

would not be practicable to review the media on site and to return to them once a second warrant was issued.  See Motion to Reconsider at 7.  Instead, according to Loera, the agents did not stop their search.  See Motion to Reconsider at 7.  Loera asserts that the agents continued to search, and to open text files and images on CDs that the agents knew contained child pornography.  See Motion to Reconsider at 7.

Loera next argues that the Court committed clear error in invoking the Supreme Court's decision in Horton v. California, 496 U.S. 128 (1990).  See Motion to Reconsider at 8.  Loera contends that, in the Court's Motion to Suppress MOO, the Court concluded that the agents performed an unlawful search on November 20, 2012 -- after finding alleged evidence of child pornography -- but that it found that the agents acted in good faith when they continued to search Loera's CDs for email offenses.  See Motion to Reconsider at 8.  According to Loera, the Court concluded that the agents could have reasonably relied on Horton v. California -- binding Supreme Court precedent -- in continuing to search for email hacking offenses after finding the first child pornography image.  See Motion to Reconsider at 8.  Loera contends that an unlawful search under United States v. Carey, 172 F.3d 1268 (10th Cir. 1999), occurred when the agents continued to look for email hacking material after allegedly finding evidence of a crime on the first CD.  See Motion to Reconsider at 9.  Loera argues that, because the search was unconstitutional under United States v. Carey, "the essential predicate for a warrantless seizure of incriminating evidence, (no Fourth Amendment violations) denies the Agents the lawful right of access to the contraband on the CDs through *Horton*, thus, negating the Good Faith exception on this point."  Motion to Reconsider at 9.

Loera asserts that, because the agents executed an unlawful search under United States v. Carey and had no lawful right of access to continue searching the CDs under the first search warrant, the Court may not invoke Horton v. California in support of the United States' ability to seize any of the contraband CDs on November 20, 2012.  See Motion to Reconsider at 9.  Loera contends that law enforcement officers must have probable cause to seize contraband under the plain-view exception and argues:

> Due to the fact that the Agents had to take out the CDs from the FBI's evidence control locker on November 27 and execute an unconstitutional search of the CDs to provide a description for a second search warrant, that activity shows that the Agents did not have probable cause when they left the Defendants residence on November 20.

Motion to Reconsider at 9.  Loera rejects the Court's conclusion that the agents acted in good faith or pursuant to the plain-view doctrine when they continued to search the CDs after encountering child pornography.  See Motion to Reconsider at 10.  Loera maintains that the agents knew that they were outside of the scope of the first search warrant when they continued to search for evidence of email hacking after finding child pornography.  See Motion to Reconsider at 10.  According to Loera, by continuing to search, the agents violated the terms of the first search warrant, rule 41(e)(2)(B), and Supreme Court case law that "any reasonably trained officer executing federal level search and seizure warrants are required to know."  Motion to Reconsider at 10-11.  Loera reiterates that the warrant did not authorize a further search of the media beyond what the agents initially found, and that the agents acted contrary to the Supreme Court's instructions in United States v. Leon and rule 41.  See Motion to Reconsider at 11.

Loera argues that the agents knew, understood, or should have known that they needed a warrant to continue searching.  See Motion to Reconsider at 12.  According to Loera, the agents, once they discovered child pornography, did not seek any additional guidance to continue their search.  See Motion to Reconsider at 12.  Loera asserts that Nishida knew from his reading of the first search warrant affidavit and attachments that it did not authorize a search for child pornography.  See Motion to Reconsider at 12.  Loera further explains:

> Defendant asserts that all the Agents knew they needed a warrant to continue their searches once the Agents became aware of evidence of another crime, and did not rely on any binding appellate precedent from the 10th Circuit or Supreme Court to continue their improperly obtained.  Nor did the Agents rely on the terms and conditions of the search warrant they had in hand when they arrived at Mr. Loera's house to search the residence where Defendant resided.

> Had Agent Cravens stopped his search, noted the attributes of the image he allegedly saw, and then sought a 2nd search warrant for evidence of CP, then the Fourth Amendment and Rule 41(e)(2)(B) may have been satisfied and the search perhaps could have continued under the 10th circuit framework of *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001) and *United States v. Burgess*, 576 F.3d 1078 (10th Cir. 2009).

> Defendant contends that the Agents executing the 1st search warrant willfully ignored all the safeguards in place that protect the public's Fourth Amendment rights. As noted, Rule 41(e)(2)(B) expressly states the warrant only authorizes searches and seizures of items consistent with the warrant.

Motion to Reconsider at 12-13.  Loera asserts that the agents should have stopped, and made some modicum of effort to ask an FBI legal advisor or counsel in the United States Attorney's Office whether to continue their search for hacking and email offenses.  See Motion to Reconsider at 13.  According to Loera, a week later, the agents again without a warrant or exception to the warrant requirement searched CDs to secure an image to place in a second warrant affidavit to search for child pornography.  See Motion to Reconsider at 13-14.  Loera "strongly urges the Court to not view the Agents' actions as 'isolated negligence or ignorance of

the subtleties of 10th circuit law.'"  Motion to Reconsider at 14.  In conclusion on this point, Loera maintains that the deterrence value is high in excluding the child pornography evidence, and that the agents knew or should have known that their actions were unconstitutional, such that they cannot rely on the good-faith exception.  See Motion to Reconsider at 14.

Loera next takes issue with the Courts' conclusion that the agents had probable cause for the issuance of the second search warrant despite the illegal search.  See Motion to Reconsider at 15.  Loera argues that, if the agents believed they had probable cause to support the issuance of the second search warrant, they would have not needed to knowingly perform an unconstitutional search to obtain the descriptions for the second search warrant.  See Motion to Reconsider at 15. According to Loera, "[t]his action was taken because they lacked the 'strength of the showing of probable cause,' thus precipitating the Agents 'jumping the gun' in their search on November 27."  Motion to Reconsider at 15 (quoting United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)).  Loera reiterates his argument from his Motion to Suppress, contending that, in this case, there was no independent and substantial basis that the four CDs contained child pornography.  See Motion to Reconsider at 15-16.  Loera maintains that the agents did not have notes which described what they saw during the search on November 20, 2012, and that the warrant application was not developed based on their recollection, but rather, based on the fruits of the illegal search conducted on November 27, 2012.  See Motion to Reconsider at 15-16.  In sum, Loera contends:

> Here the government: (1) fails to establish probable cause because it relies on unsubstantiated evidence from the Agents' unconstitutional Nov. 20th 2012 search.  As noted above, if the government had sufficient probable cause after the initial search on the Nov. 20th, therefore, why perform another unconstitutional search on Nov. 27th 2012.  And (2) the government fails to provide a nexus between the CD's and the other electronic media which they sought to search. (i.e.

computers and associated hard drives.)  The government failed to show in the warrant even the most rudimentary connection between the CD's and the Dell laptop computer.

Motion to Reconsider at 16.

Loera's next argument is that the Court cannot apply the good-faith exception here to prevent exclusion of the child pornography evidence.  See Motion to Reconsider at 17.  Loera asserts that the Tenth Circuit has held that the good-faith doctrine cannot be applied if the officer relying on the warrant's good faith knows that it is invalid.  See Motion to Reconsider at 17 (citing United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005)).  Loera contends that the same reasoning should apply to information illegally obtained.   See Motion to Reconsider at 17. According to Loera, the Court stated in United States v. Martinez, 696 F. Supp. 2d 1216, 1262 (D.N.M. 2010)(Browning, J.), aff'd, 643 F.3d 1292 (10th Cir. 2014): "The Court concludes that the good-faith exception to the exclusionary rule should not be applied in a case, such as this one, where officers learn information during an unconstitutional search and give that information to another officer for incorporation into the warrant affidavit."  Motion to Reconsider at 17 (quoting United States v. Martinez, 696 F. Supp. 2d at 1262).  Loera maintains that information in the affidavit that was illegally obtained misled the Honorable W. Daniel Schneider, United States Magistrate Judge, who issued the second search warrant, and that, without this information, the warrant lacked probable cause.  See Motion to Reconsider at 18.  Loera further asserts that Nishida knew the warrant could not be valid because of the illegally obtained material.  See Motion to Reconsider at 18.

According to Loera, in obtaining and executing the second search warrant for child pornography, the agents attempted a "good faith handoff."  Motion to Reconsider at 18.  Loera

insists that at least three factors that United States v. Leon, 468 U.S. 897 (1984), sets forth support excluding the illegally obtained evidence that is the subject of the Motion to Reconsider. See Motion to Reconsider at 18.  First, Loera asserts that information in an affidavit which the affiant knew was false or would have known was false except for his reckless disregard for the truth misled Judge Schneider.  See Motion to Reconsider at 18-19.  Second, Loera contends that the affidavit in support of the second warrant was so lacking in probable cause as to render official belief in its existence entirely unreasonable.  See Motion to Reconsider at 19.  Third, Loera asserts that the second warrant was so facially deficient that the executing agents could not reasonably presume it to be valid.  See Motion to Reconsider at 19-20.

Loera asserts that the agents in this case relied on the "good faith handoff" to undercut the exclusionary rule's deterrent function.  See Motion to Reconsider at 20 (citing United States v. Martinez, 696 F. Supp. 2d 1216 (D.N.M. 2010)).  According to Loera, the Court in United States v. Martinez was not willing to recognize good faith for the officers, because they all knew or should have known their actions were unconstitutional.  See Motion to Reconsider at 20. Loera asserts that the agents disregarded the first search warrant and rule 41's terms to pass off the fruits of that illegal search to Nishida, who then executed the second search warrant.  See Motion to Reconsider at 20.  Loera maintains that Cravens and Boady possessed knowledge of rule 41 and its provisions.  See Motion to Reconsider at 21.  Loera asserts that, given Cravens and Boady's familiarity with the first search warrant and rule 41, they could not have been acting in good faith when they conducted an unconstitutional search on November 27, 2012, to provide descriptions for the application for the second search warrant.  See Motion to Reconsider at 21. Loera accordingly asks the Court to suppress all evidence obtained as a result of the second

search warrant.  See Motion to Reconsider at 21.  Loera further asserts that Nishida knew the first search warrant's breadth and scope, and "[a]fter reading the 2nd warrant . . . would have known that Agent Cravens' actions on November 27 violated Rule 41(e)(2)(B) and the provisions of the 1st warrant and could not have been acting in good faith in executing the second warrant."  Motion to Reconsider at 22.  According to Loera, Nishida knew or should have known that the only way Cravens could have obtained the descriptions of the materials used in the affidavit for the second warrant was through an unconstitutional search of the CDs outside the scope of the first search warrant.  See Motion to Reconsider at 22.  In sum, on this issue, Loera maintains that all three agents disregarded rule 41(e)(2)(B) and the search warrant's terms.  See Motion to Reconsider at 22-23.

Loera's last argument is that application of the inevitable discovery doctrine is not appropriate in this case.  See Motion to Reconsider at 23-27.  Loera contends that the Court "must determine 'how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.'  [United States v.] Souza, 223 F.3d at 541."  Motion to Reconsider at 23 (quoting United States v. Christy, 739 F.3d 534, 541 (10th Cir. 2014)).  Loera maintains that the United States cannot prove by a preponderance of the evidence that they would have inevitably discovered images of child pornography on the Dell laptop computer.  See Motion to Reconsider at 24-25.  Moreover, Loera contends that the United States v. Souza factors indicate that inevitable discovery is not appropriate here.  See Motion to Reconsider at 25.  First, Loera argues that, regarding the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search, the Court agreed with him that the United States was not in the process of seeking a search warrant for child

pornography before the search on November 27, 2012, nullifying inevitable discovery on this factor.  See Motion to Reconsider at 25.  Second, Loera contends that the strength of the showing of probable cause for the second warrant is weak given that Cravens could not remember the exact image, did not write down the name of the file or the image he saw, and relied entirely on his memory.  See Motion to Reconsider at 25-26.

Third, Loera contends that the third United States v. Souza factor -- whether a warrant was obtained, albeit after the illegal entry -- weighs in his favor.  See Motion to Reconsider at 26.  Loera asserts that, in the Court's Motion to Suppress MOO, the Court noted that Cravens used information from his unconstitutional search on November 27, 2012, to seek and obtain a second search warrant for evidence of child pornography.  See Motion to Reconsider at 26.  According to Loera, with the Court correctly excising the fruits of the unconstitutional November 27, 2012, search, probable cause hinges on Cravens' recollection of what he saw during the November 20, 2012, search.  See Motion to Reconsider at 26.  Loera asserts that Cravens could not draw on any facts from that search to describe with particularly the images he saw.  See Motion to Reconsider at 26.  Loera maintains: "Facts from the November 20 search do not support that the Agents would be able to receive an untainted search warrant, other than the one which was ultimately obtained.  In other words, the warrant the government ultimately received was an unconstitutional one."  Motion to Reconsider at 26.

Finally, Loera addresses the evidence that law enforcement "'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."  Motion to Reconsider at 26-27.  Loera explains:

> As noted, Agent Cravens knew on November 20 that he needed a search warrant to view the contents of Defendant's electronic media for evidence of CP.

- 16 -

When Case Agent Boady took out the CD's on Nov. 27th and gave them to Cravens, Agent Boady was aware that under Rule 41 for which the 1st search warrant was issued, any electronic media seized at Defendant's residence could only be reviewed for evidence consistent with that warrant.

As previously shown in the 2nd Souza factor, because of the lack of Agent Cravens confidence in describing with sufficient particularity the images he saw on November 20, Agent Boady tasked Agent Cravens with an unconstitutional search for probable cause to find the images for a 2nd search warrant for evidence of CP.

The government cannot show through a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violations.

Motion to Reconsider at 26-27. In sum, Loera contends that all the fruits and instrumentalities of the November 27, 2012, search, CDs, and all subsequent searches on the Dell laptop containing alleged child pornography were fruits of the poisonous tree, and that the Court must suppress that evidence based on rule 41 and Fourth Amendment violations. See Motion to Reconsider at 27.

2.      **The United States' Response.**

The United States responded on March 22, 2016. See United States' Response to Motion to Reconsider (Doc. 109), filed March 22, 2016 (Doc. 119)("Response"). The United States asks the Court to deny the Motion to Reconsider. Response at 1. The United States contends that motions to reconsider are generally disfavored, but that courts have discretion whether to entertain such motions. See Response at 2. According to the United States, motions to reconsider are proper only when: (i) there has been an intervening change in the controlling law; (ii) there is newly discovered evidence which was previously unavailable; or (iii) it is necessary to correct clear error or prevent manifest injustice. See Response at 2 (quoting United States v. Harmon, 871 F. Supp. 2d 1144, 1144 (D.N.M. 2012)(Browning, J.)). The United States stresses that "[a] motion to reconsider is not an opportunity to rehash arguments previously addressed or

- 17 -

to advance new arguments that could have been raised in prior briefing."  Response at 2.  The United States urges the Court to exercise its discretion and decline to entertain the Motion to Reconsider, because it was not timely filed and because it has not met the legal standard for reconsideration.  See Response at 2.  The United States maintains that the Court thoroughly discharged its duty in denying Loera's Motion to Suppress.  See Response at 2-3.  The United States contends that the suppression issue has been extensively litigated and that Loera should not now receive "a second bite at the suppression apple."  Response at 3.

The United States asserts that Loera does not and cannot suggest that the law has changed since the Court denied his Motion to Suppress, and that he does not argue that there is newly discovered evidence that was not available to him previously.  See Response at 3.  Rather, according to the United States, Loera's arguments are ones that he made previously or that he could have made previously.  See Response at 3.  The United States specifically takes issue with Loera's repeated references to rule 41(e)(2)(B).  See Response at 3 n.2.  The United States argues that, not only is his argument unsound, but rule 41(e)(2)(B) has been in effect throughout this case's pendency and Loera could have raised this argument at any time.  See Response at 3 n.2.  The United States also notes that, in United States v. Krueger, 809 F.3d 1109 (10th Cir. 2015), the Tenth Circuit explained that, other than rule 41(b)(1), "which is unique from other provisions of Rule 41 because it implicates substantive judicial authority," the Tenth Circuit has "never conclude[d] that the alleged Rule 41 violation(s) at issue justified suppression." Response at 3 n.2 (quoting United States v. Krueger, 809 F.3d 1115-16 n.7).  Moreover, the United States asserts that, because Loera is simply making arguments that he previously made or that he could have made previously, "the United States need not waste the Court's time here by

addressing the rehashed arguments Defendant Loera makes in his motion to reconsider." Response at 3-4.

The United States argues that "Loera's stated basis for his motion is insufficient on its face, namely that 'the Court should reconsider its decision and determine that the Agents did not follow the proper procedures during their investigation.'"  Response at 4 (quoting Motion to Reconsider at 2).  The United States contends that Loera's complaint about the procedures that the agents followed formed the basis of his Motion to Suppress and that there is no point in rehashing that extensive litigation.  See Response at 4.  The United States concludes by observing.

> It is interesting to note that Defendant Loera embraces as sound the Court's reluctant rejection of the United States' position concerning the agents' ability to continue their warrant-authorized search after coming across Defendant Loera's child pornography.  He embraces the Court's decision that the second warrant's affiant was not permitted to open files on CDs he knew contained child pornography for the limited purpose of including in his affidavit a description of four images.  Yet he rejects as clearly erroneous or manifestly unjust the conclusions reached by the Court that did not go his way.  The record concerning the motion to suppress demonstrates that Defendant Loera's position is impossible to maintain, that reconsideration is not available to him, and that his motion should be denied.

Response at 4-5.  The United States accordingly asks the Court to deny the Motion to Reconsider.  See Response at 5.

**3.      Loera's Reply.**

Loera replied on April 6, 2016.  See Reply in Support of Defendants Motion to Reconsider Court's Memorandum Opinion and Order [Doc. 62] on Defendant's Motion to Suppress Evidence [Doc. 35], filed April 6, 2016 (Doc. 123)("Reply").  Loera contends that

> [t]his reconsideration argument is advanced to show the Court that there is a subtle, but important difference in the recent case law between a clear

constitutional violation of a search conducted pursuant [to] Fed.R.Crim.P. 41(e)(2)(B) and an illegal search that does not rise to the level of a constitutional violation of the rule pursuant to the recently decided case of *United States v. Krueger*, 809 F.3d 1109 (10th Cir. 2015).

Reply at 1-2. Loera explains that the Tenth Circuit decided United States v. Krueger in November, 2015, after the Court issued its Motion to Suppress MOO denying his Motion to Suppress. See Reply at 2. Loera next attacks the United States' argument that the Court dismiss the Motion to Reconsider on the basis that the motion is untimely. See Reply at 2. Loera contends that the United States does not point to any time restrictions which the rule or case law have established and maintains that the Court's ability to hear the Motion to Reconsider is at the Court's discretion. See Reply at 2 (citing United States v. Christy, 739 F.3d 534 (10th Cir. 2014)). Loera stresses that the Court appointed his current counsel on December 1, 2015, and maintains that the Motion to Reconsider is timely and proper under the circumstances to correct clear error or to prevent manifest injustice. See Reply at 2-3.

Loera next addresses the circumstances under which it is appropriate for a Court to consider a motion to reconsider. See Reply at 3. Loera agrees that he is not asserting that there is newly discovered evidence and that a party should not use a motion to reconsider to rehash arguments that it made or could have made. See Reply at 3. Loera maintains that a motion to reconsider is a tool to "correct clear error or prevent manifest injustice." Reply at 3 (quoting United States v. Christy, 739 F.3d at 539). Loera contends, however, that the United States is incorrect that his Motion to Reconsider is a mere rehashing of arguments previously presented. See Reply at 3. Loera explains:

> [T]he motion requests the Court consider further and clarifying argument that was not available earlier and to correct clear error based on the developing case law. The reconsideration argument is advanced to show the Court that there is a subtle,

but important difference in the recent case law between a clear constitutional violation of a search conducted pursuant Fed.R.Crim.P. 41(e)(2)(B) and an illegal search that does not rise to the level of a constitutional violation of the rule as decided in *United States v. Krueger*, 809 F.3d 1109, (10th Cir. 2015). *Krueger* was decided in November, 2015, after the argument and Court's Order denying the Defendant's Motion to Suppress. The Court has already determined that the search conducted on November 20, 2012, was illegal, [Doc. 62 at pg 91] and the search conducted on November 27, 2012 was unconstitutional, [Doc. 62 at 144]. *Krueger* implies, if not specifically holds, that if there is a non-constitutional violation of Fed.R.Crim.P. 41(e)(2)(B) then "[u]nless the defendant can establish prejudice or intentional disregard of the Rule, a non-constitutional violation of Rule 41 will not, by itself, justify suppression." *Krueger*, at 1114 (10th Cir. 2015).

Reply at 3-4.

According to Loera, in <u>United States v. Krueger</u>, the Tenth Circuit determined that suppression of evidence for rule 41 violations furthers the exclusionary rule's purpose. <u>See</u> Reply at 4. Loera asserts that <u>United States v. Krueger</u> represents a change in the law that permits defendants to challenge government searches which violate rule 41. <u>See</u> Reply at 4. Loera asks the Court to consider whether the rule violation was: (i) of a constitutional import; or (ii) whether the search that the agents conducted led to prejudice or deliberate disregard for the rule. <u>See</u> Reply at 4. Loera maintains that, in the Court's Motion to Suppress MOO, the Court already concluded that the November 27, 2012, search was unconstitutional and that it should consider whether rule 41 violations of a constitutional magnitude require suppression. <u>See</u> Reply at 4-5. Loera asserts that, "[w]ith the four CD's suppressed, the remaining electronic media are fruits of the poisonous tree and suppressible." Reply at 5. Loera further argues that, because the rule violation in this case was of a constitutional magnitude, "the suppression of the CD's makes any Probable Case, Good Faith or Inevitable Discovery Arguments by the government moot." Reply at 5. Loera concludes that, because the November 27, 2012, searches of Loera's CDs was

an unconstitutional violation of rule 41(e)(2)(B), "all evidence obtained should be suppressed and not just excised from the second search warrant affidavit."  Reply at 5.  Loera insists that "the Court misapplied the law when it only excised the evidence obtained by the illegal search and did not fully suppress all of the information obtained through the illegal and unconstitutional search."  Reply at 5.

Last, Loera addresses the application of the plain-view exception to this case.  See Reply at 5-6.  Loera contends that the Court permitted the seizure of the four CDs and their removal from his dwelling even though the evidence found on them was outside the first search warrant's scope.  See Reply at 5-6.  He argues that there was no probable cause allowing the seizure of the four CDs pursuant to the plain-view doctrine that Arizona v. Hicks, 480 U.S. 321, and Horton v. California, 496 U.S. 128 (1990), set forth.  See Reply at 6.  Loera maintains that, if the Court considers the Supreme Court's conception of the plain-view doctrine with the Tenth Circuit's decision in United States v. Carey, 172 F.3d at 1268, it would conclude that "the invocation of the plain view doctrine is prohibited in cases where computer files are searched."  Reply at 6.  Loera takes issue with the Court's conclusion that United States v. Carey can be distinguished in that the agents could have reasonably relied on Horton v. California to continue searching the CDs once the agents discovered the child pornography.  See Reply at 7.  According to Loera, "the Tenth Circuit in Carey refused to accept the plain view argument because 'the items seized were not authorized by the warrant.  Further they were in closed files and not in plain view." Reply at 7.  Loera also argues that the November 27, 2012 search was essentially a continuation of the November 20, 2012 search.  See Reply at 7-8.  According to Loera, on both dates, the

officers did not have a valid warrant or exception to the warrant requirement that allowed the agents to search for evidence of child pornography.  See Reply at 8.  Loera further explains:

> The Defendant notes that because the agents have yet to identify to the Court what CD was discovered first by Agent Cravens on November 20, 2012, the court should conclude that all four CDs should be suppressed.  If the court determines that the four alleged CDs are suppressed, all the fruits and instrumentalities (computers) seized as a result of the November 20, 2012 search should also be suppressed.  No probable cause, good faith or inevitable discovery arguments by the government would cure the unlawful searches and seizures.

Reply at 8.  In conclusion, Loera maintains that the entire investigation that the agents conducted was a result of continuous unconstitutional actions that violated the Fourth Amendment and rule 41(e)(2)(B).  See Reply at 8.

### 4.     The Hearing on the Motion to Reconsider.

The Court held a hearing on the Motion to Reconsider on April 8, 2016.  Loera first took up argument on in his Motion to Reconsider.  See Tr. at 3:1-4 (Court, Walz).  Loera began by stressing that he did not intend to rehash all of the arguments that the Court addressed in its Motion to Suppress MOO, but rather to focus on two points: (i) that he believes the Court committed clear error in some of its determinations; and (ii) that a recent Tenth Circuit case -- United States v. Krueger -- establishes that there can be suppression based specifically on rule 41.  See Tr. at 3:9-21 (Walz).  Loera maintained that he could not have presented the rule 41 issue to the Court because the Tenth Circuit did not decide United States v. Krueger until November 10, 2015, after the Court issued its Motion to Suppress MOO.  See Tr. at 3:21-4:2 (Walz).  According to Loera, before the Tenth Circuit's decision in United States v. Krueger, there had never been a suppression in the Tenth Circuit based on rule 41.  See Tr. at 4:3-5 (Walz).  Loera then argued that, as United States v. Krueger explains, rule 41 is not necessarily

coextensive with the Fourth Amendment, because "Rule 41 incorporates standards that are in some respects more specific and more stringent than traditional Fourth Amendment analysis . . . ." Tr. at 4:6-17 (Walz).

Loera then argued that he has several strong arguments, based on the case history, that the Court should suppress all the evidence. See Tr. 5:22-25 (Walz). Loera maintained that the Court need not even get into the good-faith exception, handoff, or inevitable discovery "because of the clear violation of Rule 41 and in particular 41(e)(2)(B)." Tr. at 5:22-6:3 (Walz). Loera explained that the analysis should focus on Rule 41(e)(2)(B), which "deals with a warrant seeking electronically stored information." Tr. at 6:11-13 (Walz). After discussing what he views as rule 41's general contours, Loera contended that the Court erred in its determination that the child pornography pictures were in plain view. See Tr. at 6:14-8:9 (Walz). The Court then asked Loera to read the language in rule 41(e)(2) that he alleges the United States violated. See Tr. at 8:10-14 (Court). The Court further explained that the language in Rule 41(e)(2) goes to what the warrant's contents should include and asked Loera whether he was arguing that the first search warrant was itself deficient. See Tr. at 8:16-21 (Court). Loera responded "no," and the Court then asked Loera how the United States could have violated rule 41(e)(2) in any way if he is not challenging the first search warrant's contents. Tr. at 8:22-25 (Court, Walz). Loera responded that he thinks "we're on some cutting edge legal argument here," and explained that rule 41(e)(2)(B) sets forth the confines of the warrant itself and describes what can be seized. Tr. at 9:1-7 (Walz). The Court and Loera then engaged in the following exchange:

> THE COURT: It really doesn't, does it. What 41, my reading of 41E2 B is that it simply is saying that a warrant may authorize the seizure of electronic storage media. I don't think that's a big deal. But I think what the second sentence is probably the bigger deal. Unless otherwise specified the warrant[] authorized a

later review of the media.  So it allows an FBI agent to seize the ESI, and then later with the same warrant without getting a new warrant review that material probably in its offices with software or something like that.  Isn't that all that really 41 E 2 B does[?]

MR. WALZ:  I think that's correct as far as what the Court states.  What it does not authorize is the facts and that's why we have to look at the facts of this case, is that agents Nashida and Cravens, pursuant to this warrant that's facially valid, the first warrant, they come across child pornography in looking at discs.  There were four of them from what the Court described in the memorandum opinion order that was set aside.  At that point they could no longer, pursuant to the seizure aspect continue a search for child pornography.  So they are violating the confines.  Now, facially the warrant is okay, but they're violating the description of what is allowed to be seized.

THE COURT:  But using the language of 41E2B, tell me how they viol[ated] 41E2B.

MR. WALZ:  Well Your Honor sure as the Court correctly zeroed in on it the warrant authorizes a later review of the media or information consistent with the warrant.  So by the very terms of the language itself, in 41E2 B, the actions must be consistent with the warrant, the actions of the agents were not consistent with the warrant.  That constituted the violation.

THE COURT:  Well, it would seem to me, you know, it's your argument, but it seems to me your argument is not that they violated 41 E 2 B but again just what we dealt with at the first hearing, which was the issue of whether they violated the Fourth Amendment as construed by the Tenth Circuit.

MR. WALZ:  Right.

Tr. at 9:8-10:25 (Court, Walz).

The Court then explained that it did not understand what the rule 41 issue adds.  See Tr. at 11:1-3 (Court).  Loera conceded that the recent Tenth Circuit decision in United States v. Krueger was not interpreting this provision and agreed that case dealt with an invalid warrant under rule 41 issued in one jurisdiction being executed in another jurisdiction.  See Tr. at 11:7-12:5 (Court, Walz).  Loera maintained that United States v. Krueger made clear that a defendant could advance a separate suppression argument based on a rule 41 violation.  See Tr. at 11:16-22

(Walz).  The Court noted that the United States v. Krueger situation -- where the officers arguably did not have a warrant -- was an extreme situation in comparison to the case at hand. See Tr. at 12:11-16 (Court).  The Court observed that it does not appear that rule 41 "add[s] anything to the constitutional analysis, either I got it right or I got it wrong, but the Rule 41 analysis doesn't seem to me to get us anywhere."  Tr. at 12:13-16 (Court).  Loera countered that he wanted to preserve the record and observed that the Tenth Circuit talks about how rule 41 is not coextensive with the Fourth Amendment, suggesting that it could not have just been talking about the warrant's facial validity.  See Tr. at 12:17-13:2 (Walz).  The Court then noted that the United States v. Krueger case is an example of where the Fourth Amendment is not coextensive with rule 41, because the Fourth Amendment does not itself indicate who issues the warrant and where it can be executed.  See Tr. at 13:3-7 (Court).  The Court further explained that one could read the Fourth Amendment as permitting a federal judge in New Mexico to issue a warrant that agents execute in New York.  See Tr. at 13:9-18 (Court, Walz).  Loera maintained, however, that rule 41 might provide a separate suppression remedy for the seizure of items outside the warrant's scope.  See Tr. at 14:2-17 (Walz).

Loera then argued that, in his briefing, he noted why he contends that the plain-view doctrine does not save the illegal searches in this case and why the good faith exception is inapplicable here.  See Tr. at 16:2-6 (Walz).  Loera asserted that, under United States v. Carey, the agents were required to get a second warrant, but instead continued the illegal search.  See Tr. at 16:9-18 (Walz).  Loera maintained that this conduct was on all fours with the United States v. Carey decision and that the Court's conclusion was potential clear error.  Loera further asserted that

> Now, why there is no good faith is because Agent Nashida was there at the first search, he kn[e]w that is there was child pornography on the discs, he get the, later he gets to do the search pursuant to the warrant, sees the statements there in. He knows, he has to show that Agent Cravens did an unconstitutional search on the 27th and misled the United States magistrate by putting in information that they know that they cannot constitutionally support by case authority under the Fourth Amendment or Rule 41.  They can't have good faith, cannot have a good faith hand off under any circumstance.

Tr. at 17:5-17 (Walz).  Loera also contended that that neither the plain view nor the inevitable discovery doctrine save the illegal searches.  See Tr. at 17:17-23 (Walz).  Loera maintained that here there was a continuing illegal search, and that, for the inevitable discovery doctrine, the officers must be in a position where they could have seen the material.  See Tr. at 17:19-18:5 (Walz).  Loera asserted, however, that the Court has already ruled that the searches on November 20, 2012, and November 27, 2012, were illegal and suggested that the agents were therefore not legally present when they saw the material.  See Tr. at 18:1-5 (Walz).  Loera concluded his remarks by stating:

> Also, they had to open things.  It wasn't just like you're scrolling down and pictures popping pup.  They had to take specific steps unlike in Hicks, or like [Hicks] where the[y are] moving the stereo around to look at a serial number that wasn't in plain view, they're actively searching, actively searching for this material.  Particularly on the November 27 search.  So where does that get us, Your Honor, I mean [] from a clear error standpoint?  If the Court conceptualizes even under Fourth Amendment forg[e]t 41 if you will even under Fourth Amendment analysis and controlling case authority, if indeed November 27 is a continuation of the November 240 search, which it had to be because there was no warrant issued intervening warrant issued, we have now continuous conduct that certainly appears to be intentional, and even pursuant to the case law, I would even state continuing and outrageous in nature in wanton violation of even traditional Fourth Amendment analysis, which should under all the balancing tests that are contained in the case law, the exclusionary rule should be upheld in this particular case.
>
> . . . .

Therefore, Your Honor, there was never good faith.  There was never inevitable discovery.  The second warrant was improper, and even excising -- and I read the transcript about excising the material that may have been improper, does that somehow save the warrant?  The answer to that is no.  I don't think you can get to that point based on the continuous and flagrant disregard for established case authority and continuous violations of the Fourth Amendment.  And the parameters, Your Honor.  I'll say the parameters of Rule 41, which are continuous in nature. Therefore, Your Honor, this case is very much like <u>United States v. Carey</u>.  We think that's applicable, we do not believe that the plain view is applicable based on our citation to case authority in the brief.  We don't think good faith, inevitable discovery saves the day either for this unconstitutional search, which was continuous in nature.  Your Honor those are my primary points.  May I confer with co-counsel for just a second.

Tr. at 18:6-20:19 (Walz).

The Court then asked Loera a number of questions.  <u>See</u> Tr. at 20:22-25 (Court, Walz). The Court first asked whether Loera would agree that the rule 41 argument is a new motion rather than a motion to reconsider anything in the Motion to Suppress MOO, and Loera "absolutely agree[d]."  Tr. at 20:23-21:5 (Court, Walz).  Loera agreed that the rule 41 argument is not a motion to reconsider, because the Court never considered it before this motion, but clarified that he "think[s] the Fourth Amendment analysis that the Court does interacts with any rule 41 violations but specifically you were never presented an argument like this at the suppression hea[r]ing."  Tr. at 21:6-17 (Court, Walz).  The Court then asked Loera whether in his motion to reconsider he has any disagreement with the facts and Loera indicated that he does not. <u>See</u> Tr. at 21:18-25 (Court, Walz).  The Court then walked through the various issues that it addressed in its Motion to Suppress MOO and asked Walz whether he was contending that the Court erred.  <u>See</u> Tr. at 22:1-25:14 (Court, Walz).  First, Loera agreed with the Court that the first warrant satisfied the Fourth Amendment's particularity requirement.  <u>See</u> Tr. at 22:1-12 (Court, Walz).  Second, he also did not have any problem with the Court's ruling on standing.

See Tr. at 22:13-17 (Court, Walz). Third, Loera agreed that the first warrant authorized the agents to open image and video files and that it authorized the agents to open files with last modified dates before July 19, 2011. See Tr. at 23:5-8 (Court, Walz); id. at 23:19-24:5 (Court, Walz). Fourth, Loera agreed that he was not disagreeing the Court's conclusion beginning on page 109 that the agents should have stopped searching once they encountered child pornography. See Tr. at 24:6-12 (Court, Walz). Loera then confirmed that he is not asking the Court to reconsider anything up until page 124 of the Motion to Suppress MOO, when the Court begins to discuss the good faith doctrine. See Tr. at 24:13-23 (Court, Walz). The Court observed that it looks like Loera is asking the Court to reconsider the last forty pages of its Motion to Suppress MOO. See Tr. at 24:24-25:2 (Court).

The Court then explained that it was surprised that Loera had focused so much on the concept of "plain view" in his briefing given that the Court did not use that language in its opinion other than in a layperson sort of way. Tr. at 25:3-14 (Court). Loera noted that the Court cited Horton v. California and the parties had the following exchange:

MR. WALZ: Well, Your Honor, you did find the November 20 search unreasonable under Tenth Circuit law.

THE COURT: Right. But not the first time they saw it. Because, otherwise, I wouldn't have been able to uphold the second search warrant in any part, even excising the portions that I had. So up to that point, I guess that's where I'm wondering if there is any sort of plain view maybe that's the plain view, but that's just within the scope of the search.

MR. WALZ: Well, Your Honor, what we recall from the testimony from the transcript, it appears from the transcript that Agent Cravens saw a thumbnail. And he was the first one to find the CP. He's the one that informed Nashida about it. So he found a thumbnail he suspected was contraband. And outside the scope of the warrant -- so we do get back to the November 20 search -- he suspected it was contraband. And now, he did not say it was child pornography off the bat.

What he did was he exceeded the scope of the warrant and opened it.  And that violated Rule 41E2 B.

THE COURT:  So are you relying solely on 41 for that point?

MR. WALZ:  No.  Also for general purposes of Fourth Amendment analysis.

Tr. at 26:14-27:15 (Court, Walz).

Loera then made a few final points on the Motion to Reconsider.  See Tr. at 27:21-31:4 (Court, Walz).  Loera argued that the agents exceeded the first warrant's scope and that they did not take notes of what they saw on the CDs.  See Tr. at 27:21-28:7 (Walz).  Loera contended that they knew that they did not have probable cause and for that reason they continued the illegal search on November 27, 2012.  See Tr. at 28:2-5 (Walz).  Loera maintained "that's why based on the knowledge that agent Nashida, Bodie, and Cravens had, you can never have good faith even though they tried to wash it through Judge Schneider by getting a second warrant."  Tr. at 28:4-9 (Walz).  According to Loera, "[e]ssentially [what] we still have is a warrantless search" and "the fruits . . . of the poisonous tree continues, because they never got a valid warrant."  Tr. at 28:10-13 (Walz).  Loera asserted that, under either rule 41 or traditional Fourth Amendment analysis, the illegal search started on November 20, 2012, when the agents opened a thumb nail drive.  See Tr. at 28:14-25 (Walz).  Loera maintained that agents continued the illegal search on November 27, 2012, with nothing intervening, and that there is accordingly no support for the second search warrant, the good faith exception, or the inevitable discovery doctrine.  See Tr. at 29:11-19 (Walz).  Loera conceded that the Rule 41 argument is a new argument, but contended that the Tenth Circuit had not issued United States v. Krueger yet and that the Motion to Reconsider is not untimely, explaining:

The Government said that this was a motion for reconsideration was, took a lot of time or is a lot of time-lapse had.  I don't think that that's really correct, given the chronological history I laid out in our reply brief as to when I got appointed, when we got the authorization for our forensics expert, when we got the information from the forensic expert, and plus the fact the Government itself, just not too long ago filed a second superseding indictment, and got yet another warrant.

So in terms of any equitable type arguments about timing on []our motion to reconsider[,] the Government itself has filed, and they're entitled to do [s]o I'm not saying they're not [. . .] a number of very important pleadings in this case [. . .].  So given everything altogether, Your Honor, I think that our motion was timely.

Tr. at 30:1-22 (Walz).

The United States then took up argument on the Motion to Reconsider.  See Tr. at 31:7-10 (Court, Tuckman).  The United States began by discussing the standard that governs motions to reconsider.  See Tr. at 31: 10-12 (Tuckman).  It explained that to be eligible for reconsideration, there must be an intervening change in the controlling law or newly discovered evidence that was previously unavailable, or reconsideration must be necessary to correct clear error or to prevent manifest injustice.  See Tr. at 31:12-18 (Court).  The Court then expressed skepticism with that standard, explaining: "[B]ut these are interlocutory orders.  If I got it wrong I need to change it, and that's.  I'm not really bound by the Paraclete[3] standard.  I think it's a good starting point for motions to reconsider, but in the end it's did I get it right."  Tr. at 31:19-32:13 (Court, Tuckman).  The Court then asked whether anybody in the United States Attorney's Office has looked at its Motion to Suppress MOO and has expressed discomfort with the Court's rulings, particularly on good faith and inevitable discovery.  See Tr. at 32:25-33:14 (Court, Tuckman).  The United States responded that it believes the Court is on solid footing with

_____

[3]The Tenth Circuit set forth the Paraclete standard in Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).

respect to the good-faith and inevitable-discovery issues, and that it would be comfortable defending the Motion to Suppress MOO.  See Tr. at 33:15-34:3 (Court, Tuckman).

The Court then asked the United States what it thinks about the rule 41 issue.  See Tr. at 34:2-3 (Court).  The United States responded that it believes it is "as red a herring as there can be."  Tr. at 34:4-5 (Tuckman).  The United States explained that rule 41 is not controlling law in this case and agreed with the Court's observation that United States v. Krueger deals with who can issue a search warrant.  See Tr. at 34:6-19 (Tuckman).  The United States then made the following comments on rule 41(e)(2)(B)'s origin:

> I mean, I remember when that rule came into effect.  When we were searching electronic media, the question always was on the face of the search warrant it says you have to execute the warrant by and then there would be a date imposed, that 10 or 14 day date would be imposed and the questions from the agents would be, does that mean we need to have CART go and complete that [e]ntire investigation?  We don't have time to do that.  So that rule was put into effect.  You can read the committee notes, it's clear.  It says this is to make sure that everyone understands a two step process is authorized; that the face of the search warrant could say you have to execute the search within ten days.  But that means you have to take possession of the media within that time.  You're then permitted to take it back to the forensic laboratory and conduct your examination is there.  It has nothing to do with the scope of a search warrant.  It answers that question of can you conduct the thorough forensic examination somewhere off-site.

Tr. at 34:21-35:16 (Tuckman).  The Court observed that rule 41(e)(2)(B) appears to empower rather than to restrict the United States.  See Tr. at 35:17-19 (Court).  The United States agreed, and noted that the rule extends the United States' power to conduct a forensic examination beyond the ten or fourteen day limitation on the warrant's face.  See Tr. at 35:20-36:7 (Court, Tuckman).  It further noted that United States v. Krueger therefore has nothing to do with this case and is not controlling law.  See Tr. at 36:6-15 (Tuckman).

The United States then clarified a couple of points.  See Tr. at 37:3-6 (Tuckman).  It argued that the agents had probable cause when they came upon the first child pornography image.  See Tr. at 35:20-36:7 (Tuckman).  According to the United States, "[t]o say that they were conducting illegal searches to get probable cause is just a mischaracterization of the evidence."  Tr. at 37:8-11 (Court, Tuckman).  The United States agreed that the Court concluded in its decision that the agents violated Tenth Circuit law, but insisted that the agents were trying to do the right thing and were not engaged in a fishing expedition.  See Tr. at 37:13-18 (Tuckman).  The United States also expressed concern about Loera's "plain view argument" in its Motion to Reconsider.  Tr. at 37:19-22 (Tuckman).  The United States explained that it examined the Court's Motion to Suppress MOO and the Court's "plain view discussion wasn't in reaching [its] conclusion."  Tr. at 37:22-25 (Tuckman).  According to the United States, the Court was concerned about the decision it had to make and how it might square with the plain view doctrine.  See Tr. at 37:25-38:5 (Tuckman).  The United States maintained that the issue is a nonstarter.  See Tr. at 38:6-7 (Tuckman).  The United States asserted that the Court merely cited to Horton v. California as precedent upon which the agents could have relied.  See Tr. at 38:11-18 (Tuckman).  The Court then asked whether the United States was comfortable in defending that portion of the Court's analysis, and the United States responded:

> And I know it's an unpublished decision so I'm aware of that limitation, but another, in addition to Horton, I think the [United States v.] Welch[, 291 F. App'x 193 (10th Cir. 2008)] case that we had cited and discussed where the agent was looking for drug evidence came upon 11 images of child pornography, and then got his warrant.  I think the agents could say, you know, we hadn't gotten to 11.  It's kind of the same thing.  They were looking they came upon it, and then, so I do think yes I'm happy to defend that part of Your Honor's decision that what they were doing was in good faith and there were cases out there th[at] they could have relied on and that there was no clear standard from the Tenth Circuit saying what they did was improper.

Tr. at 38:19-39:11 (Court, Tuckman).

The United States then asserted that the agents did not mislead Judge Schneider in seeking the second search warrant. See Tr. at 39:12-15 (Tuckman). According to the United States, Cravens informed Judge Schneider in writing that he had viewed the CDs again and that he did not mislead Judge Schneider. See Tr. at 39:16-23 (Tuckman). The United States also disputed that the November 27, 2012, search, was a continuation of the November 20, 2012, search. See Tr. at 39:23-25 (Tuckman). The United States explained that Cravens did not view the events on November 27, 2012, as a search and that he "was just going to provide, as he typically did in his search warrant, a description of some images, this being the first time that he had come upon evidence of a different crime when he was executing a search warrant for an unrelated crime." Tr. at 40:1-15 (Tuckman). The United States then took issue with Loera's assertion that a rule 41 violation of constitutional import always mandates suppression under United States v. Krueger. See Tr. at 40:16-41:2 (Tuckman). The United States maintained that this proposition cannot be the case, because the Supreme Court has stated that there is no mandatory suppression -- even in the case of a constitutional violation, a court can still consider good faith. See Tr. at 41:2-24 (Tuckman). The United States concluded by arguing that the Court thoroughly considered the vast majority of Loera's arguments at the original suppression hearing and in its 166-page Motion to Suppress MOO. See Tr. at 41:25-42:13 (Tuckman). The United States contended that Loera could have made any of these arguments at that time and that reconsideration is not an opportunity to rehash arguments previously made. See Tr. at 42:7-15 (Tuckman). The United States explained that there is no manifest injustice, clear error, or newly discovered evidence. See Tr. at 42:15-23 (Tuckman). Finally, while the United States conceded

that the Tenth Circuit issued the <u>United States v. Krueger</u> opinion in November, 2015, after the Court issued is Motion to Suppress MOO, that decision is not controlling in this case and should be treated as a red herring.  <u>See</u> Tr. at 42:23-43:3 (Tuckman).

The Court then gave Loera the last word on his Motion to Reconsider.  <u>See</u> Tr. at 43:18-20 (Court, Walz).  Loera stated that he has raised points that the Court should consider and that he believes that the Court committed clear error.  <u>See</u> Tr. at 43:23-44:1 (Walz).  The Court then asked Loera why he uses the word "clear error" and whether he do so because of the <u>Paraclete</u> standard.  Tr. at 44:2-5 (Court).  Loera responded yes, and that, for a motion to reconsider, one must bring to the Court's attention if the Court committed clear error in arriving at its decision and conclusions.  <u>See</u> Tr. at 44:6-10 (Walz).  Loera noted that the United States has conceded that Judge Schneider had been advised of the November 27, 2012 illegal search when he issued the second search warrant and asked the Court to take note of that concession.  <u>See</u> Tr. at 44:21-45:6 (Walz).  According to Loera, for that reason, Judge Schneider should never have issued the second search warrant.  <u>See</u> Tr. at 44:21-45:6 (Walz).  Loera emphasized that rule 41 allows agents to take electronic material and look at it at a later time, but contended that they still have to stay within the warrant's confines.  <u>See</u> Tr. at 46:14-17 (Walz).  According to Loera, the issue here is whether the agents stayed within the warrant's confines on November 20, 2012, and on November 27, 2012.  <u>See</u> Tr. at 46:23-46:1 (Walz).  Loera asserted that the answer to both of those questions is no.  <u>See</u> Tr. at 45:25-46:1 (Walz).

Loera argued that, in its ruling on the November 20, 2012, and November 27, 2012, searches, the Court did not address how one can have good faith or inevitable discovery.  <u>See</u> Tr. at 46:3-6 (Walz).  Loera also maintained that the Court cited to and discussed <u>Horton v.</u>

California in its opinion.  See Tr. at 46:7-8 (Walz).  According to Loera, Horton v. California states that "it is of course an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."  Tr. at 46:8-12 (Walz).  Loera suggested that, in this case, the agents did not follow Horton v. California's mandate: "And Horton says, in part, it is of course an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."  Tr. at 46:8-14 (Walz).  He asserted that the Court should have read Horton v. California and Arizona v. Hicks in conjunction with United States v. Carey. See Tr. at 46:14-22 (Walz).  Loera asserted that, in United States v. Carey, the Tenth Circuit suppressed the evidence without a discussion of good faith or inevitable discovery, and suggested that the Court should have done the same thing in this case.  See Tr. at 46:14-20 (Walz).  Loera stressed that the Court must place constitutional principles above how people may feel from a personal level about the particular crime charged.  See Tr. at 47:6-10 (Walz). According to Loera, the Court has to draw the line somewhere and in this case

> that line occurred at the second search on the 27th when they knew at that point they couldn't do what they were doing, but they continued their illegal search, and which ultimately led to the issuance of a warrant, and then the search that found the evidence that the Government would utilize at trial if this matter was to go to trial.

Tr. at 47:17-24 (Walz).

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider in civil cases fall into three categories:

(i) a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion. See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Price v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).  While the civil rules are not expressly applicable to criminal cases, the courts have used the principles somewhat interchangeably.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  The case law for the civil side can inform when a motion to consider is appropriate in a criminal case.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d at 1223-24.

1.    **Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved." Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 is not only a question of timing, but also "depends on the reasons expressed by the movant."

Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

1200 (10th Cir. 2011).   Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d

751, 753 (10th Cir. 1989)).   In other words, if the reconsideration motion seeks to alter the

district court's substantive ruling, then it should be considered a rule 59 motion and be subject to

rule 59's constraints.  Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> > (1)   mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2)   newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > (3)   fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> >
> > (4)   the judgment is void;
> >
> > (5)   the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> >
> > (6)   any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion. . . .  Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new

evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.   "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to

provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577.  This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).  The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore, supra, § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863.

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did

not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

### 2.    Motions to Reconsider Interlocutory Orders.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that neither the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions in civil cases -- "motion[s] to alter or amend a judgment" -- as "motions to reconsider,"[4]

---

[4]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion. 204 F.3d at 1005. He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category). These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii). The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should

compounded that baseline confusion.  Fed. R. Civ. P. 59(e) (emphasis added); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.   <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>.")(emphasis added).  In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of a civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  <u>See</u> Fed. R. App. P. 4(a)(4)(B). Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.   <u>See</u> Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of

---

evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void."  (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction."  (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's

jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998) (departing from the law of the case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion

to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted).  First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[5] than

---

[5]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "**Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59."  Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial

resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win

the prior ruling and any new arguments and evidence that the opposing party produces while

opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to

reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked

against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have

not only a winning legal position, but the work ethic and tenacity to single-handedly lead the

Court to his or her way of thinking.

Finally, the Tenth Circuit has applied the law regarding motions to reconsider in civil

cases to the criminal context.  See United States v. Christy, 739 F.3d at 539-40; United States v.

Huff, 782 F.3d at 1223-24.  The Tenth Circuit relies on civil cases for the principles that govern

motions to reconsider in the criminal context.  See United States v. Christy, 739 F.3d at 539

(applying the standard set forth in Servants of Paracelte v. Does in the criminal context); United

States v. Huff, 782 F.3d at 1224 (same).  In United States v. Christy, the Tenth Circuit explained:

> Motions to reconsider are proper in criminal cases even though the Federal Rules
> of Criminal Procedure do not specifically provide for them.  *Id.* at 1241-42;
> *United States v. Healy*, 376 U.S. 75, 78 (1964).  A district court should have the
> opportunity to correct alleged errors in its dispositions.  *See United States v.
> Dieter*, 429 U.S. 6, 8 (1976).
>
> A motion to reconsider may be granted when the court has
> misapprehended the facts, a party's position, or the law.  *Servants of Paracelte v.
> Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  Specific grounds include: "(1) an
> intervening change in the controlling law, (2) new evidence previously
> unavailable, and (3) the need to correct clear error or prevent manifest injustice."
> *Id.*  A motion to reconsider should not be used to revisit issues already addressed
> or advance arguments that could have been raised earlier.  *Id.*

739 F.3d 534, 539.  The Tenth Circuit similarly applied the Servants of Paracelte v. Does

standard in reconsidering a motion to suppress in the criminal context in United States v. Huff,

explaining:

We have held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.* "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994). We have specifically held that "[a] motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).

782 F.3d at 1224. The Court will thus use the same test that it has developed for motions to reconsider in the civil context for motions to reconsider in criminal cases. <u>See</u> <u>Anderson Living Trust v. WPX Energy Prod., LLC</u>, 312 F.R.D. 620, 642-49 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING RULE 41 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

First, the Court will discuss the general analytical framework under Tenth Circuit case law for analyzing violations of rule 41 of the Federal Rules of Criminal Procedure. Moreover, the Tenth Circuit applies the framework that <u>United States v. Pennington</u>, 635 F.2d 1387 (10th Cir. 1980), sets forth in determining whether a rule 41 violation justifies suppression. <u>See</u> <u>United States v. Krueger</u>, 809 F.3d at 1109. Second, the Court will discuss rule 41(e)(2)(B)'s specific requirements.

### 1.      <u>Rule 41 Generally.</u>

"At common law the admissibility of evidence against an accused was not affected by any illegality through which the evidence was obtained." David B. Levendusky, <u>Annotation, Noncompliance with requirements of Rule 41 of Federal Rules of Criminal Procedure as ground for exclusion, in federal prosecution, of evidence procured under state search warrant</u>, 25 A.L.R.

Fed. 237 (2015)(citing 8 Wigmore, Evidence § 2183 (McNaughten Rev. 1961)).  In 1914, in Weeks v. United States, 232 U.S. 383 (1914), however, the Supreme Court held that evidence which federal officers obtain in violation of the Fourth Amendment is not admissible in a federal criminal prosecution where timely objection to the use of such evidence is made.  See Levendusky, supra.  In Elkins v. United States, 364 U.S. 206 (1960), the Supreme Court extended the exclusionary rule to evidence that state officers obtained in violation of the Fourth Amendment.  See Levendusky, supra.  Similar to the Supreme Court's pronouncement in Weeks v. United States and Elkins v. United States of an exclusionary rule for the exclusion, in federal criminal trials, of evidence obtained in violation of the Fourth Amendment, the Supreme Court has also recognized an exclusionary rule with respect to evidence obtained as a result of searches by federal officers that involve violations of the Federal Rules of Criminal Procedure.  See Levendusky, supra (citing Mallory v. United States, 354 U.S. 449 (1957)).  Moreover, rule 41 of the Federal Rules of Criminal Procedure governs the procedures surrounding the execution of search warrants generally.  See Fed. R. Crim. P. 41.   "[I]n a number of cases it has been held that evidence was not admissible in a federal prosecution, on the ground that the Rule was violated by federal officers."  Levendusky, supra (citing United States v. Gross, 137 F. Supp. 244 (S.D.N.Y. 1956); United States v. Brouillette, 478 F.2d 1171 (5th Cir. 1973); Application of Houlihan for the Return of Property Illegally Seized, and for the Suppression of Evidence, 31 F.R.D. 145 (N.D. 1962)).  Rule 41 "has as its purpose the implementation of the Fourth Amendment," although it contains standards that are in some respects more specific and stringent than the Fourth Amendment.  Levendusky, supra.

In determining whether a rule 41 violation justifies suppression, the Tenth Circuit applies the framework that it set forth in United States v. Pennington, 635 F.2d 1387.  See United States v. Krueger, 809 F.3d at 1113-14.  First, the Tenth Circuit considers whether rule 41 was in fact violated.  See United States v. Krueger, 809 F.3d at 1113.  Second, the Tenth Circuit determines "whether that specific Rule 41 violation rises to the level of a Fourth Amendment violation." United States v. Krueger, 809 F.3d at 1113.  With respect to the United States v. Pennington analytical framework's second prong, the Tenth Circuit has explained:

> If we determine that the Rule 41 violation is *not* of constitutional import, we then consider whether the defendant can establish that, as a result of the Rule violation, "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Pennington*, 635 F.2d at 1390.  Unless the defendant can establish prejudice or intentional disregard of the Rule, a non-constitutional violation of Rule 41 will not, by itself, justify suppression.  *Id.*

United States v. Krueger, 809 F.3d at 1114.  The Tenth Circuit has applied this standard to numerous violations of Rule 41, including (i) executing the search warrant one day late in violation of Rule 41(e), see United States v. Sims, 428 F.3d 945 (10th Cir. 2005); (ii) failing to list a date under Rule 41(e), see United States v. Hugoboom, 112 F.3d 1081 (10th Cir. 1997); (iii) failing to record portions of oral testimony in a call in violation of Rule 41(c), see United States v. Rome, 809 F.2d 665 (10th Cir. 1987); and (iv) execution of a warrant by state officers in violation of Rule 41(c), see United States v. Pennington, 635 F.2d 1387.

Recently, in United States v. Krueger, for example, Agent Rick Moore learned that child pornography was being distributed over the internet from an IP address[6] registered to Zachary

---

[6]An internet protocol address is "the numeric address of a computer on the Internet."  IP address, Merriam-Webster Online Dictionary (2015).

Krueger, a Kansas resident.  See 809 F.3d at 1111.  Moore obtained a warrant from a United States Magistrate Judge in the District of Kansas to search Krueger's Kansas residence for items including computers and cellular telephones that may be used to depict child pornography visually.  See 809 F.3d at 1111.  Upon executing the warrant, Moore learned that Krueger was not home, and that his computer and cell phone were not in the residence.  See 809 F.3d at 1111.  Krueger's roommate indicated that Krueger was in Oklahoma City, Oklahoma, visiting a friend, Nate Benner, and that he may have taken his computer and cellular telephone with him to Oklahoma.  See 809 F.3d at 1111.  Agents then verified that Krueger's automobile was parked outside of Benner's Oklahoma residence.  See 809 F.3d at 1111.

Moore then sought and obtained a second search warrant from a different United States Magistrate Judge in the District of Kansas, which authorized law enforcement to search both Benner's Oklahoma residence and Kruger's automobile parked outside for electronic devices belonging to Krueger or in his possession.  See 809 F.3d at 1111.  Moore transmitted the second search warrant to Agent Jeff Perkins in Oklahoma.  See 809 F.3d at 1111.  Perkins and a team of other agents then went to Brenner's residence, where Krueger was present, and executed the warrant, seizing, among other things, Krueger's computer and external hard drive.  See 809 F.3d at 1111.

> Shortly after entering Benner's residence, however, one of the agents noticed that Warrant 2 had been issued by a federal magistrate judge in the District of Kansas -- rather than a federal magistrate judge in the Western District of Oklahoma, the district within which Benner's residence is located -- and asked Agent Perkins if that was acceptable.  Agent Perkins promptly called Agent Moore in Kansas, who was then advised by the Assistant United States Attorney handling the case to refrain from searching the computer and hard drive until consent or an additional warrant could be obtained. Around the time that Agent Perkins was on the phone, an agent who was not aware of the potential defect in Warrant 2 was interviewing Krueger.  During this interview, Krueger waived his *Miranda* rights, admitted to

viewing child pornography and trading it with others over the internet, and authorized HSI agents to assume his online presence with respect to his peer-to-peer networking account for investigative purposes.

Consistent with the Assistant United States Attorney's advice, the agents who seized Krueger's computer and hard drive in Oklahoma waited to search the devices until a Kansas Police Department officer visited Krueger's residence a few weeks later and obtained Krueger's written consent. A subsequent search of Krueger's computer and hard drive revealed evidence that Krueger had downloaded and traded child pornography using his peer-to-peer networking account. As a result, Krueger was charged with distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2).

809 F.3d at 1111-12.

Krueger filed a pretrial motion to suppress the evidence seized in Oklahoma as well as the statements he made to law enforcement, contending that the second search warrant violated rule 41 of the Federal Rules of Criminal Procedure. See United States v. Krueger, 809 F.3d at 1112. Specifically, Krueger contended that the second warrant -- which a federal magistrate judge in the District of Kansas issued for property located in Oklahoma -- violated rule 41(b)(1), which states that "a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located *within the district*." United States v. Krueger, 809 F.3d at 1112 (emphasis in United States v. Krueger). Krueger asserted that rule 41 mandates suppression, because the second search warrant -- which a federal magistrate judge issued without authority to do so -- was void from the outset, rendering the Oklahoma search warrantless and unconstitutional. See United States v. Krueger, 809 F.3d at 1112. Krueger further argued that, even if the second search warrant was not void at the outset, suppression was still required, "because he was prejudiced by the Rule 41 violation in the sense that he would not have cooperated with law enforcement had he known that Warrant 2 was issued by a federal

magistrate judge who lacked warrant-issuing authority under the rule." United States v. Krueger, 809 F.3d at 1112.  The District Court granted Krueger's motion, concluding that the second search warrant violated rule 41(b)(1).  See United States v. Krueger, 809 F.3d at 1113.  The District Court noted that not all Rule 41 violations require suppression, but determined that suppression was required in this case, because Krueger demonstrated prejudice in the sense that the Kansas magistrate judge would not have issued the second search warrant had rule 41 "been followed to the letter."  809 F.3d at 1113.

The United States appealed to the Tenth Circuit, which affirmed the District Court decision.  See 809 F.3d at 1113.  On appeal, the United States conceded for the first time that the second search warrant violated rule 41(b)(1), because the United States Magistrate Judge in Kansas did not have the authority to issue a warrant for property located in Oklahoma, but asked the Tenth Circuit to reverse the District Court decision on the grounds that the District Court applied the wrong legal standard in determining that Krueger demonstrated prejudice as a result of the Rule violation.  See 809 F.3d at 1113.  The Tenth Circuit began by setting forth the analytical framework to be used in considering rule 41 violations:

> Where, as here, a district court determines that a Rule 41 violation justifies suppression, our review is guided by the analytical framework this Court adopted in *United States v. Pennington*, 635 F.2d 1387 (10th Cir. 1980).  *See United States v. Pulliam*, 748 F.3d 967, 973-74 (10th Cir. 2014)(applying the *Pennington* framework to determine whether a purported Rule 41 violation justified suppression).  Under this framework, we begin by considering whether Rule 41 was in fact violated.  If so, we typically proceed by determining whether that specific Rule 41 violation rises to the level of a Fourth Amendment violation.  *See Pennington*, 635 F.2d at 1390; *see generally* David B. Levendusky, Annotation, *Noncompliance with requirements of Rule 41 of the Federal Rules of Criminal Procedure as ground for exclusion, in federal prosecution, of evidence procured under state search warrant*, 25 A.L.R. Fed. 247 (2015)(explaining that Rule 41 is not coextensive with the Fourth Amendment because Rule 41 incorporates standards that are in some respects "more specific and more stringent").  If we

determine that the Rule 41 violation is *not* of constitutional import, we then consider whether the defendant can establish that, as a result of the Rule violation, "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Pennington*, 635 F.2d at 1390.  Unless the defendant can establish prejudice or intentional disregard of the Rule, a non-constitutional violation of Rule 41 will not, by itself, justify suppression.  *Id.*

United States v. Krueger, 809 F.3d at 1113-14.

The Tenth Circuit then applied this analytical framework to the facts of this case.  See 809 F.3d at 1114.  First, the Tenth Circuit explained that "[t]he first step in the *Pennington* framework is easily established because the Government concedes that Warrant 2 violated Rule 41(b)(1)'s within-district limitation on federal magistrate judge's warrant-issuing authority." United States v. Krueger, 809 F.3d at 1114.  The Tenth Circuit then explained that it need not reach the question whether the rule 41(b)(1) violation in this case rises to the level of a Fourth Amendment violation, because "the Government abandoned all of the arguments it made against suppression below *except* its argument that Krueger failed to establish prejudice."  United States v. Krueger, 809 F.3d at 1114.  The Tenth Circuit then explained that Krueger established prejudice and that it would therefore affirm the District Court's order granting Krueger's motion to suppress.  See 809 F.3d at 1115-16.  The Tenth Circuit explained that it would focus on whether Krueger established prejudice, because under the Pennington framework, Krueger did not contest the District Court's determination that neither the Kansas magistrate judge nor the agents acted in bad faith.  See 809 F.3d at 1115.  The Tenth Circuit then concluded "that prejudice in this context should be anchored to the facts as they actually occurred," and "adopt[ed] the district court's standard for determining whether a defendant established prejudice

as a result of a Rule 41(b)(1) violation and ask whether the issuing federal magistrate could have complied with the Rule." 809 F.3d at 1116. The Tenth Circuit then concluded its analysis:

> Applying this standard, we conclude that Krueger established prejudice in the sense that the Oklahoma search might not have occurred because the Government would not have obtained Warrant 2 had Rule 41(b)(1) been followed. The Government sought and obtained Warrant 2 from a federal magistrate judge in the District of Kansas who clearly lacked Rule 41 authority to issue a warrant for property already located in Oklahoma. Had the magistrate judge recognized that clear and obvious fact, he surely would not have issued Warrant 2. And, had Warrant 2 not been issued, the Oklahoma search would not have occurred as it did, meaning that the Government would not have had occasion to secure Krueger's cooperation or seize his hard drive and computer. Although the Government *may have* been able to obtain a warrant from a federal magistrate judge in the Western District of Oklahoma, meaning it *may have* ultimately secured Krueger's cooperation and seized his devices without violating Rule 41, such hypotheticals simply cannot cure the Government's gross negligence in failing to comply with Rule 41(b)(1) in the first instance. *Cf. United States v. Glover*, 736 F.3d 509, 514-15 (D.C. Cir. 2013)(explaining that a warrant issued in "blatant disregard" of a judge's territorial jurisdiction under 18 U.S.C. § 2518(3) and Rule 41 cannot be excused as a mere "technical defect").
>
> Because Krueger met his burden of establishing prejudice and because suppression furthers the purpose of the exclusionary rule by deterring law enforcement from seeking and obtaining warrants that clearly violate Rule 41(b)(1), *see Herring v. United States*, 555 U.S. 135 (2009)(explaining that the exclusionary rule serves to deter not only deliberate and reckless police conduct but also grossly negligent conduct); *United States v. McCane*, 573 F.3d 1037, 1045 (10th Cir. 2009)(explaining that the exclusionary rule is appropriate only if the law enforcement activity at issue was not objectively reasonable), we affirm the district court's order granting Krueger's motion to suppression, *cf. State v. Rupnick*, 280 Kan. 720, 125 P.3d 541, 552 (2005) (suppressing evidence obtained through a warrant that violated state statute requiring warrants to be executed within the judicial district where the issuing judge resides).

United States v. Krueger, 809 F.3d at 1116-17.

###     2.     **Rule 41(e)(2)(B).**

Rule 41 generally addresses warrant requirements, but had not provided specific instructions for digital evidence until recent rule amendments. See James Saylor, Computers as

Castles: Preventing the Plain View Doctrine from Becoming a Vehicle for Overbroad Digital

Searches, 79 Fordham L. Rev. 2809, 2824 (2011).

> Conducting a computer search on-site -- at the suspect's home -- is often more
> intrusive to an individual's privacy because the search of the vast amount of ESI
> found on a hard drive may take "months to complete.  It would be impractical for
> agents to occupy an individual's home or office, or seize an individual's
> computer, for such long periods of time."

In the Matter of the Search of premises known as: Three Hotmail Email accounts:

[redacted]@hotmail.com  [redacted]@hotmail.com  [redacted]@hotmail.com  Search Warrant,

2016 WL 1239916, at *17 (D. Kan. Mar. 28, 2016)(Waxse, M.J.)("Three Hotmail Accounts").

As a result, "courts have sanctioned Rule 41(e)(2)(B)'s 'seize first, search later' Two-Step

Procedure."  Three Hotmail Accounts, 2016 WL 1239916 at *17 (citing United States v. Evers,

669 F.3d 645, 652 (6th Cir. 2012)(Griffin, J.); United States v. Stabile, 633 F.3d 219, 234 (3d

Cir. 2011)(Van Antwerpen, J.); United States v. Grimmett, 439 F.3d 1263, 1269 (10th Cir.

2006); United States v. Hay, 231 F.3d 630, 637 (9th Cir. 2000)(Rymer, J.); United States v.

Upham, 168 F.3d 532, 535 (1st Cir. 1999); In the Matter of A Warrant for All Content and Other

Information Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises

Controlled by Google, Inc., 33 F. Supp. 3d 386, 392 (S.D.N.Y. 2014)(Gorenstein, J.)).  The 2009

amendments to the Federal Rules of Criminal Procedure added Rule 41(e)(2)(B) to reflect that

case law.  See United States v. Ganias, 755 F.3d 125, 135 (10th Cir. 2014); Three Hotmail

Accounts, 2016 WL 1239916 at *17.  "Rule 41(e)(2)(B) was specifically created . . . to provide

additional direction on warrants for electronically stored information."  Vincent Angermeier,

Swinging for the Fences: How Comprehensive Drug Testing Inc. Missed the Ball on Digital

Searches, 100 J. Crim. L. & Criminology 1587, 1625 (2010).  Rule 41(e)(2)(B), as amended,

"explicitly states that warrants may issue for the seizure of electronic evidence for later review."

Saylor, supra, at 2824.  Rule 41(e)(2)(B) provides:

> **Warrant Seeking Electronically Stored Information.**  A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information.  Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant.  The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

Fed. R. Crim. P. 41(e)(2)(B).

> The rule notes that although officers only need one warrant in order to both seize or copy electronic media and then review that material, that is only the default rule.  If the magistrate "otherwise specifie[s]" then the default does not apply, meaning that a magistrate can authorize the initial seizure, but stay the review of the material.

Angermeier, supra, at 1625-26.  "As the text makes clear, Rule 41(e)(2) is a codification of courts' recognition that on-site searches of computer hard drives are infeasible and that courts should authorize later, off-site searches (often in the government's forensic laboratories)."  Three Hotmail Accounts, 2016 WL 1239916 at *17.  Moreover, "[a]t least one commentator has suggested that this and other provisions alone authorize the broad scope of digital searches and seizures."  Saylor, supra, at 2824 (citing Andrew Vahid Moshirnia, Note, Separating Hard Fact from Hard Drive: A Solution for Plain View Doctrine in the Digital Domain, 23 Harv. J.L. & Tech 609 (2010)).  The advisory committee's notes to the 2009 amendments support this view:

> **Subdivision (e)(2).** Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.

The term "electronically stored information" is drawn from Rule 34(a) of the Federal Rules of Civil Procedure, which states that it includes "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained." The 2006 Committee Note to Rule 34(a) explains that the description is intended to cover all current types of computer-based information and to encompass future changes and developments. The same broad and flexible description is intended under Rule 41.

In addition to addressing the two-step process inherent in searches for electronically stored information, the Rule limits the 10 [14][7] day execution period to the actual execution of the warrant and the on-site activity. While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs. The rule does not prevent a judge from imposing a deadline for the return of the storage media or access to the electronically stored information at the time the warrant is issued. However, to arbitrarily set a presumptive time period for the return could result in frequent petitions to the court for additional time.

It was not the intent of the amendment to leave the property owner without an expectation of the timing for return of the property, excluding contraband or instrumentalities of crime, or a remedy. Current Rule 41(g) already provides a process for the "person aggrieved" to seek an order from the court for a return of the property, including storage media or electronically stored information, under reasonable circumstances.

Where the "person aggrieved" requires access to the storage media or the electronically stored information earlier than anticipated by law enforcement or ordered by the court, the court on a case by case basis can fashion an appropriate remedy, taking into account the time needed to image and search the data and any prejudice to the aggrieved party.

The amended rule does not address the specificity of description that the Fourth Amendment may require in a warrant for electronically stored information,

---

[7]The advisory committee's notes state that "[t]he 10 day period under Rule 41(e) may change to 14 days under the current proposals associated with the time computation amendments to Rule 45." Fed. R. Crim. P. 41(e)(2)(B), cmt. to 2009 Amend n.1. The 10 day period under Rule 41(e) was ultimately changed to 14 days. See Fed. R. Crim. P. 41(e)(2)(A)(i).

leaving the application of this and other constitutional standards concerning both the seizure and the search to ongoing case law development.

Fed. R. Crim. P. 41(e)(2)(B), cmt. to 2009 Amend.

In other words, both rule 41(e)(2)(B) and the advisory committee's notes to the 2009 amendments indicate that, if anything, rule 41(e)(2)(B) provides the government with more power to search and seize electronically stored information by sanctioning off-site reviews. The United States Court of Appeals for the Second Circuit has observed:

> Indeed, the 2009 amendments to the Federal Rules of Criminal Procedure, which added Rule 41(e)(2)(B), clearly contemplated off-site review of computer hard drives in certain circumstances. Although Rule 41(e)(2)(B) was not in effect in 2003, when the warrant was executed with respect to Ganias's computers, case law both before and after the rule's adoption has recognized that off-site review of seized electronic files may be necessary and reasonable. See, e.g., United States v. Schesso, 730 F.3d 1040, 1046 (9th Cir. 2013); United States v. Evers, 669 F.3d 645, 652 (6th Cir. 2012); United States v. Hill, 659 F.3d 966, 976-77 (9th Cir. 2006); United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999).

United States v. Ganias, 755 F.3d at 135-36.

## ANALYSIS

Loera does not present any new evidence in his Motion to Reconsider, and he does not attack any of the 120 findings of fact that the Court made in its Motion to Suppress MOO. See Tr. at 21:18-25 (Court, Walz). Instead, Loera challenges the Court's legal conclusions set forth in the last forty pages of its Motion to Suppress MOO, see Tr. at 24:23-25:2 (Court, Walz), and advances a new argument or motion that suppression is warranted on the grounds that the agents violated rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, see Tr. at 20:23-21:17 (Court, Walz). First, the Court concludes that its legal conclusions set forth in the last forty pages of its Motion to Suppress MOO are not good candidates for reconsideration. The Court thinks that it is time for somebody else -- particularly, the Tenth Circuit -- to take a look at these

issues.  Even if the Court agreed that its legal conclusions set forth in the last forty pages of its

Motion to Suppress MOO were good candidates for reconsideration, however, the Court would

not modify its rulings or conclude that suppression is warranted in this case.  Second, the Court

has considered Loera's argument that the Court should suppress the evidence on the grounds that

the agents violated rule 41(e)(2)(B) -- an assertion he makes for the first time in his Motion to

Reconsider -- but concludes that suppression is not warranted in this case, because there is no

evidence that the agents violated rule 41(e)(2)(B).

## I.  LOERA DOES NOT ASK THE COURT TO RECONSIDER ITS 120 FACTUAL FINDINGS THAT ARE SET FORTH ON PAGES 5 TO 25 OF THE COURT'S MOTION TO RECONSIDER MOO.

Loera does not object to the Court's 120 factual findings that are set forth on pages 5

through 25 of the Court's Motion to Reconsider MOO.  See Tr. at 21:18-25 (Court, Walz).  At

the April 8, 2016, hearing on the Motion to Reconsider, the Court and Loera had the following

exchange.

> THE COURT:  . . . Let me start with the facts.  I spent a lot of time on the facts. Any disagreement about the facts?  I didn't really see any motion to reconsider the facts.  It was just what I did with the facts.  So the [facts] are pretty much accepted?
>
> MR. WALZ:  Yes.

Tr. at 21:18-25 (Court, Walz).  The Court will therefore incorporate those findings of fact herein

by reference and not repeat them.

## II.  LOERA DOES NOT ASK THE COURT TO RECONSIDER ITS LEGAL CONCLUSIONS THAT ARE SET FORTH ON PAGES 92 TO 123 OF THE COURT'S MOTION TO SUPPRESS MOO.

At the April 8, 2016, hearing on the Motion to Reconsider, Loera agreed that he is not

asking the Court to reconsider the Court's legal conclusions set forth on pages 92 to 123 of the

Motion to Suppress MOO.  In its Motion to Suppress MOO, the Court first concludes that Loera has sufficient standing to move to suppress the child pornography evidence, see Motion to Suppress MOO at 92-93, 59 F. Supp. at 1149-50, and Loera does not ask the Court to reconsider this legal conclusion, see Tr. at 22:18-20 (Court, Walz)("THE COURT:  Okay. . . . I had a standing issue but I ruled your way on that, so.  MR. WALZ: Right.").  Second, the Court concluded that the first warrant satisfied the Fourth Amendment's particularly requirement, see Motion to Suppress MOO at 93-102; 59 F. Supp. at 1150-55, and Loera likewise does not challenge this legal conclusion, see Tr. at 22:12-17 (Walz)("MR. WALZ: Your Honor, the first warrant satisfied the particularity requirement.").  Third, the Court concluded that the first warrant authorized the agents to open image and video files, and files with last-modified dates before July 29, 2011.  See Motion to Suppress MOO at 103-109; 59 F. Supp. at 1155-59.  At the April 8, 2016, hearing, Loera also agreed that he was not challenging these legal conclusions. See Tr. at 23:5-24:5 (Court, Walz).  Finally, Loera conceded at the hearing that he is not asking the Court to reconsider its legal conclusion that, under Tenth Circuit law, the agents conducted an unlawful search when they continued searching Loera's CDs for computer fraud and electronic mail hacking after they discovered child pornography.  See Tr. at 24:6-12 (Court, Walz).  In sum, Loera does not ask the Court to consider its legal conclusions that are set forth on pages 92 to 123 of the Court's Motion to Suppress MOO.

III.   **THE COURT'S LEGAL CONCLUSIONS THAT ARE SET FORTH IN THE LAST FORTY PAGES OF THE MOTION TO SUPPRESS MOO ARE NOT GOOD CANDIDATES FOR RECONSIDERATION, BUT EVEN IF THE COURT WERE TO RECONSIDER THEM, IT WOULD NOT MODIFY ITS RULINGS OR CONCLUDE THAT SUPPRESSION IS WARRANTED IN THIS CASE.**

The Court concludes that its legal conclusions that are set forth in the last forty pages of the Motion to Suppress MOO are not good candidates for reconsideration in light of: (i) how thoroughly the Court addressed the exact points that Loera raises; (ii) the degree of reasonable reliance the United States has placed in the Court's Motion to Suppress MOO; and (iii) the Servants of the Paraclete v. Does grounds, which counsel the Court to grant motions for reconsideration only if the movant presents new controlling authority, new evidence, or a clear indication that the Court erred.  Even if the Court agreed that its legal conclusions set forth in the last forty pages of the Court's Motion to Suppress MOO were good candidates for reconsideration, however, the Court would not modify its rulings or conclude that suppression is warranted in this case.  The Court will thus look for any errors, but finding none, will deny the Motion to Reconsider.

A.   **THE COURT'S LEGAL CONCLUSIONS THAT ARE SET FORTH IN THE LAST FORTY PAGES OF THE MOTION TO SUPPRESS MOO ARE NOT GOOD CANDIDATES FOR RECONSIDERATION.**

In his Motion to Reconsider, Loera spends much of his briefing rehashing arguments that the Court addressed in its Motion to Suppress MOO.  See Motion to Reconsider at 8-27.  Loera makes essentially four arguments with respect to the Court's legal conclusions set forth in the last forty pages of its Motion to Suppress MOO: (i) that the Court incorrectly ruled that the agents acted in good faith when they continued to search Loera's CDs after discovering child pornography, see Motion to Reconsider at 8-14; (ii) that the Court incorrectly concluded that

probable cause still existed for issuance of the second search warrant even though Cravens illegally opened files on Loera's CDs on November 27, 2012, to provide a description of images on the CDs in the second search warrant affidavit, see Motion to Reconsider at 15-16; (iii) that the Court incorrectly ruled that, even if the second search warrant suffered from an incurable defect, Nishida relied on the warrant in good faith when he searched Loera's CDs and laptop for child pornography, see Motion to Reconsider at 17-23; and (iv) that the Court incorrectly ruled that, even if the second search warrant contained an incurable defect and Nishida did not execute the second search warrant in good faith, the agents inevitably would have discovered child pornography, see Motion to Reconsider at 23-27. As described above, the Court should analyze motions to consider motions to reconsider based on three factors: (i) how thoroughly the Court addressed the exact point or points in the earlier ruling that the motion to reconsider challenges, looking to the amount of time and energy the Court spent on it, and the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue; (ii) the degree of reasonable reliance the opposing party has placed in the Court's prior ruling, looking to the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce; and (iii) the Servants of the Paraclete v. Does grounds, which counsel the Court to grant motions for reconsideration only if the movant presents new controlling authority, new evidence, or a clear indication that the Court erred.

First, the Court spent considerable time and energy addressing the points that Loera raises his Motion to Suppress MOO. The Court issued a 166-page opinion, spending: (i) eighteen pages analyzing whether the agents acted in good faith when they continued to search Loera's

CDs after discovering child pornography, see Motion to Suppress MOO at 124-42; 59 F. Supp. at 1068-80; (ii) seven pages analyzing whether probable cause still existed for issuance of the second search warrant even though Cravens illegally opened files on Loera's CDs on November 27, 2012, to provide a description of images on the CDs in the second search warrant affidavit, see Motion to Suppress MOO at 145-51; 59 F. Supp. at 1181-85; (iii) five pages analyzing whether, even if the second search warrant suffered from an incurable defect, Nishida relied on the warrant in good faith when he searched Loera's CDs and laptop for child pornography, see Motion to Suppress MOO at 151-55; 59 F. Supp. at 1185-87; and (iv) eleven pages analyzing whether, even if the second search warrant contained an incurable defect and Agent Nishida did not execute the second search warrant in good faith, the agents inevitably would have discovered child pornography, see Motion to Suppress MOO at 155-66; 59 F. Supp. at 1187-94.  Further, the Court held two evidentiary hearings -- on May 20, 2014, see Clerk's Minutes, filed May 20, 2014 (Doc. 53, and May 21, 2014, see Notice Resuming Motion Hearing, filed May 21, 2014 (Doc. 47) -- and an additional hearing on August 19, 2014, in which the Court heard the parties' arguments on the Motion to Suppress, see Clerk's Minutes, filed August 19, 2014 (Doc. 56).  In sum, the Court is confident that it has thoroughly addressed these four arguments to the best of its ability and believes that it is time for somebody else -- perhaps the Tenth Circuit -- to take a look at these issues.

Second, the Court concludes that the degree of reasonable reliance the opposing party has placed on the Court's prior ruling weighs against reconsidering its legal conclusions set forth on the last forty pages of the Motion to Suppress MOO.  The Court issued its Motion to Suppress MOO on October 20, 2014, and Loera did not file his Motion to Reconsider until March 8, 2016

-- fourteen days before the trial schedule for March, 22, 2016.  <u>See</u> Order Setting Trial Date for March 22, 2016, filed March 2, 2016 (Doc. 108).  Since the Court issued its Motion to Suppress MOO all parties involved have been aware that the Court was not going to suppress the evidence in this case.  Loera has been talking about filing a motion to reconsider for a long time.  He could have filed such a motion a week or two after the Court entered its Motion to Suppress MOO.  Instead, Loera filed his Motion to Reconsider on the eve of trial, which weighs against the Court reconsidering its opinion now.  In sum, although nobody has changed their position in reliance on the Court's Motion to Suppress MOO, the Court concludes that the case's overall progress and posture, and the timeliness of Loera's motion for reconsideration, weigh against the Court reconsidering the legal conclusions that it made on the last forty pages of the Motion to Suppress MOO.

Third and finally, the <u>Servants of the Paraclete v. Does</u> grounds -- which counsel the Court to grant motions for reconsideration only if the movant presents new controlling authority, or new evidence, or there is clear indication that the Court erred -- weigh against the Court reconsidering its legal conclusions set forth on the last forty pages of the Motion to Suppress MOO.  Loera does not present new controlling authority or new evidence in support of his request that the Court reconsider its rulings on these four issues.  Furthermore, the Court does not think that it committed clear or manifest error in making these legal determinations.  In sum, the Court concludes, after analyzing the applicable factors, that the Court's legal conclusions that are set forth in the last forty pages of the Court's Motion to Suppress MOO are not good candidates for reconsideration.

**B.    EVEN IF THE COURT AGREED THAT ITS LEGAL CONCLUSIONS SET FORTH IN THE LAST FORTY PAGES OF THE COURT'S MOTION TO SUPPRESS MOO WERE GOOD CANDIDATES FOR RECONSIDERATION, THE COURT WOULD NOT MODIFY ITS RULINGS OR CONCLUDE THAT SUPPRESSION IS WARRANTED IN THIS CASE.**

Even if the Court agreed that its legal conclusions set forth in the last forty pages of its Motion to Suppress MOO were good candidates for reconsideration, however, the Court would not modify its rulings or conclude that suppression is warranted in this case.  The Court has re-examined its Motion to Suppress MOO and its considerable analysis: (i) whether the agents acted in good faith when they continued to search Loera's CDs after discovering child pornography, see Motion to Reconsider at 8-14; (ii) whether probable cause still existed for issuance of the second search warrant even though Cravens illegally opened files on Loera's CDs on November 27, 2012, to provide a description of images on the CDs in the second search warrant affidavit, see Motion to Reconsider at 15-16; (iii) whether, even if the second search warrant suffered from an incurable defect, Nishida relied on the warrant in good faith when he searched Loera's CDs and laptop for child pornography, see Motion to Reconsider at 17-23; and (iv) whether, even if the second search warrant contained an incurable defect and Nishida did not execute the second search warrant in good faith, the agents inevitably would have discovered child pornography, see Motion to Reconsider at 23-27.  The Court remains convinced that it correctly applied the law to its factual findings, and will not modify its rulings or conclude that suppression is warranted in this case.

First, the Court remains convinced, after carefully reviewing is opinion and Loera's arguments, that it correctly ruled in its Motion to Suppress MOO that the agents acted in good faith when they continued to search Loera's CDs after discovering child pornography.  See

Motion to Suppress MOO at 124-29; 59 F. Supp. at 1068-80.  The Court explained in its Motion

to Suppress MOO:

>Following the Second Circuit's analysis in United States v. Aguiar, the Court first determines whether there existed any "binding appellate precedent" on which the agents could reasonably rely when they continued their search -- pursuant to the First Warrant -- for electronic mail hijacking and computer fraud after discovering child pornography.  United States v. Aguiar, 737 F.3d at 261.  "Binding appellate precedent" refers to both Tenth Circuit and Supreme Court precedent.  United States v. Aguiar, 737 F.3d at 261.  The Court first notes that there is no binding Tenth Circuit authority that addresses whether law enforcement officers may continue their warrant-authorized ESI searches upon discovering evidence of another crime.  The Tenth Circuit has, instead, sent conflicting signals on whether such conduct is constitutional.  Compare United States v. Carey, 172 F.3d at 1277 (Baldock, J., concurring)("[I]f the record showed that Detective Lewis had merely continued his [warrant-authorized] search for drug-related evidence, and, in doing so, continued to come across evidence of child pornography, I think a different result would be required."), with United States v. Walser, 275 F.3d at 987 ("Had [the officer] conducted a more extensive search than he did here by rummaging in folders and files beyond those he searched, he might well have exceeded the bounds of the warrant and the requirements of Carey.")(emphasis added), and United States v. Burgess, 576 F.3d at 1094-95 ("[A]s our cases seem to require, [the officer] immediately closed the gallery view when he observed a possible criminal violation outside the scope of the warrant's search authorization and did not renew the search until he obtained a new warrant.")(emphasis added).  The Court's ruling that Nishida and Cravens conducted unlawful searches when they continued to search Loera's CDs after discovering child pornography was based on an analysis of non-binding Tenth Circuit dicta.  Consequently, the agents could not rely on binding Tenth Circuit precedent when they continued to search Loera's CDs for evidence of computer fraud and electronic mail hijacking after discovering child pornography.

>Although the Supreme Court has never addressed the precise question here -- whether an officer may continue his or her warrant-authorized search for ESI upon discovering evidence of an unrelated crime -- it has upheld similar searches outside of the ESI context.  In Horton v. California, an officer obtained a warrant to search the defendant's house for the proceeds of a robbery.  See 496 U.S. at 131.  While executing the search warrant, the officer found, and subsequently seized, among other things, a machine gun, a .38-caliber revolver, two "stun guns," and a handcuff key.  496 U.S. at 131.  The officer did not find, however, any evidence that the search warrant sought.  See 496 U.S. at 131.  The officer testified that, while executing the search warrant, he was also looking for evidence outside the search warrant's scope.  See 496 U.S. at 131.  Finding the

officer's subjective intentions during the search irrelevant, the Supreme Court explained:

> [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant.

496 U.S. at 138. Because the items seized "were discovered during a lawful search authorized by a valid warrant," and their seizure was justified by the plain-view exception, the Supreme Court found the officer's search constitutional. 496 U.S. at 142. Relying on the Supreme Court's precedent in Horton v. California, the agents could reasonably have concluded that the First Warrant permitted them to continue searching Loera's CDs after discovering child pornography. The Supreme Court all but encouraged officers to continue their warrant authorized searches upon finding evidence of another crime by placing a single restriction on officers who execute search warrants: that they may search only items that may reasonably contain the evidence that the warrant seeks. See Horton v. California, 496 U.S. at 142 ("Police with a warrant for a rifle may search . . . places where rifles might be and must terminate the search once the rifle is found; the inadvertence rule will in no way reduce the number of places into which they may lawfully look."). Consequently, the agents could have reasonably relied upon Horton v. California to conclude that the First Warrant authorized them to continue searching Loera's CDs for evidence of computer fraud and electronic mail hijacking, because those CDs could reasonably have contained evidence of those crimes.

The Court recognizes that "the storage capacity of computers" may require "a special approach," United States v. Carey, 172 F.3d at 1275 n.7, and that Horton v. California is, therefore, not a perfect analogy. The Court notes, however, that the good-faith inquiry does not require officers to undertake the role of a judge or constitutional law scholar, and discern the precise contours of Supreme Court precedent. It instead turns on whether a reasonable officer would believe in good faith that binding appellate precedent authorized certain conduct, "which is a scenario-specific way of asking the broader question of whether the officer 'acted with an objectively reasonable good-faith belief that his conduct was lawful.'" United States v. Katzin, No. 12-2548, 2014 WL 4851779 (3d Cir. Oct. 1, 2014)(en banc)(Van Antwerpen, J., joined by Rendell, Fisher, Charages, Jordan, Hardiman, Vanaskie, & Shwartz, JJ.). Viewed in this way, the Supreme Court's holding in Horton v. California was sufficiently analogous to the agents' circumstances for them to reasonably rely on it in continuing to conduct their warrant-authorized searches after finding child pornography. Consequently, the

Court concludes that the good-faith exception applies to the agents' conduct and suppression of the child pornography evidence obtained therefrom is unwarranted.

Motion to Suppress MOO at 127-129; 59 F. Supp. at 1170-72.

The Court also continues to stand by its ruling that, even if the agents did not reasonably rely on binding appellate precedent, the good-faith balancing test weighs against excluding the evidence in this case.  See Motion to Suppress MOO at 130-42; 59 F. Supp. at 1172-80.  The Court explained in part in its Motion to Suppress MOO:

> Even if Horton v. California is not "binding appellate precedent" under United States v. Davis, the Court may still apply the good-faith exception, because the Tenth Circuit has not limited the good-faith exception to the factual circumstances that the Supreme Court has addressed.  In United States v. McCane, 573 F.3d 1037 (10th Cir. 2009), for example, the Tenth Circuit, in an opinion that Judge Murphy authored, and Judges Anderson and Tymkovich joined, held, prior to the Supreme Court's holding in United States v. Davis, that "[a] police officer who undertakes a search in reasonable reliance upon the settled case law of a United States Court of Appeals, even though his search is later deemed invalid by Supreme Court decision, has not engaged in misconduct."  573 F.3d at 1045 (footnote omitted).  Despite a lack of Supreme Court precedent on the issue indicating that the good-faith exception applied in situations where an officer acts in reasonable reliance on binding appellate precedent, the Tenth Circuit concluded that "[t]he refrain in Leon and the succession of Supreme Court good-faith cases is that the exclusionary rule should not be applied to objectively reasonable law enforcement activity."  573 F.3d at 1045-46 (citations omitted)(internal quotation marks omitted).  In the Tenth Circuit's view, "[r]elying upon the settled case law of a United States Court of Appeals certainly qualifies as objectively reasonable law enforcement behavior."  573 F.3d at 1045-46.
>
> . . . .
>
> Based on: (i) the agents' actions, which were, at most, negligent; and (ii) the unanimous opinion of the other Courts of Appeals to face this issue, which have uniformly upheld the constitutionality of the agents' conduct, the Court concludes that the deterrence value of excluding the child pornography evidence is low. Moreover, given: (i) the large volume of child pornography evidence that would be suppressed in this case; and (ii) that the evidence plays a central role in the United States' case, the Court determines that the social costs of excluding the evidence in this case would be relatively high. The Court holds, accordingly, that

the good-faith balancing test weighs against suppressing the child pornography evidence.

Motion to Suppress MOO at 130-42; 59 F. Supp. at 1172-80.

Second, the Court remains convinced that it correctly ruled in its Motion to Suppress MOO that probable cause still existed for issuance of the second search warrant even though Cravens illegally opened files on Loera's CDs on November 27, 2012, to provide a description of images on the CDs in the second search warrant affidavit.  See Motion to Suppress MOO at 145-51; 59 F. Supp. at 1181-85.  The Court explained in its Motion to Suppress MOO:

> "The Court must exclude the information illegally obtained from the warrants and determine whether, based on the remaining information, probable cause nevertheless existed."  United States v. Christy, 785 F. Supp. 2d at 1051.  With the descriptions of the three images and one video that Cravens obtained from his November 27, 2012, search of Loera's CDs excised, the remaining information in the Second Affidavit is: (i) Cravens had been an FBI agent for eight years, see Second Affidavit ¶ 2, at 1; (ii) Cravens' experience included investigations of "crimes against children on the Internet," Second Affidavit ¶ 2, at 1; (iii) in Cravens' experience, computers and electronic media -- including CDs -- are used to possess and distribute child pornography, see Second Affidavit, ¶¶ 8-14, at 3-6; (iv) during the execution of the First Warrant on November 20, 2012, child pornography images were found on the four CDs seized from Loera's residence,[8]

---

[8]Loera does not object to the Court not excising the following statement from the Second Affidavit in his Motion to Reconsider: "During the preview, the examiners identified four writable CDs, which appeared to contain images of child pornography.  The CDs were seized and placed in the evidence control room at the local FBI office."  Second Affidavit ¶ 21, at 8.  The Court remains convinced of its ruling that Cravens and Nishida conducted an illegal search on November 20, 2012, once they viewed the first image in thumbnail view and concluded that it "it appeared to be child pornography," see Motion Suppress MOO at 14-15, but continued searching for evidence of email hacking.  Cravens and Nishida should have, under United States v. Carey, United States v. Walser, and United States v. Burgess, instead immediately stopped searching the CDs and applied for a second warrant that authorized them to search for evidence of child pornography.

While Loera has not raised the issue, there is a question whether, in determining if the Second Affidavit established probable cause to support issuance of the second search warrant, the Court should have excised any reference to child pornography that Cravens and Nishida observed beyond the initial image in thumbnail view.  First, even if the Court were to excise any reference to child pornography beyond the initial image in thumbnail view, the Second Affidavit

see Second Affidavit ¶ 21, at 8; and (v) when Cravens used the term "child pornography," he meant "a visual depiction involving the use of minors engaged in sexually explicit conduct," Second Affidavit, ¶ 30, at 10.

Even with Cravens' descriptions of the three images and one video from his November 27, 2012, search excised, the Second Affidavit contains sufficient probable cause. Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Simpson, 152 F.3d at 1246 (citations omitted). In United States v. Cervini, the Tenth Circuit addressed whether a search warrant in which a law

---

would still support a finding of probable cause. Paragraph 21, once purged of any reference to child pornography beyond the first thumbnail image would read: "During the preview, the examiners identified ~~four~~ writable CDs, which appeared to contain image~~s~~ of child pornography. The CD~~s~~ were seized and placed in the evidence control room at the local FBI office." Second Affidavit ¶ 21, at 8. While maybe not the best written sentences when excised to reflect no more than a review of the thumbnail that looked like child pornography, they are enough to support a finding of probable cause.

Second, the Court has concluded that, despite Cravens and Nishida's illegal search on November 20, 2012, they acted in good faith in continuing to search for evidence of email hacking once they encountered the first image in thumbnail view, and concluded that it appeared to be child pornography. The Court has not found a case that says what it must do when evidence was obtained unconstitutionally but in good faith pursuant to a warrant issued by a neutrally and detached magistrate judge. The Court concludes it does not have to be excised out of the affidavit, because little deterrent value is achieved with such an exercise. Because Cravens and Nishida viewed the child pornography on the four writable CDs on November 20, 2012 in good faith, that information was not impermissibly tainted, and the agents could include it in the Second Affidavit that they submitted in support of the second search warrant. In other words, the Court concludes that it was not required to excise paragraph 21 entirely from the Second Affidavit, because this information was obtained in good faith. It would be strange for the Court to conclude that Cravens and Nishida's observations concerning child pornography on the four CDs made on April 20, 2012 were obtained in good faith, but find that the agents could not include this information in their application for a second search warrant. In any case, even if edited down some more, there is enough there to support a finding of probable cause.

In contrast, in the Second Affidavit, the agents also included detailed descriptions of the child pornography, which they obtained during the illegal November 27, 2012 searches of the CDs. The Court excised this information from the Second Affidavit, because in carrying out the November 27, 2012 search, the agents did not act in good faith. In contrast to the November 20, 2012 search, Tenth Circuit case law was clear that Cravens and Nishida could not search for evidence of child pornography on November 27, 2012. Further, as the Court explained in its Motion to Suppress MOO, neither exigent circumstances nor any other exception to the warrant requirement justified the April 27, 2012 searches. See Motion to Suppress MOO at 144; 59 F. Supp. at 1181.

enforcement officer states that he has viewed "child pornography" establishes probable cause. 16 F. App'x at 868-69.  The Tenth Circuit stated:

> Terry Wade, a Special Agent for the Federal Bureau of Investigation and former agent for the Oklahoma Bureau of Investigation, applied for a warrant to search Cervini's residence, attaching a personal affidavit to the application in support of the warrant.  The affidavit describes in some detail the process by which an individual may post a message to an Internet newsgroup and the manner in which the individual may be traced from his posting.
>
> In addition, the affidavit includes details of the specific crime for which the search warrant was sought. Special Agent Wade indicated in his affidavit that two images of child pornography were posted to an Internet newsgroup just before 1:00 a.m. on April 27, 1999.  The message header accompanying the transmission contained the Internet protocol (IP) address 206.154.188.85 and revealed that the message was posted from a news server owned by Innovative Technology, Ltd., an Internet service provider (ISP).  The ISP's records revealed that the account responsible for the posting had been in use for four hours and was not logged off until just before 3:00 a.m.  In response to a grand jury subpoena, the ISP identified the account holder from the IP address as Michael Cervini.  The ISP provided Cervini's address and indicated that his customer account status was active.  Cervini's residential address was corroborated through both a records check of Southwestern Oklahoma State University and an Oklahoma driver's license query.

16 F. App'x at 868-69.  Finding that the information in the agent's affidavit established probable cause, the Tenth Circuit reasoned that,

> [t]he issuing judge reasonably could have inferred from the facts provided in the affidavit that (1) an individual is likely to generate child pornography in a location where he has the greatest expectation of privacy; (2) a computer would be found at an ISP subscriber's residence; (3) Cervini was most likely at home at 1:00 a.m.; and (4) as the account holder, Cervini was the person using the account.  Contrary to Cervini's claim, these conclusions do not require the issuing judge to pile inference upon inference.  The totality of the facts enable a reasonable person to draw the common-sense conclusion that evidence of the crime would be found at Cervini's residence

16 F. App'x at 868-69.

As in United States v. Cervini, the Second Affidavit established probable cause.  Because Cravens stated in the Second Affidavit that child pornography was discovered on the CDs seized from Loera's residence during the execution of the First Warrant, and because Cravens defined child pornography as "a visual depiction involving the use of minors engaged in sexually explicit conduct," Second Affidavit, ¶ 30, at 10, the Court concludes that the First Warrant indicated that there was "a fair probability that contraband or evidence of a crime will be found" on the media items seized from Loera's residence, United States v. Simpson, 152 F.3d at 1246.  The Court holds, accordingly, that -- even with Cravens' descriptions of the three images and one video that he obtained from his November 27, 2012, searches excised from the Second Affidavit -- the Second Affidavit provided sufficient probable cause for Judge Schneider to properly issue a search warrant.

Motion to Suppress MOO at 145-51; 59 F. Supp. at 1183-85.

Third, the Court remains convinced that it correctly ruled in its Motion to Suppress MOO that, even if the second search warrant suffered from an incurable defect, Nishida relied on the warrant in good faith when he searched Loera's CDs and laptop for child pornography.  See Motion to Suppress MOO at 151-55; 59 F. Supp. at 1185-87.  The Court explained in part in its Motion to Suppress MOO:

Even if the Second Affidavit did not contain sufficient probable cause, "[e]vidence seized pursuant to an invalid warrant does not necessarily have to be suppressed."  United States v. Riccardi, 405 F.3d at 863.  The Supreme Court has explained that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations."  United States v. Davis, 131 S. Ct. at 2426.  Accordingly, where suppression "fails to yield appreciable deterrence, exclusion is clearly . . . unwarranted."  United States v. Davis, 131 S. Ct. at 2426-27 (alterations in original).  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  United States v. Riccardi, 405 F.3d at 863 (quoting United States v. Nolan, 199 F.3d 1180, 1185 (10th Cir. 1999); United States v. Tuter, 240 F.3d 1292, 1298-99 (10th Cir. 2001)).  "Thus, the evidence seized pursuant to such a warrant should not be excluded from trial." United States v. Nolan, 199 F.3d at 1184.  In cases in which officers obtained a search warrant,

> an officer cannot be expected to question the magistrate's probable-cause determination. . . .  Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

United States v. Leon, 468 U.S. at 921 (citations omitted)(internal quotation marks omitted).  The Tenth Circuit has explained that, "[u]nder Leon, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' apply."  United States v. Barajas, 710 F.3d at 1110.

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard for the truth."   Second, the exception does not apply when the "issuing magistrate wholly abandon[s his] judicial role." Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23)(citations omitted).  See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).   "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded."  United States v. Romero, 743 F. Supp. 2d at 1316.

Here, the only exception to the good-faith exception that could reasonably apply is that the Second Affidavit was "so lacking in indicia of probable cause as to render" the executing officer's belief unreasonable.  United States v. Danhauer, 229 F.3d at 1007 (citations omitted).   The "threshold for establishing this exception is a high one," Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012), and Loera has not overcome that burden here.  The affidavit in this case is not a "bare bones" affidavit.  Illinois v. Gates, 462 U.S. at 239.  It does not rely on Cravens' unsupported belief that probable cause exists.  See Illinois v. Gates, 462 U.S. at 239 (identifying the affidavits in Nathanson v. United States and Aguilar v. Texas as "bare bones," because each contained only an officer's belief that probable cause existed without providing any factual details).  Instead, the Second Warrant specifically identified child pornography as a "visual depiction involving the use of minors engaged in sexually explicit conduct" and was appropriately

limited to evidence of child pornography.   Second Affidavit ¶ 30, at 10. Moreover, the "deterrence benefits" of suppressing the child pornography evidence in this case "outweigh its heavy social costs."   United States v. Davis, 131 S. Ct. at 2427 (citations omitted).   As the Supreme Court has explained: "When police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."   United States v. Davis, 131 S. Ct. at 2438 (citation omitted).   By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."   United States v. Davis, 131 S. Ct. at 2427-28 (citations omitted)(internal quotation marks omitted).

   Cravens did not "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights" when he executed the Second Warrant. United States v. Davis, 131 S. Ct. at 2438 (citation omitted).   Nishida did not begin searching Loera's electronic media for child pornography until Judge Schneider had issued the Second Warrant.   In doing so, Nishida reasonably and in good faith relied upon Judge Schneider's determination that probable cause existed.   As the Tenth Circuit explained in United States v. Nolan, 199 F.3d 1180, (10th Cir. 1999), "[w]here an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."   199 F.3d at 1184.   Moreover, as explained previously, because of the volume of the child pornography evidence in this case, and because of the centrality of the child pornography to the United States' case, the social costs of excluding such evidence would be high.   The Court concludes, accordingly, that the good-faith balancing test weighs against excluding the child pornography evidence.

Motion to Suppress MOO at 151-155; 59 F. Supp. at 1185-87.

   Loera maintains that the Court cannot apply the good-faith exception here to prevent exclusion of the child pornography evidence, because the Tenth Circuit has held that the good-faith doctrine cannot be applied if the officer relying on the warrant's good faith knows that it is invalid.   See Motion to Reconsider at 17 (citing United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005)).   According to Loera, the Court stated in United States v. Martinez, 696 F. Supp. 2d at 1262: "The Court concludes that the good-faith exception to the exclusionary rule should not be applied in a case, such as this one, where officers learn information during an unconstitutional

search and give that information to another officer for incorporation into the warrant affidavit."
Motion to Reconsider at 17 (quoting United States v. Martinez, 696 F. Supp. 2d at 1262).  The
Court concludes, however, that the Second Affidavit is clear how the agents came up with the
evidence in support of the second search warrant.  Further, at the hearing on the Motion to
Reconsider, the United States asserted that the agents did not mislead Judge Schneider in seeking
the second search warrant.  See Tr. at 39:12-15 (Tuckman).  According to the United States,
Cravens informed Judge Schneider in writing that he had viewed the CDs again and that he did
not mislead Judge Schneider.  See Tr. at 39:16-23 (Tuckman).  The Court does not believe that
Fourth Amendment exclusion law should penalize Nishida for executing a search warrant issued
by a neutrally and detached Magistrate Judge who did not object to the information contained in
the Second Affidavit that was derived from the November 27, 2012, search.

Fourth and finally, the Court remains convinced that it correctly ruled in its Motion to
Suppress MOO that, even if the second search warrant contained an incurable defect and Nishida
did not execute the second search warrant in good faith, the agents inevitably would have
discovered child pornography.  See Motion to Suppress MOO at 155-66; 59 F. Supp. at 1187-94.
In its Motion to Suppress MOO, the Court explained in part:

> The Court concludes that the inevitable discovery applies.  First, Cravens
> and Nishida did not take substantial steps to obtain a search warrant for child
> pornography before the contested November 27, 2012, searches occurred.
> Cravens only intended to obtain a search warrant -- but had not undertaken any
> formal steps to do so -- when he conducted the unlawful searches of Loera's CDs
> on November 27, 2012.  Consequently, the first factor -- the extent to which the
> process for the Second Warrant had been completed at the time those seeking the
> warrant learn of the unlawful search -- weighs against finding inevitable
> discovery.
>
> Second, the agents possessed strong probable cause for their search of
> Loera's media before Cravens' unlawful search on November 27, 2012.  Both

- 80 -

Cravens and Nishida each viewed at least two images of child pornography on Loera's CDs when they executed the First Warrant on November 20, 2012. Although Cravens and Nishida did not note any locations, filenames, or descriptions of the images they viewed, had Cravens known he was not permitted to search Loera's CDs on November 27, 2012, either he or Nishida likely would have been able to describe at least one of the images with sufficient particularity to establish probable cause. Accordingly, the second factor -- the strength of the showing of probable cause at the time the search occurred -- weighs in favor of finding inevitable discovery.

The agents ultimately obtained a warrant, albeit based in part on the information that Cravens obtained from his unlawful November 27, 2012, searches of Loera's CDs. This factor cuts slightly in favor of finding inevitable discovery. There is also no evidence that the agents "jumped the gun" because of a lack of confidence about probable cause and out of a desire to force the issue. 223 F.3d at 1204. Instead, the record indicates that the November 27, 2012, search occurred when it did, because Cravens mistakenly believed that he could search Loera's CDs to provide Judge Schneider a detailed description of one image of child pornography from each of the CDs. As a result, the Court concludes that, as in United States v. Souza, but for Cravens' unlawful search on November 27, 2012, Nishida and Cravens would have obtained an untainted search warrant and the evidence in question would have been found. See 223 F.3d at 1205. The Court concludes, accordingly, that the inevitable discovery exception would apply even if the Second Warrant contained an incurable defect and Nishida did not act in good faith in executing it.

The Court may apply the inevitable discovery exception in this case despite there not being a second, independent investigation through which law enforcement could have obtained the child pornography evidence in this case. In United States v. Christy, the Tenth Circuit stated that no such requirement exists. See United States v. Christy, 739 F.3d at 540. In United States v. Christy, Judge Kelly explained:

> In Cunningham and Souza we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." Cunningham, 413 F.3d [1199,] 1204 n.1 [(10th Cir. 2005)]. In Cunningham, police searched the defendant's home after getting his consent. Id. at 1202. The defendant later contested the search, claiming his consent was coerced. Id. We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had

not occurred.  Id. at 1205.  In Souza, police illegally opened a UPS package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred.  Id. at 1206.  Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.

. . . .

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," Larsen, 127 F.3d at 987, and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In this case, as in United States v. Cunningham, there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."  United States v. Cunningham, 413 F.3d at 1204 n.1.  In United States v. Cunningham, the officers focused their investigation on two homes -- 1175 and 1179 East 76th Terrace -- and had drafted an affidavit to support a search warrant for one of the homes.  See 413 F.3d at 1200-1201. The officers had sufficient probable cause to search either home.  See 413 F.3d at 1201.  Rather than running the risk that they would search the wrong home, however, the officers conducted surveillance of both homes.  See 413 F.3d at 1201.  While conducting surveillance, the officers obtained consent to search 1179 East 76th Terrace, and subsequently discovered evidence that incriminated the defendant.  See 413 F.3d at 1201-1202.  The Tenth Circuit found that, even if the consent was obtained unlawfully, the four United States v. Souza factors indicated that the officers would have inevitably have discovered the evidence.  See 413 F.3d at 1204-1205.  It was, therefore, immaterial that there was no second, independent investigation through which law enforcement would have lawfully discovered the evidence.  See 413 F.3d at 1204-1205.

As in United States v. Cunningham, Cravens and Nishida had sufficient probable cause to search Loera's CDs before Cravens searched them on November 27, 2012.  See 413 F.3d at 1201.  Like the officers in United States v. Cunningham, who drafted a search warrant affidavit before the allegedly unlawful search occurred, Cravens intended to obtain a warrant to search Loera's CDs before his unlawful search occurred.  See 413 F.3d at 1200-1201.  Like in United States v. Cunningham, where, had the officers not searched the defendant's residence pursuant to unlawfully obtained consent, they would have obtained the

same evidence lawfully by executing a search warrant, the agents in this case, had Cravens not unlawfully searched Loera's CDs on November 27, 2012, would have obtained the same evidence by lawfully executing a search warrant.  See 413 F.3d at 1204-1205.  It is, therefore, immaterial that there was no second, independent investigation through which law enforcement would have lawfully discovered the child pornography evidence.  The Court holds, accordingly, that the inevitable discovery exception applies.

Motion to Suppress MOO at 155-66; 59 F. Supp. at 1187-94.

In sum, the Court remains convinced that it correctly applied the law to its factual findings in the last forty pages of its Motion to Suppress MOO.  The Court will not modify its rulings.  The Court concludes that suppression is not warranted in this case.

## IV.   LOERA MISCHARACTERIZES THE COURT'S USE OF <u>HORTON V. CALIFORNIA</u>.

The Court has already explained why it remains convinced of the correctness of its legal conclusions set forth on the last forty pages of its Motion to Suppress MOO.  Loera focuses, however, much of his briefing on the Court's use of the Supreme Court's decision in <u>Horton v. California</u>, and the Court would like to elaborate on its citation to that case in its Motion to Suppress MOO.  <u>See</u> Motion to Reconsider at 8-14.  First, in its Motion to Suppress MOO, the Court ruled that the agents performed an unlawful search on November 20, 2012, when they discovered evidence of child pornography, yet continued to search for evidence of computer fraud and electronic mail hacking.  <u>See</u> Motion to Suppress MOO at 109-122; 59 F. Supp. at 1159-68.  The Court explained its reasoning in part:

> As in <u>United States v. Carey</u>, <u>United States v. Walser</u>, and <u>United States v. Burgess</u>, Nishida and Cravens inadvertently discovered child pornography while searching for evidence of another crime.  <u>See</u> May 20, 2014 Tr. at 60:5-7 (Cravens); <u>id.</u> at 158: 20-22 (Nishida, Tuckman).  Unlike the officers in <u>United States v. Walser</u> and <u>United States v. Burgess</u>, however, Cravens and Nishida did not immediately stop their searches upon discovering child pornography.  <u>See</u> May 20, 2014 Tr. at 65:10-17 (Cravens, Tuckman); <u>id.</u> at 116:3-12 (Cravens,

Serna); id. at 161:17-162:18 (Nishida, Tuckman).   After discovering child pornography on one of Loera's CDs, Cravens ejected that CD and continued opening files on Loera's other CDs to determine if they contained evidence of computer fraud and electronic mail hijacking.   See May 20, 2014 Tr. at 61:12-13 (Cravens); id. at 65:10-17 (Cravens, Tuckman).  Cravens later discovered another child pornography image on another of Loera's CDs.   See May 20, 2014 Tr. at 67:18-68:4 (Cravens, Tuckman).  Nishida also found child pornography on one of Loera's CDs.   See May 20, 2014 Tr. at 161:17-162:18 (Nishida, Tuckman).  After finding child pornography on one of Loera's CDs, Nishida opened two or three more files on that CD to determine if they contained evidence of computer fraud or electronic mail hijacking.   See May 20, 2014 Tr. at 161:17-162:18 (Nishida, Tuckman).  The agents' searches were, therefore, closer to that of the detective in United States v. Carey, who, after discovering child pornography on one floppy disc, continued to open five to seven image files on each of nineteen floppy discs, than the searches that the Tenth Circuit found permissible in United States v. Burgess and United States v. Walser.

Unlike in United States v. Carey, however, where all of the files that the detective opened after discovering the first child pornography image were clearly labeled as image files and "most featured a sexually suggestive title," 172 F.3d at 1274, there is no evidence indicating whether any of the files in which the agents here discovered child pornography were clearly labeled as image files or whether they featured sexually suggestive titles.  Moreover, unlike the detective in United States v. Carey, who testified that he believed he had probable cause to search the other floppy discs for child pornography after discovering the first child pornography image, the agents testified that, after discovering child pornography, they continued to search Loera's CDs for evidence of electronic mail hijacking and computer fraud.   See United States v. Carey, 172 F.3d at 1271; May 20, 2014 Tr. at 65:15-17 (Cravens, Tuckman); id. at 165:4-17 (Nishida, Tuckman).

This case, thus, presents the scenario that Judge Baldock envisioned in his concurring opinion in United States v. Carey, in which he stated that, "if the record showed that [the detective] had merely continued his search for drug-related evidence and, in doing so, continued to come across evidence of child pornography, . . . a different result would be required."   172 F.3d at 1277 (Baldock, J., concurring).  The majority opinion in United States v. Carey, and the Tenth Circuit's later decision in United States v. Burgess, however, seem to require officers to immediately stop their warrant-authorized searches upon discovering evidence of another crime.  The majority opinion in United States v. Carey states:

> [L]aw enforcement must engage in the intermediate step of sorting various types of documents and then only search the ones specified in the warrant.  Where officers come across relevant documents so

> intermingled with irrelevant documents that they cannot feasibly
> be sorted at the site, the officers may seal or hold the documents
> pending approval by a magistrate of the conditions and limitations
> on a further search through the documents.

> 172 F.3d at 1275.  In United States v. Burgess, the Tenth Circuit said, in dicta, that, "as our cases seem to require, [the officer] immediately closed the gallery view when he observed a possible criminal violation outside the scope of the warrant's search authorization and did not renew the search until he obtained a new warrant." 576 F.3d at 1094-95 (emphasis added)(footnotes omitted).  "While the Court may not be bound by Tenth Circuit dicta, the Court takes seriously anything that the Tenth Circuit says."  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1124 (D.N.M. 2012)(Browning, J.).  The Court concludes that the Tenth Circuit's statements in United States v. Burgess and United States v. Walser more accurately reflect Tenth Circuit law on this issue than Judge Baldock's concurrence in United States v. Carey.  Given that Nishida and Cravens did not immediately stop searching Loera's CDs upon discovering child pornography, as Tenth Circuit law "seem[s] to require," United States v. Burgess, 576 F.3d at 1094-1095, the Court concludes that the agents conducted an unlawful search under Tenth Circuit precedent when they continued their warrant-authorized searches.

Motion to Suppress MOO at 113-15; 59 F. Supp. at 1161-63.

In reaching this conclusion, the Court did not invoke or discuss Horton v. California, and it certainly did not hold that Horton v. California or the "plain view doctrine" authorized the agents on November 20, 2012, after discovering evidence of child pornography, to continue searching for evidence of computer fraud or electronic mail hacking.  Rather, after concluding that the agents conducted an illegal search on November 20, 2012, the Court invoked Horton v. California in two distinct ways: (i) it explained that, despite its holding that the November 20, 2012, search was illegal under Tenth Circuit case law, it had concerns about the Tenth Circuit case law establishing that rule given the Supreme Court's decision in Horton v. California, see Motion to Suppress MOO at 116-17; 59 F. Supp. at 1163-64; and (ii) it later found that the agents could have relied on Horton v. California to reasonably conclude that the first warrant

authorized them to continue searching Loera's CDs after discovering child pornography, <u>see</u> Motion to Suppress MOO at 128-29; 59 F. Supp. at 1171-72.

First, the Court explained that, despite its holding, it has concerns with Tenth Circuit law -- as reflected in <u>United States v. Burgess</u> and <u>United States v. Walser</u> -- requiring agents to immediately stop their warrant-authorized searches upon discovering evidence of another crime. <u>See</u> Motion to Suppress MOO at 115-24; 59 F. Supp. at 1163-68.  The Court then outlined what it considers problems with this rule, the first of which is that it conflicts with <u>Horton v. California</u>.  <u>See</u> Motion to Suppress at 115-17.  There, an officer obtained a warrant to search a defendant's house for the proceeds of a robbery.  <u>See</u> 496 U.S. at 131.  While executing the search warrant, the officer found and subsequently seized, among other things, a machine gun, a .38-caliber revolver, two "stun guns," and a handcuff key.  496 U.S. at 131.  The officer did not discover any evidence that the search warrant sought.  <u>See</u> 496 U.S. at 131.  The officer testified that, while executing the search warrant, he was also looking for evidence outside the search warrant's scope.  <u>See</u> 496 U.S. at 131.  As the Court explained in its Motion to Suppress MOO:

> Finding the officer's subjective intentions during the search irrelevant, the Supreme Court explained, in an opinion that the Honorable Justice John P. Stevens, Associate Justice of the Supreme Court, wrote, and Chief Justice Rehnquist, Justices White, Blackmun, O'Connor, Scalia, and Kennedy joined:
>
>> [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.  The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant.
>
> 496 U.S. at 138. Because the items seized "were discovered during a lawful search authorized by a valid warrant," and their seizure was justified by the plain-view exception, the Supreme Court found the officer's search constitutional.  496 U.S. at 142.  In justifying its holding, the Supreme Court stated that a hypothetical

presented in the concurring and dissenting opinion of the Honorable Byron R. White, Associate Justice of the Supreme Court, in Coolidge v. New Hampshire, 403 U.S. 443 (1971)(White, J., concurring and dissenting), is "instructive":

> Let us suppose officers secure a warrant to search a house for a rifle. While staying well within the range of a rifle search, they discover two photographs of the murder victim, both in plain sight in the bedroom.   Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated. . . . [I]n terms of the "minor" peril to Fourth Amendment values there is surely no difference between these two photographs: the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other.  And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant."  Id. at 516.

Horton v. California, 496 U.S. at 139 (quoting Coolidge v. New Hampshire, 403 U.S. at 516 (White, J., concurring and dissenting)).  Although the Supreme Court did not explain whether the officer discovered the guns and other incriminating items simultaneously, or at different points while executing the search warrant, its holding is clear: so long as an officer acts within the scope of the search warrant -- i.e., searches only items that may reasonably contain the evidence that the warrant seeks -- it is irrelevant whether the officer either intends to find or inadvertently discovers evidence outside of the warrant's scope.  See Horton v. California, 496 U.S. at 142.  Although Horton v. California did not address computer searches, the Court finds it difficult to conclude that the privacy interests implicated by computer searches are so substantial -- and so distinct from every other search context -- that longstanding Supreme Court jurisprudence does not apply.

Motion to Suppress MOO at 116-17; 59 F. Supp. at 1163-64.  The Court remains convinced, after carefully reviewing its opinion and Loera's argument, that it did not commit error by ruling that the agents carried out an illegal search on November 20, 2012, but expressing its concern with Tenth Circuit case law, given the Supreme Court's decision in Horton v. California.

Loera focuses primarily on the Court's second invocation of Horton v. California.  After concluding that Cravens and Nishida violated the Fourth Amendment when they continued searching the CDs after discovering child pornography, the Court later concluded that Cravens

and Nishida could have relied on Horton v. California to reasonably conclude that the first

warrant authorized them to continue searching Loera's CDs after discovering child pornography.

See Motion to Suppress MOO at 128-29; 59 F. Supp. at 1171-72.  In other words, the Court

concluded that the agents acted in good faith and that it should not suppress the evidence.  The

Court remains convinced of its analysis' conclusions:

> Relying on the Supreme Court's precedent in Horton v. California, the agents could reasonably have concluded that the First Warrant permitted them to continue searching Loera's CDs after discovering child pornography.  The Supreme Court all but encouraged officers to continue their warrant-authorized searches upon finding evidence of another crime by placing a single restriction on officers who execute search warrants: that they may search only items that may reasonably contain the evidence that the warrant seeks.  See Horton v. California, 496 U.S. at 142 ("Police with a warrant for a rifle may search . . . places where rifles might be and must terminate the search once the rifle is found; the inadvertence rule will in no way reduce the number of places into which they may lawfully look.").  Consequently, the agents could have reasonably relied upon Horton v. California to conclude that the First Warrant authorized them to continue searching Loera's CDs for evidence of computer fraud and electronic mail hijacking, because those CDs could reasonably have contained evidence of those crimes.

> The Court recognizes that "the storage capacity of computers" may require "a special approach," United States v. Carey, 172 F.3d at 1275 n.7, and that Horton v. California is, therefore, not a perfect analogy.  The Court notes, however, that the good-faith inquiry does not require officers to undertake the role of a judge or constitutional law scholar, and discern the precise contours of Supreme Court precedent.  It instead turns on whether a reasonable officer would believe in good faith that binding appellate precedent authorized certain conduct, "which is a scenario-specific way of asking the broader question of whether the officer 'acted with an objectively reasonable good-faith belief that his conduct was lawful.'"  United States v. Katzin, No. 12-2548, 2014 WL 4851779 (3d Cir. Oct. 1, 2014)(en banc)(Van Antwerpen, J., joined by Rendell, Fisher, Charages, Jordan, Hardiman, Vanaskie, & Shwartz, JJ.).  Viewed in this way, the Supreme Court's holding in Horton v. California was sufficiently analogous to the agents' circumstances for them to reasonably rely on it in continuing to conduct their warrant-authorized searches after finding child pornography.  Consequently, the Court concludes that the good-faith exception applies to the agents' conduct and suppression of the child pornography evidence obtained therefrom is unwarranted.

Motion to Suppress MOO at 128-29; 59 F. Supp. at 1171-72.

Loera takes issue with the Court's conclusion that "the agents could have reasonably relied on _Horton_ to continue searching the ESI once child pornography was discovered." Reply at 7. Loera states: "[T]he Tenth Circuit in _Carey_ refused to accept the plain view argument because 'the items seized were not authorized by the warrant. Further they were in closed files and not in plain view.'" Reply at 7 (citing United States v. Carey, 172 F.3d at 1273). To an extent, the Court agrees with Loera. The Court here concluded that the agents conducted an illegal search when they continued searching the CDs after discovering child pornography and did not conclude that Horton v. California permitted the agents to continue searching for evidence of email hacking or child pornography. See Motion to Suppress MOO at 109-24; 59 F. Supp. at 1159-68. To the contrary, under United States v. Burgess, and United States v. Walser, Cravens and Nishida were required to immediately stop searching the CDs and apply for a second search warrant authorizing them to search for child pornography. See Motion to Suppress MOO at 115; 59 F. Supp. at 1162. The Court had to be as intellectually honest in addressing this question as possible, concluding that

> the Tenth Circuit's statements in United States v. Burgess and United States v. Walser more accurately reflect Tenth Circuit law on this issue than Judge Baldock's concurrence in United States v. Carey. Given that Nishida and Cravens did not immediately stop searching Loera's CDs upon discovering child pornography, as Tenth Circuit law "seem[s] to require," United States v. Burgess, 576 F.3d at 1094-1095, the Court concludes that the agents conducted an unlawful search under Tenth Circuit precedent when they continued their warrant-authorized searches.

Motion to Suppress MOO at 115; 59 F. Supp. at 1162. While, as a federal district court, the Court determined that United States v. Burgess and United States v. Walser ultimately more accurately reflect Tenth Circuit law, the Court concluded that the Tenth Circuit had sent

conflicting signals in <u>United States v. Carey</u>, <u>United States v. Burgess</u>, and <u>United States v. Walser</u> whether law enforcement officers may continue a warrant-authorized ESI search upon discovering evidence of another crime.  For that reason, the Court found that the rule announced in <u>United States v. Burgess</u> and <u>United States v. Walser</u> did not represent binding appellate precedent, and it, therefore, turned to Supreme Court precedent, and concluded that "[r]elying on the Supreme Court's precedent in <u>Horton v. California</u>, the agents could reasonably have concluded that the First Warrant permitted them to continue searching Loera's CDs after discovering child pornography."  Motion to Suppress MOO at 128; 59 F. Supp. at 1171.  Thus, the Court used <u>Horton v. California</u> in its good-faith analysis, not to justify what Agents Cravens and Nishida did on November 20, 2012.

## V.    THE COURT WILL NOT SUPPRESS THE EVIDENCE UNDER RULE 41(e)(2)(B), BECAUSE THERE IS NO EVIDENCE THAT THE AGENTS VIOLATED RULE 41(E)(2)(B) IN THIS CASE.

The Court has considered Loera's argument that the Court should suppress the evidence pursuant to rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure -- an assertion that he makes for the first time in his Motion to Reconsider -- but concludes that suppression is not warranted in this case, because there is no evidence that the agents violated rule 41(e)(2)(B). The Court first notes that Loera could have advanced this argument -- that agents violated rule 41(e)(2)(B), mandating suppression in this case -- in his original Motion to Suppress or at any time in the course of this litigation.  Loera attaches much significance to the Tenth Circuit's decision in <u>United States v. Krueger</u>, 809 F.3d 1113, which the Tenth Circuit issued on November 10, 2015, less than one month after the Court filed its Motion to Suppress MOO.  It is true that, in <u>United States v. Krueger</u>, the Tenth Circuit for the first time sided with a defendant

and suppressed evidence on the basis of a rule 41 violation.  The Tenth Circuit has, however, on numerous occasions applied the United States v. Pennington framework to consider whether various alleged rule 41 violations justified suppression.  The Tenth Circuit explained in United States v. Krueger, in evaluating whether a violation of rule 41(b)(1) justified suppression:

> Over the years, we have addressed many other provisions of Rule 41, never concluding that the alleged Rule 41 violation(s) at issue justified suppression. *See, e.g., Pulliam*, 748 F.3d at 973-74 (concluding that alleged violation of Rule 41(f) for failing to provide defendant with a copy of the search warrant contemporaneous with the search did not justify suppression); *United States v. Burgess*, 576 F.3d 1078, 1097 (10th Cir. 2009)(concluding that violation of Rule 41(e) for failing to execute a warrant within ten days did not justify suppression); *United States v. Hugoboom*, 112 F.3d 1081, 1086-87 (10th Cir. 1997)(reciting the *Pennington* framework and concluding that failing to list on the anticipatory warrant an "on or before" date for execution of the warrant, an ostensible violation of former Rule 41(c), did not justify suppression); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1436 (10th Cir. 1990)(concluding that former Rule 41(b) was not violated by a warrant permitting covert television surveillance, meaning suppression was not justified on this ground), *holding modified on other grounds by United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997), *overruled on another ground by United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002); *United States v. Rome*, 809 F.2d 665, 669-70 (10th Cir. 1987)(concluding that violations of former Rule 41(c) for failing to comply with requirements for issuing a warrant pursuant to a phone affidavit did not justify suppression); *United States v. Massey*, 687 F.2d 1348, 1355-56 (10th Cir. 1982)(concluding that former Rule 41(a) was not violated because warrants, although based upon affidavit of state official, were requested by an Assistant United States Attorney and that violations of former Rule 41(c) for failing to designate a federal magistrate to whom the warrants will be returned and to comply with requirements for taking oral testimony to supplement affidavit did not justify suppression); *Pennington*, 635 F.2d at 1389-90 (concluding that violation of Rule 41(c) by virtue of warrant being executed by a state official, instead of a federal official, did not justify suppression).

> Because none of these cases addressed Rule 41(b)(1), which is unique from other provisions of Rule 41 because it implicates "substantive judicial authority," *United States v. Berkos*, 543 F.3d 392, 397 (7th Cir. 2008), they offer limited guidance here.

United States v. Krueger, 809 F.3d at 1115 n.7.  In other words, the United States v. Pennington framework has existed throughout the course of this litigation, and Loera could have moved to

suppress the evidence on the grounds that the agents violated rule 41(e)(2)(B) at any time during the litigation.  Whether he would have succeeded is another question.  In sum, while Loera is not asserting that his rule 41 argument is a motion to reconsider, because he raises it now for the first time, it is also not a good candidate for reconsideration, because it was around when he filed his original Motion to Suppress.

The Court has nonetheless considered the merits of Loera's argument that the agents violated rule 41(e)(2)(B), justifying suppression, and concludes that it is without merit.  Under the United States v. Pennington framework, the Court's first task is to consider whether rule 41 was violated.  See United States v. Krueger, 809 F.3d at 1113.  If there is a rule 41 violation, the Court moves to the question "whether that specific Rule 41 violation rises to the level of a Fourth Amendment violation."  United States v. Krueger, 809 F.3d at 1113.

> If we determine that the Rule 41 violation is *not* of constitutional import, we then consider whether the defendant can establish that, as a result of the Rule violation, "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Pennington*, 635 F.2d at 1390.  Unless the defendant can establish prejudice or intentional disregard of the Rule, a non-constitutional violation of Rule 41 will not, by itself, justify suppression. *Id.*

United States v. Krueger, 809 F.3d at 1114.  Here, the Court need not reach the United States v. Pennington framework's second prong, because there is no evidence that the agents in this case violated rule 41(e)(2)(B).  As described above, the 2009 amendments to the Federal Rules of Criminal Procedure added Rule 41(e)(2)(B) to reflect that case law sanctioning the government's "seize first, search later" two-step procedure.  Three Hotmail Accounts, 2016 WL 1239916 at *17; United States v. Ganias, 755 F.3d at 135.  Rule 41(e)(2)(B), as amended, "explicitly states

that warrants may issue for the seizure of electronic evidence for later review."  Saylor, supra, at

2824.  Rule 41(e)(2)(B) provides:

> **Warrant Seeking Electronically Stored Information.**  A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information.  Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant.  The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

Fed. R. Crim. P. 41(e)(2)(B).

"As the text makes clear, Rule 41(e)(2) is a codification of courts' recognition that on-site

searches of computer hard drives are infeasible and that courts should authorize later, off-site

searches (often in the government's forensic laboratories)."  Three Hotmail Accounts, 2016 WL

1239916 at *17.  Moreover, "[a]t least one commentator has suggested that this and other

provisions alone authorize the broad scope of digital searches and seizures."  Saylor, supra, at

2824 (citing Andrew Vahid Moshirnia, Note, Separating Hard Fact from Hard Drive: A Solution

for Plain View Doctrine in the Digital Domain, 23 Harv. J.L. & Tech 609 (2010)).  The advisory

committee's notes to the 2009 amendments support this view:

> **Subdivision (e)(2).**  Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.
>
> The term "electronically stored information" is drawn from Rule 34(a) of the Federal Rules of Civil Procedure, which states that it includes "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained."  The 2006 Committee Note to Rule 34(a) explains that the description is intended to cover all current types of computer-based information and to

encompass future changes and developments. The same broad and flexible description is intended under Rule 41.

In addition to addressing the two-step process inherent in searches for electronically stored information, the Rule limits the 10 [14][9] day execution period to the actual execution of the warrant and the on-site activity. While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs. The rule does not prevent a judge from imposing a deadline for the return of the storage media or access to the electronically stored information at the time the warrant is issued. However, to arbitrarily set a presumptive time period for the return could result in frequent petitions to the court for additional time.

It was not the intent of the amendment to leave the property owner without an expectation of the timing for return of the property, excluding contraband or instrumentalities of crime, or a remedy. Current Rule 41(g) already provides a process for the "person aggrieved" to seek an order from the court for a return of the property, including storage media or electronically stored information, under reasonable circumstances.

Where the "person aggrieved" requires access to the storage media or the electronically stored information earlier than anticipated by law enforcement or ordered by the court, the court on a case by case basis can fashion an appropriate remedy, taking into account the time needed to image and search the data and any prejudice to the aggrieved party.

The amended rule does not address the specificity of description that the Fourth Amendment may require in a warrant for electronically stored information, leaving the application of this and other constitutional standards concerning both the seizure and the search to ongoing case law development.

Fed. R. Crim. P. 41(e)(2)(B), cmt. to 2009 Amend.

---

[9]The advisory committee's notes state that "[t]he 10 day period under Rule 41(e) may change to 14 days under the current proposals associated with the time computation amendments to Rule 45." Fed. R. Crim. P. 41(e)(2)(B), cmt. to 2009 Amend n.1. The 10 day period under Rule 41(e) was ultimately changed to 14 days. See Fed. R. Crim. P. 41(e)(2)(A)(i).

In other words, both rule 41(e)(2)(B) and the advisory committee's notes to the 2009 amendments, indicate that, if anything, rule 41(e)(2)(B) provides the United States with more power to search and seize electronically stored information by sanctioning off-site reviews.  A warrant may -- but does not have to authorize seizure; unless the warrant specifies otherwise, the warrant may authorize a later review of the media or information; and the time for executing the warrant refers to the seizure or on-site copying of the media or information and not to any later off-site copying or review.  It is hard to imagine how an agent could violate this rule, because the rule empowers rather than restricts.  Nowhere in his briefing or in oral argument has Loera explained how the agents in this case violated rule 41(e)(2)(B).  Loera focuses extensively on his assertion that a violation of rule 41 of constitutional magnitude requires suppression, but he is putting the cart before the horse.  Before the Court reaches the second prong of the United States v. Pennington framework, it must first identify the rule 41 provision that has allegedly been violated.  Loera points to rule 41(e)(2)(B), which provides the United States with expanded power to conduct off-site searches of electronically stored information, but Loera has not explained how the agents in this case violated rule 41(e)(2)(B).  The Court has reviewed the Motion to Reconsider, the Reply, and the transcript from the hearing on the Motion to Reconsider, and it cannot find a reference to any other provision of rule 41.  The Court therefore concludes that there is no evidence that the United States violated rule 41(e)(2)(B), and it does not need to reach the United States v. Pennington framework's second prong, which asks whether the rule 41 violation was of constitutional magnitude.  While, as United States v. Krueger demonstrates, suppression of evidence for rule 41 violations is possible, it is not

warranted in this case.  Accordingly, the Court denies the Motion to Reconsider on the grounds that the United States or the agents involved in this case violated rule 41(e)(2)(B).

Because the Court cannot figure out how there could have been a rule 41(e)(2)(B) violation, here or ever, for that matter, it cannot be of constitutional dimension.  Rule 41(e)(2)(B) is a rule that resembles deciding which side of the road on which people are going to drive.  Loera does not make any constitutional challenge to the rule, and on its face, it appears a reasonable accommodation how to search ESI.  The Court cannot imagine a violation of rule 41(e)(2)(B) that could be of constitutional magnitude, and there is not one here.  Without any rule 41 violation, much less one of constitutional dimension, the Court will not suppress any evidence.

Even if, however, there were a rule 41 violation of constitutional dimension, the Court still would not suppress the evidence here.  There is no sound reason to create the good-faith exception and the inevitable discovery doctrine under the Federal Constitution, and not incorporate these exceptions and doctrines to rule 41 suppression issues.  Here, where Cravens and Nishida secured two federal warrants, and the evidence would have eventually been discovered properly, the Court would conclude, as it has here, that they acted in good faith, and the inevitable discovery doctrine would protect the evidence from suppression.  At various points in his briefing and at the hearing on the Motion to Reconsider, Loera maintains that "[a]s noted, Rule 41(e)(2)(B) expressly states that the warrant only authorizes searches and seizures of items consistent with the warrant."  Motion to Reconsider at 12-13.  As stated, rule 41(e)(2)(B) is focused on expanding the power of the United States to conduct off-site searches of electronically stored information.  To the extent that Loera contends that rule 41(e)(2)(B) implies

that searches beyond the substantive limits of the Fourth Amendment are prohibited, however, the Court would apply the same suppression doctrines that apply to the Fourth Amendment -- the good faith and inevitable discovery doctrines.   Accordingly, the Court will not suppress the evidence for any rule 41 violations under the circumstances of this case.

IT IS ORDERED that the Defendant's Motion to Reconsider Court's Memorandum Opinion and Order [Doc. 62] on Defendant's Motion to Suppress Evidence [Doc. 35], filed March 8, 2016 (Doc. 109), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Dean S. Tuckman
Stephen R. Kotz
Kristopher N. Houghton
Cynthis L. Weisman
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico
        *Attorneys for the Plaintiff*

David C. Serna
David C. Serna Attorney at Law
Albuquerque, New Mexico

--and--

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

        *Attorney for the Defendant*