**INDEX OF EXHIBITS**

**MARINELAND RESTITUTION REQUEST**

**Part 1**

| Exhibit # | PDF Page # | Description of Exhibit |
|---|---|---|
| Exhibit 1 | 3 | Jane Doe's and Her Mother's Victim Impact Statement |
| Exhibit 2 | 8 | Forensic psychological evaluation, by Randall Green, Ph.D. |
| Exhibit 3 | 42 | CV of Randall Green, Ph.D; |
| Exhibit 4 | 56 | Chapter 5, "Victims of Child Pornography," United States Sentencing Commission Report to Congress, December 2012; |

# EXHIBIT 1

VICTIM IMPACT STATEMENT

I am writing to tell you what it is like for me to know that pictures of what my father did to me are on the internet. I am told that there is a known group of my pictures that is labeled the "Marineland" series. My natural father sexually molested me when I was a child. First he woke me up at 3-5:00 in the morning on school nights to take pictures. First the pictures were of me with my clothes on, then he made me take my clothes off for the pictures. Then he made me look at pictures of other people—men and little girls —who had their clothes off. He said it would give me ideas. As things progressed he started molesting me and taking pictures of me in more  and more private and uncomfortable poses.  He molested me with his own body parts and sometimes with a vibrator.  He took many pictures and I know now that he sent those pictures to his "friends" and many other people on the internet.

My father is now in jail and will be for a long time. And I am not a child anymore. But I worry that the people he sent my pictures to will come after me and try to do the same things to me again.  I worry that the pictures of me and what he did have been passed on and on and on to many other pedophiles and any one of them or more could be in my neighborhood or at the store I go to or anywhere around me.  I don't go out of my house unless I have a friend with me I really trust.

I am afraid that someone from the police will call and tell me that they found more pictures on other people's computers.  Every time someone else sees pictures or videos of me it feels like they are the ones who hurt me to begin with.  It feels like they are the ones who did this to me, like they are my father and they just want to use me for their own pleasure.  It is like I am just here for other people's pleasure and am not a person myself with my own wants and needs.  If you are looking at pictures or videos of me, or any other child for that matter, then you are hurting every one that you look at.  Anyone who looks at those horrible pictures of me or other children are abusing us.  Anyone who looks is keeping my pain going for the rest of my life. I cry at night because of this. Even though I don't know the names of all of them, I know that they are out there and I am afraid that they are all around me.  My fear keeps me from doing things that other girls my age could normally do, like go to school or have a job or be social with more than just the very small number of people that I really trust.

I need help.  I have never been able to have any counseling or therapy or someone to talk to to help me deal with my fears and nightmares and my problems in getting along in life.  I have medical conditions too, and the stress I have from my fears makes my pain worse.  I am only able to work in things I can do at home, like child care.  I would love to have a daycare business, but my medical conditions are so  much worse due to my stress that I cannot work and have had to give up caring for the children that did come to me.

I ask that the judge who sentences anyone who is convicted of having or trading my pictures make that person contribute to the costs of a counselor for me.  I am told that a

good counselor for the problems I have will cost at least $100 every time I see her. I would like to be able to do this so that I can get the help I need to get on with my life. I have no ability to pay for any counseling costs. I have no job, but would like to have one. I hope that the court will help me by granting me restitution from the people who have and trade my pictures.

DATE: 5 - 30 -14

**VICTIM IMPACT STATEMENT**

My daughter was molested by her natural father beginning when she was about five years old.  We learned later that he had taken pictures of her while he was abusing her and put those on the internet, emailed them to his pedophile friends, and used them to groom other vulnerable little girls.  He used a web cam to get video of her and of him doing things to her.  He put these videos on his computer.  Eventually spy-cams were found in some of my daughter's things, like her CD player/stereo.  These things he gave to her and she thought it was because she was special to him.

My daughter is a strong person.  She is a bright, funny, beautiful, and smart girl.  Despite all the need to talk to police and the courts she got through it and eventually put it behind her.  She seemed to go on with her life and almost be a normal teenager.  At one point she was on the honor roll at school

When she was about eighteen, she was chatting online with another girl, and that girl sent her a link to a website.  The girl did not tell her what was on the site.  When my daughter clicked on it she found many, many pictures of herself as a little girl being raped and molested by her father.  She called me right away and I came to where she was.  She felt ashamed and embarrassed.  She was crying uncontrollably and almost out of her mind.  I saw the pictures then too, and couldn't believe what I was seeing.  Even though I had known what happened, seeing it in front of me was shocking and horrible.  I can only imagine how bad it was for her.   For two days the two of us cried together and could do nothing else; we could not eat or sleep.  For her, this part of her past had been put away and wasn't a part of her everyday existence and longer.  She had pretty much forgotten the specific things her father had done to her.  Then, there it was in color on the screen in front of her, and me, and it all came crashing back in on her.  All her memories were brought back to her.  She couldn't escape them any more.  I know that I can never forget seeing those pictures of my little girl, pictures showing my ex-husband inside of her.  No parent ever wants to see their child in that position. These photos haunt me still.  I have dreams about them and can't forget them.

Much worse, and she still talks about this years later, is the fact that someone else recognized her from those pictures.  Her being molested is not just a private thing anymore.  Now she stays in the house all the time and does not go out with out having me or some close friend with her like her boyfriend or other person she knows really well.    When I go out with her I see that she is always looking around to see who is around her. She is afraid that someone will recognize her.  Her personality seems to have changed.  In the past she has not wanted to talk to anyone other than me about this. Now she has said that she wants to see a therapist.  I am so glad because I believe that she really needs it.  She needs to

learn how to cope with all that has happened to her.

She found out as a result of the girl sending the web link that my daughter has been known on the internet as "Scar Girl", though law enforcement tells us that her pictures are known as "Marineland." I imagine the "Scar Girl" name is because of the large scar on her stomach from when she was just a baby and had to have surgery. We have gotten so many notices from the FBI about people downloading and looking at pictures of her being raped that just getting the envelopes in the mail that it just made her feel horrible. Every day she was already feeling the pain and heartache of knowing her pictures are on the internet and that made it even worse.

I still lose sleep with those horrific images in my head. How many people are there in this world right now looking at and getting sexually excited or even masturbating to pictures of my baby girl? I almost lost her as a newborn and yet this is what has come of saving her. How many sick minded people are there in this world that could even want to look at a picture of a child being raped. Seeing those pictures on the computer screen, and now knowing that that is what so many people are looking at has made it for her like she has to live it all over again and again. Having someone look at her like she is a piece of meat you pick out at the market is what it is. My daughter is not a piece of meat!

I hope and pray that every person caught with pictures of my daughter is brought fully to justice. I hope they experience at least some part of the pain and anguish that my baby had to go through in order for them to get those pictures. If there is anything that can be done, I hope that they are made to help her get through this awful life that she now has to live. I ask that the judge do what can be done to make any person caught with her pictures pay for her therapy to help her get well, or as well as she can ever be.

I make the above statement  under the laws against perjury of the State of ████████ and declare that it is true and correct to the best of my personal knowledge.

Dated: _7-23-14_    at ███████████.

**EXHIBIT 2**

# RANDALL L. GREEN, Ph.D.
## Clinical Psychologist

2250 D Street NE
Salem, Oregon 97301

(503) 364-6093    Fax: (503) 364-5121    **Licensed in Oregon and Washington**

## PRIVILEGED AND CONFIDENTIAL
## FORENSIC PSYCHOLOGICAL EXAMINATION

**EXAMINEES:**          **Jane Doe**
**DATE OF BIRTH:**      ███████████

**DATES OF EXAMINATION:**    **April 29 and 30, 2014**
**DATE OF REPORT:**          **July 7, 2014**

### REASON FOR REFERRAL

Ms. Carol Hepburn, Attorney at Law, represents Ms. Jane Doe. As a minor child, Jane Doe was sexually abused by her birthfather on multiple occasions over a period of about seven years. He then placed her images on the Internet, where they have been distributed, downloaded, viewed, and/or redistributed to others. Ms. Doe has retained Attorney Carol Hepburn to represent her as a victim of Federal and state crimes with regard to pursuit of restitution in these matters. Ms. Hepburn has requested that a forensic psychological evaluation be conducted on Ms. Jane Doe to form a professional opinion with regard to the impact and injuries caused by the discovery and daily awareness that multiple individuals are viewing images of sexual crimes being perpetrated against her as a child. Hence, this evaluation was conducted in order to address the referral question.

### PROCEDURES USED

*(NOTE:  This database, in addition to psychological testing, collateral contacts, and any other available records, will provide the substance for the findings, summary and conclusions contained in this report. Quotations are accurate, but not necessarily verbatim, representations of the communications provided by persons interviewed during this evaluation.*

*Prior to commencing this forensic psychological examination, I oriented Jane Doe about the nature of this evaluation and the purposes for which it is being conducted. Ms. Doe then read and signed the Disclosure Statement: Forensic Psychological Assessment after being given the opportunity to ask any questions she might have regarding its contents.)*

The following procedures were used in conducting this evaluation:

    Diagnostic interview with Jane Doe, 4/29 and 4/30/2014: 10.0 hours
        Collateral interview with B.L. AKA John Smith, fiancé of Ms. Doe: .75 hours
    Collateral interview with Christopher J., AKA "CJ": roommate of Ms. Doe: .5 hours
    Psychometric testing and/or questionnaires, including the following:
        Detailed Assessment of Posttraumatic Stress
        Millon Clinical Multiaxial Inventory-III
        Minnesota Multiphasic Personality Inventory-2
        Posttraumatic Stress Diagnostic Scale
        Shipley-2
        Trauma Symptom Inventory-2
    Review of records, including the following:
        S.A. Munn Report, Case Number OW07QR06OW0005: 19 pp.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 2



Emails: 23 pp.
████████Clinic: 102 pp.
████████School District Discipline Records: 17 pp.
████████School District transcripts: 95 pp.
Felony Judgment and Sentencing of ██████████████: 14 pp.
████████medical records: 137 pp.
Indictment of ████████
Marineland Criminal Files
NCMEC file report, dated 11/06/2007: 70 pp.
████████County Sheriff's Office Incident Detail Report Case No. J2006000049:
35 pp.
████████County Sheriff's Office Case Supplemental Information, Case Number
2006000049: 5 pp.
U.S. District Court, ████████████████████ USA v. ████████████████ Case
Number: 2:06CR00044-001: 7 pp.
████████Department of Corrections PSI, dated 5/11/2011: 22 pp.

The diagnostic interview for this evaluation took place at the residence of Jane Doe and her fiancée, John Smith, on 4/29/2014. Ms. Doe was interviewed alone, although it was a condition that the interview would be conducted with either Mr. Smith or his cousin, CJ, in the general vicinity, a condition she required for participation.

Ms. Doe is a slight of build, Caucasian female who is 5'4" tall and weighs 100 lbs. She has had no change in weight for the past few years, though she wishes she were heavier. The only medication she takes currently is Acyclovir, as needed. However, she also uses a concentrated cannabinoid extract multiple times daily for pain associated with Fibromyalgia and stress management. During the extensive two-day interview, she displayed no obvious indications of cannabis intoxication. She presented as focused, clear, and consistently on task during the intense, stressful clinical interview, as well as in completing the testing portion of the evaluation.

Ms. Doe was casually dressed in comfortable leisure clothing. She did give good eye contact throughout the interview. Notwithstanding her slight build, she does appear slightly older than her stated age of ██ years-old.

She stated that she has been very nervous, tense, emotionally brittle, and irritable in anticipation of this evaluation. During the interview, however, she was very cooperative, responsive, and friendly. It should be noted that her knowledge of the presence in the next room of her fiancé and his cousin were likely necessary preconditions for her interview tone. She did express that she does not go out without them, because of a generalized fear she has in public, and a general distrust of most people, and certainly males who are unknown to her. She is very codependent on them for her anxiety management, a reality that has become very constricting and limiting for her.

Thus situated in this home setting, surrounded by her adoring cats, she displayed an outward composure and no outward evidence of agitation. Her psychomotor activity was within normal limits with regard to gross motor skills that were observed during the course of the interview. She displayed no hostility, impatience, or negativity towards this interviewer and was universally charitable in her description of significant persons in her life, including her mother and father, the perpetrator. She often responded to topics that were emotionally intense with either tearfulness or what appeared to be a nervous laugh that usually did not fit with the content being discussed.

Her speech characteristics were within normal limits with regard to rate, volume, and rhythm. Ms.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 3

Doe's expressive and receptive speech was unimpaired.

Her facial expressions ranged from neutral to sad or tentative. Multiple times she welled up with tears during the course of the interview. Ms. Doe's mood appeared to be calm but tense; her mannerisms communicated a notable fragility and fearfulness, even in this most protected setting. Her affect was mildly incongruent with the material being discussed. She did volunteer that she would come across to her roommates, however, as more emotionally reactive, brittle and tense.

Her ability to attend and concentrate appeared to be unimpaired. Her orientation with regard to time, person, place, and situation was intact. Her memory for many events in her life appears to be good, but she acknowledges that she has discovered over time that she does have gaps in her memory, consistent with avoidant and dissociative type responses.

Ms. Doe's ability to reason and abstract are within normal limits. Her judgment is intact and unimpaired. Her insight into the nature of her problems is limited, consistent with someone who has not been inclined to avail herself of therapy, mainly as a result of a pattern of avoidance of the anxiety- or shame-inducing subjects that cause her to want to avoid. This is a pattern one often encounters with survivors of sexual crimes.

Generally, her thought processes are intact. There is no indication of circumstantial or tangential thought processes. Neither did she display flight of ideas or loose association. Her thoughts were essentially reasonable and coherent. There are no indications of symptoms consistent with psychotic mentation. She does not present any history or markers that present a risk to self or to others.

On the second day of the evaluation, she mentioned that she had been exhausted when speaking about subjects she typically tries to avoid thinking about, because of how distressing and anxiety inducing it is for her. She said that at the end of the day, she had a severe headache. Having been diagnosed with Fibromyalgia, she stated that her pain symptoms are very sensitive to stress. Following the first interview session Jane reported that her entire body had been in pain. She said she had been exhausted. She smoked some DAB (THC oil concentrate) and went to bed, but woke up crying throughout the night because of her physical pain.

## PSYCHOSOCIAL HISTORY
### Early developmental history
Jane Doe was born in Germany on ▮▮▮▮▮▮▮. She was born three months premature and weighed just less than 3 lbs. She also was born with a congenital condition known as gastroschisis, which is a hernia-like rupture in the abdominal wall, from which the intestines protrude. A serious condition with a 25% fatality rate, she fortunately had good and prompt medical care, leading to two surgeries in rapid order. The second surgery required a resection of her intestines. She has a scar from the life-saving surgeries, and continued to experience ongoing gastrointestinal difficulties (see Medical history section). Reflecting back on her rough start, and the many challenges she has faced along the way, Jane added, "There has to be a reason why I am here, and it is the reason I have been so strong."

Records indicate she did have difficulties with early developmental milestones, such as walking and crawling; she was delayed in learning to speak.

### Family of origin
Her father is ▮▮▮▮▮▮▮▮▮▮▮▮. He was stationed in Germany when she was born. He was 20 years old and her mother was 18 years old when she was born.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 4

Jane Doe's mother is L.L. (DOB:███████) and an RN by profession. Her mother has a history positive for the presence of Depression and Bipolar Disorder. Her maternal grandfather was diagnosed with alcoholism. Her grandparents have been diagnosed with Diabetes. Ms. Doe has viewed her mother as generally a vulnerable, weak woman who has struggled with codependency and prescriptive medication dependency on and off over the years. She feels that she has never felt bonded with her mother, though she regrets that it has not been so. She says it saddens her to see mothers and daughters who appear to have a good relationship.

She says that her mother's family is prejudiced and judgmental from her perspective. She feels sad, she says, that she has not really felt included or a part of that side of the family. She has generally felt unsupported by her mother, and the relationship has generally been strained and distant, with few exceptions. However, the record does indicate her mother's involvement and attempts at support at certain points of time in Jane's life.

Besides a history of having been a in a battered relationship with her second husband, Jane says that her mother is a "pill addict." Jane observes that she has had a drug and alcohol problem over the years. In more recent years, she has observed deterioration in her mental status, describing her with impaired memory, frequently repeating herself and perseverating on topics.

Her mother subsequently remarried to a man named D.L. Jane describes him as the primary father figure in her life and she feels close to him.

Jane has a younger brother, B.B. (DOB: ███████, who is presently 18 years of age. He is still in high school. She says that he has struggled with low self-esteem and with anger issues. She also has a stepsister, J.L. (DOB: ███████). Initially she and J.L. were very close, she says, although they developed on different paths that led to their having less in common now. Nonetheless, she says that she loves her deeply. She characterizes J.L., now 16 years old, as "a pretty normal girl" and someone who likes to please others.

History of living situations
In 1994, at the age of six months, her parents moved back to the ███████████████area from Germany. In ██████, her parents divorced; Jane was about two years of age at the time. Her mother initially took the children, but had gotten herself into an abusive relationship, so sent the children to be with their father within months. Her mother later told them that she feared that if she left her new partner, he would stalk her, and did not want to place the children at risk.

Her father moved back to his parents' home in ████████████████. She and her brother were placed in her father's and grandparents' care that same year. She says that neither she nor her brother heard from their mother again until she was about 6-7 years of age, after her mother extricated herself from her unhealthy second marriage. Initially, the children had contact with their mother, while their father monitored their conversations. That way, she now realizes, he knew everything they were talking about. This was, she says, consistent of his highly controlling personality, particularly when he had a secret that he was highly invested in keeping.

For the most part, Jane says that their grandmother and her aunt raised them. When she was about eight years old, her grandfather had a heart attack. After that, her grandmother had to divide her responsibilities between parenting them and caring for their grandfather. Furthermore, her father had to work more around the farm, which he resented.

Another hardship hit the ████ family when her aunt died when Jane was about ten years old. She

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 5

had been the children's other primary nurturing parent figure. Her unexpected and untimely death meant a further loss for Jane and her brother. Their father was minimally invested in his role as a parent. ████████ has not remotely been a healthy father figure to her in any respect. She described him as generally volatile, immature and someone who could be quite abusive, physically and verbally, to both of them. She believes he was even more physically abusive to her brother than he was to her, which was hard for her to witness.

Jane resided in████from then until █████ages 2-11 years old. Her father had custody of the children for about eight years, from ████████. From ████████to ████████, Jane lived at the home of her mother and stepfather, D.L. Also residing in the home was B.B. and her stepsister, J.L.

When she first moved back in with their mother, she says her mother was physically abusive on a couple of occasions. They were arguing, Jane admits she raised her voice, and she said her mother hit her so hard that she broke her jaw. She adds that her mother refused to take her to the doctor. She estimates that she was 12-years old at the time.

On another occasion Jane said that she was texting, and her mother was angry with her so she impulsively threw a cutting board at her. Then, she says that her mother choked her, slammed her down the hall, and told her to go to her room.

At the same time, she said her mother could be an amazing person. For a brief period of time, she says when she was in her later teen years, she had talked her mother into using marijuana, and quitting other prescriptive medications. She says there was a nice but brief time when her mother became an actual parent—from her perspective. However, eventually she says she regressed, quit the marijuana, and began taking her pills again and, from Jane's perspective, under-functional.

She lived with the family in three locations during the nearly seven years she spent with them. After initially living in the █████apartments," then relocated to the ████████house during spring break, █████, when she was in the 7th grade. Then, during her 10th grade year, they moved to another home, but stayed within same school district to minimize disruptions for the children.

On 3/12/2012, Jane moved out with her then-boyfriend and now fiancé, John Smith, though she had just known him for one weekend. Notwithstanding their barely knowing one another then, they still are living together and have deepened their relationship in the past two years. He has a very stable job in the home construction industry, with the hopes of continued steady employment, as a valued employee in a small locally owned construction business. They presently live together north of ████████.

Medical history (██████ – July 2005)
Jane has been affected by a variety of significant medical difficulties over her relatively short life, to date. As noted above, Jane was born three months premature, with the dangerous, complicating condition of gastroschisis. She did require multiple surgeries during her infancy, leaving her with a prominent scar on her abdomen. She has evolved in her attitude towards her scar. She says that she was extremely self-conscious about it as a child. However, in time, she came to like it. For her, it has come to be a form of a natural tattoo, symbolizing the idea of survival, and that if "someone like (her) could get through something like that, (she) can get through anything!"

She did continue to experience multiple ongoing difficulties with gastrointestinal problems throughout childhood. She was lactose intolerant. She had ongoing difficulties with GI distress and constipation until some dietary changes following her relocation to her mother's in July 2005.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 6

Educational history: ████ School District ██████ (1ˢᵗ– 5th grades)
Jane attended ███████ Elementary from kindergarten through the fifth grade. She says she does
not recall how she felt about her experience in school, something notable in itself. She had a few
friends in the small school. She does recall liking to play tetherball and enjoyed playing the flute. She
believes that she may have been "going through the motions of life, because of the abuse at home
and the chronic sleep disruption, given the repetitive disruptions most nights from her    . She
said he would keep her up most of the nights on most nights, putting her to bed an hour before her
grandmother woke her for school. Between the chronic sexual victimizations, mainly at night, and
chronic sleep deprivations, she realizes that she was a shell of herself and had "… pretty much
blocked out things…" during the time of her victimization. (School records from ███ School District
are unavailable.)

Sexual victimization by ███████████████ :█████████████
Jane stated that her █████████████, began sexually abusing her around ████████,
when she was four or five years old. She estimated that the sexual abuse continued until she went
to live with her mother in ████, approximately 6-7 years duration.

Her typical bedtime was between 7-9 PM. He would awaken her between 1-3 AM, and keep her up
until approximately ½ hour before it was time for her grandmother to awaken her for school. She
doesn't remember how it started, but she clearly remembers that he would set a caffeinated drink,
*Rockstar* by the computer. This clearly contributed to her chronic fatigue. His involvement with
sexual abuse and pornography was the central focus of his life. It effectively displaced any care or
concern for her or others. His obsessiveness and compulsivity led to his treating her as if she were a
thing or an object, whose only purpose was to serve to enhance his perversions.

He began taking pictures, then initiated touching, overt sexual contact and eventually taking
videos. She said he was always chatting with someone on the web. She later came to find out that
he made money from individuals online. And she also eventually realized that he had a one-way
video chat that so other viewers could watch. Though she did not know at the time, he was
photographing and videotaping her "almost every time."

"Suz" was █████ s primary online and email "best friend." She refers to Susan as his mentor in
perversion; "Suz" apparently was a male. She has been told that he was in the UK, though she is not
sure what is true in matters of online representations. However, if it is, then it is likely that one of the
reasons for waking her in the middle of the night might have been to accommodate his particular
time zone in Europe.

One of the toxic elements for her regarding the Internet is that her ████ and another pedophile
employed the artifice of a child her own age to further snag her into perverse activity. In addition, he
used other child pornography to normalize the adult-child sexual activity to erode and desensitize
any qualms she might have had. This is part of the tremendous pain, anger, and helplessness she
has by knowing her images are certainly being used by some pedophiles for similar purposes. She
knows how manipulation and subterfuge can redefine what is right for a child, redefining that which
is normal and permissible.

Jane says that she does not recall a time when he was not doing what he was doing. She said it
was interwoven with everything. He would always make sure that he got his time alone. She said
that any chance he got, he would do anything he could to her. Nothing was done out of love, she
says.

Over time, she has disclosed that he engaged in the following grooming and criminal activities with

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 7

her:

- He made her sit on his lap and showed her pornographic photos of older and younger girls on his computer.
- He made her view pornographic movies and pictures of other girls he'd gotten from other web sites. She estimated the girls in the images to have been 1-2 years younger than her and up to 2-3 years older than she was at the time.
- He used these images, in addition to modeling certain sexual actions, to illustrate to her what he wanted her to do. Then, he made her copy his actions, critiquing her until she got it the way he wanted her to do it.
- He forced her to engage in a variety of acts with an online persona named "Suz," or "Suzie" on MSN by means of a web cam. In actuality, "Suz" was a male who had allegedly told ▮▮▮▮ that he had found ways to manipulate minors to comply with pedophilic manipulation. At the time, Jane was led to believe that she was confiding and communicating with a girl in England who was the same age as she was. As events later revealed, ▮▮▮entered into a devil's pact with "Suz," in which he promised to give "Suz" exclusive rights to any images that were obtained from their arrangement.
- He made her touch and play with her vagina,
- He touched and digitally penetrated her vagina,
- He inserted a vibrating dildo into her vagina,
- He attempted to force his penis without lubrication into her vagina, but she was too small and he could not fully penetrate her,
- Her father took pictures of her and touched her many times,
- He touched her breasts and genitalia,
- He made her put his penis in her mouth,
- He performed oral sex on her,
- He told her to touch him in a variety of places on his body, including his genitalia. If she did not comply, she says that he forced her to do it. He would get mad, hit her, slap her, push her, pull her hair, and pinch her to coerce her to comply. This would hurt her. She said she would relent because she didn't want to be hurt anymore. Then, after about one-half hour, he would send her to bed.
- Sometimes when she tried to sleep, he would force her to touch, lick, or suck his penis. He would press her until she complied. She reported that it seemed to her like he did this "all the time,"
- He took her in a 4-wheeler into the woods and made her do actions similar to those that he did to her in his bedroom,
- Once, he pressured her and her young friend, M.R., to dance in bras and panties, pose in the nude, and touch one another's genital areas. She later discovered that he put those images on his computer. She says she was approximately 11 years of age when he made a video of her,
- Once she invited a girlfriend stay over at ▮▮▮▮▮s insistence. He told her there was a video camera in her radio in her bedroom. He instructed her to turn it on before they took a shower. He also instructed her to initiate sex with her friend.
- He recorded at least four girls undressing in her room when they stayed with her,
- He manipulated Jane and her friend to pose and play in the nude in front of a webcam,
- He got a vasectomy with the intent that he could later penetrate and ejaculate in her without worry about her becoming impregnated.

In a later computer forensic analysis, the following images obtained from a CD-ROM in the ▮▮▮▮ ▮▮▮▮case were reviewed. These digitally memorialized Victim A/AKA Jane Doe in the following situations:

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 8

1.  Victim A/AKA Jane Doe sitting nude on a naked man with their genitals touching,
2.  Victim A/Jane Doe with a three (estimated) year old girl (identified as the daughter of her father's girlfriend) without pants lying on bed, and Victim A watching the child, or Victim A holding the younger girl's leg, exposing her genitalia to the camera,
3.  Victim A/Jane Doe holding a three-year-old (estimated) child without pants on the bed, with Jane Doe then actually spreading her genitalia apart with her fingers for the camera,
4.  Victim A/Jane Doe holding the same child's legs apart,
5.  Victim A/Jane Doe performing oral sex on the three year old child while lying on the bed,
6.  Victim A/Jane Doe present as the child lay on her back, pointing to her reddened genitalia,
7.  Victim A/Jane Doe examining the same child who is lying on her back, legs spread, knees drawn up,
8.  Victim A/Jane Doe reaching out to touch the same child,
9.  Victim A/Jane Doe holding tablets of some type with the child,
10. Victim A/Jane Doe watching as the same child, dressed in a shirt, holds her genitals open,
11. Victim A/Jane Doe on her knees, bent over onto a bed, with an adult male with his finger on her genitalia,
12. Victim A/Jane Doe lying on a bed naked, with a cat appearing to lick her genitalia,
13. Victim A/Jane Doe lying on bed, dressed only in socks, with an adult male inserting a small dildo into her vagina,
14. Victim A/Jane Doe lying on her back naked on top of male with his penis against her vagina,
15. Victim A/Jane Doe sitting on an adult male's penis in her vagina,
16. Victim A/Jane Doe holding an adult male's penis in her right hand wearing only her socks,
17. Victim A/Jane Doe tied up with a rope with an adult male penetrating her vagina with his left index finger,
18. Victim A/Jane Doe tied up with a rope with an adult male penetrating her vagina with his left index finger, but turned in such a manner as to display that it is inside of her vagina,
19. Victim A/Jane Doe lying on her bed naked, with her thighs spread wide showing her genitalia, and
20. Victim A/Jane Doe bent over, displaying her vagina and anus fully clothed with a top on, but wearing no underpants.

The last time of sexual abuse by ███████ took place on ██████, the day before she and her brother went to stay with their mother.

Disclosure and subsequent legal developments: ██████ to present
On ██████ Jane Doe's mother picked her and her younger brother up, with the intent of beginning a year when they would reside with her for the first time in approximately eight years. Her mother was unaware of any problems at the time.

However, six months later, on ██████ Jane sent her mother an unexpected email entitled "SECRET, PLEASE." She wrote that ██████ had coerced her "do things, like sexual things. I didn't like it and he *doesn't know* that. ... It is to imbarrising (sic) in person. THANKS."

Her mother said that she recognized that this was a mode of communication with which Jane was

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 9

initially more comfortable. There followed a rapid series of emails within a 24-hour period in which Jane told her mother that he made her perform oral sex on him. She said he also performed oral sex on her, and she did not like it. She shared, "It was gross all he made me do." She said he also had pressured her to perform oral sex on another male named ▓▓▓ at their house in the past, while her mother was at work. She also shared in emails that ▓▓▓ had done a lot of things to her, including involving her own childhood girlfriend on one occasion. Jane also wrote that the last time he did sexual things to her was on the day before the two of them were picked up by their mother (▓▓▓).

Jane also said that he put his penis and "that vibrating thing" in her. She said he had taken pictures of her in the nude, and it was on his computer. Her mother stated that Jane also had disclosed to her that ▓▓▓ had used his tongue on her vagina in the past. Her mother observed that Jane quickly "got upset." By that time, they had overcome Jane's embarrassment factor to the point that they could be in the same room. That was when her mother noticed she had tears in her eyes.

Jane was adamant that she didn't want to speak to anyone else about what had happened. She shared with her mother to release some pressure being caused by her "dark secret." She also wanted to be protected from future perversions forced on her by ▓▓▓ Jane expressed gratitude for her mother's response, support, and protection.

Her mother asked how she could help, and offered to take her to a doctor, the school counselor, or a professional therapist. Jane expressed apprehension and ambivalence about that, although her mother encouraged her that it really was the course of action they needed to take. With support and encouragement, Jane consented for her mother to set up an appointment with her doctor. Her mother sought reassurance from Jane that what she had disclosed to her was, in fact, true. Jane responded that it was, and that she wanted to make sure it never happened again.

On ▓▓▓, her mother appropriately contacted the police and her medical clinic to get guidance on how best to respond. Her mother was also eager to get Jane into counseling.

Then, in an email dated ▓▓▓ wrote to Jane to say that his feelings were hurt, because Jane was telling her mother things she was not telling him. He specified that he'd heard they had talked about sex and puberty. He also wrote that he understood Jane had been playing with herself daily, and "...what the next step was because (she) was getting bored with that." The following day, on ▓▓▓ he sent another email to her containing comments about her having "oral sex with boys at her age," and that he could "...teach her how to shave or trim and that he had shaved a lot of girls before."

He also asked her in his email if girls she knew would "mess around." He said he would rather have her "mess with girls" than risk having sex with boys, "for lots of reasons." He wrote that he had heard she had "messed around" with many different people whom she'd never told him about, including cousins, her brother, and a few others. He admitted he'd gone onto puberty websites to help her learn about "all that." He told her not to do "sexual stuff with [her] brother, not because it's family and gross or because society says so, but because it's just a bad idea for lots of reasons."

He encouraged her to get on "the pill." He spoke of his hope that she, as a twelve-year-old, would not have sex before he saw her again, but if she did, he encouraged her to use a condom. He told her there were many things she could do sexually with a boy other than intercourse, such as mutual masturbation and oral sex. He got even more explicit, advising her and any prospective boyfriend to start with fondling and "sucking dick."

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 10

He added that her mother informed him she had started puberty and had a "lot of pubic hair" and mood swings, and that she'd felt around and said she could tell Jane's body was changing from the "inside," too. Using that as a springboard, he asked Jane how her mother was doing that, and if she might actually be "inside." He persisted that she seriously needed to be thinking how she would "keep down [her] pubic hair," as "nobody likes a bunch of pubic hair in the way."

He perseverated on the topic of shaving her pubic hair, and returned to the theme more than once. He used terms such as "pussy" to refer to her pubic area. He summarized that he very much wanted to be there with her, because puberty is a time when "a girl needs someone to love her the most." He wanted to be the person she could come to. He closed by affirming his love for her, stating he wanted to remain a big part of her life, and closed with "Love, ███████"

These emails intensified her fears and worries about having to return to ████ and suffer being around him for the upcoming winter school break between ████████████████.

Still, her mother apparently did not know how much to believe until ████ called her on ████████ and asked her to drop the charges, for which in return ████████████████████
████ That, in her mother's mind, confirmed the truth of what Jane had been telling her. Even to the present time, however, some relatives ████████████ still say they do not believe her. ████ ████████████ has shunned her.

On ████████ authorities interviewed Jane, who was designated as "Victim A". At that time she stated that ████████ who at the time had ████████ had taken photos and videos of her on numerous occasions. In addition, she stated that he had once engaged in sexual activity with her friend, also a minor under 12 years of age.

She added that he had engaged in sexual activities with her, recording the acts on his personal computer. In addition, she stated that he had provided images to someone known as "Suz" or "Susan."

████████████ later disclosed during his Presentence Investigation (PSI) that he had essentially retained "Suz," to mentor him to sexually exploit his daughter and others. Through the internet, he had discovered that "Suz" was someone who held "herself" out as having expertise "on how to get girls to open up and do (sexual) stuff, ..." The fee "Suz" charged was to receive "exclusive rights into any pictures or things that [they] did." "Suz" proceeded to apply a sophisticated set of grooming processes that included the following:
- Being introduced to Jane as a teenage girl from England;
- Exchanging their non-compromising "pictures" with one another;
- Establishing Jane's viewing "Suz" as a confidant who was a caring, slightly older teenage girl;
- Winning over Jane's confidence and trust, thereby reducing her defenses;
- Exchanging nude pictures of one another;
- Exploited Jane's curiosity about sex that were elicited by "Suz's" asking leading questions desired to elicit such curiosity;
- Eliciting information about changes her body was undergoing;
- Mentally preparing and manipulating Jane to be interested in photo and video recordings (with no mention of how they were to be used);
- Planting the suggestion that Jane try inserting her own finger inside her vagina, which Jane did try, but stopped because of the pain;
- Intentionally planting the idea that this was something to be tried until she was able to do it, which Jane ultimately did with a sense of accomplishment, without having any idea of how

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 11

she was being victimized;
- Manipulating her to insert a "Sharpie" pen as a foreign object in her vagina, in front of the webcam, showing "Suz" she could do it;
- Calculatedly implementing a plan to encourage Jane to lower her resistance to ▮▮▮▮ ▮▮▮▮▮s having sexual intercourse with her; and
- Manipulating Jane to pose and play nude with a friend she was told to recruit to the activities.

Jane reported at that time that the sexual abuse had begun when she was 8-9 years old. It continued until the last episode around ▮▮▮▮▮▮▮ when she moved to her mother's residence in ▮▮▮▮

On ▮▮▮▮▮, police confiscated significant amounts of material from ▮▮▮s room. By ▮▮▮▮ they had also interviewed a nine-year-old identified by Jane as the other victim she'd known about.

On ▮▮▮▮▮▮▮▮▮ County Sheriff's Office (▮▮▮) requested assistance for an on-going child abuse investigation in ▮▮▮▮ from the ICE Resident Agent (RA) in ▮▮▮▮▮. Based upon evidence seized, there was a belief that ▮ might have stored pornographic images on his computer of his daughter, "Victim A," who was 12 years old at the time. Reports were also provided to ICE from the victim's mother, alleging her ▮▮▮▮▮ had engaged in inappropriate sexual activity with ▮▮▮▮▮

On ▮▮▮▮ an ICE computer forensics examiner informed local authorities that they had found approximately 300 – 400 images and at least two videos containing what appeared to be child pornography. The images depicted activities including young girls engaging in oral sex, in addition to a video of two young girls posing and playing in front of a web camera.

Later, on that same day, ▮▮▮▮▮ ▮▮▮▮▮ was arrested for the production, possession and distribution of child pornography. ▮▮▮▮ stated to authorities that Jane had walked in on him while he was looking at sites involving teen models in swimsuits. He represented that he asked her if she would be interested in modeling and making money, to which he said she agreed. He reported that he took images of her in swimsuits and dresses. He represented to authorities that Jane then used his computer to take pictures of her own body engaged in various nude or sexually explicit poses.

Essentially, he initially denied culpability for any illegal activity and shifted the blame for the presence of any child pornography images onto Jane. When confronted with the findings from the computer forensic investigation, he admitted to taking soft-core types of images. He subsequently admitted to a sexual addiction and that he wanted help for what he had done to Jane.

▮▮▮▮ made a statement to authorities that he did not believe he had hurt Jane, or forced her to do anything she didn't want to do. He said that everything was of her own free will. He said the activity being investigated began when she was ten years old. He initially said Jane was talking with a girl name "Suz" on the Internet and asked him for a digital camera to send "Suz" photos over the Internet. He then blamed the victim by claiming she asked him to take partially and later fully nude pictures of her, which he did. He admitted he had a vice of liking to look at photos of young girls, though not having sex with them.

He went on to report that ▮▮▮▮▮ then asked him to take photos of him, to which he agreed. He admitted that he'd known that was wrong. He proffered up a number of self-serving rationalizations and excuses for his behavior. He also blamed the avatar, "Suz," and Jane for coming up with other ideas, such as fully exposing herself to "Suz." (He was not aware of the information already

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 12

disclosed by Jane about "Suz.") He then blamed them for causing him to engage physical contact, portraying Jane to be the initiator. In that context he admitted to being naked with her, "allowing" himself to have his genitalia touched by her.

████ ultimately admitted they did "all types of sexual activity -- except intercourse." He also admitted that he had ejaculated while being recorded by photos or videos. He said nothing was sent to anyone beyond "Suz." He represented that "Suz" was also a minor who was about thirteen years of age who did similar things as Jane had enlisted him to do with her. He said this sexual activity took place approximately once each week.

He also blamed Jane for using a hidden "radio camera" with "Suz," setting up the camera in her bedroom on multiple occasions to record other girls changing clothing. Weakly and transparently, however, he also admitted to purchasing the hidden camera "for her." He admitted to four other victims being recorded in her bedroom with that surveillance camera he had installed. He was initially consistent about blaming Jane, and then underscored that all contact had been consensual.

Computer forensic analysis in ████ identified a white colored sex device being used in an image on Victim A. Lubrication was also confiscated from ████.

Ultimately, ████ was convicted in the ████, ████ County, on 7/25/2011 for the following charges: Rape III between 1/01/2005 and 12/31/2005, Child Molestation I between 1/01/2005 and 12/31/2005, Child Molestation I between 3/01/2005 and 3/31/2005, Rape of a Child I between 12/28/2001 and 7/03/2005, and five counts of Rape I between 12/28/2001 and 7/03/2005. He was sentenced to 279 months (24 years) of confinement.

### ████'s further admissions and Internet collaboration

████ ultimately admitted to colluding with the male mentor named "Suz" to make ████ Jane, available so that he would apply his claimed expertise in manipulating children into sexually compromising situations. A large number of images were produced from their arrangement, with Jane the primary victim.

Jane was manipulated, with ████'s deception, into increasingly revealing pictures that culminated in nudity and sexual acts. He took advantage of her inexperience, innocence, trust, gullibility, and vulnerability. He groomed, deceived, manipulated, and coerced her into complying with the predatory machinations of "Suz," whom she was led to believe was a girl in England.

Scenarios were meticulously planned between the two pedophiles prior to her arrival back home after school. ████ admitted to bribing Jane, who, "at the beginning did not want to do much." For example, with the instruction of the mentor whom he had sought out, he manipulated her by promising her ████████████████████████████████ if she allowed him to do more things. He later admitted that he exploited her curiosity about sex and changes to her body as she entered puberty.

Their collusion exposed Jane to an insidious manipulation by two adult predators who premeditated to exploit her by means of the Internet. ████ has said she succumbed to the grooming and described her as a vulnerable, susceptible child or thing to be used for his ends. He viewed her as an object, if not a form of currency to be bartered in pursuit of his own ends.

Offered through the distorted lens of his pedophilic thinking, he perceived the actions reflected mutuality and viewed his victims, chief of whom appears to have been Jane, as his girlfriends. (He equated a three-year-old female victim, his adult girlfriend's daughter, as also engaging consensual

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 13

conduct, as well.) He has described that, coached by "Suz," they groomed Jane into modeling for them, penetrating her own vagina digitally, preparatory to attempting vaginal rape (which he referred to as consensual intercourse).

In his PSI, ███ is quoted as saying that he did not believe he'd done anything wrong, that the sexual involvement with the children was not harmful. He maintained an attitude of minimization and self-justification in statements fraught with criminal thinking errors. Even in jail he drew pictures that helped him get aroused. He chose to draw sketches with sadistic and dominating themes that including bondage of females with ropes and hurting them. His thinking was consistent with someone who was a sadistic, pedophilic thrill seeker who became aroused with escalating levels of power and control over his victims, enhanced by humiliating them and inflicting shame and/or pain.

███ characterized Jane as a willing participant who did things "as long as *she* wanted to." He viewed their relationship as something special and private between them; it was theirs, he said. He was completely concerned about himself, rather than about any impact of his actions on her or his other victims.

The PSI writer observed in his conclusions that ███s treatment of Jane with regard to pinching, pulling her hair, and hitting her were consistent with his drawings incorporating violence, pedophilia, and sadism into themes eliciting sexual arousal. On 10/22/2007 ███ pleaded guilty to Transportation of Child Pornography and was sentenced to twenty years imprisonment.

### Jane Doe's life developments since ███
### Education and mental health issues
As noted above, her parents had verbally agreed that she would attend her sixth grade year, ███ ███, in ███ After her small town living experience and her even smaller school experience, she reports feeling overwhelmed when she started at ███ Middle School in her ███ 6th grade school year.

Jane then opened Pandora's box when she disclosed during Christmas break of her 6th grade year about ███s sexual victimization of her. While a relief in key respects, this also set in motion its own complication to her immediate stressors and had a significant distraction to her attempt to adjust and focus on school. Her disclosure and his subsequent prosecution intermittently interrupted her schooling and her general stability until he was sentenced in the latter part of her ninth grade year.

Concurrently, the investigation revealed that he had also abused some of her friends, of whom she had few in the small town. This revelation was very embarrassing and difficult for her. Additionally, around that time, she says that her mother informed her that she biologically was unable to biologically conceive and carry her own child; "It killed me then, and now, that I could not have kids."

On ███ the summer between her 6th – 7th grade years, her mother notified ███ that Jane had been having severe concentration problems, that she and Jane were fighting frequently, and that Jane didn't want to continue with counseling. Her mother had referred her to ███ for an evaluation to help figure out what was going on. Her grades had plummeted during the school year. Teachers commented on her being very fidgety, talkative, off-task, and argumentative.

Though multiple attempts were made to engage her in counseling, she was very resistant to do so. She did not want to talk about it, saying she had said all that she was going to say. One therapist said that she simply stopped talking. There was no progress. She told her mother it had been much more painful to talk about it than not to talk about it. At the time, the treatment provider diagnosed

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 14

her with academic underachievement and adjustment reaction.

Looking back, Jane says that the combined impact on these stressors felt overwhelming to her. She says that she just went through the motions. "I did what I had to do. I was brain dead for everything else. Everyone else was telling me what to do." She had engaged in some self-injurious, cutting behavior when she was 13-14 years old.

Jane also attended the first part of seventh grade at ▮▮▮▮▮, before the family moved, necessitating a transfer to ▮▮▮▮▮ Middle School. "I was pretty much blocking things out. It was bad for my emotional state. It was all bad for my emotional state. I only did what I had to in school." She says that she had always gotten along well with her teachers, but had a difficult time opening up to friends.

Vulnerable, she says that she set herself up for a bad situation. That is, she says she was a "fresh young girl who was used to a highly manipulative relationship." I was accustomed to being programmed and told what to do."

In June 2008 conflict in the home had become constant and her anxiety and depression were escalating, as the court date in which she would need to testify was approaching. Jane was diagnosed with Dysthymia and an Adjustment Reaction, both of which were attributed to her testimony in the pending court case. She completed a brief patient questionnaire on 6/12/2008 in which she identified medium levels of anger and sadness/depression.

Jane attended ▮▮▮▮▮ High School from ▮▮▮▮▮ to ▮▮▮▮▮. Overall, her GPA fluctuated significantly through the four years of high school. While she earned a 3.0 GPA her freshman year, she had a number of absences, excused and unexcused. As she said, she remained disconnected from her own core and looked to others for acceptance. Her focus was more on others and school, rather than on her own personal world, she thinks.

When the court action, which was a substantial impact, began to wind down during her 9th grade year, she had become much more focused on finding acceptance from others, not thinking about "what it was going to cost (her)." In the first half of high school, she realizes in retrospect that she was worried about people accepting her, in view of the internal shame and feeling of being 'damaged goods.' In retrospect, she understands there were extraordinary thoughts and feelings with which she was struggling – and, sinking under the weight of them. She had become a lost soul, she says, in looking back at that horrific, confusing time.

As noted above, Jane was seen for some very limited counseling at ▮▮▮▮▮ following her disclosure of ▮▮▮▮▮'s sexual abuse. She was observed to have significant concentration and hyperactivity-like problems but they appeared to run concurrently with the long, drawn out court case and her need to testify. She was resistant to talking about her feelings or the abuse with a therapist. She was variably diagnosed with Adjustment Disorder, Mixed Disturbance with Anxiety and Depressed Mood, in addition to Academic Underachievement. She did have two counselors at ▮▮▮▮▮, one of whom made a diagnosis of depression in mid-2008. Then, another therapist, ▮▮▮▮▮ diagnosed Jane with PTSD in early 2009.

Seen in April 2009, her mother commented on Jane's constant hyperactivity, loud voice, difficulties focusing, and distractibility. At the same time, her mother described her as extremely intelligent, a quick learner, generally happy, outgoing, someone who loved to cook, very creative and imaginative. By that time, ▮▮▮▮▮ had been sentenced to Federal prison, although his state trial for rape was still pending. She also mentioned that she had done some self-cutting in 2006-2007. Her mother

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 15

was interested in having her evaluated for ADHD with a rule out of bipolar disorder.

Completion of ADHD surveys by her parents and three teachers during spring 2009 yielded home-specific, parental perceptions of hyperactivity and inattention, but nothing of that nature at school. Therefore the possibility of depression, anxiety PTSD or bipolar might all be possible explanations for her moods, but not ADHD.

During her sophomore year (2     ), she had a difficult year academically, as she averaged a GPA of 1.65 over her two terms. She observes that this was when she became sexually active with boys and began hanging out with a "bad group of people, who talked me into skipping." While taking psychiatric medication, she was also experimenting with Ecstasy. Looking back, she says that was her darkest year.

During her junior year (     ), she met a girlfriend who coached her how to become her own person rather than a pleaser to others. Through the influence of that relationship, she became increasingly independent, although her actions were infused with the mix of depression, anger, disaffection, and need to feel in control of something, while stopping her emotional pain. Jane said her concurrent motive was to learn how to take control of her life for herself and for her brother, who was following in her footsteps. That remains a motivator for her, even now.

There were significant inconsistencies in her grades. That inconsistency reflects extensive unexcused absences and truancies. She earned an average GPA for the two terms of 2.1, failing one class each of her two junior terms.

Her senior year (     ) appears to have been similarly chaotic with regard to her focus and participation on school. In January    , she and an ex-boyfriend began selling marijuana. Then, she says he became jealous and turned her in. Though she was in fact selling marijuana, she denied it. She was arrested for possession on school property. She was involved in a diversion program and the charge was later expunged from her records.

Her February   grades for her fall semester reflected a term GPA of 2.5. However, on     , her status with the   School District was changed to Emergency Expulsion. She says that she had refused to go back because she didn't think she could graduate. She continued in that status until she was placed on suspension effective     . This status continued until she was returned to the administrative code of "unexcused absences." This administrative status was maintained until     She received 0.00 GPAs representing spring semester     and spring semester   

She had insufficient grades and credits to graduate. By 9/18/2012, now an adult, she withdrew from school. Looking back, she says that the stress levels related to the legal issues, the worries about persons' who had seen her images and might possibly be stalking her, and breaking up with an ex-boyfriend all appear to have taken their accumulative toll on her body.

She also reports the onset of physical pain -- to the point she had been unable to function. She said she worked with the doctors. She states that she had been unable to finish high school because of the physical pain (later diagnosed as Fibromyalgia). They told her she could not go more than ½ day, given her symptom severity. She said that she had dropped out in the hopes of eventually completing some type of high school completion program. She knows it is something she has to do on her own, though she is very uncomfortable about meeting people and seeing them repeatedly. She has looked at information pertaining to nearby   Community College, but she cannot override her anxieties to go by herself.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 16

Jane says that she still entertains hopes of eventually being able to attend college. However, at the present time she is fearful of going to even a local campus by herself, so that goal appears to be quite remote and unattainable at this time.

Medical developments
In a medical visit when she was 15 years old, having a history of heavy and painful menstrual flows, Jane was diagnosed with Dysmenorrhea. Around the same time, she was informed that she was infertile, secondary to the presence of scar tissue. She was diagnosed with genital herpes in May 2013.

During spring 2013 she also reported diffuse abdominal pain that she'd been experiencing for several months. While that appeared to subside in severity, she also began experiencing the onset of diffuse pain symptoms in her shoulder girdle, lower back, anterior ribs section, and in her thighs. She had the impression that the pain appeared to be localized in the muscles; no joint swelling was reported or noted upon examination. At the time, she reported using marijuana along with 1000 mg Ibuprofen daily to manage her symptoms. During a visit with              , MD, she shared that her main "concerns" at the time were relationship challenges with her mother and her fiancé. She says that was during a time that John Smith and his family, her primary support system, were apparently dealing with significant losses in their family, destabilizing Jane's own security in the process.

Referred for a rheumatology consult, she reported symptoms consistent with anxiety, depression, in addition to sleep disturbances with insomnia and early morning awakening. In a 7/09/2013 medical appointment her physician diagnosed her with Fibromyalgia and chronic pain symptoms related to the condition. This disorder of musculoskeletal pain is accompanied by fatigue; sleep problems, memory, and pain issues. The causes are varied, can be related to physical trauma, surgery sequelae, and/or significant psychological stress. Her pain level has been sufficiently severe and disruptive that it was a contributing, but not exclusive, factor to adversely impacting her school attendance and her failure to graduate from high school.

Medical records indicate a history of diagnoses of Depression and Bipolar Disorder, as well as having been a victim of statutory rape between the ages of 7-11 years old. On 11/12/2009, she was prescribed the mood stabilizer medication Lamotrigine 100 mg that was titrated up to 200 mg. However, she states that has not worked well for her. In addition, she was prescribed the anti-psychotic mediation Risperidone 1 mg twice daily, neither of which she is presently taking. At the same time, she was diagnosed with Communication Proxy, academic underachievement, and Adjustment Reaction Not Otherwise Specified. She is no longer taking either medication at this time.

She has smoked cigarettes daily since 2008; she presently smokes approximately one pack per day. She also smokes marijuana daily.

She did get fitted for contact lens in this past year. Previous to that, she had worn glasses and she says it has changed her appearance markedly.

Mental heath treatment history
While she has brief therapy, she is generally avoidant of mental health treatment. She says that she did not relate to the therapists. However, probably a greater reason for discontinuing therapy is related to her avoidance and anxiety. She admittedly has a low threshold of discomfort and is very intolerant in her willingness to address her sexual abuse or worries about downloaders, family issues, etc. These issues combine to contribute to her anger, depression, moodiness, anxiety, grief,

relationship challenges, post abuse sequelae, and PTSD. In a chart note on 12/19/2013, she was requesting therapy, although nothing has happened yet.

<u>Drug and alcohol history</u>
████████████ never gave her alcohol or recreational drugs, to her knowledge, other than highly caffeinated products as a child to waken her out of sleep. She denies that alcohol is, or ever has been, an issue for her. She does not like it. She has aversive associations of either feeling sick or helpless when formerly in an intoxicated state.

She says that she first tried cannabis when she was 16 years old. This has been the drug from which she says she has derived the greatest benefit. As she became increasingly angry, disaffected, and despondent during her sophomore and junior years, she became increasingly angry and provocative as she displaced her raw and formerly repressed anger on "whoever was around." Looking back, she has a sense this was related to an anger component of all the losses from which she was reeling, and with which she was not dealing—at least in any healthy way. During that time that she actually characterizes herself as having been "extremely violent." She began to smoke marijuana to help calm her nerves and self-manage. She says that she genuinely tries to not be angry, given that anger has been an issue for her whole family. She says she hates it and wants to avoid it. She continues to use THC multiple times a day. In fact, she says those around her notice her moodiness, depression, and irritability if she has not had it every couple of hours. She says abusing it has never been a problem, however.

More recently, Jane says that she buys DAB oil, concentrated THC, because she has found that smoking marijuana "clouds" her thinking and perceptions, even though it calms everything else. The DAB, she says, apparently helps her relax without impairing her thinking. She says that there are times when she smoked every hour (adding that she smoked "a lot" after the first day of the evaluation.) However, on a more "normal" day, she says that she might be okay for 2-3 hours, whereas a stressful day can be as frequent as hourly.

As noted earlier in this report, she has tried MDMA (Ecstasy) and disliked it. However, there was a time-limited period when, encouraged to do so, she used the drug and found that it helped her escape and feel "happy." She once did one week on the drug. She estimates that overall, her use was limited to a two-month period of time. She estimates that she also used mushrooms possibly not more than five times; most of those were with John Smith. She denies using cocaine. She says she is tempered in her own use by having seen how destructive addictions are.

<u>Jane Doe's sexual and relationship experiences</u>
Jane states that she does not <u>know if she</u> would have the primary same-gender sexual orientation that she does, were it not for ████████ 's introducing her prematurely, in a highly distorted and objectifying manner. She says that he showed her videos of girls, and made her do things with one girlfriend, as well as the grooming with a female teen "friend" named "Suz," whom she later discovered was actually a male predator. ████████ catapulted her into adult sexual themes. She shared, "I think he was an influence on my sexual development. Ever since I was a kid, sex is a normal thing interwoven into everything. I can't recall a time when it was different."

He caused her to have sex with a girl at the age of 12 or 13. She says that she thinks she may have had upwards of possibly more than two hundred female partners. And, the first time she had "sex" apart from ████████ 's abusive context, was with her best friend who remains a current friend with her. The shaping of her sexual interests, set in motion by ████████ 's manipulation and exploitation of her, remains strongly set to the present day. Her interest in activity with same sex partners continues into the present, with no internal motivation for that to be otherwise. She says that females

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 18

are "unquestionably more satisfying. I understand women more than men." At the same time, she says that, in reality, "There are not a lot of women who are interested in women."

She did not actually have sex with males until she was late 16 or possibly 17 years old. Sexual involvement with a male didn't interest her until she met John, her now ex-boyfriend, with whom she had nearly a one-year involvement, "on and off." She said that he did appear to be accepting of her ongoing involvement with females while they were together, possibly getting some vicarious enjoyment hearing about her encounters. She described John as immature, rather unintelligent, and lacking much insight, possibly having some form of autistic disorder, in addition to ADHD.

Jane says she had another relationship of about nine months duration with a teen named Billy, ending in December 2011. She thinks he "tolerated" her involvement with females. Sensing it had the potential to escalate to domestic violence after he threw something at her and expressed no remorse, she gradually pulled further away from him and ultimately left him within three months of that incident.

She says she has never initiated a relationship with a male, but has been the one pursued. She estimates that she has had approximately fifty male partners. One of the primary attractions of men for Jane, a non-sexual one, is the fact that they have the "power, the strength, and the ability to control." She explained, "A guy will protect 'his.' He has the power to protect everything, and that is not something a girl can do."

She explained further, "I hate to say it, but there are many types of threats and dangers. I feel a need to have a 'rock' to protect me. Obviously I can protect me. But it is a lot easier for someone else to protect me, than for me to protect me. There have been things that I didn't see that were dangers—things I didn't see. I have always had problems making decisions, and seeing things, or thinking through things, looking at all sides of a situation." She thinks a recurring theme is being attracted to those "guys who don't take crap off people, and yet they have a huge heart."

In that context, then, two years ago she moved in with John Smith, within one week after meeting him. At the time, she says he was going through a particularly difficult time and was on mushrooms and Ecstasy. They did Ecstasy together; she was arrested and jailed. This drama ultimately accelerated a fusion through their shared sense of intimacy enhanced by the Ecstasy. Then his rescuer mode kicked in, as he felt badly about her being jailed.

John Smith, 11 years older than Jane, describes himself as a man with "old time morals with a new kid flavor." He says he is a domineering personality who has had to learn to do things for himself. He observes that Jane gets triggered 3-4 times monthly regarding her past abuse when they are sexually involved. He says she has bad dreams 2-3 times monthly that he is aware of. There may be more, though she never shares the content. She has never told him what she has gone through with the abuse, other than in broad generalizations, but he sees that she still lives with much fear. He says she hides her feelings, tries to "keep it inside," and doesn't want to burden others.

She says that John was attracted to her early on. His attraction, she thinks, may have been that she appeared to him to be innocent and demure. However, her attraction to John Smith relates to her viewing him as "smarter and stronger than anyone." Although she characterizes herself as someone who will stand up and will fight for anything that she believes is important, it appears to only be true with male support in the near background.

An important factor in her current relationship with John relates to his being "completely open" to her involvement with women. That is important to her, although she believes that this is a concession on

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 19

his part. She thinks he is willing to go along with her bi-sexual orientation and activity, because he knows that is important to her and he wants her to be happy. Valuing their connection above any other, she is quite attuned to avoiding a relationship with a woman that then will complicate the relationship she has with John.

She admits they have a boring sex life, and that she gets very embarrassed after they have shared sexual relations.  She feels a great deal of love and attention from him, although there are times he becomes frustrated and angry, and at those times he reminds her of her father.

Jane recognizes that she has struggled emotionally, having had "mental problems" for much of her life. She describes herself as extremely dependent and clingy. She recognizes that is has been difficult for partners to handle her "emotional ups and downs." So, recognizing that John Smith likes her "ups and downs" is a very endearing quality to her, helping her feel safe and accepted in her vulnerabilities. So, for example, when she becomes angry, she says that he "… sees not my flaws, but the good parts with my flaws."

Their roommate and John Smith's cousin, CJ, has been a confidant to Jane. He describes her as indecisive, says she fears going out alone, doesn't  share with anyone, lives with a high level of fear, can be volatile, and she is "nice and outgoing."

Discovery of Internet distribution of her images
When Jane's images were provided to the National Center for Missing and Exploited Children (NCMEC), a report was generated on 11/06/2007. At that time, 97 cases involving 1315 files for "Marineland" were identified.

One or two years following her reporting of her sexual abuse, she was flown to          for one of the first court dates. One of          s best friends was there. He informed Jane that their daughter was part of the case, and she was only four years old. The ADA said there were a handful of girls and a good handful of friend's children whom her father had inappropriately touched. She says that is when the enormity of the impact of her father's actions flooded her. Her perspective could be summarized as follows:  so many of the girls with whom she had grown up had been harmed by what she had failed to stop because she had not spoken up earlier.

Adding to the emotional impact was the news that          had touched the young daughter of his best friend. She said, "I was speechless. I didn't know what I would say to them. It probably will be a long time, if I can ever speak with that family. I can only imagine how their lives have changed: their son's, daughter's, their family."

Jane added, "On the same trip to          , when everything was told me, I was told there would be a Federal case. When I went, they said it was not the only court I would be doing. They also said that he sold images through the U.S. I did not know any of that. I was told that he had two laptops and secret bank accounts, and had put cameras into a clock from my grandfather and in a few other personal items.

I have never been able to comprehend how someone could have so little heart. They had a lot of stuff on him. Until then, all I knew was that he took pictures.

"I was coping pretty well with everything, until I found out about the whole world having seen them. It is one thing to know pictures were taken. It is different from one person to a million people knowing your entire life and everything about you. Your dad is supposed to know things about you, and see

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 20

yours, but there are parts of you not to be shown to the world. ▮▮▮▮▮▮▮▮▮▮ but now strangers are seeing all of that. Now it was him *and* everyone else, too.

"That is the whole reason why I have not been able to make friends. This world is a big world, but also a small world. *You never know* if someone knows you, or is one or two removed. It is the reason I have been cautious in real life. It is a fear that someone in Maine might travel here, but it is easier for someone to do something if they lived close to me. Someone who knows me will loosen my security perimeter.

"It keeps my world small and pretty boring, too. At high school, I tried to be outgoing, but it caused me so much stress. When a girl on line said she recognized my face, I was terrified.

"When I was friends with a lot of people (referring to her girlfriends in ▮▮▮), it brought a lot of anger and their problems are going to get compounded. And now there is a chance of new people recognizing me. I can't stop the entire world, but at least control where I live (by keeping a very low profile)."

When Jane became aware that she could retain an attorney to help her manage the deluge of notifications and possibly assist with restitution, she contacted Ms. Hepburn. She says that Ms. Hepburn has been a buffer by having the notifications sent to her rather than being re-traumatized by the reminders. She also has performed a helpful service by removing her mother's involvement from the equation.

Ms. Doe also says that the knowledge of the dissemination of images of her being sexually abused or manipulated has been painful to her beyond belief. She says that her acute vigilance for persons who might recognize her or stalk her has had a debilitating effect on her, beyond what was true when she thought ▮▮▮▮ was the only sick person who had lusted after her. Now, she knows that is not true. The comfort that she had received from knowing ▮▮▮▮ was incarcerated has been supplanted by that which she perceives to be a potentially greater, albeit stealth, effect. She says, "The one person I had to worry about was behind bars. It is really scary. It no longer is a guarantee that the person who poses a risk to me is in jail. No matter how much I try to protect myself, there is always a back. I am less worried about ▮▮▮▮ being a threat (than I am the downloaders.)"

She states that she perseverates about being watched or stalked by those viewing her images. She says she has seen the lengths to which men have gone, as evidenced by her father or by "Suz." She is also worried about "Suz," who apparently has not been apprehended. She really doesn't know if he is in the United Kingdom or one block down the street.

The seemingly ubiquitous and anonymous nature of those who have downloaded her images for prurient interests ranging from pedophilic and obsessive fantasies about her to the use of her images to normalize adult-child sexual contact is a source of continuous preoccupation, anxiety, and fear for her. Jane's anxiety and sense of exposed vulnerability to anyone so inclined to search for her has been chronic and unremitting.

Ms. Doe stated during this evaluation, "Every day we were getting notifications; 4-5 per day, there were notifications. I could not check the mail, because there were notices of 4-5 new people per day. This was at home! Mom wanted to keep getting them, but every day kept reminding me that here are another four people who have the possibility of ruining your life. It's a huge privacy buster— someone seeing parts of my body that no one should see. It scares me. I can't go anywhere or do anything, or get a job without knowing if the next person who comes in to buy something, and that dude to buy smokes comes in and recognizes my face and I can't do anything about it, and every

day I know there are more and more people on that list. "

John Smith, her significant other, stated, "She is distraught about knowing there are more and more images of her." He uses descriptors consistent with hypervigilance, but says that she compartmentalizes her fears. He sees this contributing to her "hair trigger" temper. He recognizes that she gets stressed out when she becomes aware of the images, downloaders, etc. Yet, to give her a sense of some control of the unknown, she is torn, wanting to know to protect herself and know what is out there, as best she can.

She links her enhanced withdrawal from the world, her social phobia, her elevated control needs, her enhanced codependent behavior to these fears and worries. She is hypervigilant to perceiving stares from men in public. Whether that is the case of not, it is her default assumption and interpretation. She has become equally hypervigilant to seeing men in a repetitive situation, such as would be a normative experience with a job or a classroom setting. From her current perspective, Jane Doe holds the belief that more frequent exposure would increase the risk to her that someone who might not recognize her from the Internet images on a single exposure might come to make the connection if they were to see her repeatedly.

In that regard, she now is in a deep hole of avoidance and isolation that has taken on an agoraphobic-like dynamic, interfacing with PTSD-related avoidance characteristics. This dynamic is also perpetuating a sense of the world being a threatening and dangerous place to her, her fear and inadequacy to function in it independently, and reinforces the belief that she needs someone stronger to protect her. At the present time, Ms. Doe's description of her very limited living circumstances feels very bleak, depressing, and confining to her.

This dynamic appears to emotionally contribute to aggravating her Fibromyalgia symptoms. It also appears to be sufficiently intimidating and insurmountable to inhibit her from finishing her high school degree in an alternative capacity, or to work independently. The status quo with regard to these matters is contributing to a self-perpetuating pattern of diminished worth and value.

Avocational interests/vocational aspirations
Given her history and her relatively young age of ██years old, Jane Doe has had extremely limited vocational experience, to date. She had a very brief stint at being a bikini barista. Aside from that, with her substantial anxiety, agoraphobic avoidance patterns, Fibromyalgia, and lack of a high school equivalent degree, she has very limited options at this time.

In this context, Ms. Doe has stumbled upon a pseudo-community and pseudo-job that has become for her a source of connection and pseudo-esteem building, although she would not put it that way.

· She describes that her contemporary inability to override her fear to complete her high school equivalency in some capacity or to find a job in the workplace has led to a solution that contains a thumbprint of her sexual victimization, including her grooming exposure with "Suz." One of the grooming elements and manipulations by her father and "Suz" was to "model" clothing such as bathing suits, underwear, etc.

Specifically, Ms. Doe represents that her interests have taken two different, but not entirely unrelated attempted solutions to her fear-based agoraphobic, PTSD-related avoidance patterns. She has developed a "job" as a product promoter on a chat room and, separately, as a model for photographers, although that might include being photographs with products from the website chat room.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 22

Product promoter: She said she was introduced to the concept of being an online promoter who is daily involved with persons in a chat room that has become a primary community or extended family for her. She promotes products advertised on the chat room that has become a means of connecting with people from the safety of her home, as the interactions occur through the computer camera. The chat room is organized around cannabis users and promotes products that include the website name or other related promotional products.

At one level, Ms. Doe has found several needs met for community interaction and validation from "interesting individuals around the world," safety and anonymity, affiliation with like-users of some form of cannabis (including DAB), and the hope for remuneration. At the same time, it reinforces her sense of being homebound and acts as a disincentive for going into the community on her own. At this time, Ms. Doe finds the "job" to be a positive connection to the outside world.

At the same time, she says that there may be males who visit the chat room who may bring alternative agendas, such as hoping for some type of online, vicarious experience with an attractive female. However, Ms. Doe says that if someone keeps his or her camera feed off, she will turn hers off, as well. This is where the potential similarity to her experience with "Suz" comes too uncomfortably close for her.

Ms. Doe's other budding interest lies in modeling for photography shoots, which can be related, she says, to photographers doing a group shoot, possibly for someone wearing certain clothing or products advertised on the chat room. Ms. Doe recognizes the inherent risk of any one-to-one situation, and says she would only participate in a group shoot, and she will not go, she says, without being accompanied by her fiancé, John Smith, or his male cousin/roommate.

## PSYCHOLOGICAL TESTING AND QUESTIONNAIRES:
Jane Doe was administered five psychological tests, in addition to a brief measure of cognitive functioning and impairment, in order to increase the database upon which conclusions in this evaluation were made. *(NOTE: The interpretations of the psychological tests presented below are hypotheses and should not be used in isolation from other information regarding Ms. Doe. The interpretive statements from the MCMI-III are informed by computer-generated, actuarial and expert predictions based on the test patterns. Interpretations reflect characteristics of persons who have provided test response patterns that are similar to those of Ms. Doe's. Test results are probabilistic in nature and should be interpreted cautiously. It is impossible to tell, from test results alone, if these patterns and deficits pre-existed the events in question or are the sequelae of the events. Therefore, the reader should examine the test interpretations for general trends and put limited weight on any one specific statement. In the integration and presentation of the test data, where results were unclear or in conflict, I selected the most likely hypotheses for presentation here.)*

Ms. Doe initially completed the Shipley-2, a brief measure of cognitive functioning and impairment. It measures Crystalized Ability: "Knowledge that has been gained as a result of education and experience." It also measured Fluid Cognitive Ability: "The ability to use logic and other skills to learn and acquire new information." With composite reliabilities ranging from .87 to .93, the Shipley-2 can be used to provide an estimation of IQ, or overall cognitive ability for everyday applications.

On the Vocabulary Test, the measure of crystalized intelligence, she scored within the average range. There were two measures of fluid intelligence. The Abstraction Scale consists of a variety of types of logical series involving a variety of numbers, letters, or words. The Block Design Scale offers a more purely nonverbal measure of cognitive ability, and thus may be a more pure measure of fluid reasoning.

The examiner can administer the Vocabulary Scale with either the Abstraction or the Block Design Scale, combining the individual scores of either combination to obtain a composite IQ estimation. I have chosen to do both combinations to assist with obtaining multiple measures of her cognitive functioning, in view of her 11th grade education level, and her unavailable elementary school record and her inconsistent middle school and high school academic records, with so many confounding variables that were operative at that time.

Her results are as follows:

|  | Std. Score | %ile Rank | Interpretive Category |
|---|---|---|---|
| Vocabulary | 93 | 32 | Average |
| Abstraction | 97 | 42 | Average |
| Total (Combined | 95 | 37 | Average |
| Vocabulary | 93 | 32 | Average |
| Block Design | 120 | 91 | Well above aver. |
| Total (Combined | 109 | 73 | Average |

These results indicate that, notwithstanding her difficult foundation, educationally speaking, all her scores were in the average, with the exception of that scale thought to be more sensitive as a pure measure of fluid reasoning. Fluid abilities require effort and mental manipulations and transformations, such as are assessed on this scale. The items required Ms. Doe to utilize visual-spatial and attentional skills to determine missing patterns in a design. She did exceptionally well on this scale, particularly as the designs become very challenging because they require mental rotation. It also likely reduces the likelihood that she has attentional problems that rise to the level of ADHD. So a score such as she achieved is consistent with strong fluid ability and working memory, in addition to good visual-spatial and attentional skills.

The implications of these preliminary findings about her average and/or above cognitive capacity support the conclusion that she is cognitively able to achieve more educationally and vocationally than she has, to date. Completing a high school equivalency and pursuing some college or vocational training classes does not appear to be out of her reach, based on her intellectual capacity. Further exploration in areas involving the abilities related to her Block Design performance might be of particular value for her to further investigate.

Ms. Doe completed the Minnesota Multiphasic Personality Inventory-2. This is a standardized personality test composed of 567 items that compares his response patterns to those of various normative clinical and non-clinical populations. Her test was not interpretable, because of an excessive number of acquiescent responses, i.e., a tendency to mark items true or false, possibly without regard to the content of the item.

She also completed the Millon Clinical Multiaxial Inventory-III. This is a personality test for those who are in early phases of assessment or treatment. Her profile is valid and interpretable. However, it is consistent with the other data in this report, in that such persons have levels of anxiety that "awfulize" or "catastrophize" worries and problems. Such individuals may feel extreme vulnerability and turmoil. She is experiencing a high level of psychological tension and rejections.

Her profile is consistent with those who have not been successful in developing a core, stable sense of self, inadequate internal psychological cohesion, and coping strategies that are insufficient to cope with the emotional and situational state in which she finds herself. She has great difficulty regulating her thoughts and emotional state, and her emotional stability is extremely fragile and

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 24

brittle. She struggles with feelings of low self-esteem and can be very self-critical.

As noted in this report, she has marked dependency needs, alternatively seeking reassurance, and then angry that she perceives others are being insensitive to her dependency needs that manifest themselves through attempting to control others. This, too, is a pattern consistent with someone who relates to others codependently. Internally they feel overwhelmed with fear, anxiety, insecurity and desperately looks to others to do for her what she believes she is unable to do for herself. So while feeling helpless and fearful, those on whom she depends can paradoxically feel controlled by her neediness and demands for them to be responsible for her and thereby soothe her fears. At those times, she might come across as very submissive, compliant, and cooperative.

However, when her fears overwhelm and she perceives they have not met her needs in a way that she needs/hopes/expects, such persons can become volatile and angry, if not rageful. In that context, they can be experienced as very controlling by others. Those who live with her may not know who will "show up," at any given time.

Such persons with such a profile likely have a complex PTSD disorder, with a core feature of lacking a stable core sense of self. This is more likely to be found with those exposed to the effects of chronic repetitive trauma. Hence, the longstanding separation from her mother, the severe chronic sexual, physical abuse (as victim or witness to brother's), and later the discovery of the chronic, permanent existence of downloaders and distributors of her images has only added to demands of this highly vulnerable woman.

Ms. Doe also completed the Trauma Symptom Inventory-2. This inventory is a 136-item test exploring the presence of symptoms consistent with posttraumatic stress and other psychological sequelae of traumatic events that have been experienced in the previous six months by the examinee. These results are valid and are consistent with someone who is struggling with clinical levels of anxious arousal and tension reduction behavior where she seeks to resort to behaviors that temporary offer respite, though not long term resolution and, in fact, may perpetuate the problem. She does not appear to be suicidal.

The TSI-2 identifies underlying factors that reflect clusters of scales where there is more content overlap, while measuring distinct symptom areas. All of her Factors are clinically significant but not extreme. They include Disturbance of Self (as discussed above), PTSD, a tendency to externalize or act out her feelings rather than effectively suppress, and Somatization (which would be also affected by her Fibromyalgia).

Ms. Doe completed the Detailed Assessment of Posttraumatic Stress, with a focus on responding to most of the items with that particular situation that bothers her the most: "Am scared someone would recognize me and beat me." The questions are to be answered with symptoms present/experienced in the previous one month.

The validity scale reflects the overwhelming factor addressed in other test interpretations. She denies and does not display symptom patterns consistent with presenting a risk of suicide. However, a review of clinical scales again reveals clinically significant levels of the classic PTSD triad of Re-experiencing, Avoidance, and Psychophysiological Arousal Response. Her reliance or use of substances to cope is clinically significant, as is a tendency to dissociate when prior trauma was happening, as well as with anxiety-inducing stimuli in the present. This may manifest as being spacy, tuned out, "not cognitively present," and a strong tendency not to process or integrate her live experiences into a coherent sense of self. Her avoidance keeps her from psychologically and psychophysiologically metabolizing or digesting the anxiety-inducing experiences/memories. Her

sense is that her life is impaired and impacted in multiple ways.

Finally, she completed the PTSD Screening and Diagnostic Scale (PSDS) that assesses the six criteria of DSM-IV for making a diagnosis of PTSD. This test does not have a validity scale to assess the test-taking attitude of the examinee. Her response pattern is consistent with clinical levels of PTSD, as defined by the <u>DSM-IV-TR</u>. The examinee is asked to respond to the items pertaining to symptom severity experienced in the previous thirty days. Her responses also are consistent with someone reporting severe impact on her social life, enjoyment of leisure time, and her health. She rates the domains of intimacy, ability to function at work or school, and overall satisfaction of life had been affected to a considerable degree.

## SUMMARY AND CONCLUSIONS
### Summary
The clinical interviews, psychological testing, collateral interviews, and review of records support the following summary with regard to Ms. Jane Doe, in my professional opinion, stated to a reasonable degree of psychological probability.

- Her early childhood was marked with pre-mature birth, major health problems that were surgically corrected, separation and divorce of her parents by the age of two, and a lengthy separation from her mother from ages two to eleven.

- She lived with ▊▊▊▊▊▊▊▊, from the ages of 2 - 11½ years old. She was not completely abandoned from nurturing relationships. She was primarily cared for by her grandparents and her paternal aunt, surrogate caregivers, until there were changes in the health of her grandfather and the subsequent death of her aunt.

- ▊▊▊▊▊ appears to have been fundamentally uninvolved with her day-to-day care in any noteworthy healthy manner. She reports that he had a violent temper and could be domineering and intimidating.

- In service of his objectifying ▊▊▊▊▊ for any purpose that suited his self-immersed interests, his primary pattern was to awaken her in the middle of the night, chronically depriving her of needed sleep, causing additional adverse impact on her during the daytime hours.

- At the age of 4-5 years old, Jane Doe states that he groomed her for sexual abuse, which led to an extensive, invasive, process of sexual degradation and violation that continued until ▊▊▊▊▊. The range of sexual violations included digital and penile penetration of her vagina, insertion of a vibrator, vaginal rape, cunnilingus, fellatio, manipulation to have her engage one or more other female children in some form of sexual contact or "sexual activity," use of an internet confederate disguised as a same age female child, bondage, and numerous other types of criminal sexual acts.

- He made a large number of digital prints, in addition to videos, which he proceeded to sell or trade with other child pornographers. While Ms. Doe was aware of photos being taken, she was unaware of the Internet distribution to an indefinite number of other individuals.

- He was actively engaged in the Internet commerce of selling and/or exchanging images of children whose images were taken while crimes were being perpetrated against them.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 26

- In his criminal file are indications of the manner in which he and others involved with these images of child sexual crimes treated her and other children as if they were inanimate objects, without thoughts or feelings.

- When she was eleven years old, she and her brother were transferred to their mother's care. There were then, and continues to be now, tensions in her relationship with her mother that remain unresolved.

- Six months later she disclosed her sexual victimization for the first time. This led to an investigation, his arrest, and subsequent incarceration for 24 years. In the process, it was confirmed that he had taken digital images of his crimes against ███████, and possibly others, and had distributed them on the internet for profit.

- Jane Doe subsequently struggled in multiple domains of her life, including her education, family relationships, social relationships, significant relationships, sexual promiscuity, development of diagnosed psychological symptoms, and medical symptoms.

- Chief among her symptoms were anxiety, self-esteem problems, shame, anger, and depression, and PTSD-related symptoms.

- Chief among her coping mechanisms have been avoidance of anxiety-inducing situations, resulting in her flight from dealing with the core issues of her abuse, as well as issues related to other loss experiences, including her relationship with her mother, her infertility, and more recently, her health.

- A very significant complication was added to her very difficult challenges when she discovered the distribution of numerous images taken while she was being manipulated and sexually victimized.

- Her description of the impact of this news has caused additional significant injury. Though her father has been incarcerated, the news of the image dissemination has had an unnerving effect on her.

- She has retreated behind the protection of male "protectors," contaminating her motive for seeking a prospective partner, particularly in view of her strongly preferential same-sex orientation.

- Furthermore, the implications of unknown males who may be watching or stalking her has significantly enhanced the threat risk with which she perceives her world. She has responded to this with her primary defense mechanism of avoidance, which is reflected by her retreat into the confines of their rental home, unless she is able to go with one of her two male protectors.

- Her development into an independent adult has been severely and adversely impacted, interfering with her finishing school, developing other healthy social relationships, and working outside the home.

- She has constructed a fear-based cocoon of a life, creating connection with an online chat room in which she is a "product promoter," and an aspiring "model" who can only go to group photo shoots when accompanied by one of her "protectors."

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 27

- She continues to be impacted by her Fibromyalgia that in turn is aggravated by stress.

## Diagnostic Impressions

| | |
|---|---|
| 300.4 | Persistent Depressive Disorder (Dysthymia), with Anxious Distress, Early Onset, With Pure Dysthymic Syndrome |
| 300.02 | Generalized Anxiety Disorder |
| 309.81 | Posttraumatic Stress Disorder with Dissociative Symptoms: Depersonalization |
| 316 | Psychological Factors Affecting Other Medical Conditions: Fibromyalgia, Moderate |
| 304.20 | Cannabis Use Disorder, Mild |
| 301.83 | Borderline Personality Disorder |
| 301.9 | Unspecified Personality Disorder with Paranoid, Schizotypal, and Dependent Features |
| V15.41 | Personal History of Physical Abuse in Childhood |
| V15.41 | Personal History of Sexual Abuse in Childhood |
| V15.42 | Personal History of Psychological Abuse in Childhood |
| V62.3 | Educational Problems |
| V62.29 | Other Problems Related to Employment |
| V60.2 | Low Income |
| V62.89 | Victim of Crime |
| M79.7 | Fibromyalgia |

## Conclusions

In my professional opinion, the interview of Jane Doe, collateral interviews, psychological testing, and the review of available records form the basis for the following conclusions regarding the referral questions, stated to a degree of reasonable psychological probability. The following opinions and recommendations are provided based on available information and, should additional information become available, are subject to revision.

- Ms. Doe is a significantly compromised individual with multiple psychiatric diagnoses, a significant chronic illness, who is presently impaired in her ability to function productively on a daily basis.

- Early familial difficulties, including protracted separation/abandonment by her mother, constitute a risk factor in its own right. There do appear to be mitigating factors through the presence of the compensating factors of grandparents and a highly involved aunt during the foundational years of her early childhood.

- However, the perpetration of ████████'s chronic and egregious sexual and psychological abuse over the span of approximately 6-7 years overshadowed all else up to that point. As described in his report, she was exposed to a horrific, degrading, dehumanizing, and traumatizing array of despicable acts that undermined her ability to form an integrated sense of self or develop an effective array of adaptive coping mechanisms.

- When she reported her abuse and his criminal conduct on 1/01/2006, one nightmare fortunately ended, and the high stress of being a witness in criminal litigation in Federal and ████████ State cases began, concurrent with attempting to build a relationship with a mother with whom she'd had minimal contact over the previous 7-8 years. She was also trying to cope with the cultural transition from a very small town to a large city, small schools to large schools, and perform her "job" of being a full-time student.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 28

- In this context, this psychologically injured, vulnerable female was informed that her perpetrator had disseminated images of her being criminally sexually victimized onto the Internet. She was also notified that multiple individuals had downloaded these images of her degradation – and were continuing to do so.

- ▮▮▮▮▮s abuse of her had been reported, adjudicated, and settled in the sense that he was incarcerated for nearly one-quarter of a century. While there was much therapy to be done and much recovery to be made, he could no longer harm her.

- However, the discovery of multiple downloaders and distributors of her images effectively exponentially multiplied in her mind the number of sick and dangerous males "out there" who might be obsessed or fixated on her and do her harm.

- She knows the depths of depravity of which he was capable, but she knows where he is. She knows the potential darkness and self-serving ends to which sexually obsessed and power-preoccupied males can go. Every downloader and/or distributor represents to her a danger and a threat, causing an accumulative effect upon an already weakened psychological foundation.

- She does not know whether a neighbor, a fellow student, a potential co-worker, or someone who gives too long of a look is, in fact, someone who is stalking her or fantasizing about her. Although she has changed her looks in some respects, she has no confidence that she cannot be detected.

- Ms. Doe's choice to not identify herself in the restitution cases is one manifestation of her fear of being identified and possibly stalked.

- To a reasonable degree of psychological probability, in my professional opinion, Ms. Doe daily suffers psychological damage from the knowledge of the existence of those individuals who have downloaded her images. Individually and collectively, each who has chosen to involve himself in this type of crime contributes to the perpetuation of her fear that has reached a paranoid-like level of intensity.

- For her, the nameless or unknown are as threatening as the named, if not possibly somewhat more so. She says that it is their anonymity that poses its own unique threat profile for her, in her fearful state. And, as noted above, the threat posed by a person obsessed with child pornography is not theoretical or abstract, in view of her personal experience: ▮▮▮▮▮▮▮ his mentor named "Suz," and her knowledge of some her ▮▮▮▮▮ Internet conspirators.

- In the field of traumatology, a time-limited trauma (albeit hers was a lengthy one of 6-7 years) is sometimes referred to as a Type I trauma. There also exists a Type II trauma that refers to a chronic, low-grade trauma exposure that may be indefinite and, over time, equally toxic to one exposed to such trauma.
  - It is my professional opinion that ▮▮▮▮▮ exposed her to a protracted Type I trauma. However, those who participate individually and collectively to download and/or distribute her images cause psychological damages consistent with a Type II trauma.

- The sequelae related to the Type I and/or Type II trauma complications include the following, stated to a reasonable degree of psychological probability:

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 29

- Anger and rage towards the sources of original and continuing pain or harm, including ▮▮▮▮▮▮▮, her mother, and the downloaders/distributors of the images taken when she was being victimized.
  - Ms. Doe is saddened and feels angry, devalued, when she says she hears the phrase that child pornography is a victimless crime. She says, "Whether you are doing it and taking the pictures, or whether you are enjoying the picture, you are enjoying an unlawful act. It is extremely, uh, I don't even know how to explain it. It is just as bad to enjoy it as to do it yourself."
  - "I don't have to know the name of that person to know they are there, or could be. I don't have to know the person to know a crime has been committed against me. I am left with being aware that any person walking down the street might have seen my images."

- Anxiety and obsessive worry characterized by paranoid-type, catastrophic fears of persons stalking her and preparing to do harm to her, and she is not sure which ones they may be.
  - This has manifested itself as an agoraphobic expression of Jane's fear of being out in public alone. This is predominately, if not exclusively, caused by the impact of her fear that people with malignant intent are watching her, stalking her, and even may harm her.

- Avoidance patterns: pervasive, maladaptive, and self-defeating, only serving to magnify her sense of fear, powerlessness, and inadequacy to face the world outside of narrowly circumstances defined and prescribed by her.

- Cognitive assumptions shattered:
  - That the world is safe,
  - That she is worthy of love for who she is, rather than how she performs,
  - That people are trustworthy, and
  - That love and concern are lies and cloaked in hidden agendas.

- Conditioned to be an object or "thing," with a loss of intrinsic self-respect, worth, and value as a human being and as a woman who has intelligence and capabilities beyond her appearance or performance for others.

- Conditioned to view her worth to reside in her appearance and her presentation of her body in a seductive and/or enticing way to others.
  - Progressive desensitization and disregard for recognizing and trusting her own core thoughts and feelings.

- Control needs are extreme, as an attempt to reduce anxiety.

- Damaged self-worth.

- Dependency on males she perceives to be stronger than herself, and thus needed protectors for her safety, imbuing those relationships with unrealistic expectations that will never be met, and will always disappoint.

- Depression and profound sadness.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 30

- o Educational obstacles enhanced by fear of being in public, pursuing a high school degree, or then going to a vocational training or actual college degreed program.

- o Exposure, vulnerability, and shame:
  - "I was coping pretty well with everything, until I found out about the whole world having seen (the images). It is one thing to know pictures were taken. It is different from one person to a million people knowing your entire life and everything about you. Your dad is supposed to know things about you and see yours, but there are parts of you not to be shown to the world. Your dad changes your diapers, but now strangers are seeing all of that. Now it was him, *and everyone else*, too."
  - "That is the whole reason why I have not been able to make friends. This world is a big world, but it is also a small world. You never know if someone knows you, or is one or two removed. It is the reason I have been cautious in real life. It is a fear that someone in Maine might travel here, but it is easier for someone to do something if they already live close to me. Someone who knows me will loosen my security perimeter."
  - "It keeps my world small and pretty boring, too. At high school, I tried to be outgoing, but it caused me so much stress ... and, when a girl on line said she recognized my face..." (This is an example of an instant trigger that activated her fear of being "known" and "watched.")

- o Fears for her safety and personal security; "scared," whether it be from believing her ███████ is going to retaliate through a released felon he may have known, or believing "Suz" may be stalking her, or that one of the many downloaders is watching for her or stalking her.

- o Fibromyalgia aggravation and exacerbation secondary to the anxiety and stress she experiences.

- o Grieving unresolved, related to her accumulative, serial losses.

- o Hypervigilance for threat of harm to herself, primarily related to her paranoid-level fears of being watched. She is constantly "on alert," and wary of how someone may be intruding into her life space and do harm to her.
  - This rises to the level of not wanting to shut her eyes in the shower, wanting her mattress on the floor so no one can hide underneath, keeping blinds over the windows, being house bound without the presence of one of her protectors, and not really being comfortable being alone.
  - She stated in this evaluation: "When someone looks at me like that, I never know if they recognize my face or missed an opportunity. And, with being a model trying to get my name out, I can lose an opportunity for business to come in. It is no longer my dad, but any other person who could tear my life apart."
  - "I worry about stalkers a lot. Because I am so aware of the world, every day, if I see someone in multiple spots or times, I start to get extremely paranoid. Every day that I go out of my house, I notice where there is extra attention directed to me. Unfortunately, if I pay attention more, I am less likely to be shocked or surprised."

- o Insecurity.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 31

- o Nightmares, intermittent.

- o Reactivated reminders of situations of former abuse and feelings of shame or helplessness/powerlessness in the face of a more dominating, controlling individual. Anything from a stimulus of a red truck (like       formerly drove) to reminders of downloaders, someone staring at her in public, etc., act as triggers for her, particularly in her constantly adrenalized, hypervigilant state.

- o Self-doubt and distrust of her judgments, leading to indecisiveness and enhancing dependent on someone perceived to be smarter and stronger than her: "I don't know if anything I do is right or normal, or if I should act in a different way."

- o Shame, believing she is "damaged goods."

- o Sleep disturbances, chronic.

- o Social avoidance and isolation: "When I was friends with a lot of people, it brought a lot of anger or if their problems are going to get compounded by being with me. And now there is a chance of people recognizing me. I can't stop the entire world, but at least I can control where I live."

- o Stripped of privacy: "It takes away anything personal that no one else knows this about you. It puts into the entire world that now knows. It goes from private and now someone is going out of their way to put your most personal parts out there. Everything has your picture. Your personal box (of privacy) is completely available to others. I feel anger, sadness—I can't get control of my life. All those other people have it. Fear. Anxiety. Lost confidence—knowing who has viewed the pictures."

- o Trust problems: "It is hard to trust someone actually helping, and I have ruined a lot of relationships in my insecurities. I always wonder about self-serving, self-centered motives."

- o Vocational challenges posed by her conditioned past and her current anxiety about being seen by strangers unless over the internet (which she tells herself she can control, or when protected by her bodyguard.)

- o Worry: "Another thing worrying me is that someone like my dad will use my pictures to normalize, groom, instruct, and abuse a victim. Sadly, it worries me that some girl might come up to me, blaming me for what was done to her."

### Recommendations

- Based upon my summary and conclusions stated above, it is my professional opinion that the symptoms and the diagnostic picture she presents support the conclusion that that Ms. Doe requires extensive and intensive therapy for the trauma layered upon complex trauma.

- She currently is self-prescribing, and she is in a very stuck place, and getting worse with the passage of time. Her psychobiological, psychological, and psychosocial problems will not remit with the current regimen of avoidance strategies, social isolation, codependency, and self-medication with cannabis. While the cannabis in prescribed and monitored amounts

may be efficacious for her Fibromyalgia, that intervention should be transferred to someone who is competent in the comprehensive treatment of that disease.

- Her prognosis is extremely poor apart from appropriate levels of intervention in a comprehensive, multi-dimensional program. While I seriously considered the appropriateness of a trauma-informed residential program, that is not something that she would consider, given her current agoraphobic-like existence.

- Even still, the following recommendations will be daunting for her, as a concession to her strong dependency and avoidance patterns, as she has tended to be treatment-avoidant/resistant up to now, and it will be a significant achievement for her to implement the following recommendations. But, the cost of her failure to implement something like the following recommendations will, in my opinion, play out the tragedies of her life in a self-defeating spiral of greater desperation and dysfunction.

- These components include the following:
  - Psychiatric evaluation and ongoing psychiatric care. Working with her, there are a wide array of psychotropic medications that a trauma-informed prescriber can choose to ameliorate the psychobiological symptoms with which she struggles.
    - Given the severity of her symptoms and the indefinite nature of the Type II stressors, if she consents to avail herself of this recommendation, after the initial psychiatric medication evaluation, she likely will require follow up visits.
      - Until she stabilizes on a particular regimen, she might reasonably require 12 visits in the first two years (Estimated 2 years x 12 = 24 sessions), and
      - Appointments every other month for another 3-5 years (Estimated 3-5 years x 6 =18-30 sessions), and
      - Quarterly sessions beyond that (Estimated 30 years x 4 = 120 sessions).
      - The cost per session after the initial intake ($350) is estimated to be $120/session.
      - Estimated total for psychiatric intervention, not including medication costs: $19,790 – $21,230
  - Psychotherapy sessions with a trauma-informed therapist who also works with Dialectical Behavioral Therapy and can offer EMDR therapy (or refer out):
    - Functioning within the average range of intellectual capabilities, she does have the ability to benefit from an array of psychotherapeutic and psychoeducational interventions.
    - Given the severity of her symptoms and the indefinite nature of the Type II stressors and her underdeveloped personality structure, with impoverished coping skills and inadequate affect regulatory systems, it is my opinion that she may require 2 sessions weekly for an estimated two years (2 years x 100 sessions = 200 sessions).
    - After that, it is my estimate that she will require a maximum frequency of weekly sessions (it could be bi-weekly or monthly in the later years, but it is difficult to predict with any certainty) on an indefinite basis (35 years x 25-50 (average is 37.5) sessions/year = up to1312 sessions).
    - Estimated total costs for psychotherapeutic and psychoeducational interventions at the rate of $160/session is $209,920.

Psychological Evaluation
Examinee: Jane Doe
Marineland Case
Page 33

- o <u>Conjoint therapy</u> with partner and/or significant others to address high probability relational problems secondary to the issues identified in this report and the projected Type II impact of ongoing downloading of her images:
  - With a seasoned, complex trauma-informed therapist, I project that she will require between 200-400 lifetime sessions.
  - Estimated total costs for conjoint therapeutic interventions projected at 200-400 sessions @ $180/session = $36,000 to $72,000.

Please do not hesitate to contact me in the event that you have questions or clarification about the contents, conclusions, and recommendations contained herein. My conclusions are based upon the body of information available to me as of the completion of this report. I reserve the right to revise any portions of this forensic evaluation in the event that additional materials are provided that might affect the conclusions that I have reached.

Respectfully submitted,

Randall L. Green, Ph.D.
Clinical Psychologist

**EXHIBIT 3**

# CURRICULUM VITA

**RANDALL L. GREEN, PHD**
**CLINICAL PSYCHOLOGIST**
**2250 D Street NE**
**Salem, OR  97301**
**Office:  (503) 364-6093**
**Fax:  (503) 364-5121**

### *EDUCATION*:

> PhD, June, 1982, Clinical Psychology
> Western Conservative Baptist Seminary
> Portland, Oregon
>
> MS Degree, August, 1973, Personnel Counseling
> Miami University
> Oxford, Ohio
>
> BA Degree, June, 1970, Political Science
> Miami University
> Oxford, Ohio

### *LICENSING AND CERTIFICATION*:

> Psychologist, License No. 0585, State of Oregon, February 1984 to present
> Psychologist, License No. PY 60270933, State of Washington, December 2012 to present

### *PROFESSIONAL EXPERIENCE*:

August, 1986 - Present
> CLINICAL PSYCHOLOGIST, Private Practice, Salem, Oregon
>
> Conduct general clinical practice of assessment, treatment and consultation. Perform forensic evaluations involving dangerousness determinations, amenability for treatment, personality profiles, Children's Service Division assessments, child custody recommendations, and general diagnostic assessments. Expert witness in forensic work and consultation in criminal and civil litigation.
>
> Clientele span a wide range of ages from children to adults.  Treat diagnostic problems which include sexual deviancy, victim/trauma recovery, co-dependency, "adult child" syndromes, anxiety, depression, schizophrenia, paranoia, non-chemical addictions, eating, and personality disorders as well as disorders of childhood.  Utilize individual, marital, family and group therapy modalities.

Practice Demographics (To present) include:

1)      total no. children/adolescents assessed and/or treated: approx. 500 cases
        total no. hours: approx. 8200hrs.
2)      total no. sex offenders assessed and/or treated:  471 cases
        total no. hours: approx. 10,560 hrs.
3)      total no. forensic evaluations:  (pertaining to aid and assist, responsibility,
        pre-sentencing, SCF court-referred evaluations,  and defense-related
        evaluations): approx. 850
4)      total no. child victims of trauma: sexual abuse, assessed and/or treated:
        approx. 148
5)      total no. adults molested as children, assessed and/or treated: approx. 900
6)      total no. trauma victims:  adult rape, assessed and/or treated: approx. 85
7)      total no. other trauma/harassment victims/survivors,
        assessed and/or treated: approx. 157
8)      total no. court appearances, all reasons: 12
9)      total no. custody evaluations:  28 cases
10)     total no. CSD/Juvenile Ct. related evaluations: approx. 60 cases
11)     total no. hours, deposition hours: 17
12)     total no. hrs., all mental health assessment or treatment:  approx. 49,000

1985 - 1987

**CONSULTANT AND INSTRUCTOR**, National Institute for Correction.
Washington D.C. Coordinator:  John Moore, NIC

Provide consultation and training to the institute regarding assessment and
treatment strategies for sex offenders in Federal and State correctional programs.
Participated in four training sessions at the National Academy of Corrections in
Boulder, Colorado.  Authored four articles on comprehensive treatment planning,
psycho-educational modules program evaluation and community based follow-up
strategies.

August, 1985 - August, 1986

**DIRECTOR**
Forensic Sex Offender Treatment Program
Oregon State Hospital
Salem, Oregon

Direct a comprehensive and assessment treatment program for mandated sexual
offenders within a residential treatment setting.  Population consists of 40 males
with a variety of disorders, including anxiety and depressive disorders, mild
mental retardation, mild organic impairment, paranoid schizophrenia, impulse
control, chemical abuse/dependency, sexual dysfunction, sexual deviance and/or
personality disorders.

Responsibilities include the following:

1. Selection, supervision, training and administration of a multi-disciplinary staff of 20 persons;
2. Supervision of an assessment program performing 150 evaluations per year;
3. Clinical direction of a multimodal treatment program.  Treatment includes the following:
    a) <u>Individual, marital, family and group therapy</u>,
    b) <u>Educational modules</u> focusing on assertiveness training, stress reduction and relaxation techniques, social skill development, cognitive behavioral coping strategies, communication and problem solving, criminal thinking error remediation, human sexuality and sexually addictive behavior patterns, chemical abuse/dependence and relapse prevention.
    c) <u>Behavioral therapy</u> utilizing the penile plethysmograph, covert sensitization, aversive olfactory and galvanic shock methods; and
    d) <u>Chemotherapy</u> involving Medroxyprogesterone Acetate (Depo-Provera) and neuroleptic medications as needed.
4. Program development;
5. Participation in the Forensic Disposition Board and Executive Committee;
6. Periodic training of hospital staff in "Abnormal Psychology" and DSM III;
7. Membership in Hospital Treatment Planning/Documentation Committee;
8. Provide consultation services to circuit court judges, district and defense attorneys, community corrections officers and mental health professionals, as needed; and
9. Court testimony.

July, 1983 - July, 1985

**CLINICAL PSYCHOLOGIST**
Forensic Psychiatric Program
Oregon State Hospital
Salem, Oregon

Provide both direct and consultative clinical psychological services to two wards, approximately 80 patients who were mentally ill offenders, within a secure treatment facility.  Population was predominantly schizophrenic, manic-depressive and/or organic, with frequent dual diagnoses of chemical abuse/dependency and/or personality disorder.

Responsibilities included staff training, psychological assessment, treatment team participation, program development and therapy group facilitation.

August, 1981 - June, 1982

**PSYCHOLOGICAL ASSOCIATE**
Forensic Psychiatric Program
Oregon State Hospital
Salem, Oregon

Participated in the development of a comprehensive treatment program for the mentally ill.

Under the supervision of a clinical psychologist, provided psychological services to a mentally ill offender population within a secure treatment facility.

August, 1979 - August, 1986

**DIRECTOR AND THERAPIST** (part-time)
Mid-Valley Counseling Center
1880 Lancaster Dr. NE, #123
Salem, Oregon

After three years of part-time, solo private practice, co-founder and counseling center currently staffed by seven full or part-time Christian therapists including myself.  Serve as Co-Director of this center which provides approximately 85-95 hours per week of counseling, education services and consultative services.

Provide direct therapeutic services, 8 to 10 hours per week, to children, adults, couples or families.

Primary Therapeutic Orientation:  Cognitive-Behavioral.  Additional modalities include insight orientation and family system intervention.

***CLINICAL INTERNSHIPS***:

Sept., 1980 - June, 1981

**INTERN**
Oregon State Hospital
Salem, Oregon

Internship included rotations through Neuropsychological Services Section, Community Psychiatric Program and Forensic Psychiatric Program (half-time)

Sept., 1979 - August, 1980

**INTERN**
Delaunay Mental Health Center
Portland, Oregon

Participated in individual and group counseling services (half-time)

Provided psychological testing in an outpatient community mental health facility.

***OTHER PROFESSIONAL EXPERIENCE***:

March, 1989    Addiction Dynamics: Unhealthy Dependencies, Part I
                        Community class offering
                        Salem, Oregon

May, 1989    Addiction Dynamics:Unhealthy Dependencies, Part II
                        Community class offering
                        Salem, Oregon

April, 1989    Childhood Fears, Anxieties and Nightmares
                        Alliance Day Care Center/Parents Education Seminar
                        Salem, Oregon

March 1977-1979

**PROFESSOR/INSTRUCTOR**

Taught classes at Western Baptist College, Chemeketa Community College and Conservative Baptist Seminary. (Subjects included Personality Theory, Partner Relationships and Sex Offender Topologies.)

Taught adult education classes for a variety of church groups. (Subjects included marriage enrichment, premarital preparation and parent education.)

March 1977-Present

**CONFERENCE/WORKSHOP SPEAKER**

Led a variety of workshops/conferences for community and professional groups. (Subjects included Sexual Intimacy in Marriage; Marriage Enrichment; Communication and Conflict Resolution; life planning and values clarification; stress reduction and relaxation; sexual offender and classification; assessment and treatment; and liability issues in sex offender assessment and treatment.

August, 1972 - August, 1976

**OTHER WORK-RELATED EXPERIENCE**

Prior work experiences have included the following: "Youth Employment Counselor" for the Employment Division, Youth Counselor for low-income and disadvantaged teenagers, Head Resident and Program Coordinator for Oregon State University and Miami University, and

USAF Personnel Officer.

## *PROFESSIONAL ORGANIZATIONS*:

American Association of Marriage and Family Therapists
Clinical member 1981-1995

American Psychological Association
Clinical member since 1983

Association for the Treatment of Sexual Abusers;
Member of the Board of Directors, 1984-1988
Clinical member: 1984-2001

Oregon Society of Professional Marriage and Family Therapists
Member of the Board of Directors, 1984-1987
Clinical member from 1984-1989

Oregon Psychological Association
Clinical member since 1982

The American Academy of Experts in Traumatic Stress
Clinical member:  1995

International Society for Traumatic Stress Studies:
Clinical member since 1995

## *CIVIC INVOLVEMENT:*

Oregon Board of Bar Examiners
Public Member since 2004

Liberty House
Board Member since 2006

## *CONTINUING EDUCATION:*

| 2013 | Revolutionizing Diagnosis &Treatment Using the DSM-5 | 6.0 hours |
|------|------------------------------------------------------|-----------|
|      | Pharmacological Treatment of PTSD                    | 1.5 hours |
| 2012 | HIV/AIDS                                             | 7.0 hours |
|      | Trauma, Addiction & Grief:  Proven, Practical Treatment Plans | 6.0 hours |
| 2011 | Treating Trauma and Addiction                       | 6.0 hours |

| 2010 | From Betrayal to Trust:  Treating Affairs & Pornography Addiction | 5.0 hours |
| | Risk Management for Clinicians:  The Nuts & Bolts of Legal and Ethical Practice | 6.0 hours |
| 2009 | Informed consent and the Therapeutic Process | 1.0 hours |
| | Forensic Mental Health Assessment | 6.0 hours |
| | Testifying in Court | 6.0 hours |
| | Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions  (Workshop Part I) | 7.0 hours |
| | Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions  (Workshop Part II) | 7.0 hours |
| | Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions  (Part III) | 7.0 hours |
| | Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions  (Part IV) | 3.5 hours |
| | EEG Biofeedback Comprehensive Training Course | 25.0 hours |
| 2007 | Advancing Pain Management in Oregon | 1.0 hours |
| | Psychological Assessment & Mgmt of Pain | 6.0 hours |
| | Diagnosis & Treatment of Depression | 1.0 hours |
| | Treatment Resistant Depression and PTSD | 1.0 hours |
| | ADHD: Diagnosis and Treatment | 1.0 hours |
| | Diagnosis & Treatment of Bipolar Spectrum | 1.0 hours |
| | Longitudinal Impact of Adolescent Victimization: Findings From the National Survey of Adolescents | 1.25 hour |
| | Childhood Stressors, Adult Vulnerability | 1.25 hour |
| | Psychophysiological & Emotional Effects of Avoidant Coping In Diverse Samples of Trauma Survivors | 1.25 hour |
| | Psychological Assessment & Management of Pain   7.0 hours | |
| | Psychobiology & Treatment of PTSD | 1.25 hour |
| | Gene X Environment Interactions in Mental Health | 1.25 hour |
| | Ethical and Legal Solutions to Common Clinical Dilemmas | 6.0 hours |
| | Sexual Compulsivity Clinical Training | 16.5 hours |
| 2006 | Cognitive Dysfunction in Schizophrenia: Assessment & Treatment | .5 hours |
| | Overcoming Seasonal Affective Disorder | .5 hours |
| | Sapient Sleep Solutions | 1 hours |
| | Acceptance & commitment Therapy (ACT) for the treatment Of PTSD | 6.5 hours |
| | From Consolidation to Reconsolidation Blackade: Innovations In the Treatment of PTSD | 1.25 hour |
| | Perspectives on Loss, Grief and Resilience | 1.25 hour |
| | Trauma-related Cognitions among Assault Survivors with | 1.25 hour |

|  |  |
|---|---|
| PTSD Symptoms | |
| Impact of Prior Trauma History of Psychobiological Reactions To Subsequent Trauma and PTSD Risk | 1.25 hour |
| Transitional approaches to the Study of Resilience: Implications For Recovering from Traumatic Stress - A Defining & Operationalizing Resilience | 1.25 hour |
| Cognitive Affective Bases of Resilience to Stress & Trauma | 1.25 hour |
| Responding to the Clinical Complexity of Trauma-Treatment Response to Adults: What do we know and how can we best Apply it to the full range of clinical presentations? | 1.25 hour |
| Translational approaches to the Study of Resilience: Implications For Recovering from Traumatic Stress - Roundtable discussion | 1.25 hour |
| Who Develops PTSD and Who Doesn't: Early Predictors Across Trauma Populations | 1.25 hour |

| | | | |
|---|---|---|---|
| 2005 | Oregon Psychological Association - 2005 Conference | | |
| | How We Recover from Trauma | | |
| | Psychologists at the Intersection of Mental Health & Law Enforcement | | |
| | Legal Issues in the Professional Practice of Psychology | | |
| | Professional Impairment in Psychology: Steps to Prevention/Intervention | | |
| | Documentation in Clinical Practice: Managing the Clinical Record | | |
| | Assessment & Treatment of Obsessive Compulsive Disorder in Adults | | |
| | Expanding Uses of Psychotropic Medications: recent Advances in Child, Adolescent & Adult Psychiatry | Above total of | 13.0 hours |
| | | | |
| | HIPAA Security Role Online Compliance Workbook | | 4.0 hours |
| | Treatment of Substance Abuse/Dependence | | 2.0 hours |
| | Do Not Resuscitate | | 2.0 hours |
| | Applications of EMDR in the Treatment of Adult Survivors Of Childhood Sexual Abuse | | 15.0 hours |
| | Psychopharmacology | | 6.0 hours |
| | Update on Dementia | | 2.0 hours |
| | Learning Disabilities/ADHD in Adults | | 2.0 hours |
| | Behavioral and Mood Disorders in Parkinson's Disease | | .5 hours |
| | CBT with Older Adults | | |
| | Psychiatric Conditions Caused by Nonpsychiatric Medication | | .75 hour |
| | Manic-Depressive Illness and the Bipolar Spectrum | | 2.0 hours |
| | Ethics in Psychological Practice: Fundamental Principles and Emerging Issues | | 6.0 hours |
| | | | |
| 2003 | Clinical Perspectives on a New Treatment Option for ADHD | | 1.0 hours |
| | HIPAA Follow-Up Workshop | | 3.0 hours |
| | | | |
| | The Ethics of Good Report Writing | | |
| | Ethics & Competency Issues in Forensic Assessment & Testimony | | |

Updated 04/25/14                              8

Legal, Ethical & Practice Issues that Face the Forensic Psychologist
Psych. & Legal Considerations in Relocation/Removal Cases
Neonaticide
A Law Guardian's Worse Case, et. al.       Above total of                    7.0 hours

Can Psychologists Testify to "state of mind" in Criminal Proceedings?
Communicating Psychological Findings to Attorneys
Post-Traumatic Stress Dishonesty
A Critical View of Neuropsych Testing
A Theoretical & Practical Rationale for Drug Treatment Alternatives
Stalkers and Their Targets            Above total of                    5.0 hours

Workshop on Forensic Practice in Employment Litigation
Comorbid Medical/Psychological Disability
Forensic Skills Workshop
Forensic Neuropsych Examination of Pediatric Brain Injury Patient
Separation Anxiety
Psych. Impairment and work Function in Medicolegal Assessments
*Atkins v. Virginia* and its impact on the mentally retarded capital
    offender                              Above total of            7.0 hours

After Prozac: Mindfulness-Based Cognitive Therapy              13.0 hours
RBH Treatment Conference                                        2.0 hours

| | | |
|---|---|---|
| 2002 | Clinical Privacy and HIPAA Standards for Behavioral Health Practitioners & Providers | 4.0 hours |
| | Gaps in Memory & Awareness for Trauma: Perspectives from Betrayal Trauma Theory | 2.0 hours |
| | Not Just PTSD: The Complexity of Post-Traumatic States | 3.0 hours |
| | Transference & Counter-transference Revisited | 3.0 hours |
| | Recent Developments in Treatment of Abuse Survivors | 3.0 hours |
| | The Psychobiology of Post-Traumatic Stress | 3.0 hours |
| | Frontiers of Trauma Treatment | 7.0 hours |
| 2001 | Law & Ethics for Psychologists | 6.0 hours |
| | Life-Span Treatment Approach to PTSD & Anger Management | 6.0 hours |
| | BPE Orals Exam Training (2 different times @ 4 ea.) | 8.0 hours |
| | BPE Orals Exam Testing (2 different times @ 6 ea.) | 12.0 hours |
| | Adv. Ethical Issues: Witness Liability & Immunity | 2.5 hours |
| | Assessment of Malingering | 2.0 hours |
| | Violence Risk Assessment | 1.5 hours |
| | Juvenile Civil Issues: Termination of Parental Rights | 1.5 hours |
| | Child Custody Examinations | 2.0 hours |
| | Personal Injury: Laws & the Liability Expert Witness | 2.0 hours |
| | Personal Injury: The Damages Expert Witness | 1.0 hours |

| | |
|---|---|
| Competence & Individual Liberties | 1.0 hours |
| Employment Discrimination | 2.0 hours |
| Americans with Disability Act | 1.5 hours |
| Juvenile Justice/Declination Hearings | 2.0 hours |
| Sex Offender Risk Assessment | 2.0 hours |
| Criminal Forensic Psychology: Miranda Waivers & Mens Rea | 2.0 hours |
| Criminal Forensic Psychology: Capital cases | 1.0 hours |

| | | |
|---|---|---|
| 2000 | Behavioral/Psychological Treatment for ADHD in Children, Adolescents and Adults | 3.0 hours |
| | Medication for ADHD in Children, Adolescents & Adults | 2.0 hours |
| | Law & Ethics for Psychologists | 3.0 hours |

### *CLINICAL/COUNSELING PSYCHOLOGY, PHD*

### *EDUCATIONAL RECORD*
Graduation:  June, 1982

Core Areas of Study

| | | |
|---|---|---|
| 1. | Statistical Methods | 4 hours |
| 2. | Research Design | 7 hours |
| 3. | Learning Theory | 3 hours |
| 4. | Physiological Psychology | 6 hours |
| 5. | History and Systems of Psychology | 9 hours |
| 6. | Developmental Psychology | 9 hours |
| 7. | Personality Theory | 6 hours |
| 8. | Abnormal Psychology | 10 hours |
| 9. | Social Psychology | 6 hours |
| 10. | Others | 6 hours |
| 11. | Individual Differences | 3 hours |
| 12. | Psychological Tests & Measurements | 10 hours |

### *COURT TESTIMONY AND DEPOSITION - January 1998 through Present*

**Testimony**

A.M v. Craig Steven Ley and Pacific Intercultural Exchange, U.S.A., Inc.
Circuit Court of the State of Oregon for Multnomah, Case No. 1102-02024
September 27, 2012

Casey Deckard v. Diana Bunch and Jeffrey N. King as Personal Representative of the Estate of Roland King, Case No. 102298, Circuit Court of the State of Oregon for Lincoln County
May 11, 2012

U.S. v. Sr.A Kyle R. Dietz, USAF, AETC 56; Luke AFB, AZ

Contact: Julie A. Beyer, Capt., USAF, Trial Counsel
February 2, 2012

U.S. v. Chadwick Keith Brannon, Case No. 4:09-CR-038-WEJ-RLV,
U.S. District Court, Northern District of Georgia
March 30, 2011

B.D., by and through his guardian ad litem, Douglas Fellows, an individual, Plaintiff v.
State of Oregon, by and through its Department of Human Services, et. al. Defendants
Case No 0912-16976 in the Circuit Court of the State of Oregon for the County of
Multnomah
October 12, 2011

U.S. v. C.R., Case No. CR-09-0155, Eastern District of New York
October 8, 2010

U.S. v. Heady, USMC, MCAS Cherry Point, NC
Contact: Kevin Shows, Major, USMC, Joint Law Center, Cherry Point, NC
October 29, 2010

U.S. v. Laursen, Case No. 08-00263-01-CR-W-HFS, Western District of Missouri
September 17, 2010

U.S. v. Faxon, Case No. 09-14030-CR-DLG/FJL, U.S. District Court, Southern District
of Florida
January 19, 2010

U.S. v. McDaniel, Case No. 4:08-CR-026-01-HLM, U.S. District Court for the Northern
District of Georgia, Rome Division
December 22, 2009

U.S. v. Jason David Bingham, Case No. 09-CR-10422
U.S. District court, Southern District of Florida
December 30, 2009

U.S. v. Howard Fluitt, Case No. 09-14014-CR-DLG and 09-14037-CR-DLG,
U.S. District Court of Southern Florida
November 30, 2009

U.S. v. Phillip M. Jacobs, Corporal, U.S. Marine Corps, Navy and Marine Corps Trial
Judiciary, Western Pacific Judicial Circuit
October 16, 2009

A.G. v. Robert Guitron; Aerobic and Dancewear Shoppe LLC, dba Lake Oswego
Academy of Dance,   Case No. 0609-09578, Multnomah County Circuit Court

October 10, 2007


Joan Thomas v. William L. Newton, M.D.          Complaint for Medical Malpractice
Case No. 0406-06635
Multnomah County Circuit Court
January 18, 2006


Kristofer Leake v. Distribution, Inc., etc.
Case No. 02C-21348
Marion County Circuit Court
March 16, 2005


C.Y. v. Church of God in Christ, Inc., et. al.
Case No. 0404-04052
Multnomah County Circuit Court
June 7, 2005


T.R. v. The Boy Scouts of America, et. al.
Case No. 020605750
Multnomah County Circuit Court
April 2004


Jane Doe v. Oregon Conference of Seventh-Day Adventists, Defendant
Case No. 00C11876
Marion County Circuit Court
October 2002


Jane Doe II v. Oregon Conference of Seventh-Day Adventists, Defendant
Case No.  00C11875
Marion County Circuit Court
October 2002


Ah Young Shin, Plaintiff, v. Sunriver Preparatory School, Inc., Defendant
Case No. 99CV0417MA
Circuit Court of the State of Oregon for the County of Deschutes
April 2001

## ADDITIONAL TESTIMONY & DEPOSITION

Child John Doe, by and through his Guardian *ad Litem* Pamela King, v.
The Family Young Men's Christian Association of Marion and Polk Counties, an Oregon
nonprofit organization, and Robert Harry Kansman, Defendants
Case No. 98C-13475
Circuit Court of the State of Oregon for the County of Marion

January 1998

**<u>Deposition</u>**

A.K.M. and J.E.M. v. The Alaska Club, Inc. and Shnon Hero Choi
Case No. 3AN-07-6978 CI
In the Superior Court for the State of Alaska, Third Judicial District at Anchorage
April 27, 2009 – 3.5 hrs.

T.T.D.S., S.S., G.L., & C.M., Plaintiffs v.
The Salvation Army aka the Salvation Army, Northwest Division, A California Nonprofit
Corporation and Robert Lee DeHaan, individually, Defendants
Case No. 07-2-03505-2 KNT
Superior Court of the State of Washington for King County
Deposition: 6/19/08 and 6/20/08 - 11 hrs total

Robert Curtis, Plaintiff, v.
North Lincoln Hospital Health District dba North Lincoln Hospital, and MRI Imaging
Services II, Defendants
Case No. 941288
In the Circuit Court of the State of Oregon for the County of Lincoln
Deposition: 5/14/99

**EXHIBIT 4**

# FEDERAL CHILD PORNOGRAPHY OFFENSES



**Patti B. Saris**
*Chair*

**William B. Carr, Jr.**
*Vice Chair*

**Ketanji B. Jackson**
*Vice Chair*

**Ricardo H. Hinojosa**
*Commissioner*

**Beryl A. Howell**
*Commissioner*

**Dabney L. Friedrich**
*Commissioner*

**Jonathan J. Wroblewski**
*Commissioner, Ex-officio*

**Isaac Fulwood, Jr.**
*Commissioner, Ex-officio*

# FEDERAL CHILD PORNOGRAPHY OFFENSES

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................................................... i
   A.  Overview............................................................................................................... i
   B.  Summary of the Child Pornography Sentencing Scheme................................... iv
   C.  Highlights of the Commission's Report ............................................................ vi
   D.  Recommendations to Congress....................................................................... xvii
   E.  Conclusion ...................................................................................................... xxi

CHAPTER 1: THE PURPOSES AND METHODOLOGY OF THIS REPORT ..........................................1
   A.  Introduction.........................................................................................................1
   B.  Background ..........................................................................................................3
   C.  General Trends in Sentencing Data.....................................................................6
   D.  Criticisms of the Existing Non-Production Penalty Scheme and a Widespread
       Belief that Changes are Necessary....................................................................10
   E.  Overview of Report............................................................................................15
       1.  Methodology ..........................................................................................15
       2.  Child Pornography Special Coding Project:  The Commission's
           Contribution to the Emerging Social Science Research About Offense
           Conduct and Offender Characteristics ...................................................16
       3.  Organization...........................................................................................18

CHAPTER 2:  STATUTORY AND GUIDELINE PROVISIONS IN CHILD
PORNOGRAPHY CASES ...................................................................................................21
   A.  Federal Statutes Concerning Child Pornography...............................................21
       1.  Overview of Federal Child Pornography Penal Statutes ........................21
       2.  Definition of "Child Pornography" .......................................................22
       3.  Production Offenses................................................................................23
       4.  Non-Production Offenses........................................................................24
       5.  Summary of Statutory Penalty Ranges ..................................................27
       6.  Related Sex Crimes:  "Enticement" and "Travel" Offenses.................30
   B.  Child Pornography Sentencing Guidelines........................................................31
       1.  Sections 2G2.1 and 2G2.2 .....................................................................31
       2.  Recurring Legal Issues Concerning Enhancements in Child
           Pornography Cases.................................................................................33
   C.  Additional Sentencing Enhancements for Certain Child Pornography Offenders ...........36
   D.  State Criminal Penalties for Child Pornography Offenses ................................38
   E.  Conclusion ........................................................................................................38

CHAPTER 3:  TECHNOLOGY AND INVESTIGATION BY LAW ENFORCEMENT IN CHILD
PORNOGRAPHY CASES ...................................................................................................41
   A.  Child Pornography Offenders' Use of Technology to Commit the Offense ....................41
       1.  Technology Primer.................................................................................43
       2.  Internet Technologies Used to Access Child Pornography ....................47
       3.  Technology Child Pornography Offenders Use to Evade
           Detection and Prosecution .....................................................................56

4.   Emerging Technology ........................................................................59
5.   Offender Culpability and Technology .............................................61
B. Law Enforcement Efforts to Combat Child Pornography .........................62
1.   Organization Overview ....................................................................63
2.   Law Enforcement Investigations ....................................................64
3.   Digital Forensics .............................................................................67
C. Conclusion ..................................................................................................71

**CHAPTER 4: CHILD PORNOGRAPHY OFFENDER BEHAVIOR** .......................................73
A. Types of Child Pornography Offenders .....................................................73
B. Motivations to Collect Child Pornography ...............................................76
1.   Sexual Motivations to Collect Child Pornography .........................77
2.   Non-Sexual Motivations to Collect Child Pornography .................78
C. Child Pornography Offender Collecting Behavior .....................................80
1.   Child Pornography Collecting Activities ........................................80
2.   Child Pornography Collections .......................................................84
D. Child Pornography "Community" Behavior ..............................................92
1.   Child Pornography Communities and Socialization .......................92
2.   Structure of Child Pornography Communities ................................94
3.   Child Pornography Communities and Deviant Beliefs....................97
4.   Child Pornography Communities and the Child Pornography "Market" .............98
E. Relationship Between Child Pornography Offending and Criminal
Sexually Dangerous Behavior ....................................................................99
1.   Distinguishing Child Pornography Offenders Who Have Committed
Other Sex Offenses ......................................................................100
2.   Discussion of a Causal Relationship Between Child Pornography and
Other Sex Offending ....................................................................102
3.   Child Pornography as an Alternative to Other Sex Offending ...........103
F. Conclusion ................................................................................................104

**CHAPTER 5: VICTIMS OF CHILD PORNOGRAPHY** ..................................................107
A. Victimization Through Production ............................................................107
B. Recurrent Victimization Through Existence of Images............................112
C. Crime Victims' Rights Issues Specific to Child Pornography Victims..........114
1.   Victim Notification and the Right to Be Heard ............................115
2.   Restitution to Victims ...................................................................117
D. Conclusion ................................................................................................118

**CHAPTER 6: ANALYSIS OF SENTENCING DATA IN CASES IN WHICH OFFENDERS
WERE SENTENCED UNDER THE NON-PRODUCTION GUIDELINES** .............................121
A. Introduction...............................................................................................121
B. Understanding the Data Based on the Changing Legal Landscape
from 1992 to 2010......................................................................................122
C. Non-Production Sentencing Data Derived from the Commission's
Annual Datafiles ........................................................................................126
1.   Introduction....................................................................................126
2.   Sentence Length Data ....................................................................129
3.   Comparative Proportionality Analysis:  Other Federal Sex Offenses ...............136

4.   Specific Offense Characteristics ....................................................138
5.   Offender Characteristics .............................................................141
D.   Non-Production Sentencing Data Derived from the Commission's
Special Coding Project ...............................................................144
1.   Offense Conduct ....................................................................145
2.   Fiscal Year 2012 (First Quarter) Supplemental Coding Project .......................152
3.   Offender Characteristics .............................................................155
E.   Conclusion ........................................................................164

CHAPTER 7:  PRIOR CRIMINAL SEXUALLY DANGEROUS BEHAVIOR BY OFFENDERS
SENTENCED UNDER THE NON-PRODUCTION CHILD PORNOGRAPHY GUIDELINES ...................169
A.   Relevance of Criminal Sexually Dangerous Behavior (CSDB) in
Child Pornography Cases ...........................................................170
B.   Existing Social Science Research ...................................................171
C.   The Commission's Study:  Definitions, Methodology, and Limitations .........................174
1.   Definition of Criminal Sexually Dangerous Behavior ............................174
2.   Methodology .......................................................................178
3.   Limitations .......................................................................179
D.   Findings of Commission's Fiscal Year 2010 Study ...................................181
1.   Findings Concerning All Types of CSDB ...........................................181
2.   Findings Concerning "Contact" CSDB ..............................................183
E.   The Association Between CSDB and Offense and Offender Characteristics ...................186
1.   Association Between CSDB and Offense Characteristics ..................................187
2.   Association Between CSDB and Offender Characteristics .................................195
3.   Association Between CSDB and Geographic Location of Prosecutions ...................197
F.   Association Between CSDB and Sentence Length ......................................198
G.   Differences in Departure/Variance Rates Based on CSDB .............................200
H.   Findings of Commission's Study of First-Quarter Fiscal Year 2012 Cases ...................201
I.   Findings of Commission's Study of Fiscal Years 1999 and 2000 .........................202
J.   Conclusion ........................................................................204

CHAPTER 8:  EXAMINATION OF SENTENCING DISPARITIES IN §2G2.2 CASES .........................207
A.   Sentencing Framework in Non-Production Child Pornography Cases .........................208
B.   Common Guideline Ranges for Offenders Sentenced Under the Non-Production
Guidelines:  Fiscal Year 2010 Versus Fiscal Year 2004 ...................................210
1.   Common 2010 Guideline Ranges ......................................................210
2.   Common 2004 Guideline Ranges ......................................................211
C.   Growing Sentencing Disparities Since 2004 .........................................213
1.   Case Type One:  No Distribution Enhancement .........................................213
2.   Case Type Two:  Distribution Resulting in a 2-Level Enhancement .......................215
3.   Case Type Three:  Distribution Resulting in a 5-Level Enhancement ...................217
D.   Common Practices of Courts and Parties in Limiting Offenders' Sentencing
Exposure Under the Statutory and Guideline Penalty Schemes .........................219
1.   Charging Practices ................................................................219
2.   Guideline Stipulations in Plea Agreements ............................................222
3.   Government Sponsored Downward Variances and Departures .........................223

    4.  Non-Government Sponsored Downward Variances and Departures ..................224

E.  Analysis of the Cumulative Effect of Four Practices to Reduce Defendants' Sentencing Exposure in Non-Production Cases ........................................................225
    1.  Variation in Sentence Lengths ...........................................................226
    2.  Analysis of Possible Influences on Sentencing Practices ....................227

F.  Differences in Appellate Review Among the Courts of Appeals.....................238
    1.  Review of Variances Based on "Policy Disagreements" with USSG §2G2.2 ......................................................................................238
    2.  Appellate Review of Extensive Downward Variances.........................241
    3.  Conclusions About Appellate Review ................................................244

G.  Conclusion .............................................................................................244

**CHAPTER 9: CHILD PORNOGRAPHY PRODUCTION OFFENSES**............................247

A.  Background...........................................................................................247

B.  Penal Statutes and Guideline Provisions Concerning Production ...................248

C.  Analysis of Sentencing Data......................................................................252

D.  Offender and Offense Characteristics.........................................................257
    1.  Offender Characteristics ..................................................................257
    2.  Offense Characteristics ....................................................................260

E.  Classification of Production Offense Behavior .............................................262
    1.  Extent of Involvement with Victims of Production Offenses...............262
    2.  Extent of Involvement with Child Pornography Generally ..................264

F.  Victim Characteristics...............................................................................265

G.  Conclusion .............................................................................................268

**CHAPTER 10: POST-CONVICTION ISSUES IN CHILD PORNOGRAPHY CASES**.........271

A.  Supervised Release in Child Pornography Cases ..........................................271
    1.  Statutory and Guideline Provisions ..................................................271
    2.  Analysis of Supervised Release Data ................................................274

B.  Evaluation and Treatment of Child Pornography Offenders' Sexual Disorders ............277
    1.  Treatment Generally .......................................................................278
    2.  Treatment in Prison and on Supervision............................................282
    3.  Risk Assessments of Child Pornography Offenders ............................285

C.  Sex Offender Registration and Civil Commitment Issues Facing Child Pornography Offenders...........................................................................287
    1.  Sex Offender Registration.................................................................288
    2.  Civil Commitment ...........................................................................289

D.  Conclusion .............................................................................................291

**CHAPTER 11: RECIDIVISM BY CHILD PORNOGRAPHY OFFENDERS** ..........................293

A.  Introduction..............................................................................................293

B.  Methodology of the Commission's Recidivism Study ...................................294

C.  Results of the Commission's Recidivism Study............................................299

D.  Relevance of the Commission's Recidivism Study to Current Child Pornography Offenders...........................................................................304

E.  Comparison of the Commission's Recidivism Study to Other Relevant Recidivism Studies...................................................................................306
    1.  Other Studies of Child Pornography Offenders..................................306

    2.  BJS Recidivism Study of State Sex Offenders Released in Fiscal
        Year 1994................................................................................307
    3.  Recidivism by Federal Offenders Generally................................308
  F.  Conclusion ....................................................................................310

**CHAPTER 12:  FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS TO CONGRESS** ...............311
  A.  Introduction ..................................................................................311
  B.  Major Findings Concerning §2G2.2 Cases....................................311
  C.  Commission's Recommendations for the Non-Production (§2G2.2) Guideline ............320
    1.  Amendments to USSG §2G2.2 ...............................................320
    2.  Supervised Release Terms for Child Pornography Offenders..........................325
  D.  Possible Changes to the Non-Production Child Pornography Statutes ........................326
    1.  Statutory Penalties ...............................................................326
    2.  Notice to and Restitution for Victims of Non-Production Offenses..................330
  E.  Findings and Recommendations Concerning §2G2.1 (Production) Cases....................330
  F.  Conclusion ....................................................................................330

## APPENDICES

**APPENDIX A**
    GLOSSARY OF RELEVANT TERMINOLOGY ................................................... A-1

**APPENDIX B**
    CURRENT VERSIONS OF THE PRIMARY CHILD PORNOGRAPHY SENTENCING
    GUIDELINES, USSG §§ 2G2.1 AND 2G2.2, AND THE SENTENCING TABLE
    (USSG CHPT. 5, PT. A)................................................................B-1

**APPENDIX C**
    SUMMARIES OF THE TESTIMONY OF THE WITNESSES,
    UNITED STATES SENTENCING COMMISSION — SENTENCING REFORM ACT
    25TH ANNIVERSARY REGIONAL PUBLIC HEARINGS ........................................C-1

**APPENDIX D**
    SUMMARIES OF THE TESTIMONY OF THE WITNESSES,
    UNITED STATES SENTENCING COMMISSION — PUBLIC HEARING ON
    FEDERAL CHILD PORNOGRAPHY CRIMES.................................................. D-1

**APPENDIX E**
    SOURCE OF CURRENT §2G2.2 BASE OFFENSE LEVELS AND SPECIFIC
    OFFENSE CHARACTERISTICS ...............................................................E-1

**APPENDIX F**
    STATE CHILD PORNOGRAPHY STATUTES ..................................................F-1

**APPENDIX G**
    REPORT TO THE CONGRESS:  FEDERAL CHILD PORNOGRAPHY OFFENSES —
    SELECTED BIBLIOGRAPHY ................................................................. G-1

## LIST OF TABLES AND FIGURES

TABLE 1          Child Pornography Statutory Penalty Ranges ............................................................v

TABLE 2–1       Child Pornography Statutory Penalty Ranges......................................................27

FIGURE 3–1      Federal Defender Technology Presentation:  Screenshot of LimeWire ...............49

FIGURE 3–2      Federal Defender Technology Presentation:  Screenshot of LimeWire
                Shared Folders ........................................................................................50

FIGURE 3–3      Federal Defender Technology Presentation:  Screenshot of P2P
                Search Window........................................................................................70

FIGURE 4–1      Relationship Among Child Pornography Offenders, Pedophiles
                and Other Sex Offenders (does not reflect actual percentages)............................73

FIGURE 4–2      DOJ Presentation:  Screenshot of Rules of Child
                Pornography Community...................................................................81–82

FIGURE 4–3      DOJ Presentation:  Screenshot of Child Pornography
                Offender Collection ...............................................................................83

TABLE 4–1       Data from the Online Victimization Survey ........................................................87

FIGURE 4–4      Gender of Victims in CEOP Database....................................................................88

FIGURE 4–5      Age of Female Victims in CEOP Database ............................................................89

FIGURE 4–6      Age of Male Victims in CEOP Database................................................................89

FIGURE 4–7      DOJ Presentation:  Screenshot of Rules of Child
                Pornography Community...................................................................96

TABLE 6–1       Increases in Base Offense Levels — Non-Production Guidelines .....................124

TABLE 6–2       Increase in Specific Offense Characteristics —
                Non-Production Guidelines ...................................................................125

FIGURE 6–1      Non-Production Cases Fiscal Years 1992–2010...................................................126

FIGURE 6–2      Non-Production Offense Types Fiscal Year 2010 ...............................................127

TABLE 6–3       Frequency of §2G2.2 Child Pornography Cases by   Circuit –
                Fiscal Year 2010 ....................................................................................128

FIGURE 6–3    Frequency of Non-Production Offenses by District
Fiscal Year 2010 ...............................................................129

TABLE 6–4    Type of Sentence Imposed on R/T/D and Possession Offenders Fiscal
Years 1992, 2004, 2010 ....................................................131

FIGURE 6–4    Non-Production Sentences Over Time Fiscal Years 1992–2010 .......................132

TABLE 6–5    Sentences Relative to the Guideline Range for R/T/D and Possession
Offenders Fiscal Years 1992, 2004, 2010...........................133

FIGURE 6–5    Within Range and Out of Range Sentences:  R/T/D Offenses Fiscal
Years 2005–2010 .............................................................134

FIGURE 6–6    Within Range and Out of Range Sentences:  Possession Offenses
Fiscal Years 2005–2010....................................................134

FIGURE 6–7    Average Guideline Minimum and Sentence Imposed:  Possession
Offenses Fiscal Years 1992–2010 ......................................135

FIGURE 6–8    Average Guideline Minimum and Sentence Imposed:  R/T/D Offenses
Fiscal Years 1992–2010.....................................................135

TABLE 6–6    Sex Offenses:  Prison Sentences Fiscal Year 2010...............................................137

TABLE 6–7    Sex Offenses:  Sentences Relative to the Guideline Range
Fiscal Year 2010 ...............................................................138

FIGURE 6–9    Application of Specific Offense Characteristics:  Non-Production Offenses
Fiscal Years 1992–2010.....................................................139

FIGURE 6–10    Application of Specific Offense Characteristics:  R/T/D Offenses Fiscal
Years 1992–2004 .............................................................139

FIGURE 6–11    Application of Specific Offense Characteristics Number of Images:
Possession Offenses Fiscal Years 1992–2004 ....................................140

FIGURE 6–12    Application of Specific Offense Characteristics:  Non-Production Offenses
Fiscal Years 2005–2010....................................................141

TABLE 6–8    Demographic Characteristics of Offenders Convicted of R/T/D and
Possession Offenses Fiscal Years 1992, 2004, and 2010 ....................................142

FIGURE 6–13    Non-Production Offense Characteristics:  Criminal History Category
Fiscal Year 2010 ...............................................................143

FIGURE 6–14   Non-Production Offense Characteristics:  Nature of Most Serious Offense of Conviction Fiscal Year 2010 .......................................................146

FIGURE 6–15   Non-Production Offense Characteristics:  Receipt and/or Distribution Conduct Fiscal Year 2010........................................................147

FIGURE 6–16   Possession Offense Characteristics:  Receipt and/or Distribution Conduct Fiscal Year 2010 ...........................................................148

TABLE 6–9   Non-Production Offense Characteristics:  Types of Receipt Conduct Fiscal Year 2010.............................................................149

TABLE 6–10   Non-Production Offense Characteristics:  Types of Distribution Conduct Fiscal Year 2010 ..........................................................150

FIGURE 6–17   Non-Production Offense Characteristics:  Nature of Most Serious Offense of Conviction 1st Quarter, Fiscal Year 2012 ........................153

FIGURE 6–18   Non-Production Offense Characteristics:  Receipt and/or Distribution Conduct 1st Quarter, Fiscal Year 2012...............................153

TABLE 6–11   Non-Production Offense Characteristics:  Types of Receipt Conduct 1st Quarter Fiscal Year 2012 ........................................154

TABLE 6–12   Non-Production Offense Characteristics:  Types of Distribution Conduct 1st Quarter Fiscal Year 2012 ........................................155

FIGURE 6–19   Non-Production Offender Characteristics:  History of Childhood Sexual Abuse Fiscal Year 2010........................................................156

FIGURE 6–20   Non-Production Offender Characteristics:  History of Substance Abuse Fiscal Year 2010 ...........................................................157

FIGURE 6–21   Non-Production Offender Characteristics:  U.S. Military Service (Active Duty or Veteran) Fiscal Year 2010.......................................159

FIGURE 6–22   Military Veterans by Census Age Group for Non-Production Offenders and the General Population Fiscal Year 2010.....................................161

FIGURE 6–23   Non-Production Offender Characteristics:  Offender Net Worth at Time of Conviction Fiscal Year 2010 .............................................162

FIGURE 6–24   Non-Production Offender Characteristics:  Offender Employment at Time of Arrest Fiscal Year 2010 ......................................163

TABLE 7–1   Number of CSDBs for §2G2.2 Offenders Fiscal Year 2010 ..............................181

FIGURE 7–1     §2G2.2 Offense Characteristics:  Most Serious CSDB Fiscal Year 2010 ...........182

FIGURE 7–2     §2G2.2 Offense Characteristics:  Categories of CSDB Fiscal Year 2010...........183

FIGURE 7–3     §2G2.2 Contact CSDB Offense Characteristics:  Nature of Contact
Fiscal Year 2010 ...............................................................................................184

FIGURE 7–4     §2G2.2 Contact CSDB Offense Characteristics:  Age of Youngest
Victim at Time of Offense Fiscal Year 2010 .........................................................184

FIGURE 7–5     §2G2.2 Contact CSDB Offense Characteristics:  Offender-Victim
Age Differential at Time of Offense Fiscal Year 2010........................................185

FIGURE 7–6     §2G2.2 Contact CSDB Offense Characteristics:  Offender-Victim
Relationship Fiscal Year 2010 ............................................................................186

FIGURE 7–7     CSDB for §2G2.2 Offenses by Offense Type Fiscal Year 2010 ........................188

FIGURE 7–8     CSDB for §2G2.2 Offenders by Receipt and Distribution Conduct
Fiscal Year 2010 ...............................................................................................189

FIGURE 7–9     CSDB for §2G2.2 Offenders by Type of Distribution Fiscal Year 2010 ...........192

FIGURE 7–10    CSDB for §2G2.2 Offenders by Number of Images SOC Fiscal Year 2010 ......194

FIGURE 7–11    CSDB for §2G2.2 Offenders by Education Level Fiscal Year 2010 .................196

FIGURE 7–12    CSDB for §2G2.2 Offenders by Circuit Fiscal Year 2010 ................................198

FIGURE 7–13    Sentence Length for §2G2.2 Offenders by CSDB Fiscal Year 2010 .................199

FIGURE 7–14    Sentence Length for §2G2.2 Offenders by Contact and Non-Contact
CSDB Offenses Fiscal Year 2010........................................................................200

FIGURE 7–15    Within Range and Out of Range Sentences for §2G2.2 Offenses by
CSDB Fiscal Year 2010......................................................................................201

FIGURE 7–16    §2G2.2 Offense Characteristics:  Most Serious CSDB 1st Quarter
Fiscal Year 2012 ...............................................................................................202

FIGURE 7–17    §2G2.2 Offense Characteristics:  Categories of CSDB Fiscal Years
1999–2000.........................................................................................................203

TABLE 8–1      FY10 Application Rates of Enhancements in §2G2.2 ........................................209

FIGURE 8–1     Comparison of Non-Production Offenses:  Common Guideline Calculations
and Ranges (CHC I) Fiscal Years 2004 and 2010 ...............................................212

FIGURE 8–2    Case Type One:  No Distribution Enhancement................................214

FIGURE 8–3    Variation of Sentence Length for Case Type One Offenders Convicted of Possession and Receipt Offenses ........................................................215

FIGURE 8–4    Case Type Two:  Two-Level Distribution Enhancement ...................216

FIGURE 8–5    Variation of Sentence Length for Case Type Two Offenders Convicted of Possession and Distribution Offenders.............................................217

FIGURE 8–6    Case Type Three:  Five-Level Distribution Enhancement .................218

FIGURE 8–7    Variation of Sentence Length for Case Type Three Offenders Convicted of Possession and Distribution Offenses.........................................219

FIGURE 8–8    Charging Practices in Possession Offenses without Mandatory Minimums Fiscal Year 2010 .....................................................................221

FIGURE 8–9    Charging Practices in Non-Production Offenses with Predicate Sex Convictions and Receipt/Distribution Conduct Fiscal Year 2010.....................222

FIGURE 8–10   Guideline Stipulations in Non-Production Plea Agreements Fiscal Year 2010.............................................................................................223

FIGURE 8–11   Departures and Variances in Non-Production Offenses Fiscal Year 2010..........225

FIGURE 8–12   Charging and Sentencing Practices to Limit Defendants' Sentencing Exposure Fiscal Year 2010 ...................................................................225

FIGURE 8–13   Distribution of Sentence Lengths for Non-Production Offenses Fiscal Year 2010 ....................................................................................226

FIGURE 8–14   Non-Production Offense Characteristics:  Distribution Conduct by Sentencing Exposure Fiscal Year 2010 ...............................................228

FIGURE 8–15   Non-Production Offense Characteristics:  Offender Criminal History Category by Sentencing Exposure Fiscal Year 2010............................229

FIGURE 8–16   Non-Production Offense Characteristics:  CSDB by Sentencing Exposure Fiscal Year 2010 .................................................................230

FIGURE 8–17   Non-Production Offense Characteristics:  Nature of CSDB and Allegations by Sentencing Exposure Fiscal Year 2010 .........................................231

FIGURE 8–18   Non-Production Offense Characteristics:  Offender Race by Sentencing Exposure Fiscal Year 2010 ...................................................................232

FIGURE 8–19   Non-Production Offense Characteristics:  Offender Education by Sentencing Exposure Fiscal Year 2010 ...............................................232

FIGURE 8–20   Non-Production Offense Characteristics:  Offender Employment by Sentencing Exposure Fiscal Year 2010 ...............................................233

FIGURE 8–21   Non-Production Offense Characteristics:  Offender Assets by Sentencing Exposure Fiscal Year 2010 ...................................................233

FIGURE 8–22   Non-Production Offense Characteristics:  Offender Age Range by Sentencing Exposure Fiscal Year 2010 ...............................................234

FIGURE 8–23   Non-Production Offense Characteristics:  Offender Substance Abuse History by Sentencing Exposure Fiscal Year 2010 ............................234

FIGURE 8–24   Non-Production Offense Characteristics:  Offender Military Background by Sentencing Exposure Fiscal Year 2010 ..........................235

FIGURE 8–25   Non-Production Offense Characteristics:  Offender History of Sexual Abuse by Sentencing Exposure Fiscal Year 2010 .........................235

TABLE 8–2   Non-Production Cases by Circuit Fiscal Year 2010 ............................236

TABLE 8–3   Districts with the Most Non-Production Cases Fiscal Year 2010 ......................237

FIGURE 9–1   Child Pornography Production Cases Fiscal Years 1992–2010 ..........................248

FIGURE 9–2   Production Cases:  Most Serious Conviction Fiscal Year 2010 ..........................252

FIGURE 9–3   Child Pornography Sentences Over Time Fiscal Years 1992–2010..................253

FIGURE 9–4   Within Range and Out of Range Sentences:  Production Offenses Fiscal Years 1992–2010...................................................254

FIGURE 9–5   Within Range and Out of Range Sentences:  Production Offenses Fiscal Years 2005–2010...................................................255

FIGURE 9–6   Average Guideline Minimum and Sentence Imposed:  Production Offenses Fiscal Years 1992–2010 ........................................256

TABLE 9–1a   Production Offender Characteristics Fiscal Year 2010 ......................................258

TABLE 9–1b   Production Offender Characteristics Fiscal Year 2010 ......................................258

FIGURE 9–7   Production Offender Characteristics:  Criminal History Category Fiscal Year 2010 .....................................................259

FIGURE 9–8     Production Cases:  Application of the Specific Offense Characteristics
Fiscal Years 1992–2010.................................................................................260

FIGURE 9–9     Production Cases:  Application of the Specific Offense Characteristics
Fiscal Years 2005–2010.................................................................................261

FIGURE 9–10    Production Offender Characteristics:  Physical Presence/Contact
Victimization Fiscal Year 2010 ....................................................................263

FIGURE 9–11    Production Offender Characteristics:  Involvement with Child Pornography
Fiscal Year 2010 ...........................................................................................265

FIGURE 9–12    Production Offense Characteristics:  Age of Youngest Victim at Time
of Offense Fiscal Year 2010 .........................................................................266

FIGURE 9–13    Production Offense Characteristics:  Number of Victims Fiscal
Year 2010.......................................................................................................266

FIGURE 9–14    Production Offense Characteristics:  Offender-Victim Relationship
Fiscal Year 2010 ...........................................................................................267

FIGURE 10–1    Child Pornography Offense Characteristics:  Mean Months of Supervised
Release Fiscal Years 1992–2010 ..................................................................275

TABLE 10–1     Offenders Sentenced to a Term of Supervised Release Comparison of All
Child Pornography Offenders Fiscal Year 2010...........................................276

FIGURE 10–2    Child Pornography Offenders Sentenced to Lifetime Supervision Fiscal
Years 2004–2010 ..........................................................................................276

FIGURE 10–3    Non-Production Characteristics:  CSDB by Lifetime and Non-Lifetime
Supervision Fiscal Year 2010 .......................................................................277

FIGURE 11–1    Non-Production Offender Characteristics:  Recidivism Fiscal Years
1999–2000......................................................................................................299

TABLE 11–1     Non-Production Offenders:  Most Serious Criminal Justice Failure
Fiscal Years 1999–2000................................................................................300

FIGURE 11–2    Non-Production Offender Characteristics:  Recidivism Fiscal Years
1999–2000......................................................................................................301

FIGURE 11–3    Non-Production Offender Characteristics:  General Recidivism by
Criminal History Category Fiscal Years 1999–2000.....................................302

FIGURE 11–4    Non-Production Offender Characteristics:  General Recidivism by History
of CSDB Fiscal Years 1999–2000.................................................................302

FIGURE 11–5   Average Prison Term for Recidivist and Non-Recidivist Child Pornography
Offenders Fiscal Years 1999–2000.......................................................................303

TABLE 11–2   Comparison of Non-Production Offenders Fiscal Years 1999–2000 and
Fiscal Year 2010 ...................................................................................................304

TABLE 11–3   Comparison of Child Pornography Recidivism for White Male Offenders
Fiscal Year 1992 & Fiscal Years 1999–2000 .....................................................309

# EXECUTIVE SUMMARY

### A.   OVERVIEW

This report is the result of a multi-year process in which the United States Sentencing Commission ("the Commission") examined cases of offenders sentenced under the federal sentencing guidelines and corresponding penal statutes concerning child pornography offenses. The primary focus of this report is USSG §2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor), the current guideline for non-production offenses such as possession, receipt, transportation, and distribution of child pornography, the four primary offense types. One chapter of this report also analyzes cases of offenders sentenced under the guideline for production of child pornography, USSG §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production). The purpose of this report is to contribute to the ongoing assessment by Congress and the various stakeholders in the federal criminal justice system regarding how federal child pornography offenders are prosecuted, sentenced, incarcerated, and supervised following their reentry into the community.[1]

This report complements and expands upon the Commission's 2009 report, *History of the Child Pornography Guidelines*.[2] The 2009 report chronicled the federal non-production child pornography guidelines (§2G2.2 and the former §2G2.4 (Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct)) from their inception through 2009. In particular, it tracked all substantive amendments made to those guidelines, several of which resulted from congressional directives to the Commission or other legislation. The most significant amendments to the guidelines resulted from the PROTECT Act of 2003,[3] which also created new statutory mandatory minimum statutory penalties for most child pornography offenses.[4]

Several factors have prompted the Commission to continue its examination of child pornography cases. First, during the past two decades, cases in which offenders have been sentenced under the child pornography guidelines, while only a small percentage of the overall

---

[1]  This report is submitted pursuant to the Commission's general statutory authority under 28 U.S.C. §§ 994 and 995 and its specific responsibility to advise Congress on sentencing policy under 28 U.S.C. § 995(a)(20).

[2]  *See* U.S. SENT'G COMM'N, HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES (Oct. 2009) (available at http://www.ussc.gov/Research/Research_Projects/Sex_Offenses/20091030_History_Child_Pornography_Guidelines .pdf).

[3]  Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today ("PROTECT") Act of 2003, Pub. L. No. 108–21, 117 Stat. 650 (2003). The PROTECT Act is discussed in Chapter 1. *See* Chapter 1 at 4.

[4]  *See* HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES, *supra* note 2, at 38-48 (discussing the changes to the statutory and guideline penalties for child pornography offenses resulting from the PROTECT Act).

federal criminal caseload, have grown substantially both in total numbers and as a percentage of the total caseload.[5]

Second, since the enactment of the PROTECT Act of 2003 and *United States v. Booker*, which made the guidelines "effectively advisory"[6] in 2005, there has been a steadily decreasing rate of sentences imposed within the applicable guidelines ranges in non-production cases. That rate decreased from 83.2 percent in fiscal year 2004 — the last full fiscal year before *Booker*, when most offenders were not subject to increased statutory and guideline penalty ranges resulting from the PROTECT Act[7] — to 32.7 percent in fiscal year 2011.[8] The corresponding rate of below range sentences for reasons other than an offender's substantial assistance to the authorities likewise has increased significantly. By fiscal year 2011, that rate was 62.8 percent.[9] The steady decrease in the rate of sentences imposed within the applicable guideline ranges has occurred at the same time that average minimums of such ranges and average sentences imposed have significantly increased.[10] These sentencing data indicate that a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders. As the Supreme Court has observed, the Commission's obligation to collect and examine sentencing data directly relates to its statutory duty to consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions.[11]

Third, as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability. Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography.[12] The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims),

---

[5] *See* Chapter 6 at 126 (noting that, in fiscal year 1992, there were 77 non-production cases, which accounted for 0.2% of the total federal criminal caseload; by fiscal year 2010, there were 1,717 non-production cases, which accounted for 2.0% of the total caseload); Chapter 9 at 247 (noting that, in fiscal year 1992, there were ten production cases; by fiscal year 2010, there were 207 such cases, which accounted for 0.25% of the total caseload).

[6] 543 U.S. 220, 245 (2005).

[7] *See* Chapter 1 at 4 (discussing the effect of the PROTECT Act amendments).

[8] *See id.* at 7.

[9] *See id.* (noting that, in fiscal year 2011, 48.2% of offenders received non-government sponsored downward departures or variances, and 14.6% received government sponsored departures or variances other than for offenders' substantial assistance to the authorities).

[10] *See* Chapter 1 at 8 (noting that the average minimum of guideline ranges in non-production child pornography offenses in fiscal year 2004 was 50.1 months, and the average sentence imposed was 53.7 months; by fiscal year 2010, the average guideline minimum was 117.5 months, and the average sentence imposed was 95.0 months).

[11] Rita v. United States, 551 U.S. 338, 350 (2007); *see also* 28 U.S.C. §§ 994(o), (p), (w) & 995(a)(15), (20) (setting forth the Commission's obligation to collect and analyze sentencing data and, where appropriate, amend the guidelines and make recommendations to Congress to amend relevant legislation based on such data analysis).

[12] *See* Chapter 3 at 41–56; Chapter 6 at 146–51, 153–55.

which are now readily available on the Internet.[13]  As a result, four of the of six sentencing enhancements in §2G2.2 — those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels —  now apply to most offenders[14] and, thus, fail to differentiate among offenders in terms of their culpability.  These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders.[15]  Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.[16]

Fourth, recent social science research — by both the Commission and outside researchers — has provided new insights about child pornography offenders and offense characteristics that are relevant to sentencing policy.  This research includes information regarding the prevalence of child pornography offenders' criminal sexually dangerous behavior[17] both before their arrests and after their ultimate reentry into the community following their convictions,[18] as well as emerging research on the efficacy of psycho-sexual treatment of offenders' clinical sexual disorders.[19]

Finally, most stakeholders in the federal criminal justice system consider the non-production child pornography sentencing scheme to be seriously outmoded.[20]  Those stakeholders, including sentencing courts, increasingly feel that they "are left without a meaningful baseline from which they can apply sentencing principles" in non-production cases.[21]

For these reasons, the Commission prepared this report.  In preparing the report, the Commission:  (1) reviewed both relevant statutory and case law as well as social science and legal literature concerning child pornography offenses, offenders, and victims; (2) engaged in extensive data analyses of several thousands of federal child pornography cases from fiscal year 1992 through the first quarter of fiscal year 2012; (3) studied recidivism rates for child pornography offenders, including conducting a recidivism study of 610 federal child

---

[13]  *See* Chapter 1 at 5–6.

[14]  *See* Chapter 8 at 209; *see also* USSG §2G2.2(b)(2), (4), (6) & (7) (enhancements for use of a computer, possession of images of a prepubescent minor, possession of sado-masochistic images, and possession of a certain number of images in increments from 10 or more to 600 or more).

[15]  *See* Chapter 1 at 6.

[16]  *See id.*

[17]  Chapter 7 at 174 (defining criminal sexually dangerous behavior as including "illegal sexually abusive, exploitative, or predatory conduct" against "real-time victims").

[18]  *See id.* at 171– 74 (discussing social science research); *id.* at 174–86 (discussing the Commission's special coding project concerning criminal sexually dangerous behavior occurring before offenders' prosecutions for non-production offenses); Chapter 11 at 294–303 (discussing Commission's recidivism study of non-production offenders).

[19]  *See* Chapter 10 at 277–87.

[20]  *See* Chapter 1 at 10–14 (discussing the views of the Criminal Law Committee of the Judicial Conference of the United States Courts, the Department of Justice, the defense bar, and other interested parties).

[21]  United States v. Stern, 590 F. Supp. 2d  945, 961 (N.D. Ohio 2008).

*United States Sentencing Commission*

pornography offenders sentenced under the non-production guidelines in fiscal years 1999 and 2000; and (4) held a public hearing at which the Commission received testimony from experts in technology and the social sciences, treatment providers, law enforcement officials, legal practitioners, victims' advocates, and members of the judiciary.

### B. SUMMARY OF THE CHILD PORNOGRAPHY SENTENCING SCHEME

#### 1. *Penal Statutes*

Several statutory provisions proscribe a variety of acts related to the production, advertising, distribution, transportation (including by shipping or mailing), importation, receipt, solicitation, and possession of child pornography.[22]  For sentencing purposes, child pornography offenses generally are divided into two larger categories — production offenses and non-production offenses.  Offenses related to the production of child pornography are prosecuted in approximately ten percent of all federal child pornography cases.[23]  The four primary non-production offense types are distribution, transportation, receipt, and possession of child pornography, which represent approximately 90 percent of all federal child pornography prosecutions.[24]

The statutory penalties for these federal offenses vary in severity.  A production offense carries a statutory mandatory minimum term of 15 years of imprisonment and a maximum term of 40 years (and higher minimum and maximum penalties if the offender has a predicate conviction for a sex offense).[25]  A receipt, transportation, or distribution (R/T/D) offense carries a statutory mandatory minimum sentence of five years of imprisonment and a maximum sentence of 20 years (with increased minimum and maximum penalties if the offender has a predicate conviction for a sex offense).[26]  A simple possession offense carries no statutory mandatory minimum penalty and a maximum term of ten or 20 years of imprisonment (unless the offender has a predicate conviction for a sex offense, which would result in a mandatory minimum term of imprisonment of ten years and a maximum term of 20 years).[27]

---

[22]  *See* 18 U.S.C. §§ 2251, 2252, 2252A, & 2260.  An additional statute, 18 U.S.C. § 1466A, prohibits possession, receipt, distribution, and production of "obscene visual representations of the sexual abuse of children"; although it is an obscenity offense in the penal statutes, its violation is considered a child pornography offense for sentencing purposes.  *See* USSG §2G2.2(a)(1).  Section 1466A's penalty provisions mirror those in § 2252A for equivalent offense conduct.  *See* 18 U.S.C. § 1466A(a), (b).  Prosecutors also occasionally bring obscenity charges under other obscenity statutes when the offenses in fact involved images that would qualify as child pornography.  *See* 18 U.S.C. §§ 1461 *et seq.*  Such offenses, if they involved the obscene depiction of minors, are subject to the guidelines' child pornography provisions rather than the guideline applicable to obscenity depicting adults.  *See, e.g.*, USSG §2G3.1(c).

[23]  *See* Chapter 1 at 7 n.42.

[24]  *See id.*; *see also* Chapter 6 at 146.

[25]  18 U.S.C. § 2251(a), (d)(1)(B) & (e).

[26]  18 U.S.C. §§ 2252(b)(1), 2252A(b)(1), 2260(c)(2).

[27]  18 U.S.C. §§ 2252(b)(2) & 2252A(b)(2).  In late 2012, Congress enacted the Child Protection Act of 2012, Pub. L. No. 112–206, 126 Stat. 1490 (Dec. 7, 2012), which raised the statutory maximum term of imprisonment for possession of child pornography from ten to 20 years for defendants who possessed images of a prepubescent minor

Table 1 below summarizes the statutory penalty ranges for offenses involving child pornography or sexually obscene images of children:

**Table 1**
**Child Pornography Statutory Penalty Ranges**

| Production | | | Receipt/Distribution/ Transportation | | Possession | | Obscenity | |
|---|---|---|---|---|---|---|---|---|
| No Prior Sex Conviction | Prior Sex Conviction | > 1 Prior Sex Conviction | No Prior Sex Conviction | Prior Sex Conviction | No Prior Sex Conviction | Prior Sex Conviction | 18 U.S.C. § 1466A | 18 U.S.C. §§ 1461 *et seq.* |
| 15 to 30 years | 25 to 50 years | 35 years to life | 5 to 20 Years | 15 to 40 years | 0 to 10 years or 0 to 20 years (depending on age of victim) | 10 to 20 years | Mirrors penalties in CP statutes | 0 to 5 years or 0 to 10 years (varies by statute) |

### 2.    *Sentencing Guidelines*

Sentencing guidelines for child pornography offenses are found in Chapter Two, Part G, Subpart 2 (Sexual Exploitation of a Minor), of the *Guidelines Manual*.  The Commission's report focuses on §2G2.1, which addresses offenses related to production of child pornography, and §2G2.2, which addresses non-production child pornography offenses.[28]  Both guidelines are reproduced in full in Appendix B at the end of the report.  For readers' convenience, §2G2.2, which is a primary focus of this report, also is set forth at the end of this executive summary.

Section 2G2.1, the guideline for production offenses, has a base offense level of 32 and six sentencing enhancements for different aggravating factors primarily related to the nature of the images produced (the type of sexual acts perpetrated upon victims and the ages of the victims

---

or a minor under 12 years of age.  *See* Chapter 1 at 4–5.  Commission data show that virtually all offenders possess such images.  *See* Chapter 8 at 209 (noting 96.3% of non-production offenders possessed such images in fiscal year 2010).

Violations of § 1466A involving receipt, distribution, or production of "obscene visual representations of the sexual abuse of children" carry a statutory mandatory minimum penalty of five years of imprisonment and a statutory maximum of 20 years of imprisonment.  Violations of § 1466A involving simple possession of such obscene material carry no statutory mandatory minimum penalty and have a statutory maximum of ten years of imprisonment.  18 U.S.C. § 1466A(a) & (b) (subjecting violators to the same "penalties provided in section 2252A(b)" for comparable offense conduct involving child pornography rather than obscenity depicting minors).  Other obscenity statutes occasionally are used to prosecute offenders who possess, receive, transport, or distribute what legally would be considered child pornography; they carry no mandatory minimum penalty and have a statutory maximum penalty of five or ten years of imprisonment depending on which statute applies.  *See* 18 U.S.C. §§ 1461, 1462, 1463, 1465, 1466, 1468, & 1470.

[28]  For non-production offenses committed before November 1, 2004, defendants only convicted of possession offenses were sentenced under the former USSG §2G2.4, while defendants convicted of R/T/D offenses were sentenced under the prior version of USSG §2G2.2.  Offenders convicted of any type of non-production offense committed on or after November 1, 2004, are sentenced under the current version of §2G2.2.  *See* Chapter 1 at 2 n.13.

depicted in the images), whether defendants distributed the images, and the relationship between the defendants and victims.[29]

Section 2G2.2, which covers non-production offenses, has a two-tiered system for assigning a base offense level to a defendant based on the nature of the most serious statute of conviction.  A defendant convicted of simple possession of child pornography[30] has a base offense level of 18.[31]  A defendant convicted of an R/T/D offense has a base offense level of 22.[32]  The offense level of a defendant convicted solely of receipt is reduced by two levels if the court finds that the defendant's actual conduct was limited to receipt or solicitation of child pornography and that he "did not intend to traffic in, or distribute" any child pornography.[33]  Section 2G2.2 thus differentiates offenders' starting points in calculating their offense levels by dividing them into three primary groups:  (1) those convicted of simple possession (offense level 18); (2) those convicted of receipt who did not intend to distribute (offense level 20); and (3) those convicted of receipt but who intended to distribute as well as all those convicted of distribution or transportation (offense level 22).  Section 2G2.2 contains six sentencing enhancements based on aggravating circumstances related to the nature of the images possessed (the ages of the victims depicted and whether the sexual acts depicted involved sadistic or masochistic acts or other violence), the number of images possessed, whether the defendant used a computer in the commission of the offense, whether the defendant distributed child pornography, and whether the defendant engaged in a "pattern of activity" involving the sexual exploitation or abuse of minors.[34]

## C.  HIGHLIGHTS OF THE REPORT

1.  *All child pornography offenses, including the simple possession of child pornography, are extremely serious because they both result in perpetual harm to victims and validate and normalize the sexual exploitation of children.*

- Child pornography offenses inherently involve the sexual abuse and exploitation of children.  Typical child pornography possessed and distributed by federal child pornography offenders today depicts prepubescent children engaging in graphic sex acts, often with adult men.[35]  Approximately half of child pornography offenders in the United States possess one or more images (including still images and/or videos)

---

[29]  USSG §2G2.1(b).

[30]  18 U.S.C. §§ 2252(a)(4) or 2252A(a)(5).

[31]  USSG §2G2.2(a)(1).  In addition, defendants convicted of a child pornography "morphing" offense under 18 U.S.C. § 2252A(a)(7), or of certain obscenity offenses in which the obscene images depicted children, *see, e.g.*, 18 U.S.C. § 1466A(b), also have a base offense level of 18 under the guideline.  USSG §2G2.2(a)(1).

[32]  USSG §2G2.2(a)(2).

[33]  USSG §2G2.2(b)(1).

[34]  USSG §2G2.2(b)(2)-(7).

[35]  *See* Chapter 4 at 86–87.

depicting the sexual abuse of a child under six years old and approximately one-quarter of offenders possess one or more images depicting the sexual abuse of a child two years old or younger.[36]

- Child pornography victims are harmed initially during the production of images, and the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims.  Many victims live with persistent concern over who has seen images of their sexual abuse and suffer by knowing that their images are being used by offenders for sexual gratification and potentially for "grooming" new victims of child sexual abuse.[37]

- Child pornography offenses are international crimes.  Images depicting the abuse of children are transmitted both domestically and internationally to offenders across the world, each of whom may continue to redistribute the same images.  Once an image is distributed via the Internet, it is impossible to eradicate all copies of it.[38]  The harm to victims thus is lifelong.

- The ready availability of child pornography on the Internet, the existence of online child pornography "communities" that validate child sexual exploitation, and a growing but largely non-commercial "market" for new images all contribute to the further production of child pornography and, in the process, to the sexual abuse of children.[39]

- Although child pornography validates and normalizes the sexual abuse of children, social science research has not established that viewing child pornography "causes" the typical offender to progress to other sex offending against minors.  For some offenders, however, obtaining sexual gratification through the use of child pornography is a risk factor for other sex offending against minors, as child pornography may strengthen existing tendencies in ways that may create a "tipping-point effect" if other risk factors are also present.[40]

2.   *Child pornography offenders engage in a variety of behaviors reflecting different degrees of culpability and sexual dangerousness.*

- Typical offenders maintain collections of still and video images numbering in the hundreds or thousands.  Such images often depict

---

[36]   *See id.* at 87.

[37]   *See* Chapter 5 at 107–14.

[38]   *See* Chapter 3 at 41, 64.

[39]   *See* Chapter 4 at 97–99.

[40]   *See id.* at 102–03.

prepubescent children engaging in graphic sexual acts with adults.  A minority of offenders acquire enormous and often well-organized collections containing tens of thousands or occasionally even hundreds of thousands of images.  Some offenders also intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers.[41]

- There have been dramatic technological changes related to computers and the Internet in the past decade, such as the ascendance of P2P file-sharing programs, which have changed the way that typical offenders today receive and distribute child pornography.[42]  The Commission's special research project of 1,654 fiscal year 2010 §2G2.2 cases found that nearly two-thirds of offenders (65.4%) distributed child pornography to others.  The most common manner of distribution was a P2P file-sharing program.

- Child pornography offenders vary widely in their technological sophistication.  Many are relatively unsophisticated "entry-level" offenders who use readily available technologies such as "open" P2P file-sharing programs to receive and/or distribute child pornography in an indiscriminate manner.  Other offenders, however, use their technological expertise to create private and secure trading "communities" and to evade, and help others evade, detection by law enforcement.[43]

- Technological advances in Internet and computer technologies have resulted in the growth of Internet-based child pornography communities, which not only operate as a forum for offenders to receive and distribute images but also serve to validate and normalize the sexual exploitation of children.  Such communities thrive in Internet chat-rooms and bulletin board systems and also through the use of "closed" P2P file-sharing programs in which offenders directly communicate with each other.[44]  Not all child pornography offenders join such communities, and those who do vary in the level of their engagement.  The Commission's data suggest that a significant minority of offenders (approximately one-fourth) have some level of involvement in such communities.[45]

---

[41]  *See id.* at 84–92.

[42]  *See* Chapter 3 at 41–56; *see also* Chapter 6 at 153–55 (noting the Commission's study of large samples of federal child pornography cases from fiscal year 2002 and fiscal year 2012 revealed that no presentence reports ("PSRs") mentioned the use of P2P file-sharing programs by offenders sentenced in fiscal year 2002, while PSRs in the majority of cases of offenders sentenced in fiscal year 2012 mentioned their use of P2P file-sharing programs).

[43]  *See* Chapter 3 at 61–62.

[44]  *See* Chapter 4 at 92–99.

[45]  *See* Chapter 6 at 151 & n.70 (finding that 445 of the 1,654 non-production offenders sentenced in fiscal year 2010, or 26.9% of offenders, engaged in "personal" distribution of child pornography to other adult offenders using modes of distribution such as email, which suggests at least some degree of involvement in child pornography communities).

- Some federal offenders who commit non-production child pornography offenses also have engaged in sexually dangerous behavior, either prior to or concomitantly with their instant child pornography offenses.  Existing studies, which have employed different methodologies and examined different offender populations — including some offenders outside the United States — have yielded inconsistent findings concerning the prevalence rate of other sex offending by non-production offenders.[46]  The Commission thus engaged in a special research project that reviewed virtually all federal non-production child pornography cases from fiscal year 1999, 2000, and 2010, as well as a sample of such cases from fiscal year 2012, to provide reliable data concerning the percentage of federal offenders sentenced under the non-production child pornography guidelines who have known histories of criminal sexually dangerous behavior ("CSDB").

- For purposes of this report, CSDB comprises three different types of criminal sexual conduct:  (1) actual or attempted "contact" sex offenses occurring before or concomitantly with offenders' commission of non-production child pornography offenses; (2) "non-contact" sex offenses occurring before or concomitantly with offenders' commission of  non-production child pornography offenses;[47] and (3) prior non-production child pornography offenses (if the prior and instant non-production offenses were separated by an intervening arrest, conviction, or some other official intervention known to the offender).

- After examining the presentence reports ("PSRs") in a total of 2,696 non-production child pornography cases, the Commission found that approximately one in three[48] offenders had engaged in one or more types of CSDB predating their prosecutions for their non-production offenses.[49]

- The Commission's study had certain limitations that resulted in its being underinclusive in certain important respects.  The study did not include

---

[46]  *See* Chapter 7 at 171–74 (discussing the existing studies); *see also* Michael Seto et al., *Contact Sex Offending by Men With Online Sexual Offenses*, 23 SEXUAL ABUSE 124 (2011) (meta-analysis of 24 international studies, which found that approximately one in eight "online offenders" – the majority of whom were child pornography offenders – had an "officially known contact sex offense history," but estimating that a much higher percentage, approximately one in two, in fact had committed prior contact sexual offenses based on offenders' "self-report" data in six studies).

[47]  Contact offenses include sexual molestation offenses (rape and sexual assault).  Non-contact offenses include enticing a minor to engage in sexual conduct via the Internet (*e.g.*, "cybersex" via a webcam), knowingly distributing child pornography to a real or perceived minor, and sexual voyeurism and exhibitionism offenses.  *See* Chapter 7 at 174–78.

[48]  The rate of CSDB reflected in prior convictions or findings in PSRs was 33.9% for offenders sentenced in fiscal years 1999-2000, 31.4% for offenders sentenced in fiscal year 2010, and 33.0% for offenders sentenced in the first quarter of fiscal year 2012.

[49]  *See* Chapter 7 at 181, 201–02.

CSDB that was not reported to or detected by the authorities or otherwise not recounted in PSRs. The Commission coded offenders' CSDB only as reflected in: (1) convictions for sex offenses; (2) findings in PSRs that offenders had engaged in CSDB (which did not result in convictions); and (3) unresolved allegations of CSDB in PSRs.[50] It is well established that the *actual* rate of offenders' CSDB is higher than the *known* rate because official records of known sex offenses by child pornography offenders fail to account for all such sex offenses.[51] In addition, the Commission's study is underinclusive of all conduct reflecting offenders' sexual dangerousness insofar as the study was limited to prior sexually dangerous behavior that amounted to a *criminal offense* and did not include *non-criminal* acts of sexually deviant behavior.[52] The Commission's review of PSRs revealed a variety of non-criminal but sexually deviant conduct (*e.g.*, an offender's collection of children's underwear associated with his collection of child pornography or an offender's "diary" containing graphic descriptions of his sexual fantasies concerning children).[53]

3.    *Guideline penalty ranges, average sentences of imprisonment, and average terms of supervised release have substantially increased in significant part because of the statutory and guideline amendments resulting from the PROTECT Act of 2003.*

- The average guideline minimum for non-production child pornography offenses in fiscal year 2004 — the last full fiscal year when the guidelines were mandatory and the first full fiscal year after the enactment of the PROTECT Act — was 50.1 months of imprisonment, and the average sentence imposed was 53.7 months. By fiscal year 2010, as a larger percentage of cases was affected by the provisions of the PROTECT Act that increased penalty levels, the average guideline minimum was 117.5 months of imprisonment, and the average sentence imposed was 95.0 months.[54]

---

[50] *See id.* at 179. The Commission was limited to coding such information from PSRs because the Commission does not receive other documents that may contain relevant information concerning CSDB (*e.g.*, transcripts of court proceedings). The Commission's study reports unresolved allegations separately from CSDB reflected in prior convictions and findings in PSRs. *See* Chapter 7 at 181-82.

[51] *See id.* at 179–80.

[52] The Commission could not code non-criminal sexually dangerous behavior in reviewing PSRs as a result of difficulties in classifying such varied behavior without a bright-line standard such as criminality. Existing social science research has only undertaken to determine the prevalence of *criminal* sexually dangerous behavior among child pornography offenders. *See generally* Seto et al., *supra* note 46.

[53] *See* Chapter 7 at 176. Such sexual deviance, even if not criminal, is a risk factor for sexual recidivism. *See* Chapter 10 at 286.

[54] *See* Chapter 1 at 8; *see also id.* at 4 (discussing the PROTECT Act).