- Typical guideline penalty ranges and average sentences of imprisonment have increased since fiscal year 2004 not only because of a growth in the number and severity of enhancements following the PROTECT Act amendments but also because of an increase in the incidence of the underlying conduct and circumstances triggering such enhancements, particularly in the technology used.[55]  In particular, four of the six enhancements in §2G2.2(b) — together accounting for 13 offense levels — now apply to the typical non-production offender.[56]  In fiscal year 2010, §2G2.2(b)(2) (images depicting pre-pubescent minors) applied in 96.1 percent of cases; §2G2.2(b)(4) (sado-masochistic images) applied in 74.2 percent of cases; §2G2.2(b)(6) (use of a computer) applied in 96.2 percent of cases; and §2G2.2(b)(7) (images table) applied in 96.9 percent of cases.[57]  Thus, sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders.  Higher penalty ranges and average sentences also have resulted from the statutory mandatory minimum penalties created by the PROTECT Act, which apply in approximately half of all §2G2.2 cases today and which result in higher base offense levels under the guidelines for offenders convicted of offenses carrying such mandatory minimum penalties.[58]

- Supervised release terms in child pornography cases have increased significantly since the PROTECT Act.  The PROTECT Act raised the maximum statutory term of supervised release from three years for most child pornography offenders to a lifetime term for all child pornography offenders and also created a statutory mandatory minimum term of five years for all such offenders.  In fiscal year 2010, the average term of supervised release for non-production offenders was approximately 20 years (220.3 months for offenders convicted of possession and 273.7 months for offenders convicted of R/T/D offenses); the average term of supervised release for offenders sentenced under the production guideline was nearly 27 years.[59]  The sentencing guidelines currently recommend the statutory maximum term of lifetime supervision for all child pornography offenders.[60]

---

[55]  *See* Chapter 6 at 123–25; *see also* Chapter 8 at 208–12.

[56]  *See* Chapter 8 at 209 (Table 8-1).

[57]  The images table contains incremental enhancements depending on the number of images.  The majority of offenders receiving an enhancement based on the images table (69.6%) received the maximum enhancement of 5 levels based on their possession of 600 or more images.  *See* Chapter 6 at 141.

[58]  *See* Chapter 2 at 32; Chapter 6 at 146.

[59]  *See* Chapter 10 at 271–76.

[60]  *See id.* at 272.

4.     *Increasing numbers of courts and parties in non-production cases have engaged in charging and sentencing practices that have had the effect of limiting the sentencing exposure for many offenders as a result of the view that the current non-production sentencing scheme is outmoded, fails to distinguish adequately among offenders based on their levels of culpability and dangerousness, and is overly severe in some cases. Growing sentencing disparities have resulted from these practices.*

- A variety of stakeholders in the federal criminal justice system, including the Department of Justice, the defense bar, and many in the federal judiciary, are critical of the current non-production penalty scheme. Although these stakeholders are not unanimous concerning the perceived flaws in the penalty scheme, many believe that it fails to adequately differentiate among offenders based on their culpability and sexual dangerousness, needs to be updated to reflect recent changes in typical offense conduct associated with the evolution of computer and Internet technologies, and is too severe for some offenders.[61] As a result, courts and parties increasingly have engaged in charging and sentencing practices that have limited many offenders' sentencing exposure. Such inconsistent application of the existing guideline and statutory penalty provisions has led to growing sentencing disparities among similarly situated offenders.[62]

- The Commission's special research project of fiscal year 2010 §2G2.2 cases revealed four common practices used to limit non-production offenders' sentencing exposure: (1) charging practices that permitted offenders to be convicted only of simple possession despite having committed R/T/D offenses (46.6% of cases); (2) plea agreements containing guideline stipulations regarding sentencing enhancements that limited offenders' sentencing exposure under the guidelines (11.4% of cases); (3) government sponsored downward departures and variances for reasons other than for an offender's substantial assistance to the authorities (10.3% of cases); and (4) non-government sponsored downward departures and variances (44.3% of cases).[63] In fiscal year 2010, approximately four out of five (78.8%) §2G2.2 offenders benefited from one or more of the above-mentioned four practices. The Commission's analysis also showed that no offender or offense characteristics (*e.g.*, an offender's military service record, history of criminal sexually dangerous behavior, or distribution of child pornography) appeared to account for these practices in most cases. Rather, geographical differences in charging, plea bargaining, and sentencing practices among the 94 districts

---

[61]  *See* Chapter 1 at 10–14.

[62]  *See generally* Chapter 8.

[63]  *See id.* at 219–25. Because multiple practices occurred in some cases, the percentages mentioned above add up to more than 100%.

appear to be the strongest factor explaining whether an offender benefitted from one or more of these practices.[64]

- The Commission's special coding project of fiscal year 2010 cases revealed that slightly over half of §2G2.2 offenders were convicted solely of possession, which subjected them to no statutory mandatory minimum sentence and a statutory maximum sentence of ten years (assuming they had no predicate conviction for a sex offense).  According to their PSRs and/or plea agreements, however, well over 90 percent of these offenders committed one or more R/T/D offenses.[65]  Had these offenders been convicted of an R/T/D offense, they would have been subject to significantly higher statutory penalty ranges as well as a higher base offense level under §2G2.2 than offenders convicted only of possession.[66]

- The Commission's study of a large sample of similarly situated §2G2.2 offenders with no criminal history who were sentenced in fiscal year 2010 revealed substantial sentencing disparities resulting from how they were charged and sentenced under the guidelines.  On average, offenders convicted of possession but who knowingly received child pornography were sentenced to a term of 52 months of imprisonment, while on average similarly situated offenders convicted of receipt were sentenced to a term of 81 months of imprisonment.  On average, offenders convicted of possession but who distributed child pornography in exchange for other child pornography received a sentence of 78 months, while similarly situated offenders convicted of distribution received an average sentence of 132 months.[67]

- Appellate review of sentences in non-production cases since *Booker* has not reduced the growing disparities.  Indeed, differing approaches among the circuit courts have contributed to the sentencing disparities.[68]

---

[64]  *See id.* at 227–38.

[65]  *See* Chapter 6 at 145–48.  As noted in *supra* note 27, the statutory maximum sentence for possession offenses was ten years (for offenders who did not have a predicate conviction for a sex offense) in fiscal year 2010.  In late 2012, Congress raised the statutory maximum to 20 years for offenders who possess images depicting prepubescent minors or minors under 12 years of age.

[66]  *See* Chapter 8 at 213, 218.  Offenders without a predicate sex conviction would have been subject to a statutory mandatory minimum sentence of five years and a statutory maximum sentence of 15 years if convicted of an R/T/D offense.  Such offenders with a predicate conviction for a sex offense would have faced a statutory mandatory minimum of 15 years and a statutory maximum sentence of 40 years.  *See id.*

[67]  *See id.* at 215.

[68]  *See id.* at 238–44.

5. *Emerging research indicates that child pornography offenders with clinical sexual disorders may respond favorably to psycho-sexual treatment, particularly if administered pursuant to the "containment model."*

- Experts disagree on what percentage of child pornography offenders have clinical sexual disorders such as pedophilia. Some experts believe most or even virtually all child pornography offenders are pedophiles, while other experts believe that most child pornography offenders are not pedophiles.[69]

- Many experts believe that sex offenders, including child pornography offenders, with clinical sexual disorders such as pedophilia cannot be "cured." Nevertheless, some recent studies indicate that psycho-sexual treatment may be effective in reducing recidivism for many sex offenders. Emerging research on the effectiveness of psycho-sexual treatment administered as part of the "containment model" is especially promising and warrants further study. The containment model involves close cooperation among the treatment provider, a polygraph examiner, and a qualified probation officer or other supervising officer. The containment model is now widely considered to be a "best practice" to be implemented in supervising sex offenders, including federal child pornography offenders. The success of the containment model depends on adequate resources and proper training of the professionals who administer it.[70]

- Polygraph testing is an important part of the treatment of child pornography offenders. Polygraph testing encourages offenders in treatment to be truthful, which can advance the goals of treatment.[71]

- Researchers are beginning to develop actuarial risk assessments to gauge child pornography offenders' risk of sexual recidivism. Two primary factors that appear to be correlated with criminal sexually dangerous behavior are an offender's antisociality and his sexual deviance.[72]

- Psycho-sexual treatment providers report that the accuracy of their risk assessments of offenders and the efficacy of their treatment could be increased if they had better access to information about offense and offender characteristics (*e.g.*, access to the results of forensic analyses of offenders' computers and knowledge of offenders' histories of sexually dangerous behavior discussed in their PSRs).[73]

---

[69] *See* Chapter 4 at 75.

[70] *See* Chapter 10 at 277–78, 283–84.

[71] *See id.* at 282.

[72] *See id.* at 285–87.

[73] *See id.* at 281.

6.     *The Commission's study of 610 offenders sentenced under the non-production guidelines in fiscal years 1999 and 2000 found that their rate of known general recidivism was 30.0 percent and their rate of known sexual recidivism (a subset of general recidivism) was 7.4 percent.*

- The Commission conducted a study of the rate of known recidivism by 610 federal offenders sentenced under the non-production guidelines during fiscal years 1999 and 2000.  In evaluating any recidivism study, particularly one involving sex offenders, caution should be exercised because the known recidivism rate is lower than the actual recidivism rate.[74]  Using Federal Bureau of Investigation Record of Arrest and Prosecution ("RAP") sheets, the Commission tracked the 610 offenders during an average eight-and-one-half year follow-up period after their reentry into the community and found a rate of known general recidivism of 30.0 percent (183 of the 610 offenders).  Consistent with many other recidivism studies, general recidivism was measured by offenders' arrests for or convictions of any felony or serious misdemeanor offense (including sex offender registration violations) as well as "technical" violations of the conditions of supervision resulting in an arrest or revocation.  The Commission found that the offenders' rate of sexual recidivism, which is a subset of general recidivism, was 7.4 percent (45 of the 610 offenders).  Likewise consistent with many other recidivism studies, sexual recidivism was measured by offenders' arrests for or convictions of a sexual offense (including a new child pornography offense but excluding a sex offender registration violation).  Twenty-two of those 45 offenders (or 3.6% of the 610 offenders) were arrested for or convicted of sexual "contact" offenses.[75]

- The Commission's findings concerning offenders' general and sexual recidivism rates are similar to the findings of two recent child pornography offender recidivism studies by other researchers (one study of federal offenders and the other of Canadian offenders).[76]  In addition, the rate of known general recidivism by the Commission's study group is similar to the rate of known general recidivism by a comparable segment of the entire federal offender population (*i.e.*, white male United States citizen offenders), and the study group's general recidivism rate and sexual "contact" offense recidivism rate were lower than the equivalent rates of state "contact" sex offenders.[77]

---

[74]  *See* Chapter 11 at 295.

[75]  *See id.* at 299–301.

[76]  *See id.* at 306–07.

[77]  *See id.* at 307–08 (noting that the sexual contact offense recidivism rate of the state sex offenders was 5.3% over a three-year follow-up period, while the sexual contact recidivism rate of the federal child pornography offenders was 2.6% over a comparable three-year follow-up period).

7.    *Current federal laws regarding victim notification and restitution present unique challenges for victims of federal non-production child pornography offenses.*

- Under the Crime Victims' Rights Act (CVRA),[78] codified at 18 U.S.C. § 3771, federal law enforcement officials must notify a child pornography victim (or his or her guardian if the victim is still a minor) each time the officials charge an offender with a child pornography offense related to an image depicting the victim. Because images circulate widely on the Internet, it is not unusual for some victims to receive multiple official notifications each week. Such notifications can be emotionally traumatic because they serve to remind the victims that the images of their sexual abuse are indelible and increasingly widespread. Although under the CVRA victims may opt out of receiving such notice, doing so may prevent them from obtaining restitution and otherwise exercising their rights as victims. Thus, even as the victims' rights laws have empowered child pornography victims and enabled them to be involved in the criminal justice process, the notification process itself has had the unintended and incidental effect of exacerbating the harms associated with the ongoing distribution of the images for some victims.[79]

- In recent years, some victims of child pornography offenses have started to attempt to enforce their statutory right to restitution in 18 U.S.C. § 2259 against non-production offenders who have had no connection to the victims other than in the possession, receipt, or distribution of their images. Federal courts have struggled with calculating restitution for these victims and have reached different outcomes. Courts uniformly have found that child pornography victims are "victims" of the offenses under § 2259 and have suffered harm. Many district courts have refused to order restitution, however, because they have concluded either that a non-production child pornography offense was not the "proximate cause" of the victim's injury or that it would be impossible to apportion a specific amount of restitution owed by an individual defendant. Other district courts either have not required proximate cause or have found proximate cause and then attempted to calculate an appropriate restitution award. This division among federal courts has now extended to the appellate level where a split in the federal circuit courts has developed regarding the process of awarding restitution for child pornography victims.[80]

---

[78]  *See* Justice for All Act of 2004, Pub. L. No. 108–405, tit. I, § 102, 118 Stat. 2260, 2261-64 (Oct. 30, 2004).

[79]  *See* Chapter 5 at 115–17.

[80]  *See id.* at 117–18.

8.      *The Commission will continue to study sentencing practices in child pornography production cases, which in the past decade have shown both significant increases in average guideline minimums and average sentence lengths as well as significant decreases in the rate of sentences within the applicable guideline ranges.*

- Average prison sentences for §2G2.1 offenders steadily increased from fiscal year 2004 to fiscal year 2009 (from 153.4 months to 282.9 months), as increasing percentages of offenders were subject to the PROTECT Act's provisions raising penalty ranges.  However, the average sentence lengths decreased slightly in fiscal year 2010 (to 267.1 months) and remained essentially stable in fiscal year 2011 (at 274.0 months).[81]

- The annual rates of sentences imposed within the applicable guideline ranges for production offenders have steadily decreased since fiscal year 2004.  By fiscal year 2011, the within range rate had decreased to 50.4 percent of cases from a within range rate of 84.0 percent in fiscal year 2004.[82]

## D.    RECOMMENDATIONS TO CONGRESS

The Commission concludes that the non-production child pornography sentencing scheme should be revised to account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purposes of punishment by accounting for the variations in offenders' culpability and sexual dangerousness.

### 1.     *Potential Amendments to the Sentencing Guidelines*

As reflected in the report, the Commission believes that the following three categories of offender behavior encompass the primary factors that should be considered in imposing sentences in §2G2.2 cases:

(i)      the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the age of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technologies);

(ii)     the degree of an offender's involvement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

---

[81]   *See* Chapter 9 at 252–53.

[82]   *See id.* at 254–57.

(iii)     whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

The current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness.  As a result, penalty ranges are too severe for some offenders and too lenient for other offenders.  The guideline thus should be revised to more fully account for these three factors and thereby provide for more proportionate punishments.

Consistent with the position of the Department of Justice,[83] the Commission believes that Congress should enact legislation providing the Commission with express authority to amend the current guideline provisions that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines.[84]  If such legislation were enacted, the Commission would proceed to draft a comprehensive revision of the child pornography guidelines according to the Commission's regular procedures for amendment pursuant to 28 U.S.C. § 994(o).  Public comment would be sought, a public hearing would be held, and the proposed revision would be submitted for congressional review prior to becoming effective, pursuant to 28 U.S.C. § 994(p).

Without congressional action, the Commission is able nevertheless to amend the child pornography guidelines in a more limited manner that better reflects the three sentencing factors discussed above.  As shown in Appendix E of this report, which contains an analysis of the provenance of each section of the current version of §2G2.2, a number of its provisions were promulgated on the Commission's own initiative — not as a result of a specific congressional directive or by direct statutory amendment — and, thus, could be amended pursuant to 28 U.S.C. § 994(o) (subject to congressional review prior to becoming effective pursuant to 28 U.S.C. § 994(p)).

Potential amendments to the guideline would update specific offense characteristics in §2G2.2(b) in order to reflect:

- recent changes in typical offense behavior (*e.g.*, revisions of the enhancements in §2G2.2(b)(2), (4), and (7) related to the types and volume of images possessed to better reflect the current spectrum of offender culpability);

- recent changes in technology (*e.g.*, revisions of the enhancements in §2G2.2(b)(3) and (6), which concern distribution and use of a computer, to

---

[83]  *See* Letter from Jonathan Wroblewski, Director, Office of Policy and Legislation, Criminal Division, U.S. Department of Justice, to Hon. William K. Sessions III, Chair, United States Sentencing Commission, at 6 (June 28, 2010) ("We think the report to Congress ought to recommend legislation that permits the Sentencing Commission to revise the sentencing guidelines for child pornography offenses.").

[84]  *See* History of the Child Pornography Guidelines, *supra* note 2, at 11-49 (discussing how the current guidelines have been influenced by both a series of congressional directives since 1991 and also the direct amendments to the guidelines in the PROTECT Act of 2003).

reflect offenders' use of modern computer and Internet technologies such as P2P file-sharing programs); and

- emerging knowledge about offenders' histories and behaviors gained from social science research (*e.g.*, modifying the "pattern of activity" enhancement §2G2.2(b)(5) to better account for  offenders' sexually dangerous behavior and possibly creating a new enhancement for offenders' involvement in child pornography "communities").

While a comprehensive revision of the guideline addressing production offenses, §2G2.1, is not necessary at this time, certain conforming amendments may be appropriate if the corresponding provisions in §2G2.2 were to be amended.[85]

Finally, the Commission will continue to study subsection (b) of USSG §5D1.2 (Term of Supervised Release), which recommends that courts impose "the statutory maximum term of supervised release" for all offenders convicted of a sex offense, including any child pornography offense.  That guideline effectively recommends a lifetime term of supervision for all child pornography offenders because the current statutory maximum term of supervision for any offender convicted of a child pornography offense is "any term of years not less than 5, or life."[86] The recommendation in §5D1.2(b) was made before the enactment of the PROTECT Act of 2003, which raised the statutory maximum term of supervision from three years for most child pornography offenders to a lifetime term for all child pornography offenders.[87]  The Commission is considering amending the guideline in a manner that provides guidance to judges to impose a term of supervised release within the statutory range of five years to a lifetime term that is tailored to individual offender's risk and corresponding need for supervision.

## 2.    *Potential Amendments to the Statutory Scheme*

The Commission also believes that Congress should amend the statutory scheme to align the penalties for receipt and possession offenses.  Since possession was first criminalized by Congress in 1990, receipt has carried more severe statutory penalties.[88]  The limited legislative history from the early 1990s indicates that Congress had two primary reasons for punishing

---

[85]  The guideline for production offenses contains certain enhancements that are similar to enhancements in the guideline for non-production offenses.  *See* USSG §2G2.1(b)(2) (providing for 4-level enhancement for production of images depicting children under 12 years of age and a 2-level enhancement for children under 16 years of age), (b)(3) (providing for a 2-level enhancement for distribution of images), & (b)(4) (providing for a 4-level enhancement for production of images that depict sado-masochistic sexual conduct or other violence).

[86]  18 U.S.C. § 3583(k).

[87]  *See* Chapter 10 at 272.

[88]  Currently, if they have no predicate convictions for sex offenses, offenders convicted of possession face a statutory range of punishment of zero to ten or 20 years (depending on the age and sexual maturity of the minors depicted in the child pornography), while offenders convicted of receipt face a mandatory minimum five-year term of imprisonment and a 20-year statutory maximum term.  If they have predicate convictions for sex offenses, offenders convicted of possession face a statutory range of punishment of ten to 20 years, while offenders convicted of receipt face a mandatory minimum 15-year term of imprisonment and a 40-year statutory maximum term.  *See* Chapter 2 at 26.

receipt more harshly than possession: first, that aligning the penalties for receipt with the penalties for distribution rather than with the penalties for possession was important for law enforcement purposes (insofar as it was easier to detect distributors in the act of receiving than in the act of distributing); and, second, that many receipt offenses contributed to the commercial child pornography market. Those reasons no longer apply with the same force because of changes in offense conduct and law enforcement methods to detect offenders on the Internet during the past two decades. Prosecutors can prove distribution as or more easily than receipt in a typical case today. Furthermore, as the result of changes in the child pornography "market" since the early 1990s, *non-commercial* child pornography distribution has overtaken commercial child pornography distribution, and most offenders thus pay nothing to receive child pornography. Both of these developments militate in favor of punishing receipt in an equivalent manner to possession rather than in an equivalent manner to distribution.[89]

Moreover, the Commission's review of over 2,000 non-production cases has demonstrated that the underlying offense conduct in the typical case in which an offender was prosecuted for possession was indistinguishable from the offense conduct in the typical case in which an offender was prosecuted for receipt. Yet the Commission's analysis of §2G2.2 cases from fiscal year 2010 revealed significant unwarranted sentencing disparities among similarly situated offenders based in large part on whether they were charged with possession or receipt.[90] For these reasons, the Commission recommends that Congress align the statutory penalties for receipt and possession. There is a spectrum of views on the Commission, however, as to whether these offenses should be subject to a statutory mandatory minimum penalty and, if so, what any mandatory minimum penalty should be.[91] Nevertheless, the Commission unanimously believes that, if Congress chooses to align the penalties for possession with the penalties for receipt and maintain a statutory mandatory minimum penalty, that statutory minimum should be less than five years.

The Commission's analysis of current offenders' distribution behaviors revealed several different types of common distribution conduct, ranging from "personal" modes of distribution associated with "community" involvement (*e.g.*, emailing images to other offenders or trading images in "closed" P2P file-sharing programs) to "open" P2P file-sharing programs involving impersonal and indiscriminate distribution to strangers.[92] The most common mode of distribution today is "open" P2P file-sharing.[93] The different types of distribution reflect a significant evolution in the technologies used to distribute child pornography, particularly in the past decade.[94] Because the existing statutory provisions prohibiting distribution and the related

---

[89]  *See* Chapter 12 at 327-28.

[90]  *See* Chapter 8 at 214–15 (Figures 8-2 & 8-3).

[91]  *Cf.* U.S. SENT'G COMM'N, MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM xxxi (2011) (noting that "there is a spectrum of views among members of the Commission regarding mandatory minimum penalties" generally).

[92]  *See* Chapter 6 at 149–52.

[93]  *See id.* at 150, 154.

[94]  *See id.* at 155 & n.77.

act of transportation of child pornography[95] were enacted in earlier technological eras,[96] Congress may wish to revise the penalty structure governing those offenses to differentiate among the various types of distribution.

Finally, the Commission recommends that Congress consider amending the current federal statutes governing notice to and restitution for victims of non-production child pornography offenses. The notice provision has been deemed necessary to protect the victims' rights (including their right to seek restitution) but in some cases has exacerbated victims' emotional harm. The restitution statute has generated confusion and disparate results around the country. Congress may wish to amend those two statutory provisions in order to minimize emotional trauma to victims and also provide specific guidance to sentencing courts to ensure appropriate restitution for victims.

### E.   CONCLUSION

The Commission's report is intended to provide Congress and the various stakeholders in the federal criminal justice system with relevant and thorough information about child pornography offenses and offenders. As illustrated by the report, child pornography offenses result in substantial and indelible harm to the children who are victimized by both production and non-production offenses. However, there is a growing belief among many interested parties that the existing sentencing scheme in non-production cases no longer distinguishes adequately among offenders based on their degrees of culpability and dangerousness. Numerous stakeholders — including the Department of Justice, the federal defender community, and the Criminal Law Committee of the Judicial Conference of the United States Courts — have urged the Commission and Congress to revise the non-production sentencing scheme to better reflect the growing body of knowledge about offense and offender characteristics and to better account for offenders' varying degrees of culpability and dangerousness.

The Commission believes that the current non-production guideline warrants revision in view of its outdated and disproportionate enhancements related to offenders' collecting behavior as well as its failure to account fully for some offenders' involvement in child pornography communities and sexually dangerous behavior. The current guideline produces overly severe sentencing ranges for some offenders, unduly lenient ranges for other offenders, and widespread inconsistent application. A revised guideline that more fully accounts for all three factors in Part D above — the full range of an offender's collecting behavior, the degree of his involvement in a child pornography community, and any history of sexually dangerous behavior — would better promote proportionate sentences and reflect the statutory purposes of sentencing. Such a revised guideline, together with a statutory structure that aligns the penalties for receipt and possession, would reduce the unwarranted sentencing disparities that currently exist. The Commission also

---

[95]  18 U.S.C. §§ 2252(a)(1),(2) & 2252A(a)(1), (2). As noted in Chapter 7, the vast majority of offenders convicted of transportation of child pornography in fact knowingly distributed it to other offenders. *See* Chapter 7 at 189 n.72. Transportation charges, which do not require proof of intent to distribute to another, often are brought in lieu of distribution charges. *See* Chapter 2 at 24–25.

[96]  Section 2252 originally was enacted in 1977, and § 2252A originally was enacted in 1996. *See* United States v. Polizzi, 549 F. Supp. 2d 308, 341 (E.D.N.Y. 2008), *vacated on other grounds*, 564 F.3d 142 (2d Cir. 2009). *See also* Chapter 1 at 5–6 (discussing the evolution of technology in offense conduct during the past four decades).

suggests that Congress may wish to revise the penalty structure governing distribution offenses in order to differentiate among the wide array of newer and older technologies used by offenders to distribute child pornography.  Finally, the Commission also recommends to Congress that it consider amending the notice and restitution statutes for victims of child pornography offenses. The Commission stands ready to work with Congress, the federal judiciary, the executive branch, and others in the federal criminal justice community to improve the sentencing scheme for these extremely serious offenses.

* * *

**§2G2.2.**      **Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor**

    (a)     Base Offense Level:

        (1)     **18**, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7).

        (2)     **22**, otherwise.

    (b)     Specific Offense Characteristics

        (1)     If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by **2** levels.

        (2)     If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by **2** levels.

        (3)     (Apply the greatest)  If the offense involved:

            (A)     Distribution for pecuniary gain, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than **5** levels.

            (B)     Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by **5** levels.

            (C)     Distribution to a minor, increase by **5** levels.

            (D)     Distribution to a minor that was intended to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other

than illegal activity covered under subdivision (E), increase by **6** levels.

(E)     Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by **7** levels.

(F)     Distribution other than distribution described in subdivisions (A) through (E), increase by **2** levels.

(4)     If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

(5)     If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by **5** levels.

(6)     If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by **2** levels.

(7)     If the offense involved—

(A)     at least 10 images, but fewer than 150, increase by **2** levels;

(B)     at least 150 images, but fewer than 300, increase by **3** levels;

(C)     at least 300 images, but fewer than 600, increase by **4** levels; and

(D)     600 or more images, increase by **5** levels.

(c)     Cross Reference

(1)     If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

<u>*Commentary*</u>

<u>*Statutory Provisions*</u>:  *18 U.S.C. §§ 1466A, 2252, 2252A(a)-(b), 2260(b).*

<u>*Application Notes*</u>:

*1.*     <u>*Definitions.*</u>—*For purposes of this guideline:*

*"Computer" has the meaning given that term in 18 U.S.C. § 1030(e)(1).*

*"Distribution" means any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor. Accordingly, distribution includes posting material involving the sexual exploitation of a minor on a website for public viewing but does not include the mere solicitation of such material by a defendant.*

*"Distribution for pecuniary gain" means distribution for profit.*

*"Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain" means any transaction, including bartering or other in-kind transaction, that is conducted for a thing of value, but not for profit. "Thing of value" means anything of valuable consideration. For example, in a case involving the bartering of child pornographic material, the "thing of value" is the child pornographic material received in exchange for other child pornographic material bartered in consideration for the material received.*

*"Distribution to a minor" means the knowing distribution to an individual who is a minor at the time of the offense.*

*"Interactive computer service" has the meaning given that term in section 230(e)(2) of the Communications Act of 1934 (47 U.S.C. § 230(f)(2)).*

*"Material" includes a visual depiction, as defined in 18 U.S.C. § 2256.*

*"Minor" means (A) an individual who had not attained the age of 18 years; (B) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years, and (ii) could be provided for the purposes of engaging in sexually explicit conduct; or (C) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.*

*"Pattern of activity involving the sexual abuse or exploitation of a minor" means any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct.*

*"Prohibited sexual conduct" has the meaning given that term in Application Note 1 of the Commentary to §2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse).*

*"Sexual abuse or exploitation" means any of the following: (A) conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)-(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2421, § 2422, or § 2423; (B) an offense under state law, that would have been an offense under any such section if the offense had occurred within the special maritime or territorial jurisdiction of the United States; or (C) an attempt or conspiracy to commit any of the offenses under subdivisions (A) or (B). "Sexual abuse or exploitation" does not include possession, accessing with intent to view, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor.*

2.   *Application of Subsection (b)(4).*—Subsection (b)(4) applies if the offense involved material that *portrays sadistic or masochistic conduct or other depictions of violence, regardless of whether the defendant specifically intended to possess, access with intent to view, receive, or distribute such materials.*

3.  *Application of Subsection (b)(5).*—A conviction taken into account under subsection (b)(5) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History).

4.  *Application of Subsection (b)(7).*—

    (A)  *Definition of "Images".*—"Images" means any visual depiction, as defined in 18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8).

    (B)  *Determining the Number of Images.*—For purposes of determining the number of images under subsection (b)(7):

        (i)  *Each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered to be one image.  If the number of images substantially underrepresents the number of minors depicted, an upward departure may be warranted.*

        (ii)  *Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images.  If the length of the visual depiction is substantially more than 5 minutes, an upward departure may be warranted.*

5.  *Application of Subsection (c)(1).*—

    (A)  *In General.*—The cross reference in subsection (c)(1) is to be construed broadly and includes all instances where the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting live any visual depiction of such conduct.

    (B)  *Definition.*—"Sexually explicit conduct" has the meaning given that term in 18 U.S.C. § 2256(2).

6.  *Cases Involving Adapted or Modified Depictions.*—If the offense involved material that is an adapted or modified depiction of an identifiable minor (*e.g.*, a case in which the defendant is convicted under 18 U.S.C. § 2252A(a)(7)), the term "material involving the sexual exploitation of a minor" includes such material.

7.  *Upward Departure Provision.*—If the defendant engaged in the sexual abuse or exploitation of a minor at any time (whether or not such abuse or exploitation occurred during the course of the offense or resulted in a conviction for such conduct) and subsection (b)(5) does not apply, an upward departure may be warranted.  In addition, an upward departure may be warranted if the defendant received an enhancement under subsection (b)(5) but that enhancement does not adequately reflect the seriousness of the sexual abuse or exploitation involved.

*Background:*  Section 401(i)(1)(C) of Public Law 108–21 directly amended subsection (b) to add subdivision (7), effective April 30, 2003.

*United States Sentencing Commission*

Historical Note:  Effective November 1, 1987.  Amended effective June 15, 1988 (see Appendix C, amendment 31); November 1, 1990 (see Appendix C, amendment 325); November 1, 1991 (see Appendix C, amendment 372); November 27, 1991 (see Appendix C, amendment 435); November 1, 1996 (see Appendix C, amendment 537); November 1, 1997 (see Appendix C, amendment 575); November 1, 2000 (see Appendix C, amendment 592); November 1, 2001 (see Appendix C, amendment 615); April 30, 2003 (see Appendix C, amendment 649); November 1, 2003 (see Appendix C, amendment 661); November 1, 2004 (see Appendix C, amendment 664); November 1, 2009 (see Appendix C, amendments 733 and 736).

*Chapter 5*

# VICTIMS OF CHILD PORNOGRAPHY

This chapter presents information on victims of child pornography.  It is unknown how many victims of child pornography exist worldwide.  The National Center for Missing and Exploited Children ("NCMEC") has reviewed over 57 million images and videos of child pornography (many of them duplicates) and has assisted law enforcement in the identification over 4,103 individual victims.[1]  The number of identified victims represents only a small portion of the victims whose images are in circulation.  It is estimated that there are over five million unique child pornography images on the Internet[2] and some offenders possess over one million images of child pornography.[3]  This chapter considers the issues and harms surrounding victimization through the production of child pornography and the continued existence and distribution of child pornography.  It also addresses the legal issues surrounding victims' rights for child pornography victims.

## A.    VICTIMIZATION THROUGH PRODUCTION

Child pornography victims have usually been the victims of contact child sex abuse.[4]  Like other victims of child sex abuse, child pornography victims can suffer physical harms

---

[1]  NCMEC was established in 1984 as a nonprofit organization working in partnership with federal law enforcement. NCMEC works to find missing children, prevent victimization, and identify exploited children.  *See* http://www.missingkids.com/missingkids/servlet/PageServlet?LanguageCountry=en_US&PageId=4327; Prepared Statement of Michelle Collins Vice President, Exploited Children Division and Assistant to the President of the National Center for Missing & Exploited Children, to the Commission, at 4 (Feb. 15, 2012) ("Collins Statement").

[2]  Government of Canada, Federal Ombudsman for Victims of Crime, *Every Image Every Child:  Internet Facilitated Child Sexual Abuse in Canada*, 18 (Aug. 20, 2009), http://www.victimsfirst.gc.ca/pdf/childp-pjuvenile.pdf.

[3]  *See, e.g.,* Sentencing Memorandum, United States v. Burr, No. 09-cr-308 (D. Or. July 23, 2010), ECF No. 26 at 3–4 ("A forensic review of the defendant's computer and digital media storage devices have located over one million images of child pornography"); Sentencing Memorandum, United States v. Worman, 07-cr-40 (E.D. Pa. July 30, 2009), ECF No. 208 at 1 ("1.2 million images of child pornography were seized"); Peggy O'Hare, *Pilot Arrested on Child Porn Charges*, HOUS. CHRON., July 1, 2010, http://www.chron.com/disp/story mpl/metropolitan/7089813.html ("police investigators seized what they called the largest cache of child pornography ever discovered in Harris County, amounting to 'millions of images'").

[4]  *See* Chapter 9 at 263.  Two primary exceptions are victims whose images were taken with hidden cameras or recorded remotely (*e.g.,* via webcam) and victims whose images were used to create morphed child pornography images.  *See id.*  While victims of sexual exploitation, they may not have been victims of contact sex abuse.  "Morphed" child pornography is produced by manipulating images of identifiable children in conjunction with computer generated graphics or drawings.  In 2007, the PROTECT Our Children Act of 2008 made it unlawful to knowingly produce with intent to distribute or to knowingly distribute morphed child pornography ("child pornography that is an adapted or modified depiction of an identifiable minor").  *See* PROTECT Our Children Act of 2008, Pub. L. 110–401, § 304 (2008); USSG App. C., Amend. 733 (Nov. 1, 2009).  Morphed child pornography offenses are rarely prosecuted in federal court.  *See* Chapter 6 at 146.

*United States Sentencing Commission*

during the abuse, including bone fractures and sexually-transmitted diseases.[5]  They may also suffer long-term physical and psychological harms.[6]

There is limited information available about the subset of child sex abuse victims who are also victims of child pornography production offenses.[7]  Though children of both genders are sexually abused, females appear more likely to be victims of child pornography production offenses.[8]  Children of all ages are victimized by child pornography producers, from as young as infants and toddlers to adolescents; about half of victims are younger than 12 years of age.[9]  NCMEC reports that 24 percent of identified victims were pubescent, and 76 percent were prepubescent.  Ten percent of the prepubescent identified victims were infants or toddlers.[10]  That range of victim ages is consistent across different data pools.  Child pornography producers may target young victims because they are pre-verbal and unable to report their abuse.  They are also less likely to recognize inappropriate touching.[11]

---

[5]  Ian O'Donnell & Claire Milner, Child Pornography Crime, Computers & Society 77 (2007).

[6]  *See, e.g.,* Holly L. Wegman & Cinnamon Stetler, *A Meta-Analytic Review of the Effects of Childhood Abuse on Medical Outcomes in Adulthood*, 71 Psychosomatic Med. 805 (2009); O'Donnell & Milner, *supra* note 5, at 77; Beth E. Molnar, Stephen L. Buka, & Ronald C. Kessler, *Child Sexual Abuse and Subsequent Psychopathology: Results from the National Comorbidity Survey*, 91 Am. J. of Pub. Health 753 (2001); Bernice Andrews, Chris R. Brewin, Suzanna Rose, & Marilyn Kirk, *Predicting PTSD Symptoms in Victims of Violent Crime: The Role of Shame, Anger, and Childhood Abuse*, 109 J. of Abnormal Psychol. 69 (2000); Angela Browne & David Finkelhor, *Impact of Child Sexual Abuse: A Review of the Research.* 99 Psychol. Bull. 66 (1986); Marvin L. Blumberg, *Depression in Abused and Neglected Children*, 35 Am. J. of Psychotherapy 342 (1981).

[7]  Additional information regarding the child pornography victims can be found in the discussion of child pornography images.  *See* Chapter 4 at 85–92.

[8]  Janis Wolak, David Finkelhor, Kimberly J. Mitchell, & Lisa M. Jones*, Arrests for Child Pornography Production: Data at Two Time Points From a Nat'l Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 188 (2011); David Finkelhor & Richard Ormrod, *Child Pornography:  Patterns From NIBRS*, Office of Juvenile Just. & Delinquency Prevention, Juv. Just. Bull., NCJ 204911, at 6 (Dec. 2004) (available at https://www.ncjrs.gov/pdffiles1/ojjdp/204911.pdf).

[9]  While recent research finds that most victims of child pornography production are teens, *see* Janis Wolak, David Finkelhor, & Kimberly J. Mitchell, *Trends in Arrests for Child Pornography Production: The Third Nat'l Juv. Online Victimization Study (NJOV-3)*, 3 (2012), http://www.unh.edu/ccrc/internet-crimes/papers html (last visited Nov. 30, 2012), the same researchers agree that offenders possessed images of victims of different ages including those of children under three (28%), aged three to five (46%), aged six to 12 (86%), and older than 12 years (67%). Janis Wolak, Kimberly J. Mitchell, & David Finkelhor, *Child Pornography Possessors:  Trends in Offender and Case Characteristics,* 23 Sexual Abuse: A J. of Res. & Treatment 22, 31 (2011).  Criteria for inclusion in the N-JOV studies include an Internet-related sexual exploitation crime (possession, trafficking, distribution, or production) ending in arrest, in which a victim was under the age of 18.  *Id.* at 22–23.

[10]  Collins Statement, *supra* note 1, at 4–5.

[11]  Max Taylor, Gemma Holland & Ethel Quayle, *Typology of Paedophile Picture Collections,* 74 The Police J. 97, 106 (2001) ("Very young children (of 5 and under) may be particularly vulnerable to involvement in child pornography, in that they may be more susceptible to what for an older child would be inappropriate requests to undress, for example.  Very young children have little or no awareness of the sexual context to what they are being asked to do, and may be subject to sexual victimisation without the same risk of disclosure to adults.").

Child pornography producers make victims participate through different methods.  Like other contact sex offenders, they often groom their victims prior to engaging in sexual abuse.[12]  While underage children are incapable of legal consent, many child pornography producers will manipulate victims to make them "agree" to participate.[13]  Some offenders produce child pornography by convincing or coercing a child to take images of himself or herself.  Coercion of a child to take nude images of himself or herself is production of child pornography.[14]  Such images should be distinguished from self-produced nude images without an adult producer's involvement (sometimes called "sexting" or "youth-only experimental" production).[15]  While sexting and youth-only experimentally produced images are serious and can lead to many negative repercussions,[16] there is little evidence that children are regularly prosecuted for such behavior.[17]

Most identified victims of child pornography production offenses are abused by a family member or acquaintance.[18]  Depending on the age of the child and the relationship of the abuser

---

[12]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190; *see* Kenneth V. Lanning, *Child Molesters: A Behavioral Analysis*, for NCMEC, at 10 (2001), http://www.missingkids.com/en_US/publications/NC70.pdf.

[13]  *See* Deborah Muir, *Violence against Children in Cyberspace: A Contribution to the UN Study on Violence Against Children,* End Child Prostitution, Child Pornography & Trafficking of Children for Sexual Purposes ("ECPAT Int'l"), 43(2005), www.ecpat.net/ei/Publications/ICT/Cyberspace_ENG.pdf; Max Taylor & Ethel Quayle, Child Pornography: An Internet Crime 22–23 (2003) (referring to child pornography videos where "bribes and threat made by the photographer to induce the child to do what is required"); Lanning, *supra* note 12, at 56–58.  Regardless of whether a child appears to consent, a child cannot legally consent to participation in production of child pornography.  18 U.S.C. § 2251.  *See also* Kenneth V. Lanning, *Compliant Child Victims: Confronting an Uncomfortable Reality* (hereinafter "*Compliant Child Victims*"), *in* Viewing Child Pornography on the Internet 56–58 (Ethel Quayle & Max Taylor, eds. 2005).

[14]  A child pornography producer is an individual who "employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . sexually explicit conduct for the purpose of producing any visual depiction of such conduct." 18 U.S.C. § 2251(a).

[15]  Nat'l Ctr. For Missing & Exploited Children, *Policy Statement on Sexting*, (Sept. 21, 2009), http://us missingkids.com/missingkids/servlet/NewsEventServlet?LanguageCountry=en_US&PageId=4130 (Last visited Nov. 30, 2012); Wolak et al., *Trends in Arrests for Child Pornography Production*, *supra* note 9, at 2 (distinguishing "youth-only experimental" production and "youth-only aggravated" production from "adult-involved" production). For a discussion of appropriate law enforcement and societal response to sexting *see* Mary G. Leary, *Sexting or Self-Produced Child Pornography? The Dialog Continues - Structured Prosecutorial Discretion Within a Multidisciplinary Response,* 17 Virginia J. of Soc. Pol. & the L. 487, 491–92 (2010).

[16]  *See, e.g.,* Slate V Staff, *Almost 9 in 10 Sexted or Emailed Youth Photos Turn Up as Porn*, http://www.slate.com/blogs/trending/2012/10/23/sexting_risk_study_says_naked_photos_end_up_online_on_porn_s ites_nine_times html (last visited Oct. 23, 2012).

[17]  *See* Wolak et al., *Trends in Arrests for Child Pornography Production*, *supra* note 9, at 2 ("research shows that few youth actually participate in sexting and most police do not arrest youth in cases that come to police attention") (footnotes omitted); Leary, *supra* note 15, at 488.  No juveniles were sentenced in 2010 for self-produced child pornography images. *See generally*, Chapter 9 (discussing Commission's coding project of federal child pornography producers sentenced in fiscal year 2010).

[18]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190; Taylor & Quayle, *supra* note 13, at 23 (noting that the abuser is "invariably a parent, guardian of some kind").  Interestingly, trends suggest that non-family acquaintances are increasingly arrested for child pornography production offense.  Wolak et al., *Trends in Arrests for Child Pornography Production*, *supra* note 9, at 3 (noting that in 2009, half of production offenders in the sample were acquaintances).

to the child,[19] offenders may pressure the victims via parental authority, threats, and/or payment with drugs, alcohol, or money.[20]  Other offenders manipulate by using one child to recruit other victims, including siblings.[21]  These child pornography producers sometimes rely on peer pressure to encourage multiple children to participate.[22]

Images of child pornography often present a distorted picture of what actually occurred. Some child pornography images show forcible rape, forced penetration, and other violent sexual assaults,[23] but images reflecting a child crying or in distress appear to be the exception.[24]  Rather, most images are manipulated to show "a compliant sexually involved child who willingly participates in the sexual behavior being portrayed."[25]  Some perpetrators use such images that depict victims enjoying themselves to groom other child victims.[26]  Some offenders can be heard on videos suggesting poses or exhorting victims to smile for the camera while they are abused.[27]

While the vast majority of child pornography images are created with the victim's knowledge,[28] approximately one-quarter of child pornography images appear to have been produced, at least to some extent, without the victim's knowledge.[29]  Production of these images occurs by using hidden cameras, creating morphed images, or by photographing or filming

---

[19]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190–191; TAYLOR & QUAYLE, *supra* note 13, at 21–23; Ethel Quayle, *The Impact of Viewing on Offending Behavior, in* CHILD SEXUAL ABUSE AND THE INTERNET: TACKLING THE NEW FRONTIER 31 (Martin Calder ed. 2004).

[20]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190*; see* Lanning, *supra* note 12, at 5–6.

[21]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190.  Sometimes these are siblings sets and sometimes an initial victim may be encouraged by the offender to "recruit" another child.  *See id;* Lanning, *Compliant Child* Victims, *supra* note 13, at 59 ("[S]ome older child victims . . . . may assist the offender in obtaining new victims.").

[22]  *See* Janis Wolak, David Finkelhor & Kimberly J. Mitchell, *The Varieties of Child Pornography Production, in* VIEWING CHILD PORNOGRAPHY ON THE INTERNET, *supra* note 13, at 38–40; Finkelhor et al., *Patterns From NIBRS, supra* note 8, at 6.

[23]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190.

[24]  TAYLOR & QUAYLE, *supra* note 13, at 22 (noting that "[a] common characteristic of child pornography is that the subject is smiling . . . [s]miling is important because it suggests that the child is happy, even enjoying, what is happening").

[25]  *Id.*

[26]  "[C]hild pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children 'having fun' participating in such activity." Child Pornography Prevention Act of 1996, P.L. 104–208, § 121(1)(3);  *see also* Save the Children Europe*, Position Paper on Child Pornography and Internet-Related Sexual Exploitation of Children*, 9 (June 2003), http://ec.europa.eu/justice_home/daphnetoolkit/files/projects/2002_004/int_position_paper_on_child_pornography.pdf ("Abusers often use images in which children have been forced to smile so it can be claimed, especially with younger children, that they are 'having fun' and have given 'consent'".).

[27]  Taylor et al., *supra* note 11, at 104; TAYLOR & QUAYLE, *supra* note 13, at 22.

[28]  Wolak et al., *Arrests for Child Pornography Production, supra* note 8, at 190.

[29]  *Id.* (approximately 22% of offenders used covert methods to produce images).

sleeping or drugged victims.[30]  Child victims may also be too young to be aware of the abuse or of the recording.[31]

Child pornography victims, like victims of other types of sexual abuse, generally are reluctant to report child sexual abuse for a variety of reasons.[32]  Some victims do not report the crime because offenders have threatened to harm the victims or others if the victim reports the crime.[33]  As mentioned, in some cases, the victim is pre-verbal and unable to communicate to the authorities or may not be aware that images were recorded.

It also appears that the existence of images of abuse can make a victim even less likely than other sex abuse victims to report the crime.[34]  The "feelings of guilt, shame and self-blame"[35] regarding the images can be so powerful that some victims deny existence of pornographic images even when confronted with them.[36]  Those who have studied child pornography victims note that "probably the greatest inhibitors to disclosing what has occurred is the humiliation that the children feel regarding who may have seen their images and their fear of being recognized."[37]  Victims report feelings of shame and embarrassment that are exacerbated by the images and prevent them from reporting the abuse.[38]  Some victims fear the images will

---

[30]  Wolak et al., *Varieties of Child Pornography, supra* note 22, at 39–40.

[31]  *Id.* at 39; Taylor et al, *supra* note 11, at 106 (discussing abuse of very young children).

[32]  Tink Palmer, *Behind the Screen: Children who are the Subjects of Abusive Images in* Viewing Child Pornography on the Internet 63–64 (Ethel Quayle & Max Taylor eds. 2005).  Studies relying on self-reports estimate that from one in six to one in nine men report that they were sexually abused as boys and one in three to one in five women report that they were sexually abused as girls.  John Briere & Diana M. Elliot, *Prevalence and Psychological Sequelae of Self-reported Childhood Physical and Sexual Abuse in a General Population Sample of Men and Women*, 27 Child Abuse & Neglect 1205, 1205 (2003) (32.3% of women and 14.2% of men reported child sex abuse).  By contrast, official reports of child sex abuse are much lower. *See* Emily M. Douglas & David Finkelhor, *Childhood Sexual Abuse Fact Sheet*, Crimes Against Children Res. Ctr., (May, 2005), www.unh.edu/ccrc/factsheet/pdf/CSA-FS20.pdf (official records reflect that approximately 0.1% children were victims of substantiated incidents of child sex abuse in 2003 and roughly 225,000 sex abuse crimes against children were reported to the police in 2001).

[33]  *See, e.g.*, United States v. Snyder, 189 F.3d 640, 643 (7th Cir. 1999) (defendant showed minor victim firearms and threatened to kill him if he reported the sexual abuse which the defendant had filmed).

[34]  Palmer, *supra* note 32, at 63–64; *see* Muir, *supra* note 13, at 40–41.

[35]  Prepared Statement of Dr. Sharon Cooper, Adjunct Professor, Pediatrics, University of North Carolina-Chapel Hill School of Medicine, to the Commission, at 10 (Feb. 15, 2012) ("Cooper Statement").

[36]  Lanning, *Compliant Child Victims*, *supra* note 13, at 71*; see also* Testimony of Dr. Sharon Cooper, to the U.S. Senate Committee on Commerce, Science and Transportation (Sept. 19, 2006) (available at http://commerce.senate.gov/public/?a=Files.Serve&File_id=e81f4756-9ebe-43c1-9d6c-b853b51bfddb) ("children not only typically do not tell of their abuse, but will in fact deny the presence of images"); Muir, *supra* note 13, at 41 ("[i]n Sweden, a group of child victims of pornography denied the abuse despite visual evidence of its occurrence").

[37]  Palmer, *supra* note 32, at 63–64.  Others have described the existence of the photos as establishing a "silent conspiracy" and explaining "[o]ne of the most destructive impacts on juveniles of their participation in pornography is the silent conspiracy into which they feel bound by their offender. Taylor & Quayle, *supra* note 13, at 25 (internal citation omitted).

[38]  *See* Palmer, *supra* note 32, at 64.

*United States Sentencing Commission*

make it appear as though they were complicit or actively participated in the abuse.[39]  Other victims, at the behest of an adult offender, may have influenced other minor victims to participate in the abuse and are afraid that their own behavior was illegal.[40]  Finally, even if the contact abuse is discovered, investigators may fail to ask the victim whether images were created and miss an opportunity to identify the child as a victim of child pornography production in addition to contact sex abuse.[41]

### B.    RECURRENT VICTIMIZATION THROUGH EXISTENCE OF IMAGES

Child pornography victims face other types of victimization that that are separate from the harm of production.  Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images.[42]  Both Congress and the Supreme Court have concluded that the ongoing distribution of child pornography images violates the victim's privacy and exacerbates the continued harms to the victim.[43]  Congress has spoken about ongoing circulation, noting that "its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years."[44]  The Supreme Court likewise has described child pornography images as "a permanent record" and explained that "the harm to the child is exacerbated by their circulation."[45]  It further noted that this is a harm distinct from that caused during the production of the images:  it is "the pornography's continued existence caus[ing] the child victims continuing harm by haunting the children in years to come."[46]

---

[39]  *See* Muir, *supra* note 13, at 40–41; TAYLOR & QUAYLE, *supra* note 13, at 22; *see also* Lanning, *Compliant Child Victims, supra* note 13, at 56–58.

[40]  O'DONNELL & MILNER, *supra* note 5, at 74.  Abusers sometimes convince their victims that they will be legally liable for involving participating in abuse with other children and this "can be used as blackmail to force the child to remain silent and compliant."  *Id.*

[41]  Gemma Holland, *Identifying Victims of Child Abuse Images: An Analysis of Successful Identifications*, *in* VIEWING CHILD PORNOGRAPHY ON THE INTERNET *supra* note 13, at 79 (noting an instance in which one child disclosed abuse but failed to mention that she was photographed).

[42]  *See,* Prepared Statement of Susan Howley, Chair of the Commission's Victims Advisory Group, to the Commission, at 2–5 (Feb. 15, 2012)(discussing harm suffered by victims); *see also* Cooper Statement, *supra* note 35, at 7 (finding that many victims suffer from posttraumatic stress disorder, anxiety, depression, and non-delusional paranoia).

[43]  *See* New York v. Ferber, 458 U.S. 747, 759 n.10 (1982) ("distribution of the material violates the individual interest in avoiding disclosure of personal matters") (internal quotations and citation omitted); Child Pornography Prevention Act § 121(1)(7) ("the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests"); *see also* Cooper Written Testimony, *supra* note 35, at 7 (noting that "the invasion of privacy is a foremost concern" for child pornography victims).

[44]  Child Pornography Prevention Act § 121, Pub. L. 104–208, §121, 110 Stat. 3009 (1996).

[45]  Ferber, 458 U.S. at 759.

[46]  Osborne v. Ohio, 495 U.S. 103, 111 (1990) (citation omitted); *see also* United States v. Blinkensop, 606 F.3d 1110, 1117 (9th Cir. 2010) (affirming the sentencing judge, who stated "it is a clear reality . . . that every time one of these web sites is opened and every time one of these images is viewed, additional harm is visited upon the victim. And the tiny children who frequently are displayed in these images are truly victims"); United States v. Pugh, 515 F.3d 1179, 1197 (11th Cir. 2009) ("Congress repeatedly has stressed the terrible harm child pornography inflicts on its victims, dating back to its first enactment of child pornography laws in 1977") (footnote omitted).

Unlike child sex abuse victims whose abuse has not been recorded, child pornography victims "grow up knowing that there are images of [themselves] being sexually abused which are available in perpetuity."[47]  For this reason, child pornography victims are subject to a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder than other child sexual assault victims.[48]  As one victim stated, "[u]nlike other forms of exploitations, this one is never ending.  Everyday people are trading and sharing videos of me as a little girl being raped in the most sadistic ways."[49]

Victims have reported suffering from the knowledge that the images of their graphic abuse are being utilized for sexual gratification.[50]  They also state that they fear that the images are being used to groom new victims for sexual abuse.  One victim explained, "I am horrified by the thought that other children will probably be abused because of my pictures. Will someone show my pictures to other kids . . . then tell them what to do?  Will they see me and think it's okay for them to do the same thing?"[51]

Victims suffer from not knowing who has seen their images.  Victims "report remaining always vigilant and fearful that any interaction with a computer might lead to exposure of the images of the sexual abuse that they have endured."[52]  Victims fear that strangers they see on the street have seen images of their abuse, and they are ashamed and embarrassed that a teacher, a potential date, or a stranger in public will recognize them.[53]  One victim explained that "[e]very day of my life I live in constant fear that someone will see my pictures and recognize me and that I will be humiliated all over again.  It hurts me to know someone is looking at them — at me — when I was just a little girl being abused for the camera."[54]

Consistent with a finding that some victims suffer a non-delusional paranoia,[55] victims also fear being stalked by viewers of images.  Multiple victims have reported that they have been tracked down by those who have viewed their images.  In one instance, a child pornography offender who discovered a victim's real name used a social networking site to send the victim messages that he had enjoyed looking at her images for years, accused her of being a willing

---

[47]  Palmer, *supra* note 32, at 71; *see also* Mimi Halper Silbert, *The Effects on Juveniles of Being Used for Prostitution & Pornography in* PORNOGRAPHY RESEARCH ADVANCES & POLICY CONSIDERATIONS at 228 ("The long term impact of participating in pornography appears to be even more debilitating than the immediate effects.").

[48]  *See* Palmer, *supra* note 32, at 71.

[49]  Notice of Filing Victim Restitution Claim and Impact Statements, United States v. Faxon, No. 09-cr-14030 (S.D. Fla. Nov. 3, 2009), ECF No. 34-15 at 4.

[50]  Palmer, *supra* note 32, at 63. Silbert, *supra* note 47, at 228 (identifying three stages of victimization and noting that they are exploitation, disclosure (for those victims who disclosed), and post-abuse).

[51]  *Faxon*, No. 09-cr-14030, ECF No. 34-9 at 3 (victim impact statement of "Amy" of the "Misty" series).

[52]  Cooper Statement, *supra* note 35, at 7.

[53]  *See* O'DONNELL & MILNER, *supra* note 5, at 71.

[54]  *Faxon*, No. 09-cr-14030, ECF No. 34-9 at 2–3.

[55]  *See* Cooper Statement, *supra* note 35, at 7–9 (describing victims who feel they are constantly being watched).

participant in her abuse, and demanded that she make a pornographic video with him.[56]  In another case, a victim and her mother reported that a collector of the victim's images was identified outside of the victim's middle school and followed her to softball games.[57]  This victim explained that "I have had people follow me, find me from my pictures I didn't even know were out there.  I have been found even by my [social networking website] profile . . . ."[58]

The types of harm suffered by victims through the continued circulation (or fear of circulation of the images) are shared by family and guardians of these victims.[59]  Family members also fear that their child will be recognized by strangers who have viewed the child's images.[60]  One mother stated that due to her daughter's exploitation, "I do not foster her dreams as I normally would in a normal situation.  I fear her becoming famous and someone digging up 'dirt' about her unfortunate past."[61]

Additionally, guardians of underage victims, in particular victims who may not remember the contact sexual abuse or be aware the images are being circulated, struggle with whether and when to share that the abuse occurred or that the images exist.  Guardians may choose not to share the frequency with which a victim's image is traded for fear of exacerbating the harms.  As a mother of a young victim whose images are in circulation explained, "[m]y daughter understands that some police and social workers have seen 'the pictures' . . . [b]ut now that she's older and realizing the extent of the [I]nternet, she's beginning to grasp the darker side — how many people saw those same pictures . . . . Someday the full realization will surely strike her.  I dread the day the question 'have they seen the pictures?' becomes a daily trial for her . . . as I know it already is for me."[62]

## C.   CRIME VICTIMS' RIGHTS ISSUES SPECIFIC TO CHILD PORNOGRAPHY VICTIMS

Children whose images appear in the collections of child pornography offenders are considered to be victims of federal non-production child pornography offenses.  As such, they may be eligible for certain victims' services under the Victims Rights and Restitution Act (VRRA)[63] and have rights under the Crime Victims Rights Act (CVRA).[64]  The VRRA provides

---

[56]  The offender was convicted of child pornography and stalking offenses and sentenced to 300 months.  *See* Judgment, United States v. Hoffman, No. 08-CR-027 (D. Nev. Apr. 30, 2010), ECF No. 64.

[57]  *Faxon*, No. 09-cr-14030, ECF No. 34-6 at 2–3 (statement of mother of two girls who were four and five when they were photographed for ostensibly non-pornographic purposes but whose images have been morphed into pornographic images and are highly traded).  One of these victims was contacted through a social networking website by a collector of her images.  *Id.* at 8.

[58]  *Id.*

[59]  Palmer, *supra* note 32, at 70–72.

[60]  One mother stated that "I have learned that these images of our sons on the Internet will never go away . . . . As their mother, this situation has caused me to fear for [my sons'] emotional health and their abilities to trust adults."  She continued "[t]his is an open-ended and ongoing problem for my husband and me." Faxon, No. 09-cr-14030, ECF No. 34-1(mother of victim).

[61]  *Faxon*, No. 09-cr-14030, ECF No. 34-13 (mother of victim).

[62]  *Faxon*, No. 09-cr-14030, ECF No. 34-5 at 3 (mother of victim).

[63]  42 U.S.C. § 10607.

that victims of federal crimes are to be kept informed during the investigation and about victims' services,[65] while the CVRA provides that victims of the charged offense are afforded certain enforceable rights during the federal prosecution.

The CVRA provides a victim with the rights: to reasonable notice of public court proceedings; to be reasonably heard at public proceedings involving release, plea, sentencing, or any parole; to full and timely restitution; to confer with the attorney for the government; to proceedings free from unreasonable delay; and to be treated with fairness and respect for their dignity.[66]  Notification is considered by some victims' rights advocates to be a "gateway right" because "if a victim is unaware of his or her rights or proceedings in which those rights are implicated, the victim cannot participate in the system."[67]

During the investigation and prosecution of child pornography offenses, child pornography victims face unique challenges.  While most federal crime victims are victims in only one or a limited number of federal cases, child pornography victims can be victims in hundreds or thousands of cases each year.  The potentially large number of prosecutions makes the provision of VRRA services and the enforcement of CVRA rights a logistical challenge for victims and prosecutors,[68] particularly concerning the rights to notification and restitution.[69]

### 1.    *Victim Notification and the Right to be Heard*

When a child pornography victim is initially identified, the victim may elect to be notified if his or her image is possessed future cases.  For minor victims, a non-offending parent or guardian will make decisions about victim notification until the victim reaches the age of majority.  The victim, or victim's proxy, fills out a form indicating whether the victim wishes to be notified if his or her image appears in a future case.[70]  When a victim "opts-in" to being notified, he or she is entered into the DOJ's Victim Notification System ("VNS").  The VNS is

---

[64]   18 U.S.C. § 3771.  In the case of minor or incapacitated victims, a representative may enforce the victim's rights. 18 U.S.C. § 3771(e).

[65]   Services include identification, access to mental health services, reasonable protection from the offender, and notification of ongoing case events.  42 U.S.C. § 10607.

[66]   18 U.S.C. § 3771(a).

[67]   *See* Nat'l Crime Victim L. Instit., *Featured Right: Notice*, http://law.lclark.edu/centers/national_crime_victim _law_institute/news/story/?id=9896  ("right to notice is at the heart of victims' participatory status") (last visited Nov. 30, 2012).

[68]   Department of Justice policy recognizes the challenges of working with child pornography victims and determining victim status.  It notes that "[c]hildren who are depicted in child pornography . . . are presumed to have been directly and proximately harmed as a result of those crimes for purposes of determining whether they are a victim under the VRRA or CVRA."  Attorney General Guidelines for Victim and Witness Assistance, 2011 Edition, at (Rev. May 2012) (available at http://www.justice.gov/olp/pdf/ag_guidelines2012.pdf)

[69]   The FBI manages a program which works to ensure that child pornography victims know their rights throughout federal criminal proceedings.  *See* FBI, Child Pornography Victim Assistance ("CPVA"): A Reference for Victims and Parent/Guardian of Victims. http://www fbi.gov/stats-services/victim_assistance/brochures-handouts/cpva.pdf.

[70]   *See* CPVA: A Reference for Victims and Parent/Guardian of Victims. http://www.fbi.gov/stats-services/victim_assistance/brochures-handouts/cpva.pdf.

an electronic system of providing automatic notice and outcome information of court events to crime victims in order to comply with the CVRA.[71]  Victims may update their VNS notification status at any time and choose to withdraw a request to be notified.

For child pornography victims who have opted into notification, it is not unusual to receive multiple court notifications each week informing them that their images have been recovered from child pornography offenders.[72]  One victim stated, "I can't tell you how many letters from the courts have come to me and how helpless they make me feel."[73]  A parent who opted to receive notification as the minor victim's representative has described receiving enough "notices to overflow a 55 gallon drum."[74]  Thus, even as the victims' rights laws have empowered victims and enabled them to be involved in the criminal justice process,[75] the notification process itself can have the unintended and incidental effect of exacerbating the harms associated with the ongoing distribution of the images.

As mentioned briefly above, an additional issue regarding notification has to do with the age of the victims.  While victims may be minors during initial prosecution, many continue to be victims in new cases into adulthood.  The CVRA permits a representative to assert a minor victim's rights, but on reaching the age of 18, the victim is entitled to exercise his or her CVRA rights.  Therefore, guardians must evaluate when the victim should be told that images of their sexual abuse are in circulation or the frequency of the circulation in a manner intended to minimize distress.[76]  Guardians are faced with a quandary as to whether they should reveal the ongoing distribution early or wait until a child is closer to adulthood.  This decision is more difficult if the victim does not recall the initial abuse.[77]

Victims may also choose to be heard at sentencing in accordance with the CVRA.[78]  In order to address the logistical challenge of affording a single victim the right to be heard at hundreds or thousands of sentencings each year, and the desire of most victims to retain as much

---

[71]  For additional information on the VNS see Criminal Division's Victim Notification Program, http://www.justice.gov/criminal/vns/.  *See also* FBI, CPVA NOTIFICATION PREFERENCE FORM, http://www fbi.gov/stats-services/victim_assistance/notification-preference.

[72]  *See, e.g., Faxon*, No. 09-cr-14030, ECF No. 34-3("I can't tell you how many letters from the courts have come to me and how helpless they make me feel") (handwritten victim impact statement, no additional information provided).  As one parent described, "I have been informed on a monthly basis of accounts where someone is being charged for having possession of her images that are on the internet.  These images will never be erased." Faxon, No. 09-cr-14030, ECF No. 34-10 at 2.

[73]  *Id.* ECF No. 34-3 (victim impact statement of victim, no additional information provided).

[74]  *Faxon*, No. 09-cr-14030, ECF No. 34-15 at 1(stepfather of victim).

[75]  *See, e.g., Faxon*, No. 09-cr-14030, ECF No. 34-13 ("I can choose to stop receiving the notifications, but I don't. If my words can keep a pedophile off the streets to protect our young innocent children then that is what I need to do.")

[76]  The FBI has developed a protocol to notify victims of child pornography who are turning 18 and whose parents will no longer serve as representative victims and to notify adults who may not be aware that their image is in circulation.  *See* http://www.fbi.gov/hq/cid/victimassist/cpva.

[77]  *See* http://www.fbi.gov/stats-services/victim_assistance/brochures-handouts/cpva.pdf.

[78]  18 U.S.C. § 3771(a)(4).

privacy as possible, the DOJ has developed a unique way to ensure that child pornography victims are able to contribute victim impact statements (VIS) to be considered by the sentencing court.  Regardless of whether a child pornography victim has opted to be notified, he or she may submit a VIS and sign a release permitting the DOJ to attach the same VIS in each case where the victim's image has been possessed.  Similar to opting into and out of notification, a victim may update or withdraw the VIS at any time.

2.  *Restitution to Victims*

Enforcement of the restitution provision of the CVRA is complicated by the fact that child pornography victims' images are usually possessed, received, or distributed by individuals who have no other connection to the victim.  Section 2259 of Title 18, United States Code, provides for mandatory and complete restitution for any victim harmed as a result of a commission of a child pornography crime or other child sex crime.[79]  Section 2259 does not distinguish between production, distribution, receipt, or possession of child pornography with respect to victim status.  If the offender committed one of those crimes and the victim was harmed by the commission of that crime, restitution is mandatory.

Victims have sought and received restitution from child pornography production offenders for some time.[80]  A small number of child pornography victims have started seeking to enforce this statutory right to restitution against child pornography possession, receipt, and distribution offenders who may have no other connection to the victim.[81]  Courts have struggled with calculating restitution for this victim population and have reached different outcomes.  While courts uniformly find that the child pornography victims are victims of the offenses and have suffered harm, many district courts refuse to order restitution because they find that the defendant's crime is either not the proximate cause of the victim's injury or that it is impossible to apportion an amount of restitution to an individual defendant.[82]  By contrast, other district courts that have granted restitution have agreed that apportioning restitution is a challenge but have concluded that it is clear that child pornography victims are "harmed as a result of the commission of a crime"[83] and, thus, are entitled to an appropriate restitution award.[84]

---

[79]  18 U.S.C. § 2259(c).

[80]  *See, e.g.,* United States v. Laney, 189 F.3d 954, 967 (9th Cir. 1999) (child pornography conspiracy participant liable for restitution to child victim of coconspirator).

[81]  United States v. Faxon, No. 09-14030-CR, 2010 WL 430760, at *12 (S.D. Fla. Feb. 5, 2010) (noting that the "difficulty" of finding that "restitution is due from this particular Defendant relates to causation").

[82]  *See, e.g.,* United States v. Woods, 689 F. Supp. 2d 1102, 1113 (N.D. Iowa 2010) (government failed to demonstrate the losses that the victim suffered as a result of defendant's child pornography receipt offense); United States v. Rowe, No. 09cr80, 2010 WL 3522257, at *5 (W.D. N.C. Sep. 7, 2010) (government failed to establish "the amount of losses proximately caused by the Defendant's conduct with any reasonable certainty"); United States v. Church, 701 F. Supp. 2d 814, 816 (W.D. Va. 2010) (finding that government failed to prove "'victim's losses'… proximately caused by the Defendant's offense of conviction," but awarding nominal restitution in the amount of $100) (citation omitted).

[83]  18 U.S.C. § 2259.

[84]  *See, e.g.,* Order of Restitution, United States v. Baroun, No. CR-09-64 (D. Mont. Mar. 25, 2010), ECF No. 61 at 9. ("[i]t is certainly difficult, if not impossible, to determine the exact degree of victimization [], however . . . every

This uncertainty has now extended to the appellate level, where a split in the circuits has developed as to the availability of restitution for child pornography victims in possession, receipt, and distribution cases. The United States Courts of Appeals for the Seventh Circuit, Second Circuit, Ninth Circuit, D.C. Circuit, and Eleventh Circuit have held that child pornography victims are entitled only to losses that were proximately caused by the individual offender who committed a non-production offense.[85] By contrast, the en banc Fifth Circuit recently held that victims are entitled to restitution for a variety of losses without a showing of proximate cause, including for medical and mental services, transportation, lost income, and attorneys' fees from those who offenders who possessed, received, or distributed child pornography depicting the victims.[86]

### D.    CONCLUSION

- Like other child sex abuse victims, child pornography victims suffer physical and emotional harms during the production of child pornography images. Child pornography victims appear even less likely than other child sex abuse victims to report the abuse because of the existence of the images.

- Most identified victims of child pornography production offenses are abused by a family member or acquaintance. NCMEC reports that 24 percent of identified victims were pubescent, and 76 percent were prepubescent. Ten percent of the prepubescent identified victims were infants or toddlers.

- The ongoing nature of child pornography offenses causes a significant and separate harm to the victims depicted in the images. Some of these victims live their lives wondering who has seen images of their sexual abuse and suffer by knowing that their images are being used for sexual gratification and potentially to lure new victims into sexual abuse.

- Child pornography victims, like all federal crime victims, are entitled to certain services under the Victims Rights and Restitution Act and have rights under the Crime Victims Rights Act.

- Victims may choose to be notified when their image is found in a child pornography offender's collection. Because a victim's image may be possessed in hundreds or thousands of cases, some victims report that the notification itself has exacerbated the harm. Nevertheless, without notification, victims may be unable to enforce other rights.

---

person who possesses these images causes a real and cognizable harm to the victim.); United States v. Laursen,  No. 08-00263, 2010 WL 3834322, at *1 (W.D. Mo. Sept. 27, 2010) (using estimated apportionment "analogous to the rough justice allowed in class action" to award $3,000 to victim in child pornography possession case).

[85]  United States v. Laraneta, 700 F.3d 983 (7th Cir. 2012), United States v. Aumais, 656 F.3d 147 (2d Cir. 2011); United States v. Kennedy, 643 F.3d 1251 (9th Cir. 2011); United States v. Monzel, 641 F.3d 528 (D.C. Cir. 2011); United States v. McDaniel, 631 F.3d 1204 (11th Cir. 2011).

[86]  In re Amy Unknown, 701 F.3d 749 (5th Cir. 2012) (en banc).

- Many victims are minors when identified but will continue to be victims in new cases after they reach adulthood.  The CVRA permits a representative to assert a minor victim's rights but, on reaching the age of 18, the victim is entitled to exercise his or her CVRA rights.

- The nature of child pornography offenses creates particular challenges for application of victims' rights.  Enforcement of the CVRA, in particular the right to restitution, is complicated by the fact that child pornography victims' images are usually possessed or distributed by individuals who have no other connection to the victim.   The lower federal courts have grappled with legal issues related to restitution in non-production cases.

**INDEX OF EXHIBITS**

**MARINELAND RESTITUTION REQUEST**

**Part 2**

| Exhibit # | PDF Page # | Description of Exhibit |
|---|---|---|
| Exhibit 5 | 2 | National Society for the Prevention of Cruelty to Children, Images of abuse: A Review of the Evidence on Child Pornography (2006); |
| Exhibit 6 | 8 | American Professional Society on the Abuse of Children, Amicus Brief in Support of Respondent Amy Unknown, *Paroline v. United States*, No. 12-8561; |
| Exhibit 7 | 29 | Declaration of Carol L. Hepburn re Attorneys Fees and Out of Pocket Expenses. |
| Exhibit 8 | 36 | Vocational Assessment by Merrill Cohen, MC, CDMS, CRC, CCM, CLCP |
| Exhibit 9 | 46 | CV of Merrill Cohen; |
| Exhibit 10 | 51 | Economic Analysis of Present Value of Life Care Costs and Lost Income by Stan V. Smith, Ph.D. |
| Exhibit 11 | 116 | CV of Stan V. Smith, Ph.D. |

**EXHIBIT 5**



October 2003

www.nspcc.org.uk/inform

# IMAGES OF ABUSE
**A review of the evidence on child pornography**

**Summary of research and findings**

**Emma Renold and Susan J. Creighton with Chris Atkinson and John Carr**

## Aims and purpose of the review

Commissioned by the National Society for the Prevention of Cruelty to Children (NSPCC), this report provides an overview of the findings from a literature review into our past and current knowledge of child pornography, or 'images of abuse' as it is now referred to. With very little written specifically on child pornography, and with much of the data subsumed within broader studies of child sexual abuse and sexual exploitation, the report goes some way to outlining the findings extracted and collated from studies conducted over the past two decades. These include: how child pornography has been, and is currently, defined; what is known regarding its scope and character (within and beyond the UK), findings relating to patterns of production, distribution and consumption, the effect upon children and young people used to produce child pornography. There is also an extensive chapter detailing the impact of computer technologies in the transformation of child pornography into a global cottage industry, where boundaries between consumers, distributors and producers of child pornography become blurred.

## Defining child pornography

- Child pornography is not a separate genre outside of other forms of child sexual abuse and exploitation, but one practised within a cycle of exploitation. Furthermore, what constitutes child pornography is contingent upon different legal, cultural, moral, religious beliefs and codes

- Differences in what constitutes the legal definition of the age of a child, for example between the United Nations Convention on the Rights of the Child (UNCRC) and many European countries, needs to be resolved, particularly for the production of coherent cross-national comparisons

- There is no specific UK law on the content or classification of a pornographic image but it is an offence to take any 'indecent' photograph of a child. What counts as 'indecent' however is subject to interpretation

- It is necessary to distinguish between the use of materials for sexual gratification and materials that record or depict the sexual abuse of a child. While pictures of semi-naked children playing on the beach may sexually stimulate an individual, it does not constitute child pornography. Child pornography is a visual record of the sexual abuse of a child, either by adults, other children or which involves bestiality

- The UK legislates against the production, distribution and possession of child pornography. However, there are still countries within and beyond Europe that do not have possession and distribution laws. Consequently legislative loopholes do exist and are exploited. Of concern is that UK extra-territorial power to prosecute those who sell or possess child pornography abroad only applies to those countries in which possession and distribution is a crime

- Existing laws have been adapted or amended to cater for the rise of crimes on the internet and computer-generated child pornography. However, different countries hold different definitions and laws, and the technological advances of the internet respects neither international boundaries or criminal jurisdictions. It is possible to produce child pornography in one country, distribute it in another and consume it in yet another country.

**Scope and character**

- Global figures regarding the number of children used in pornography are often guestimates, subsumed within data on child prostitution and child trafficking

- Most of the studies, which indicate the number of children exploited in child pornography, emanate from the United States. UK data is restricted to small case studies, survivor stories, Home Office statistics and police operations

- UK prevalence studies of child sexual abuse rarely include questions on children being exposed or used in pornography. A recent NSPCC study, however, has estimated that less than one per cent of the child population has been exploited through child pornography

- Police operations and individual cases, reported in the media, highlight the number of offenders involved in the production, distribution and possession of child pornography, and often cite the number of images and videos seized. They do not, however, generally indicate the number of children abused, or provide an adequate understanding of how child pornography is part of a cycle of sexual exploitation. Data on this is gained from small or isolated case studies

- US studies suggest a link between involvement in child prostitution and involvement in child pornography. There is very little UK research that examines the relationships between child prostitution and child pornography

- Both UK and US research demonstrate the production of child pornography within child sexual abuse rings. Some UK studies, however, do not include pornographic involvement in their questionnaires. The percentage of child pornography reported within sex rings in some US studies is higher than that reported from studies in the UK

- Recent media reports and police seizures have focused on the problem of child pornography and the internet. However, little systematic and reliable data is available

- Recent research on child pornography and the internet found 140,000 child abuse images and concluded that the volume was increasing

- Recent research on the use of the internet by adults with a sexual interest in children has focused more on the risks to children from this activity.

**Patterns of production, distribution and consumption**

- From the late 1970s to mid 1990s there was a shift from the professional commercial to the amateur non-profit making production and distribution of child pornography produced predominantly within a cottage industry with and for 'paedophiles'.

- There is a fear that making child pornography for commercial gain is re-emerging with the advent and widespread use of the internet and new computer technologies, particularly as much of the child pornography today can only be accessed via credit cards

- The number of multiple offences of possession, production and distribution, both local, national and international, marks the impact of the internet and questions the use of old typologies, as boundaries between amateur and commercial, makers and collectors become blurred

- There is evidence to suggest that child pornography is used for sexual stimulation, to legitimate and normalise offenders' sexual activities with children, to maintain a permanent record, to ensure a constant source of material at the age of sexual preference and as a tool for grooming, entrapment and blackmail

- Child pornography must continue to be viewed as instrumental in the on-going sexual abuse of children, that is, within organised abuse (prostitution, sex rings and trafficking), within and outside the family and with adults and children, both known and unknown

- Child pornography needs to be understood, not as a separate genre for and by 'paedophiles', but in a wider context in which cultural ideals of beauty are youth, and the media is reliant upon the sexualisation of children for financial gain.

**Impact upon children**

- The impact on children and young people exploited in child pornography, and its consequences, is a neglected and under-researched area. This is primarily due to the difficulty of isolating impacts of child pornography from other sexually exploitative practices

- Data from four studies goes some way to enhancing our understanding of the impact during exploitation, during disclosure and following children's exploitation of being used in child pornography

- Children can experience intense feelings of powerlessness, knowing that there is nothing they can do about others viewing pornographic pictures/films of themselves (and sometimes their coerced sexual abuse of others) indefinitely

- Children express concerns over how pornography will be viewed (i.e. that they enjoyed it or were complicit in its production)

- Children are aware that the sexual abuse they endured to produce the pornography can be distributed commercially or non-commercially for the arousal of others. They are also aware that it can be used to groom and abuse other children

- Children suffer in the knowledge that there is a permanent record of their sexual abuse, which can subsequently prevent, delay or exacerbate the fear of disclosure

- This knowledge has implications for the need for long-term support and treatment of the children involved, and for possession offences to reflect the harm that indefinite circulation can cause. There is also a need for more UK research into how child pornography investigations are handled (especially the impact upon children when pictures are used to identify them), and more generally, regarding the impact of being used and abused in child pornography.

**Child pornography and the internet**

- The internet is fast becoming one of the main mediums for the distribution and consumption of child pornography, as evidenced by the number of police operations and seizures. The emergence of a range of new cyber crimes, of which child pornography offences were a key part, led to the establishment of a new police unit, the National Hi-Tech Crime Unit

- Fears and hazards surrounding the internet include its potential to produce child pornography through scanners, digital cameras, technologies which allow the creation of child pornography without using a 'real' child, and on-line abuse through e-mail,

internet relay chat and video conferencing technologies. It can also facilitate global communication networks via newsgroups, chatrooms and bulletin boards. The ability to make communications anonymous with encryption software and re-mailing, and hide text through steganography, also causes great concern.

- Reliable and systematic research regarding the use of the internet and newsgroups to produce, consume and distribute child pornography is limited

- European and UK attempts to police the internet focus on:
  - self-regulation by ISPs and on-line users;
  - the introduction of the Internet Watch Foundation;
  - the setting up of a government task force;
  - increased legislation for internet crimes and the development of protective software;
  - public awareness campaigns and guidelines for the internet industry.

---

**Renold, E. and Creighton, S. J. (2003)** *Images of abuse: a review of the evidence on child pornography*. **London: NSPCC.**
**ISBN: 1842280309**
**£7.50**

The report offers a number of recommendations for legislation, policy, practice and further research on the topic.

The full report is available to purchase from NSPCC Publications and Information Unit, Weston House, 42 Curtain Road, London, EC2A 3NH, tel: 020 7825 2775. It can also be ordered online from NSPCC inform - www.nspcc.org.uk/inform.

**EXHIBIT 6**

No. 12-8561

In The

# Supreme Court of the United States

——————— ♦ ———————

DOYLE RANDALL PAROLINE,

*Petitioner,*

v.

AMY UNKNOWN and UNITED STATES,

*Respondents.*

——————— ♦ ———————

**On Writ Of Certiorari To The
United States Court Of Appeals
For The Fifth Circuit**

——————— ♦ ———————

**AMICUS BRIEF OF THE AMERICAN
PROFESSIONAL SOCIETY ON THE
ABUSE OF CHILDREN IN SUPPORT
OF RESPONDENT AMY UNKNOWN**

——————— ♦ ———————

MARCI A. HAMILTON, ESQ.
*Counsel of Record*
36 Timber Knoll Drive
Washington Crossing, PA 18977
(215) 353-8984
hamilton.marci@gmail.com

i

## TABLE OF CONTENTS

Page

INTEREST OF *AMICUS* AMERICAN PROFES-
SIONAL SOCIETY ON THE ABUSE OF
CHILDREN ........................................................ 1

SUMMARY OF ARGUMENT ............................... 2

ARGUMENT ......................................................... 3

   I.  For the Victim, the Sexual Abuse, Its Me-
morialization, Distribution, and Viewing
Are Psychologically Intertwined with and
Compound the Impact of the Abuse ............ 6

  II.  Pornography Is Not Only an End-Product,
But Also a Common Element of Grooming .... 9

 III.  Child Sex Victims Typically Experience Long-
Term Harm and Need Lifelong Care ........... 10

 IV.  Child Pornography Victims Experience Ex-
acerbated Negative Effects ......................... 12

CONCLUSION ...................................................... 15

TABLE OF AUTHORITIES

Page

CASES

*New York v. Ferber*, 458 U.S. 747 (1982) .........2, 3, 4, 5


OTHER AUTHORITIES

18 U.S.C. § 2251 (2012) ................................................4

18 U.S.C. § 2259 (2012) ..........................................2, 4

American Professional Society on the Abuse of Children, APSAC Statement on the Harm to Child Pornography Victims (Oct. 18, 2013) .............6

Chris Atkinson & David Newton, *Online Behaviours of Adolescents: Victims, Perpetrators and Web 2.0*, 16:1 JOURNAL OF SEXUAL AGGRESSION (2010) .....................................................8, 9

CENTERS FOR DISEASE CONTROL AND PREVENTION, ADVERSE CHILDHOOD EXPERIENCES (ACE) STUDY: MAJOR FINDINGS (1997) ...................10

Ryan J. Herringa, et al., *Childhood maltreatment is associated with altered fear circuitry and increased internalizing symptoms by late adolescence*, PNAS EARLY EDITION 1, 6 (Oct. 2013) ....................................................................11

PHILIP JENKINS, BEYOND TOLERANCE: CHILD PORNOGRAPHY ON THE INTERNET (2001) ....................6

Marcella Mary Leonard, *The Impact of Being a Victim of Internet Offending*, 16:2 JOURNAL OF SEXUAL AGGRESSION (2010) ...........................13, 15

iii

TABLE OF AUTHORITIES – Continued

Page

Joseph Nowinski, Ph.D., *Childhood Trauma and Adult Alcohol Abuse: Shedding Light on the Connection*, THE HUFFINGTON POST (July 22, 2013, 10:01 AM), http://www.huffingtonpost.com/joseph-nowinski-phd/alcohol-abuse_b_3595743.html ............................................................11

ETHEL QUAYLE ET AL., CHILD PORNOGRAPHY AND SEXUAL EXPLOITATION OF CHILDREN ONLINE (2008)............................................................8, 9, 10, 12

U.S. DEP'T OF JUSTICE: THE NATIONAL STRATEGY FOR CHILD EXPLOITATION PREVENTION AND INTERDICTION: A REPORT TO CONGRESS (Aug. 2010)................................................................7, 9

Julia von Weiler, et al., *Care of Treatment of Child Victims of Child Pornographic Exploitation in Germany*, 16:2 JOURNAL OF SEXUAL AGGRESSION 211, 218 (2010)....................................14

RICHARD WORTLEY & STEPHEN SMALLBONE, INTERNET CHILD PORNOGRAPHY: CAUSES, INVESTIGATION, AND PREVENTION (Graeme R. Newman, ed. 2012) .........................................*passim*

## INTEREST OF *AMICUS* AMERICAN PROFESSIONAL SOCIETY ON THE ABUSE OF CHILDREN[1]

The American Professional Society on the Abuse of Children ("APSAC") is the leading national organization supporting professionals who serve children and families affected by child maltreatment and violence, including child sex abuse and child pornography. As a multidisciplinary group of professionals, APSAC achieves its mission in a number of ways, most notably through expert training and educational activities, policy leadership and collaboration, and consultation that emphasizes theoretically sound, evidence-based principles. With more than 26 years of existence and a central role in the development of professional guidelines addressing child abuse and neglect, APSAC is well-qualified to help inform this

---

[1] On September 3, 2013, Counsel for Respondent, Amy, filed a consent to the filing of *amicus curiae* briefs, in support of either party or of neither party. On September 6, 2013, Counsel for Respondent, Wright, filed a consent to the filing of *amicus curiae* briefs, in support of either party or of neither party. On September 6, 2013, Counsel for Respondent, United States, filed a consent to the filing of *amicus curiae* briefs, in support of either party or of neither party. On September 6, 2013, Counsel for Petitioner, Paroline, filed a consent to the filing of *amicus curiae* briefs, in support of either party or of neither party. No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No persons other than the Amici or their counsel made a monetary contribution to this brief's preparation or submission.

Court about the current nature of child pornography and the harm it causes its victims. APSAC is submitting this *amicus* brief in this case to assist the Court in understanding the most recent science documenting the nature and harm done to victims by the market in child pornography and all of its participants.

————————◆————————

## SUMMARY OF ARGUMENT

To understand how to interpret the Mandatory Restitution for Sexual Exploitation of Children Act, 18 U.S.C. § 2259 (2012), which is the focus of this case, it is necessary to comprehend the nature of the harm inflicted by child pornography. This *amicus* brief documents the following essential facts to aid this Court in understanding the phenomenon of child pornography and its actual effects.

First, from the perspective of the victim whose image appears in child pornography, there is no meaningful difference between the creator, the viewers, or the distributors of pornographic images. They are all participants in a marketplace of child pornography, as this Court acknowledged in *New York v. Ferber*, 458 U.S. 747, 753 (1982), all of whose participants inflict pain and suffering on the victims. Second, even when a child is not sexually assaulted or abused in the creation of the pornography, the memorialization, distribution, and viewing of the pornographic images inflict harm, which is multiplied once the images are uploaded to the Internet. When the

child is sexually assaulted or abused, the distribution of the pornography compounds the victim's psychological injuries. Third, child pornography is not simply an end-product, but also a tool to groom potential victims and, therefore, victims suffer even more knowing that their images are being used to harm other children. Finally, victims of child pornography typically experience lifelong negative and exacerbated effects.

———————◆———————

## ARGUMENT

Over thirty years ago, in *New York v. Ferber*, 458 U.S. 747 (1982), this Court addressed the following question: "To prevent the abuse of children who are made to engage in sexual conduct for commercial purposes, could the New York State Legislature, consistent with the First Amendment, prohibit the dissemination of material which shows children engaged in sexual conduct, regardless of whether such material is obscene?" *Id.* at 753. The Court's answer was an unequivocal, "Yes." Most important for purposes of this *amicus* brief, the decision turned on the facts of child pornography known at the time, with the majority explaining the need to stop pornography as follows:

> The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to

the child is exacerbated by their circulation. **Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.** Indeed, there is no serious contention that the legislature was unjustified in believing that it is difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies. While the production of pornographic materials is a low profile, clandestine industry, the need to market the resulting products requires a visible apparatus of distribution. The most expeditious, if not the only practical, method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product. *Id.* at 759-60 (emphasis added; footnotes omitted).

The statute at issue in this case, the Mandatory Restitution for Sexual Exploitation of Children Act, 18 U.S.C. § 2259 (2012) ("Mandatory Restitution Act"), was enacted, in part, to fulfill the goal of drying up the market for this material by imposing severe penalties on those selling, viewing, transmitting, and distributing the material. Mandatory Restitution Act, 18 U.S.C. § 2251 (2012).

Since *Ferber* was decided decades ago, technology has dramatically progressed to the benefit of the pornography market and to the detriment of child sex

abuse victims, as Amy's experience illustrates so well. The science regarding the impact of child sex abuse also has progressed. The purpose of this brief is to provide, on behalf of the leading professional association dedicated to the issue of child abuse, the best scientific understanding today of how the marketplace in child pornography and child pornography itself harms its victims.

It is not only that a child is sexually assaulted or abused as part of its production that makes child pornography so damaging, but also the fact that detailed and graphic images of the child's sexual assault or abuse are made available to millions across the globe. Respondent's Br. at 5. Once those images are released, it is impossible to recapture them. Each person who views the images inflicts fresh damage to the victim. Thus, as this Court first noted in *Ferber*, and as technology has reinforced, it is the marketplace of exchange in these images that is the social evil, and every participant in the market, whether producer, distributor, possessor, or viewer, inflicts serious damage on the subject of the images, whether or not the child is sexually assaulted or abused as part of the creation of the images.

The harm is multiplied by the very size of the global marketplace. As this Court noted in *Ferber*, it is necessary to destroy the market in order to protect children from child sex abuse. This is an extraordinary challenge, because of the global character of the market, which has far surpassed the era of still photographs and films. Now, the Web is the marketplace,

which means every corner of the world can participate. While there is some progress in terms of policing child pornography in the western world, "large areas of the world make virtually no pretense at combating underage sex or child pornography." Philip Jenkins, Beyond Tolerance: Child Pornography on the Internet 195 (2001).

APSAC recently devised a statement on the properly understood relationship between child pornography and the protection of children. American Professional Society on the Abuse of Children, APSAC Statement on the Harm to Child Pornography Victims (Oct. 18, 2013), *available at* http://www.apsac.org/assets/documents/apsac%20statement%20on%20harm%20to%20child%20pornography%20victims%2010.29.13.pdf. This brief tracks the statement and provides further elaboration to assist this Court in understanding the state of the science on child sex abuse, child pornography, and their effects on the child subjects of pornography.

## I.  **For the Victim, the Sexual Abuse, Its Memorialization, Distribution, and Viewing Are Psychologically Intertwined with and Compound the Impact of the Abuse**

The memorialization, distribution, and viewing of child pornography add on to the harm already done as part of the child sex abuse and assault that are often the subject of the pornography. As the Department of Justice has explained:

. . . knowing that all copies of child pornography images can never be retrieved compounds the victimization. The shame suffered by the children is intensified by the fact that the sexual abuse was captured in images easily available for others to see and revictimizes the children by using those images for sexual gratification. Unlike children who suffer from abuse without the production of images of that abuse, these children struggle to find closure and may be more prone to feelings of helplessness and lack of control, given that the images cannot be retrieved and are available for others to see in perpetuity. They experience anxiety as a result of the perpetual fear of humiliation that they will be recognized from the images.

U.S. DEP'T OF JUSTICE: THE NATIONAL STRATEGY FOR CHILD EXPLOITATION PREVENTION AND INTERDICTION: A REPORT TO CONGRESS 9 (Aug. 2010).

Even when a child is not sexually assaulted or abused to make the images, once he or she learns of the images and their distribution, the pornography is experienced as "abusive and harmful." RICHARD WORTLEY & STEPHEN SMALLBONE, INTERNET CHILD PORNOGRAPHY: CAUSES, INVESTIGATION, AND PREVENTION 77 (Graeme R. Newman, ed. 2012). They typically feel shame, embarrassment, anxiety regarding who will view the images, a lack of control over their images, and concern that they may meet someone who has viewed the images. *Id.* The victims "developed a general sense of 'unsafeness [sic], feeling

sexualized, and feeling victimized' because they did not know who may now be viewing their images and because they understood that some may use the images for sexual purposes . . . [I]magining how a stranger may use their image for sexual gratification is likely to be deeply disturbing." *Id*. at 77-78.

The Internet establishes easy, widespread, and worldwide access to sexual images; therefore, victims may never be certain of viewers' identities. *Id*. Many of these victims thus fear that not only stranger-viewers will subsequently recognize them, but also those viewers who know the victims. *Id*. As a result, there are laws in many jurisdictions that ban media identification of sexual abuse victims. *Id*. These laws recognize that the mere knowledge that a child was sexually abused is inherently harmful. *Id. See also* Chris Atkinson & David Newton, *Online Behaviours of Adolescents: Victims, Perpetrators and Web 2.0*, 16:1 JOURNAL OF SEXUAL AGGRESSION 107, 109 (2010).

The effects are often long-term. Respondent's Br. at 5-6. For example, not only is the original victimization damaging, but ongoing fears throughout a victim's life can exist. "One account given . . . by a victim of abuse images talked of feeling fearful every time the mail arrived, overwhelmed with anxiety that the photographs would be in the post and that her mother would see them." ETHEL QUAYLE ET AL., CHILD PORNOGRAPHY AND SEXUAL EXPLOITATION OF CHILDREN ONLINE 49 (2008).

## II.  Pornography Is Not Only an End-Product, But Also a Common Element of Grooming

It is common for pedophiles to use pornography to groom their next victims. ETHEL QUAYLE ET AL., CHILD PORNOGRAPHY AND SEXUAL EXPLOITATION OF CHILDREN ONLINE 24-25, 48 (2008); Chris Atkinson & David Newton, *Online Behaviours of Adolescents: Victims, Perpetrators and Web 2.0*, 16:1 JOURNAL OF SEXUAL AGGRESSION 107, 109 (2010). As the Department of Justice has documented:

> Grooming usually involves normalizing sexualized behavior in the offender-child relationship by introducing increasingly intimate physical contact by the offender toward the victim, very gradually sexualizing the contact, and sometimes using child pornography to break down the child's barriers. This gradual process and the relationship of trust and authority that the offender usually holds over the child, along with the child's immaturity and subservience, serves to break down the child's resistance. These children have a difficult time understanding what is happening to them and why and have very little control over their circumstances.

U.S. DEP'T OF JUSTICE: THE NATIONAL STRATEGY FOR CHILD EXPLOITATION PREVENTION AND INTERDICTION: A REPORT TO CONGRESS 21 (Aug. 2010); *see also id.* at 31 ("predators gradually introduce child pornography into their seduction methodology. As instructions for desired behaviors, children are shown suggestive images, nudity is introduced, and then actual sexual

abuse is carried out. Gradually the idea of sex between adults and children is normalized.") (internal citation omitted).[2]

## III. Child Sex Victims Typically Experience Long-Term Harm and Need Lifelong Care

Child pornography often involves contact sexual abuse. There is empirical data that indicates an association between sexual abuse victimization and grave short and long-term outcomes. RICHARD WORTLEY & STEPHEN SMALLBONE, INTERNET CHILD PORNOGRAPHY 72 (2012) (internal citations omitted). In comparison with those who were not sexually abused, victims were found to experience greater "anxiety and depression, somatic complaints, social withdrawal, anger, and aggressive and sexual behavior problems." *Id*. Hundreds of other studies have established that child sex victims are at higher risk for and often suffer from health problems such as depression, alcoholism, illicit drug use, unintended pregnancies, and sexually transmitted diseases. CENTERS FOR DISEASE CONTROL AND PREVENTION, ADVERSE CHILDHOOD EXPERIENCES (ACE) Study: Major Findings (1997)

---

[2] In addition, "the child may often consider images that seem very normal, portraying the child with clothes on but taken by the abuser, as equally or even more disturbing, since these images will form part of the entire abusive process and possibly remind the child of how the perpetrator has violated and built trust and rapport with the child." ETHEL QUAYLE ET AL., CHILD PORNOGRAPHY AND SEXUAL EXPLOITATION OF CHILDREN ONLINE 49 (2008).

*available at* http://www.cdc.gov/ace/findings.htm (last updated Jan. 18, 2013). For example, a recent study found that the severity of the child abuse often correlates with the severity of the subsequent alcohol abuse. *See* Joseph Nowinski, Ph.D., *Childhood Trauma and Adult Alcohol Abuse: Shedding Light on the Connection*, THE HUFFINGTON POST (July 22, 2013, 10:01 AM), http://www.huffingtonpost.com/joseph-nowinski-phd/alcohol-abuse_b_3595743.html.

Furthermore, these victims also experienced greater levels of anxiety, depression, and anger, and were more likely to act "impulsively" as a response to these emotions. *Id.* This impulsiveness could take the form of abusing alcohol "as a means of coping with or anesthetizing" those feelings. *Id.* Additionally, another study found a "direct neural mechanism, via alteration of the brain's fear circuitry . . . [where] maltreatment [led] to anxiety and depressive symptoms by late adolescence." Ryan J. Herringa, et al., *Childhood maltreatment is associated with altered fear circuitry and increased internalizing symptoms by late adolescence*, PNAS EARLY EDITION 1, 6 (Oct. 2013), *available at* http://www.pnas.org/content/early/2013/10/30/1310766110.full.pdf+html. In addition, "[a]mong the more troubling long-term outcomes of sexual abuse, particularly for female victims, is an increased risk of further sexual victimization later in life – often in apparently unrelated circumstances . . . In one study, women who had experienced sexual abuse as a child were twice as likely as previously nonvictimized women to be raped." WORTLEY & SMALLBONE at 73.

## IV. Child Pornography Victims Experience Exacerbated Negative Effects

A subject of child pornography, whether sexually abused or not in the process, can suffer serious negative effects. Respondent's Br. at 5-6. As discussed above, after being abused, child victims "may feel grief, guilt and fear." ETHEL QUAYLE ET AL., CHILD PORNOGRAPHY AND SEXUAL EXPLOITATION OF CHILDREN ONLINE 44 (2008) (internal citations omitted). As a result, the subject's behavior may reflect an "inability to trust, cognitive confusion, lack of mastery and control, repressed anger and hostility, blurred boundaries and role confusion, pseudo-maturity and failure to complete development tasks, depression and poor social skills." *Id*. These negative effects, however, are not limited to situations in which a child was sexually assaulted or abused. Even in "non abusive" situations, when a child's image appears in pornography and learns about the images, the subject will likely suffer from shame, embarrassment, anxiety, and even a feeling that they have an overall loss of control. RICHARD WORTLEY & STEPHEN SMALLBONE, INTERNET CHILD PORNOGRAPHY 77 (2012). *See also* Respondent's Br. at 6. The harm of child pornography extends beyond the particular subject as the behavioral effects of the abuse not only affect the child, but also further complicate problems in the victim's home. WORTLEY & SMALLBONE at 77.

The pornography's depiction of the child being sexually assaulted or abused (whether or not the child was physically assaulted or abused as part of

the production) creates an ongoing fear that is virtually impossible to quell, because the images cannot be controlled. Each time the image is viewed is experienced as a fresh assault by the victim. Respondent's Br. at 6. Thus, child pornography victims typically feel helpless to protect themselves from the harm arising from the distribution and viewing of the images. Upon learning that their images have been disseminated over the Internet and viewed by others, these victims feel "impotent because they will have had no control over the disclosure process – they have not been able to choose when to disclose, what to disclose, how to disclose and to whom they want to disclose." *Id.* at 51. Because victims cannot identify exactly how many and who these viewers may be, they develop a "general feeling of unsafeness [sic] and feeling sexualized." Marcella Mary Leonard, *The Impact of Being a Victim of Internet Offending*, 16:2 JOURNAL OF SEXUAL AGGRESSION 249, 252-53 (2010). The knowledge that strangers will view these images and "convince themselves that the victim is either smiling at them or that they are enjoying the sexual act" further multiplies the victimization. *Id*. Furthermore, the "thoughts of unknown individuals gaining and performing sexual gratification" to the victims' images causes these victims to undergo re-victimization. *Id*. For the child, the issue is still in present tense, and it may be impossible for them to identify a point in time at which their abuse ended. *See* Leonard at 253; WORTLEY & SMALLBONE at 78-79. This is particularly problematic from a recovery standpoint, as it prevents the victim from knowing

14

that the abuse is a thing of the past. Often times, this can cause a victim to regress to a point of "sickening anticipation," which is the psychotherapeutic term used to describe "the sick feeling in the pit of their stomachs that victims have to live with when their trauma is happening." *See* WORTLEY & SMALLBONE at 78-79; Leonard at 254.

Not knowing who may view, or who has viewed the images of them magnifies the victims' developed sense of unsafeness. WORTLEY & SMALLBONE at 77-78. Unfortunately, as children mature, they will be more likely to understand that adults are using such images for sexual gratification, thereby compounding their victimization. *Id.* Understanding that the pictures are still in use for sexual gratification makes it almost impossible for the victim to fully recover and, therefore, creates the new need for ongoing therapy and care over the course of their lives, particularly at times of stress. Consequently, counselors for Internet victims often fear that younger children will eventually develop a "new experience of loss of control, powerlessness, helplessness, shame and fear." *Id.*

As victims begin to "grasp permanence, they [are] burdened even further, and [feel] a loss of control, powerlessness, helplessness, shame and fear," which further makes it difficult for them to obtain closure. Julia von Weiler, et al., *Care of Treatment of Child Victims of Child Pornographic Exploitation in Germany*, 16:2 JOURNAL OF SEXUAL AGGRESSION 211, 218 (2010). Unfortunately, the worldwide grasp of the Internet further memorializes the child's abuse. While a

child's natural environment may already be a host of anxiety, their fear that strangers will view the images extends not only to people that they see regularly, but also to those in even the most distant locations, indeed, anyone with whom they come into contact. Consequently, the child is "unable to think of the world as a safe place, because no matter where they are they could meet someone who is looking at pictures of them." Leonard at 253. In fact, the mere mention of the Internet can trigger a victim's recollection of the abuse. *Id.* In a technological age, it is impossible for one to not be constantly accessing, or reminded of, the World Wide Web. What may seem like a mere statement to one person, could act as a trigger of re-victimization for a child of abuse. Thus, not only the creation, but also the distribution, sharing, and viewing of child pornography, causes serious harm to the victims. Respondent's Br. at 5-6. Sadly, victims may live lives of "sickening anticipation." Leonard at 254.

———————◆———————

## CONCLUSION

Those like the Respondents in this case have suffered serious harm that is distinct from and additional to the harm of initial child sex abuse that leads to child pornography. It is APSAC's hope that this brief has assisted this Court with understanding the legitimate need of pornography subjects for restitution from pornography market participants. For child pornography victims, a distinction between creators

and distributors and viewers is a false distinction. They are all part of the marketplace that endangers children generally and can continue to harm victims throughout their adulthood.

Respectfully submitted,

MARCI A. HAMILTON, ESQ.
*Counsel of Record*
36 Timber Knoll Drive
Washington Crossing, PA 18977
(215) 353-8984
hamilton.marci@gmail.com

**EXHIBIT 7**

DECLARATION OF VICTIM'S COUNSEL IN SUPPORT OF RESTITUTION

I, CAROL L. HEPBURN, declare that the following statement is made based on personal knowledge, is true and accurate to the best of my knowledge, and is made under penalty of perjury under the laws of the State of Washington.

1.      I am one of the attorneys for the primary identified victim in the Marineland series of child pornography images and make this declaration in support of her request for restitution.

**Background.**

2.      I was originally admitted to practice law in the State of Washington in 1978. I have had a litigation practice based in Seattle, Washington since that time.  I began practice as a Deputy Prosecuting Attorney for King County Washington in 1978 and continued in that position for four years.  Over that time I filed and tried a variety of felonies including sexual assault and economic crime cases.   I served in the office's Appellate Unit as well, during which time I received appeals from other deputies and was responsible for handling all post judgment and appellate prosecution of these cases.

3.   I began private practice in 1982 in Seattle.  Since that time I have handled a number of types of cases including serious personal injury cases involving sexual assault, child sex abuse, sexual and racial harassment, and serious bodily and emotional injury, as well as family law cases involving allegations of incest.

DECLARATION OF VICTIM'S COUNSEL RE FEES AND COSTS- 1

4.  I was admitted to practice law in Oregon in 2003.  Since that time I have had an active practice in Oregon which has focused on personal injury, including crime victim's compensation and medical malpractice. In 2003, was also was one of 48 lawyers selected that year to attend the Trial Lawyers College in Dubois, Wyoming.  I have been active in participation in graduate and regional seminars with the Trial Lawyers College and was elected to and served a two year term on the college's  Alumni Board.

**Experience in representing child pornography victims.**

5.  In the fall of 2008 I began representing the young woman identified as the victim in the Marineland series of child pornography cases.  I travelled to meet with her and her family at the outset of the representation and spent an extended time with them getting to know them and the basic facts of the case.

6.  Since that time I have consulted with experts in understanding and developing documentation of her losses and have submitted multiple restitution requests for her.  I have also represented her together with appellate co-counsel in multiple appeals on issues of restitution.  These appeals include cases in the Ninth Circuit, Tenth Circuit, Seventh, Eighth, and Fourth Circuits, and culminated in the filing of an Amicus brief in the United States Supreme Court in the case of *Paroline v. United States.*

7.  I have met with "Jane Doe", the primary victim in the Marineland case, on multiple occasions, communicated with her via telephone and email, apprised her of matters ongoing relative to her representation and development of the caselaw, and have communicated with her mother and roommate.  I have spoke with DOJ representatives in advising of our representation and coordinating transfer of notices from the VNS System

DECLARATION OF VICTIM'S COUNSEL RE FEES AND COSTS- 2

**CAROL L. HEPBURN, P.S.**
**ATTORNEYS AT LAW**
2722 EASTLAKE AVENUE E., SUITE 200
SEATTLE, WA 98102
TEL: (206) 957-7272 / FAX: (206) 957-7273

from the victim to my offices.  I have contacted NCMEC as well to obtain background information on the cases.

**Retention of experts.**

8.  As a part of the representation of the Marineland victim I retained Dr. Randall Green and communicated with him concerning his potential involvement in this matter as an forensic psychological evaluator.  I sought Dr. Green's participation because of his reputation as a preeminent forensic psychologist with specialized knowledge of the effects of child sex abuse and the behavior of sexual abusers and his experience in evaluation of another child pornography victim whose images are very widely traded. I gathered records necessary to his work in this case, including the client's medical and school records, I provided to him, as well, selected pleadings from the criminal prosecution of the original perpetrator of the victim designed to give him an adequate factual background of the legal proceedings which involve this client.

9.  I have also contacted additional experts on vocational and economic issues to provide further information to the courts.  I have retained vocational consultant Merrill Cohen MC, DCMS, and I have facilitated her access to documentation pertinent to the assessment of vocational and economic losses.  In addition to the experts retained to evaluate and report I have spoken and conferred with a number of other professionals whose practice involves mental health services and legal representation for exploited children.

DECLARATION OF VICTIM'S COUNSEL RE FEES AND COSTS- 3

**CAROL L. HEPBURN, P.S.**
**ATTORNEYS AT LAW**
2722 EASTLAKE AVENUE E., SUITE 200
SEATTLE, WA 98102
TEL: (206) 957-7272 / FAX: (206) 957-7273

**Fees and Costs**

10. My standard fee when billed at an hourly rate is $350.00. This is consistent with the median rate charged by other attorneys in the Seattle area of my experience and tenure.

11. Attached hereto as Exhibit 1 is a true and correct summary of the out of pocket costs expended in this matter. They include costs for expert fees for forensic reports, records fees paid to health providers and schools, fees paid for the Public Access to Court Electronic Records (PACER) files relative to prosecutions involving the Marineland images, documentation fees, a conference registration fee, appellate costs, travel expenses for me to meet directly with my client and to.

DATED this 22th day of September, 2014, as Seattle, Washington

CAROL L. HEPBURN, P.S.

_____
CAROL L. HEPBURN, WSBA NO. 8732
Attorney for Victim

DECLARATION OF VICTIM'S COUNSEL RE FEES AND
COSTS- 4

1

2

3

4

EXHIBIT 1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CAROL L. HEPBURN, P.S.
ATTORNEYS AT LAW
2722 EASTLAKE AVENUE E., SUITE 200
SEATTLE, WA 98102
TEL: (206) 957-7272 / FAX: (206) 957-7273

| Date | Num | Memo | Account | Amount |
|------|-----|------|---------|--------|
| 01/11/14 | fm | Travel expenses to meet with client | Brown, Jessica | 32.21 |
| 03/10/14 | | County Prosecutor--copy of criminal file | Brown, Jessica | 1.00 |
| 06/05/14 | | US Legal Support med recs In med & sch recs | Brown, Jessica | 16.24 |
| 06/05/14 | | US Legal Support med recs In 727607 | Brown, Jessica | 46.17 |
| 07/03/14 | | TLO | Brown, Jessica | 8.00 |
| 07/09/14 | | Travel expenses to visit client | Brown, Jessica | 64.41 |
| 07/10/14 | | US Legal Support medical records INV 748881,746584 | Brown, Jessica | 302.40 |
| 08/27/14 | | pacer---online court file access | Brown, Jessica | 57.30 |
| 09/02/14 | | TLO | Brown, Jessica | 5.00 |
| 09/10/14 | | School Records | Brown, Jessica | 52.56 |
| 09/24/14 | | Smith Economic Group  forensic report | Brown, Jessica | 1250.00 |
| 09/26/14 | | Strategic Consulting Services, Inc vocational assessment | Brown, Jessica | 620.00 |
| 09/29/14 | | MidValley Counseling Center Inc forensic report | Brown, Jessica | 3432.50 |
| 11/25/14 | | PACER | Brown, Jessica | 30.40 |
| 03/05/15 | | pacer---online court file access | Brown, Jessica | 64.00 |
| 03/17/15 | | Smith Economic Group  forensic report | Brown, Jessica | 65.00 |
| | | | | **24,807.19** |

**EXHIBIT 9**



# Strategic Consulting Services, Inc.
VOCATIONAL REHABILITATION SOLUTIONS FOR THE INDIVIDUAL AND EMPLOYER
www.StrategicConsultingInc.com

*Offices throughout Washington and neighboring states*

15 S Grady Way, Suite 410, Renton, WA  98057

Tel:  (425) 917-2001  mcohen@strategic.vocmail.com  Fax: (206) 350-3629

September 10, 2014

Carol L. Hepburn
Hepburn Law Firm
2722 Eastlake Avenue East, Suite 200
Seattle, WA 98102

Re:  Marineland/Jane Doe

Dear Ms. Hepburn:

Thank you for referring Jane Doe for a Vocational Assessment.  Ms. Doe was sexually abused by her ▮▮▮▮▮▮▮ and images of her victimization have been distributed, downloaded, viewed, and/or redistributed to others. This assessment will evaluate the vocational impact of Ms. Doe's discovery that pornographic images of her had been widely distributed on the internet nationally and internationally.  Her knowledge and understanding that the images themselves will persist in perpetuity has led to significant psychological sequelae that impacts her education, career development, vocational situation, and earning capacity.

I had the opportunity to interview and test Ms. Doe at the Mill Creek office of Strategic Consulting Services on July 29, 2014.  I have reviewed medical records from Randall L. Green, Ph.D.,                    and the             Clinic.  I have also reviewed school and academic records from the             School District.

## CLIENT INFORMATION:

Ms. Doe is        years of age with a date of birth of                    She lives with her boyfriend,      , in the garage of her mother's home in                    The household also includes her mother, her mother's husband, her brother, her sister, and two cousins.

Marineland
September 10, 2014
Page 2

Ms. Doe,      , and his cousin, have been trying to get their own apartment.  Both of the men work in construction and have adequate income to obtain an apartment.  However, none of them have much of a credit history so they have not been able to find anybody willing to rent to them.

Ms. Doe reports no history of military service.  She knows how to drive but has never had a driver's license.  She explained that she failed the first test at age 16 and moved out of the house at age 18.  She is not really concerned because she gets rides from friends or family members whenever she needs to go anywhere.  She added that before she can think about taking the driving test, she needs to learn to drive a car with a manual transmission (stick shift) since none of the vehicles in her household have an automatic transmission.  Ms. Doe added that she is much more concerned with finding an apartment and caring for her cats.

Ms. Doe discussed her current status and daily activities.  She typically does the household tasks that need to be done such as laundry and cooking.  She does, however report that she is limited by fibromyalgia.  Specifically, bending over the washer and dryer hurts her back.  She fights through her pain in order to take care of things that need to be done.  Ms. Doe feels that it is her "duty" to cook at least one full, healthy, meal per day for          For example she may cook a meal of chicken, broccoli, and potatoes.  She explained that her grandmother taught her how to cook and made three meals daily.  Ms. Doe recently obtained a book of her grandmother's recipes.

Ms. Doe primarily addressed her physical difficulties related to the fibromyalgia diagnosis.  She may have a few months where she is pretty functional followed by a week or so where she is not able to do anything.  On a good day, she can climb stairs with some pain.  On a bad day, she cannot get out of bed.  She has limitations with walking and lifting.  Various medications have been suggested for her but she has had bad reactions to or experiences with medications in the past so she has not followed through with getting any of them.

EDUCATIONAL BACKGROUND:

Educationally, Jane Doe completed grade 11.  She has not returned to obtain her GED.  Dr. Green's report provides a comprehensive review of Ms. Doe's performance and experience in school as it related to history of her victimization and learning of the internet distribution of her images.

By way of a very brief summary, Ms. Doe was in grade six when she disclosed her victimization.  She was in grade nine when ████████ was convicted and prosecuted.  During these years, according to Dr. Green, Ms. Doe was overwhelmed, suffered from an adjustment reaction, and underachieved academically.  Her grades in grade nine were uneven.

In her senior year, (             , Ms. Doe's life was chaotic.  She was expelled from high school in February      Her status was changed to suspend in May      Her status was then changed to an administrative status for unexcused absences which was in effect through April 19,     .  She did not earn any credits in spring semester,      and had a GPA of 0.0.  As noted, Ms. Doe did not have enough credits to graduate.

By September 18,      Ms. Doe was considered an adult.  She withdrew from high school at that time.  She attributes this to the combination of stress related to legal issues, anxiety about

Marineland
September 10, 2014
Page 3

who may have seen her images and the onset of physical pain that was later diagnosed as Fibromyalgia.  Even at that time, however, she hoped to be able to earn her diploma through alternative means.

Ms. Doe has looked at information about completing her high school diploma or GED at Everett Community College.  However, as noted by Dr. Green, her anxiety keeps her from being able to attend a school and interact with others on a regular basis.

OCCUPATIONAL BACKGROUND:

Dr. Green provides a very thorough and insightful synopsis of Ms. Doe's current vocational profile:

*Avocational interests/vocational aspirations*
*Given her history and her relatively young age of      years old, Jane Doe has had extremely limited vocational experience, to date.  She had a very brief stint at being a bikini barista.  Aside from that, with her substantial anxiety, agoraphobic avoidance patterns, fibromyalgia, and lack of a high school equivalent degree, she has very limited options at this time.*

*In this context, Ms. Doe has stumbled upon a pseudo-community and pseudo-job that has become for her a source of connection and pseudo-esteem building, although she would not put it that way.*

*She describes that her contemporary inability to override her fear to complete her high school equivalency in some capacity or to find a job in the workplace has led to a solution that contains a thumbprint of her sexual victimization, including her grooming exposure with "Suz."  One of the grooming elements and manipulations by ▮▮▮▮▮ and "Suz" was to "model" clothing such as bathing suits, underwear, etc.*

*Specifically, Ms. Doe represents that her interests have taken two different, but not entirely unrelated attempted solutions to her fear-based agoraphobic, PTSD-related avoidance patterns. She has developed a "job" as a product promoter on a chat room and, separately, as a model for photographers, although that might include being photographed with products from the website chat room.*

During our meeting, I explored the "work" that Ms. Doe is doing with respect to modeling and product promotions.  It became apparent to me that this group provides Ms. Doe with a sense of belonging and support.  It does not, however, in any conceivable way; function as a "job" or income source.  I pulled up the website and reviewed it with Ms. Doe at our meeting.  Ms. Doe confirmed that in fact, she paid the organization $79.00 for the "starter kit".

I concur with Dr. Green that this group is victimizing and exploiting Ms. Doe once more.  A quick glance at the photos on the website illustrates the exploitive nature of the business.  Ms. Doe is aware of the suggestive nature of the photographs and even stated that she understands that "sex sells". She clearly does not comprehend the exploitative nature of this group.

Marineland
September 10, 2014
Page 4

Ms. Doe has been spending two to three hours per day engaged in "marketing" activities for the promotional company for about six months. To date, she has not earned any income whatsoever from this endeavor. I gently pointed out to her that, in fact, this has been a negative sum proposition, costing her $80.00 and about 300 hours of her time and effort without resulting in any economic benefit. Ms. Doe replied that she is willing to put in the effort to lay the groundwork for future revenue.

We further explored the revenue potential of working for this group based on the knowledge that Ms. Doe has of the compensation available through modeling jobs. Each "job" can pay about $200.00. I calculated that she would need two modeling jobs every week in order to make the equivalent of a fulltime position that pays $10.00 per hour.

## VOCATIONAL TESTING:

Dr. Green administered a comprehensive test panel that included measures of intelligence and academic ability. Please refer to his report for detailed information. Dr. Green summarized his findings related to cognitive function/intellectual capacity:

*These results indicate that, notwithstanding her difficult foundation, educationally speaking, all her scores were in the average, with the exception of that scale thought to be more sensitive as a pure measure of fluid reasoning. Fluid abilities require effort and mental manipulations and transformations, such as are assessed on this scale. The items required Ms. Doe to utilize visual spatial and attentional skills to determine missing patterns in a design. She did exceptionally well on this scale, particularly as the designs become very challenging because they require mental rotation. It also likely reduces the likelihood that she has attentional problems that rise to the level of ADHD. So a score such as she achieved is consistent with strong fluid ability and working memory, in addition to good visual-spatial and attentional skills.*
*The implications of these preliminary findings about her average and/or above cognitive capacity support the conclusion that she is cognitively able to achieve more educationally and vocationally than she has, to date. Completing a high school equivalency and pursuing some college or vocational training classes does not appear to be out of her reach, based on her intellectual capacity. Further exploration in areas involving the abilities related to her Block Design performance might be of particular value for her to further investigate.*

As part of my evaluation, I asked Ms. Doe to complete the **Keirsey Temperament Sorter.** Temperaments are an innate aspect of an individual's basic lifestyle preferences and behavioral characteristics. Temperaments can be used to identify general career interest areas associated with each type and help to identify a well-rounded retraining goal for career exploration. Please note, temperament type does not explain everything and should not be used to keep one from pursuing a particular career. The client is the best judge of whether or not the temperament results are an accurate description of his or her personal characteristics. Ms. Doe's temperament preference is INFJ:

## INFJs generally have the following characteristics:
Seek meaning and connection in ideas, relationships, and material possessions. Want to understand what motivates people and are insightful about others. Conscientious and committed to their firm values. Develop a clear vision about how best to serve the common good. Organized and decisive in implementing their vision.

Marineland
September 10, 2014
Page 5

The INFJ is a special individual who needs more out of a career than a job. They need to feel as if everything they do in their lives is in sync with their strong value systems - with what they believe to be right. Accordingly, the INFJ should choose a career in which they are able to live their daily lives in accordance with their deeply held principles, and which supports them in their life quest to be doing something meaningful. Since INFJs have such strong value systems, and persistent intuitive visions which lend them a sense of "knowing", they do best in positions in which they are leaders, rather than followers. Although they can happily follow individuals who are leading in a direction which the INFJ fully supports, they will very unhappy following in any other situation.

*Possible Career Paths for the INFJ:*
**Counseling/Education/Wellness:** Career Counselor, Psychologist, Educational Consultant, Mediator, Teacher of Art/Drama/Music/Social Science, Special Education Teacher, Bilingual Education Teacher, Librarian, Crisis Counselor, Social Worker, Counselor, Religious Worker/Clergy, Nutritionist, Audiologist, Speech Pathologist, Occupational Therapist, Alternative Medicine
**Creative:** Artist, Novelist, Designer, Graphic Design, Editor/Art Director, Playwright, Interpreter/Translator, Media Specialist
**Business:** Human Resources, Management Consultant, Marketing, Corporate Trainer, Organizational Development, Public Relations

**MEDICAL INFORMATION:**

Ms. Doe's medical file from the            Clinic includes a letter dated 7/9/    from
M.D.: *This letter is to inform you of the status of my patient Jane Doe, (DOB), who was diagnosed with fibromyalgia. Suffers from chronic pain as a result of this disease.*

Dr. Green evaluated Ms. Doe on July 7, 2014, and provided the following <u>Diagnostic Impressions:</u>

•Persistent Depressive Disorder (Dysthymia), with Anxious Distress, Early Onset, With Pure Dysthymic Syndrome
•Generalized Anxiety Disorder
•Posttraumatic Stress Disorder with Dissociative Symptoms: Depersonalization
•Psychological Factors Affecting Other Medical Conditions: Fibromyalgia, Moderate
•Cannabis Use Disorder, Mild
•Borderline Personality Disorder
•Unspecified Personality Disorder with Paranoid, Schizotypal, and Dependent Features
•Personal History of Physical Abuse in Childhood
•Personal History of Sexual Abuse in Childhood
•Personal History of Psychological Abuse in Childhood
•Educational Problems
•Other Problems Related to Employment
•Low Income
•Victim of Crime
•Fibromyalgia

Marineland
September 10, 2014
Page 6

Dr. Green provided a number of conclusions and recommendations.  All of the findings impact every aspect of Ms. Doe's life.  Some of the more vocationally oriented conclusions are excerpted below:

•*Ms. Doe is a significantly compromised individual with multiple psychiatric diagnoses, a significant chronic illness, who is presently impaired in her ability to function productively on a daily basis.*

•*Educational obstacles enhanced by fear of being in public, pursuing a high school degree, or then going to a vocational training or actual college degree program.*

•*Fibromyalgia aggravation and exacerbation secondary to the anxiety and stress she experiences.*

•*Vocational challenges posed by her conditioned past and her current anxiety about being seen by strangers unless over the internet (which she tells herself she can control, or when protected by her bodyguard.)*

Dr. Green provides a number of specific treatment recommendations:

•  *Her prognosis is extremely poor apart from appropriate levels of intervention in a comprehensive, multi-dimensional program.  While I seriously considered the appropriateness of a trauma-informed residential program, that is not something that she would consider, given her current agoraphobic-like existence.*

•  *Even still, the following recommendations will be daunting for her, as a concession to her strong dependency and avoidance patterns, as she has tended to be treatment- avoidant/resistant up to now, and it will be a significant achievement for her to implement the following recommendations. But, the cost of her failure to implement something like the following recommendations will, in my opinion, play out the tragedies of her life in a self-defeating spiral of greater desperation and dysfunction.*

## VOCATIONAL ASSESSMENT:

In order to identify Ms. Doe's pre-morbid earning capacity, I inquired about the educational and occupational attainment of her family members.  The literature on this subject consistently shows a high correlation between the educational attainments of family members on children.   Her mother graduated from high school and went on to college to become a Registered Nurse.  Her aunt is also a Nurse.  Her stepfather had a career in the Army and then went to college.  Ms. Doe reported that all of her father's family at least finished high school and many went to college.

Considering this information, I believe it is reasonable to assume that had Ms. Doe not experienced the severe trauma, she would have at a minimum, graduated from high school, and potentially completed an Associate level degree.  Her earnings, therefore, would be consistent with earnings of similarly educated individuals.

Marineland
September 10, 2014
Page 7

The United States Census Bureau provides earnings data by worker characteristics, including education.  An October, 2013 release from the Bureau of Labor Statistics, Highlights of Women's Earnings in 2012; is appended to this report.  A more current but less detailed chart from the Bureau of Labor Statistics is below:  The data below illustrates that earnings and labor market participation increase significantly with education.

# Earnings and unemployment rates by educational attainment

| Earnings and unemployment rates by educational attainment | | |
|---|---|---|
| **Education attained** | **Unemployment rate in 2013 (Percent)** | **Median weekly earnings** |
| Doctoral degree | 2.2 | $1,623 |
| Professional degree | 2.3 | 1,714 |
| Master's degree | 3.4 | 1,329 |
| Bachelor's degree | 4.0 | 1,108 |
| Associate's degree | 5.4 | 777 |
| Some college, no degree | 7.0 | 727 |
| High school diploma | 7.5 | 651 |
| Less than a high school diploma | 11.0 | 472 |
| Note: Data are for persons age 25 and over. Earnings are for full-time wage and salary workers. Source: Current Population Survey, U.S. Department of Labor, U.S. Bureau of Labor Statistics | | |

All of the data confirms that individuals with less than a high school diploma work less and earn less than those with more education.  Unfortunately, in my opinion, the data reflecting the earnings for that educational level over represents Ms. Doe's earning capacity.

As she presents today, in my opinion, the psychological and physical barriers faced by Ms. Doe render her incapable of working even in an unskilled, minimum wage, position on a reasonably continuous basis.  Dr. Green discussed the impact of Ms. Doe's psychiatric conditions on her ability to function, in general.  Additional vocational impairments include lack of a stable living environment, driver's license, or a car.  Dr. Green characterized her prognosis as "extremely poor".

It is impossible to project with any degree of probability whether Ms. Doe will eventually engage in treatment or to what degree said treatment would be effective in improving her ability to function.  I cannot, therefore, project that Ms. Doe will ever be capable of returning to school and/or gainful employment.  The following recommendations are offered as a pathway to increased opportunity, in the even that Ms. Doe's mental health impairments respond to treatment in the future:

1.  Enroll in an on-line GED preparation program.  I have referenced the information for one, although there are others available as well:

DCS GED® Prep Online will guide you along the way to successfully passing the GED® test.  It will help you take practice tests, grade them, and suggest practice lessons to help improve in any

Marineland
September 10, 2014
Page 8

*weak areas. When you have passed all of the practice tests, you will need to make an appointment at your local GED® testing center to take the official GED® test. The GED® test cannot be taken online.*
**You Set The Pace**
*You are not locked into any classroom schedule.  DCS GED® Prep Online gives you the ability to study anywhere you have Internet access.  If you are serious about passing the GED® test, you have to make the commitment to study hard.*

The cost for a four-month subscription is $65.00.  Ms. Doe would also require a laptop computer and a reliable internet connection, probably a hotspot through her cellphone provider.

2.  GED Test:  The GED testing fee in Washington is $75 for all five tests.  This must be done at a testing center and cannot be done on-line.

Ms. Doe has expressed an interest in working with children.  Her real goal would be to have her own in-home day care center.  I have explained to her that she would be in a better position to succeed in self-employment if she had some experience working in a day care center.  Many employers require that staff members can physically lift the smaller children.  Labor market research confirms that many employers have lifting requirements.  For example, 24 Hour Fitness requires lifting of 50# and Kindercare requires lifting of 40#.  Other job postings, however, do not include a description of the physical demands.  To determine if this is a viable long-term goal for her I recommend:

3.  Physical Capacities Evaluation ($1000).  There are several clinics that provide this service including:

Assuming completion of the first two recommendations and further assuming continued interest in a career in childcare, Ms. Doe could peruse the necessary training for certification to allow her to move up from the assistant position.  Total cost for the program is approximately $6000.

Monday, August 25, 2014 3:22 PM
**State Early Childhood Education Certificate (Statewide)**
Award Type: Certificate
Everett Community College
**Program Details**

Marineland
September 10, 2014
Page 9

**Program Overview for State Early Childhood Education Certificate (Statewide)**

| | |
|---|---|
| **Training provider:** | Community College |
| **Program website:** | |
| **Program description:** | Prepares individuals to meet requirements for working with children from birth through age eight.  This program is designed to meet                  State standards and requirements as well as those recommended by the National Association for the Education of Young Children.  There is an emphasis on a blend of theory, research and learning principles with applied practices.  This program has a strong emphasis on field experiences offered throughout the curriculum. |
| **Length of training:** | 9 Months |
| **Award type:** | Certificate |
| **Credits:** | 47 |

As noted, the above recommendations are offered for possible future reference. I cannot project that Ms. Doe will ever overcome the severe impairments documented by Dr. Green to the extent that she will be able to enroll in school or to engage in any type of competitive employment on a reasonably continuous basis.

Thank you for asking me to consult in this matter.  Please feel free to contact me if you have any questions or require additional information.

Respectfully,

*Merrill A. Cohe*

Merrill Cohen, MC, CDMS, CRC, CCM, CLCP
Vocational Consultant/Life Care Planner

# EXHIBIT 10

# MERRILL A. COHEN, M.C., C.D.M.S., C.R.C., C.C.M., C.L.C.P.

**STRATEGIC CONSULTING SERVICES INC**.
15 South Grady Way, Suite 410; Renton, WA 98057
Telephone:  425.917.2001          Fax: 206.350.3629          Email: mcohen@scsvoc.com
Website: www.scsvoc.com          **Linked** in http://www.linkedin.com/in/mcohencrcclcp

## EDUCATION

**Master of Counseling,** Seattle University
Seattle, Washington, 1995

**Bachelor of Arts in Sociology,** George Washington University
Washington D.C., 1977

**Life Care Planning Certificate**, The University of Florida
Gainesville, Florida,   2008

## CERTIFICATIONS AND REGISTRATIONS

• **Certified Rehabilitation Counselor**  #35083, March 1997
   Commission on Rehabilitation Counselor Certification
   Schaumburg, Illinois

• **Certified Case Manager**  #13824, December 1997
   Commission for Case Manager Certification
   Schaumburg, Illinois

• **Certified Disability Management Specialist**  #08345, March 1996
   Certification of Disability Management Specialists Commission
   Schaumburg, Illinois

• **Certified Life Care Planner**, #1011, December, 2008
   Commission on Health Care Certification
   Midlothian, Virginia

• **Registered Vocational Rehabilitation Counselor,** 1994
   Counselor #8841; Provider #218134,
   Washington State Department of Labor and Industries
   Olympia, Washington

• **Approved Vocational Expert,** 2005
   U.S. Social Security Administration, BPA#:  0091
   Office of Disability Adjudication and Review
   Seattle, Washington

• **Approved Vocational Expert,** 2005
   U.S. Railroad Retirement Board
   Chicago, Illinois

• **Approved Vocational Rehabilitation Counselor**
   U.S. Department of Veterans Affairs
   Washington, D.C

• **Approved Rehabilitation Specialist**
   Alaska Department of Labor
   Alaska Workers' Compensation Board
   Anchorage, Alaska

Merrill Cohen, C.V.
2

## EMPLOYMENT HISTORY

### Vocational Rehabilitation Counselor and Case Manager

Strategic Consulting Services, Inc.                    March 2007 to Present
OSC Vocational Systems, Inc.                           1993 to March 2007

Provide vocational rehabilitation assessment, placement, and rehabilitation planning in various   rehabilitation programs, insurance systems,   and jurisdictions,  including  Social Security Administration, Office of Adjudication and Review (ODAR); Washington State Workers Compensation (L&I); U.S. Longshore and Harborworkers Compensation Act (USL&H); U.S. Defense Base Act; Jones Act, Federal Employees' Liability Act (FELA);   Long Term Disability; Employment Discrimination, Marriage Dissolution, and Personal Injury cases.

- **Vocational Assessment**:  interview clients with injuries or disabilities; evaluate their educational background and past relevant work; conduct analysis of transferrable skills; assess employability in the local and national labor market utilizing Federal and State resources including but not limited to DOT, OOH, Career One Stop, Washington Workforce Explorer, Access Washington, WOIS, etc.
- **Rehabilitation Planning and Implementation**:  Develop vocational retraining plans to assist individuals with disabilities re-enter the labor market in a position consistent with residual physical and/or mental capacities; monitor progress in training and assist with any problems to facilitate    successful completion of training followed by gainful employment.
- **Psychometric Testing**: Administer, score, and interpret vocational tests of achievement, aptitude, interests, and personality.
- **Labor Market Survey**:  Contact employers to determine the necessary qualifications for and the occupational and physical demands of jobs.  Also determine if the hiring pattern and number of openings constitute a positive or negative labor market.
- **Job Analysis**:  On site evaluation of the essential functions and physical demands of jobs based on direct observation, personnel interviews, and other resources.
- **Job Development and Client Placement:**  Contact employers to identify potential contacts for disabled clients.  Promote the hiring of workers with disabilities and assist clients with job placement.  Placement services also include resume development, instruction in job seeking skills, and mock interviews
- **Wage Earning Capacity Analysis:**  Evaluate suitable jobs and the potential wages for injured workers based on a transferrable skills analysis and evaluation of labor market conditions.
- **Life Care Planning and Medical Case Management**:  Develop Life Care  Plans to reflect the future medical and other needs and services that will be required for individuals with catastrophic injuries.
- **Expert Testimony:**  Serve as a Vocational Expert in Administrative Hearings, Superior Court, or Federal Court.

Switchman, Brakeman, Conductor, Hostler
Burlington Northern Railroad, Seattle, Washington              1989-1993

Plastic Tool Maker
The Boeing Company, Seattle, Washington                        1986-1989

Merrill Cohen, C.V.
3

## RESEARCH/PUBLICATIONS/PRESENTATIONS

• Presenter, "There is Light Duty on the Waterfront**,"** Northwest Longshore Administrators Fall Meeting, September, 2013

• Presenter, "Vocational Issues in Maritime Claims**,"** Puget Sound Marine Claims Association, March 18, 2010.

• Presenter, "Issues Facing Vocational Counselors under the New Vocational Rules**,"** WSTLA's Annual Workers' Comp Seminar. Washington State Trial Lawyers Association, May 29, 2008.

• Presenter, "Changes in the Medical/Vocational Rules," Virginia Mason Medical Center Rehabilitation Medicine In-Service**,** March 31, 2008.

• Presenter, "Vocational Rehabilitation:  Quantifying and Proving Future Needs." EXPERTS:  Plotting Your Course with Expert Assistance.  Washington State Trial Lawyers Association, October 18, 2006.

• Presenter, "Applied Methodology in Vocational Rehabilitation," Washington Chapter, International Association of Rehabilitation Professionals Fall Conference, September 30, 2006.

• Presenter, "Vocational Assessment and Life Care Planning," Life Care Planning In Washington.  Lorman Education Services, October 2004.

• Presenter, "Vocational Counselors:  New Voc Rules and What They Mean to Practitioners," Workers Comp:  Helping the Worker Through Difficult Times. Washington State Trial Lawyers Association, May 9, 2003.

• Presenter, "New Ways to Use Vocational Evidence in Longshore Cases."  The Longshore Act:  2000.  Northwest Longshore Administrators Association, October 12, 2000.

• Presenter, "How to Help the Employee Get Back to Work."  Workers Compensation in Washington.  National Business Institute, June 16, 2000.

• Presenter, "Using a Vocational Consultant to Get the Right Result For Your Client." Plaintiff's Employment Law:  Leveling the Playing Field.  Washington Employment Lawyers Association, February 4, 2000.

• Using Vocational Rehabilitation Experts in Employment Claims, Trial News, June 1999.

• Presenter, "One Claim, Three Possible Vocational Outcomes."  Workers Compensation in Washington.  Lorman Education Services, April 15, 1999.

• The Use of Vocational Consultants to Assess Impact of Injuries on the Wage Earning Capacity of Children and Young Adults," Trial News, November, 1998.

• Presenter, "Characteristics Associated with Successful Return to Work Outcomes."

Merrill Cohen, C.V.
4

Workers Compensation in Washington, Lorman Education Services, April 15, 1998.

• Presenter, "Vocational Assessment in Marriage Dissolution."  Snohomish County Bar Association, Family Law Committee, March 16, 1998.

• Presenter, "The Road to Return to Work."  Workers Compensation in Washington. Lorman Education Services, April 1997.

• "A Family Systems Approach to Rehabilitation Counseling," <u>Rehabilitation Review</u>, Vol.
12, Number 3, summer 1997.

• "Life Care Planning and Mediation," National Association of Rehabilitation Professionals in the Private Sector.  <u>Rehabilitation Review</u>, Vol. 2, Number 5, September/October 1994.

## <u>AFFILIATIONS</u>

• International Association of Rehabilitation Professionals (IARP)

• International Academy of Life Care Planners (IALCP)

• American Rehabilitation Counseling Association

• Professionals in Workers Compensation – Board Member Emeritus

• Washington Self Insurers Association (WSIA)

• Northwest Longshore Administrators Association (NWLAA)

• Puget Sound Marine Claims Association (PMSCA)