# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

    Plaintiff,

vs.                                             No. CR 13-1876 JB

JASON LOERA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Opposed Motion Requesting Medical Services and Reconsideration of Conditions of Detention, filed January 10, 2017 (Doc. 163)("Motion"). The Court held an evidentiary hearing on April 28, 2017. The primary issues are: (i) whether, under 18 U.S.C. § 3145(c), "exceptional reasons" permit the Court to release Defendant Jason Loera from detention at Cibola County Detention Center pending sentencing so that Loera can undergo ileostomy reversal surgery; (ii) whether the Court should demand that the United States Marshals Service provide Loera with an ileostomy reversal surgery while Loera is in the United States Marshals Service's custody; (iii) whether, in a motion to reconsider Loera's detention made under 18 U.S.C. § 3145, Loera may allege a constitutional claim for deliberate indifference in violation of the Eighth Amendment to the Constitution of the United States of America; and (iv) whether, while in the United States Marshals Service's custody, Loera has suffered deliberate indifference in violation of the Eighth Amendment, because either the United States Marshals Service or Cibola County Detention Center has not provided Loera with necessary care for his ileostomy. The Court concludes: (i) under 18 U.S.C. § 3145(c), "exceptional reasons" do not exist which would warrant the Court releasing Loera from detention at Cibola County Detention Center pending sentencing; (ii) the United States

Marshals Service should not provide Loera with an ileostomy reversal surgery while Loera is in its custody; (iii) Loera may not allege a constitutional claim of deliberate indifference in a motion brought under 18 U.S.C. § 3145; and (iv), even if Loera has alleged his constitutional claim through the proper procedural vehicle, Loera did not suffer deliberate indifference in violation of the Eighth Amendment. Accordingly, the Court will deny the Motion.

### **FACTUAL BACKGROUND**

In United States v. Loera, 59 F. Supp. 3d 1089, Memorandum Opinion and Order, filed October 20, 2014 (Doc. 62)(D.N.M. 2014)(Browning, J.)("Motion to Suppress MOO"), the Court made one-hundred and twenty findings of fact. See 59 F. Supp. at 1096-1108, Motion to Suppress MOO at 5-25. The Court incorporates those findings of fact herein by reference and does not repeat them. The Court will find and state only some additional facts that are needed to evaluate the Motion.

1.      Loera has been in the United States Marshal's Service's custody since September, 2016. See Transcript of Hearing at 70:10 (taken April 28, 2017)(Wolf)("Tr.").[1]

2.      Cibola County Detention Center houses Loera. See Tr. at 11:1 (Lucero).

3.      Cibola County Detention Center has "a contract with the U.S. Marshal's Service and . . . accept[s] whatever detainees they send . . . ." Tr. at 7:17-18 (Lucero).

4.      Dr. Steve Wolf is a career United States Public Health Service physician and has worked in that capacity for twenty-five years. See Tr. at 52:10-12 (Wolf).

5.      The United States Public Health Service is "responsible for prisoner healthcare while prisoners are in their federal proceedings." Tr. at 53:17-18 (Wolf).

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original unedited version. Any final transcript may contain slightly different page and/or line numbers.

6. Since 2007, Dr. Wolf has been assigned to the United States Marshals Service as the medical director for prisoner operations. <u>See</u> Tr. at 52:24-25 (Wolf).

7. When making decisions about care, the United States Public Health Service "look[s] at how long an individual will be in custody." Tr. at 53:14-15 (Wolf)(alteration added).

8. "[A] surgery that has more risk of complications is a surgery that [the United States Public Health Service] would generally defer until an individual gets to a long-term destination." Tr. at 55:25-56:1 (Wolf)(alterations added).

9. "[A] lot of [prisoner] requests are best addressed in a long-term setting." Tr. at 53:24-25 (Wolf)(alterations added).

10. The standard of care that the United States Public Health Service provides "is basically the community standard of care." Tr. at 55:4-19 (Wolf).

11. The United States Public Health Service receives "a lot of requests from jails all over the country and many of the requests would be for things that might be considered desirable but aren't medically necessary." Tr. at 55:4-19 (Wolf).

12. When

an individual may be leaving [the United States Marshals Service's] custody very shortly[,] . . . something [i.e., a medical procedure] that [the United States Public Health Service] might normally approve, [the United States Public Health Service] would not approve, because of the fact that [the individual is] being released from custody, or they're being transferred to their long-term institution where it would be more appropriate to do that [i.e., to carry out the procedure].

Tr. at 55:4-19 (Wolf)(alterations added).

13. Ileostomy procedures[2] "are not typically emergency procedures or even urgent procedures . . . ." Tr. at 57:17-19 (Wolf).

---

[2]An ileostomy is a procedure by which the small intestine is diverted through an opening in the abdomen. The opening is known as a stoma. A special bag covers the stoma and collects

14.     Since August 2013, Michelle Lucero has worked as a Physician Assistant at the Cibola County Detention Center.  See Tr. at 4:6-10 (Lucero).

15.     Lucero is the primary care provider at Cibola County Detention Center.  See Tr. at 6:7 (Lucero).

16.     Lucero must write prescriptions under a supervising physician's authority.  See Tr. at 27:16-23 (Walz, Lucero).

17.     Lucero is familiar with Loera.  See Tr. at 8:10 (Lucero).

18.     Upon Loera's arrival at Cibola County Detention Center, Lucero knew that Loera had an ileostomy and that "there is maintenance that has to be done for a condition like that."  Tr. at 11:1 (Lucero).

19.     Inmates at the Cibola County Detention Center infrequently have ileostomy bags.  See Tr. at 31:17-23 (Walz, Lucero).

20.     Although Lucero generally does not treat inmates with ileostomy bags, she is "not incapable of treating it."  Tr. at 32:3 (Lucero).

21.     After Lucero's initial evaluation of Loera, Lucero attempted to obtain Loera's medical records, because Loera had disclosed to Lucero "that the plan was to eventually do the [ileostomy] take down after a certain amount of time."  Tr. at 11:23 (Lucero)(alteration added).

22.     While housed at the Cibola County Detention Center, Loera made numerous requests to see medical staff.  See Tr. at 17:13 (Lucero).

---

waste output.  If an ileostomy is intended to be temporary, further surgery is required to rejoin the bowels and close the stoma.    See "What Is an Ileostomy?" American Cancer Society, https://www.cancer.org/treatment/treatments-and-side-effects/physical-side-effects/ostomies/ileostomy/what-is-ileostomy.html (last viewed June 13, 2017); Ileostomy Reversal, NHS choices, http://www.nhs.uk/Conditions/Ileostomy/Pages/Reversal.aspx (last viewed June 13, 2017).

23.    Lucero saw Loera in clinic on December 8, 2016, because Loera had complained of: (i) a leaking ileostomy bag; (ii) the need for a replacement bag, and (iii) the need of a sanitary location to change the ileostomy bag.  See Tr. at 17:17-19 (Lucero).

24.    On December 12, 2017, a nurse saw Loera, and provided him with a new ileostomy bag and "an antifungal powder that he typically uses with the bag to adhere it [to his body] to help minimize the risk of infection or irritation."  Tr. at 17:22-25 (Lucero)(alterations added).

25.    Changing of an ileostomy bag does not require a sterile procedure.  See Tr. at 18:19-19:2 (Lucero)("[I]t's not a sterile procedure.  It's not -- when you go into surgery, you're having to do a sterile procedure.  This isn't anything that's sterile.  You should be clean about it, you should wash your hands before and after, but there's nothing markedly beyond that that needs to be executed."); id. at 64:17-18 (Wolf)(stating that caring for an ileostomy is "not sterile procedure").

26.    Patients frequently care for and change their ileostomy bags at home, "keeping it clean, wiping it, using soap and water, keeping the site clean."  Tr. at 64:17-18 (Wolf).

27.    Loera expressed a primary concern "for nutritional compromise and electrolyte[3] balance."  Tr. at 19:24-15 (Lucero).

---

[3]"Electrolytes take on a positive or negative charge when they dissolve in . . . body fluid. This enables them to conduct electricity and move electrical charges or signals throughout [the] body.  These charges are crucial to many functions . . . including the operation of [the] brain, nerves, and muscles, and the creation of new tissue."  "How to Prevent an Electrolyte Imbalance,"  http://www.healthline.com/health/food-nutrition/how-to-prevent-an-electrolyte-imbalance#overview1 (last viewed June 19, 2017).  "Electrolytes come from . . . food and liquids . . . . Salt, potassium, calcium, and chloride are examples of electrolytes."  "How to Prevent an Electrolyte Imbalance,"  http://www.healthline.com/health/food-nutrition/how-to-prevent-an-electrolyte-imbalance#overview1 (last viewed June 19, 2017).

28.     Lucero assured Loera that "his B12 and folate[4] were normal, that his iron levels were normal . . . ."  Tr. at 20:4-5 (Lucero).

29.     Based on Loera's labs, there "wasn't any sign that he needed to have any type of additional supplementation other than the dietary meals that have been provided from the Center."  Tr. at 21:3-6 (Lucero).

30.     Loera "stressed that he did want to have [the ileostomy take-down] procedure done . . . [and voiced] his other concerns . . . for nutritional deficiency and [the] need[] to have Ensure supplement drinks, [and Gatorade] for electrolyte imbalances . . . ."  Tr. at 12:11-15 (Lucero)(alterations added).

31.     Lucero "didn't feel" that Loera's first request for surgery was appropriate.  Tr. at 38:21-39:2 (Lucero).

32.     Lucero told Loera that the ileostomy take down "would probably be considered an elective procedure" and that she could not "approve that kind of surgical procedure," but would have "to submit the request through the U.S. Marshal service."  Tr. at 12:22-25 (Lucero).

33.     Lucero sent Loera's request for an ileostomy take-down procedure to the United States Marshal's Service, but indicated that she "did feel that it was elective because he was stable and this was his request."  Tr. at 13:22-24 (Lucero).

34.     The United States Public Health Service received Loera's request for a surgical consult regarding an ileostomy take-down procedure "in late December or early January 2017 . . . ."  Tr. at 56:13-57:2 (Wolf).

_____

[4]"Folate is a water-soluble B vitamin that is naturally present in some foods, added to others, and available as a dietary supplement.  Folate, formerly known as folacin, is the generic term for both naturally occurring food folate and folic acid, the fully oxidized monoglutamate form of the vitamin that is used in dietary supplements and fortified foods."  "Folate," https://ods.od.nih.gov/factsheets/Folate-HealthProfessional/ (last viewed June 19, 2017).

35.     The United States Public Health Service denied Loera's request, because the agency "determined that it was not medically necessary to do this while in the short term custody of the U.S. Marshals." Tr. at 57:5-13 (Wolf).

36.     Loera made complaints related to his abdominal pain that Lucero "couldn't prove or disprove." Tr. at 14:1 (Lucero).

37.     Lucero does not know the etiology of Loera's abdominal pain, because the appropriate radiology studies have not been performed. See Tr. at 39:4-7 (Walz, Lucero).

38.     "[A] lot of [Loera's] discomfort was . . . [the result of] a lot of scar tissue from his previous surgeries," and "that's a very difficult thing to address because if you were to go back in and cut out that scare tissue, per se, you're just going to develop more because that's part of the healing process, is developing a scar." Tr. at 16:3-6 (Lucero)(alterations added).

39.     After Loera raised the issue of his abdominal pain, Loera "pressed . . . to have the [surgical] consult so that [Loera and his physicians] could get a better idea of the etiology of his abdominal pain." Tr. at 38:21-39:2 (Lucero)(alterations added).

40.     Lucero was not in a position to stop Loera's request for a surgical consult, because she is neither a surgeon nor a gastroenterologist. See Tr. at 25:21-24 (Lucero).

41.     As a result of Loera's complaints, Lucero sent a second request for an ileostomy take-down procedure to the U.S. Marshal's Service, emphasizing "the need for having a surgical consultant [to] have him evaluated." Tr. at 14:5-6 (Lucero)(alteration added).

42.     In early 2017, Dr. Wolf received a second request "specifying that Mr. Loera was complaining of decreased output from his [ileostomy] site and was having abdominal pain." Tr. at 58:1-4 (Wolf).

43.     Loera's reported symptoms of abdominal pain were new to Dr. Wolf.  See Tr. at 58:4 (Wolf).

44.     The United States Public Health Service approved Loera's second request for a surgeon's consultation.  See Tr. at 58:7-8 (Wolf).

45.     Dr. Wolf requested that the surgeon address whether Loera's ileostomy take-down procedure was urgent or could be deferred.  See Tr. at 58:10-11 (Wolf).

46.     The surgeon, Dr. Ray, did not address Dr. Wolf's question.  See Tr. at 58:16 (Wolf); id. at 58:21-22 (Wolf).

47.     Lucero sent Loera's California medical records to the University of New Mexico and requested that the University of New Mexico determine whether Loera's ileostomy take-down procedure is elective.  See Tr. at 22:25-23:8 (Lucero); id. at 23:20-22 (Lucero).

48.     An attending physician and a nurse-practitioner at the University of New Mexico responded to Lucero's request, but did not specifically answer the questions that Lucero had posed.  See Tr. at 24:4-15 (Lucero).

49.     Dr. Ray's request for a CAT scan and a gastro-graphing[5] study are currently pending "and so the decision really rests with the decision of the Court as to whether these studies will be done, because those studies will need to be done if we're going to be ordered to do the surgery."  Tr. at 59:11-14 (Wolf).

---

[5]An electrogastrogram is a graphic produced by an electrogastrograph that records the electrical signals that travel through the stomach muscles and control the muscles' contractions. An electrogastroenterogram (or gastroenterogram) is a similar procedure, which records electric signals not only from the stomach, but also from intestines.  See "Electrogastrogram," https://en.wikipedia.org/wiki/Electrogastrogram (last viewed June 19, 2017).

50.     Dr. Wolf deferred those requests until the Court renders a decision whether the United States Public Health Service was "going to be obligated to do this surgery." Tr. at 59:4-5 (Wolf).

51.     When Loera "went to his March 1st consult, [the surgeon] then requested a CT scan and a gastro graph and study . . . ." Tr. at 38:21-39:2 (Lucero)(alteration added).

52.     Dr. Wolf received two more requests "for specific procedures that Dr. Ray wanted to do in anticipation of doing the [ileostomy] reversal . . . for a CAT scan and one was for a gastro-graphing study . . . ." Tr. at 58:23-59:2 (Wolf)(alteration added).

53.     Lucero's last visit with Loera was on March 17, 2017, at which she informed him that, after his University of New Mexico consult, the University of New Mexico had requested a gastrographic study and CT scan. See TR. at 49:11-49:23 (Lucero).

54.     Dr. Ray's recommendations for follow-up tests "were solely based on the need to get those tests if surgery was going to go forward." Tr. at 60:22-24 (Wolf).

55.     Dr. Ray shared Loera's examination with Dr. Wolf. See Tr. at 60:3-61:18 (Wolf).

56.     According to Dr. Ray's findings, there was no report of pain; the site where Loera changed his ileostomy bag was clean and uninfected; and there was a hernia near to that site, which could be addressed at the time of the ileostomy take-down procedure. See Tr. at 60:7-13 (Wolf).

57.     Cibola County Detention Center extends to Loera the "standard care that [it] would to anybody else in the community." Tr. at 26:15-19 (Lucero).

58.     Loera "is getting what is medically necessary." Tr. at 26:15-19 (Lucero).

59.     If Loera were housed at a long-term Center, while in the United States Marshals Service's custody, his surgery might be reconsidered. Tr. at 39:20-23 (Lucero).

60.    Loera "lost some weight since he had been" housed at Cibola County Detention Center.  Tr. at 25:6-14 (Lucero).

61.    Loera's weight loss is potentially a "good thing for him because he also has a hernia associated with his [ileostomy] and it's not uncommon for obese[6] people to have hernias that they incur with situations like this."  <u>See</u> Tr. at 25:6-14 (Lucero).

62.    Certain circumstances relating to a strangulation of a hernia render an ileostomy take-down procedure urgent, including: "severe nuisance, severe pain, possible evidence of inflammation, redness or swelling at the site, fever, and nausea, vomiting; [t]hese are signs potentially of an acute abdominal process that would warrant urgent intervention."  Tr. at 61:4-14 (Wolf).

63.    "[H]ernias of [the type that Loera exhibits] very rarely strangulate, meaning very rarely do they get stuck in a way that strangles the intestinal contents in them, which leads to the death of the intestinal contents, and the potential infection and emergency need for surgery."  Tr. at 61:4-14 (Wolf).

64.    At the time of Loera's examination, his hernia did not exhibit these conditions, and the ileostomy site was "reduceable, meaning that you could press on it and . . . [that is] one thing you want to see."  Tr. at 61:17-18 (Wolf).

---

[6]Obesity means having too much body fat.  It is different from being overweight, which means weighing too much. . . .  Both terms mean that a person's weight is greater than what's considered healthy for his or her height. . . .  Being obese increases your risk of diabetes, heart disease, stroke, arthritis, and some cancers.  If you are obese, losing 5 to 10 percent of your weight can delay or prevent some of these diseases.  For example, that means losing 10 to 20 pounds if you weigh 200 pounds.

"Obesity," MedlinePlus, U.S. National Library of Medicine, https://medlineplus.gov/obesity.html (last viewed June 19, 2017).

65.     The surgery that Loera requests entails risks of surgical complications that "could ensue very rapidly thereafter or there may be development of scarring and fibrosis[7] that could lead to obstruction . . . [or] leakage." Tr. at 62:19-63:12 (Wolf).

66.     If Loera underwent surgery while in the custody of the United States Marshals Service, these complications "might develop after [Loera] . . . goes to the federal Bureau of Prisons and then they would have an individual who is in their hands, not in the hands of the surgeon who treated him, and ha[ve] to deal with the complications; this is never desirable." Tr. at 62:19-63:12 (Wolf).

67.     Conversely, if Loera underwent surgery and developed complications while in the United States Marshals Service's custody, the United States Marshals Service would become the "long-term custodian as a consequence of that until the situation is stabilized . . . ." Tr. at 62:19-63:12 (Wolf).

68.     The Court does not have any concerns about the care that Loera is receiving at Cibola County Detention Center. See Tr. at 64:12.

69.     Cibola County Detention Center's care of Loera's ileostomy "has been good." Tr. at 64:13 (Wolf).

70.     With respect to Loera's ileostomy, "there was no evidence of inflammation, redness or infection." Tr. at 64:24 (Wolf).

---

[7]Fibrosis is the formation of excess fibrous connective tissue in an organ or tissue in a reparative or reactive process. This can be a reactive, benign, or pathological state. In response to injury, this is called scarring, and if fibrosis arises from a single cell line, this is called a fibroma. Physiologically, fibrosis acts to deposit connective tissue, which can obliterate the architecture and function of the underlying organ or tissue. Fibrosis can be used to describe the pathological state of excess deposition of fibrous tissue, as well as the process of connective tissue deposition in healing.

"Fibrosis," Wikipedia, https://en.wikipedia.org/wiki/Fibrosis (last viewed June 19, 2017).

71.    The Court does not have any concerns about Loera, his condition, and his safety in remaining in a temporary detention Center while awaiting sentencing and ultimate transfer to the Bureau of Prisons.  See Tr. at 65:13-17.

72.    Loera "is getting appropriate care."  Tr. at 65:19 (Wolf).

## PROCEDURAL BACKGROUND

A federal grand jury indicted Loera on two counts of receipt of visual depictions of minors engaged in sexually explicit conduct, allegedly occurring on September 9, 2009, and one count of possession of a visual depiction of a minor engaged in sexually explicit conduct, allegedly occurring on February 20, 2010.  See Indictment at 1-2, filed May 29, 2013 (Doc. 2). A federal grand jury filed a superseding indictment that charged Loera with three counts of possession of material containing any visual depiction of a minor engaged in sexually explicit conduct, each allegedly occurring on November 20, 2012.  See Superseding Indictment at 1-2, filed January 9, 2014 (Doc. 25)("Superseding Indictment").  A federal grand jury then filed a second superseding indictment that charged Loera with three counts of possession of material containing any visual depiction of a minor engaged in sexually explicit conduct, each allegedly occurring on November 20, 2012, and three counts of knowingly receiving a depiction which involved the use of a minor engaging in sexually explicit conduct.  See Second Superseding Indictment, filed March 8, 2016 (Doc. 113).

On April 22, 2016, the parties notified the Court of Loera's plea agreement pursuant to rule 11 of the Federal Rules of Criminal Procedure.  See Plea Agreement, filed April 22, 2016 (Doc. 129)("Plea Agreement").  Loera pled guilty to the Second Superseding Indictment's Count 3, which charges a violation of 18 U.S.C. §§ 2252(a)(2), 2252(b)(1), and 2256, being a receipt of a visual depiction of a minor engaged in sexually explicit conduct.  See Plea Agreement ¶ 3, at 2.

On October 7, 2016, the Honorable William P. Lynch, United States Magistrate Judge for the United States District Court for the District of New Mexico, adjudged Loera guilty and continued Loera's conditions of release. See Plea Minute Sheet at 1, filed April 22, 2016 (Doc. 130)("Plea Minute Sheet"). Magistrate Judge Lynch found "exceptional circumstances . . . to allow Defendant to continue on release" and required Loera "to self surrender on 6/1/2016 in California." Plea Minute Sheet at 1.[8]

On May 27, 2016, Loera filed an Unopposed Motion to Modify Order on Defendant Jason's Loera's Self-Surrender, filed May 27, 2016 (Doc. 134)("Unopposed Motion to Modify Order on Self-Surrender"). Loera moved the Court to set June 24, 2016, as the date for his self-surrender to enable Loera to receive a colorectal surgery in Los Angeles, California, on June 3, 2016. Unopposed Motion to Modify Order on Self-Surrender ¶ 5, at 1. Magistrate Judge Lynch granted Loera's motion, stating that "Loera will continue on release until June 24, 2016, at which time he is ordered to self-surrender to the United States Marshals Service in the Central District of California." Amended Order on Defendant Jason Loera's Self-Surrender at 1, filed May 31, 2015 (Doc. 135).

On June 23, 2016, Loera filed a Second Unopposed Motion to Modify Order on Defendant Jason Loera's Self Surrender Date Based on Exceptional Medical Needs, filed June 23, 2016 (Doc. 138)("Second Unopposed Motion to Modify Order on Self Surrender Date"). Loera moved the Court to set July 15, 2016, as a new date for self-surrender, because Loera wanted to "complete what will be two significant and necessary additional surgeries, and related medical treatment, related to colorectal surgery." Second Unopposed Motion to Modify Order

---

[8]Judge Lynch found exceptional circumstances "because of [Loera's] surgery and the recovery time [he] will need from that." Plea Minute Hearing at April 22, 2016, 10:35:32 AM, Gila Courtroom (accessed via Liberty Court Player, June 20, 2017).

on Self Surrender Date at 1.  Magistrate Judge Lynch granted Loera's Second Unopposed Motion to Modify Order on Self Surrender Date, ordering "that the United States Marshals Service in the Central District of California is ordered to accept Loera's self-surrender date and take him into custody on July 15, 2016."  Second Amended Order on Defendant Jason Loera's Self-Surrender at 2, filed June 24, 2016 (Doc. 139).

On July 15, 2016, Loera filed a Third Unopposed Motion to Modify Order on Defendant Jason Loera's Self Surrender Date Based on Exceptional Medical Needs, filed July 15, 2016 (Doc. 144)("Third Unopposed Motion to Modify Order on Self Surrender Date").  Loera moved the Court to set August 15, 2016, as a new date for self-surrender, because "the surgeon, Dr. Moshe Barnajian, is to perform a second (final) surgery, in approximately one month . . . ."  Third Unopposed Motion to Modify Order on Self Surrender Date at 1.  Loera averred that the "motion is not filed for purposes of delay, but to complete what will be two significant and necessary additional colorectal surgeries, and related medical treatment."  Third Unopposed Motion to Modify Order on Self Surrender Date at 1.   On July 15, 2016, the Honorable Karen B. Molzen, Chief Magistrate Judge for the United States District Court for the District of New Mexico, granted Loera's Third Unopposed Motion to Modify Order on Self Surrender Date, stating "that the United States Marshals Service in the Central District of California is ordered to accept Defendant Loera's self-surrender date and take him into custody on August 15, 2016."  Third Amended Order on Defendant Jason Loera's Self-Surrender at 2, filed July 15, 2016 (Doc. 145).

On August 12, 2016, Loera filed a Fourth Unopposed Motion to Modify Order on Defendant Jason Loera's Self Surrender Date Based on Exceptional Medical Needs, filed August 12, 2016 (Doc. 146)("Fourth Unopposed Motion to Modify Order on Self Surrender Date").

Loera moved the Court to set September 30, 2016, as a new date for self surrender, because "the surgeon, Dr. Moshe Barnajian, is to perform a second (final) surgery . . . ."   Fourth Unopposed Motion to Modify Order on Self Surrender Date at 1.  Loera again stated that the "motion is not filed for purposes of delay, but to complete what will be the second of two significant and necessary colorectal surgeries, and related medical treatment."   Fourth Unopposed Motion to Modify Order on Self Surrender Date at 1.  On August 12, 2016, Magistrate Judge Lynch granted Loera's Fourth Unopposed Motion to Modify Order on Self Surrender Date, stating "that the United States Marshals Service in the Central District of California is ordered to accept Defendant's Loera's self-surrender date and take him into custody on September 15, 2016."  Fourth Amended Order on Defendant Jason Loera's Self-Surrender at 2, filed August 12, 2016 (Doc. 147).

On August 23, 2016, Loera filed a Fifth Unopposed Motion to Modify Order on Defendant Jason Loera's Self Surrender Date and to Vacate Sentencing Hearing of October 5, 2016, Based on Exceptional Needs, filed August 23, 2016 (Doc. 148)("Fifth Unopposed Motion to Modify Order on Self Surrender Date").  Loera moved the Court to set October 31, 2016, as a new date for self-surrender, because "the surgeon, Dr. Moshe Barnajian, is tentatively set to perform a second (final) surgery on September 16, 2016 . . . ."   Fifth Unopposed Motion to Modify Order on Self Surrender Date at 1.  Loera also requested the Court to vacate the October 5, 2016, sentencing hearing and to reschedule the sentencing hearing "for no earlier that [sic] November 15, 2016, to allow sufficient time for the United States Marshal to transport Defendant from his self-surrender in Los Angeles CA to Albuquerque, NM."  Fifth Unopposed Motion to Modify Order on Self Surrender Date at 1.  The Court granted Loera's Fifth Unopposed Motion to Modify Order on Self Surrender Date, and scheduled a sentencing hearing

for November 22, 2016. See Fifth Amended Order to Continue Sentencing Date of October 5, 2016 at 2, filed August 24, 2016 (Doc. 149).

On August 29, 2016, Loera filed a Sixth Unopposed Motion to Set Amended Self-Surrender Date Based on Exceptional Medical Circumstances Due to Scheduling of Surgery, filed August 29, 2016 (Doc. 150)("Sixth Unopposed Motion to Modify Order on Self Surrender Date"). Loera moved the Court to "enter an order setting an amended voluntary self-surrender date for October 31, 2916 [sic]." Sixth Unopposed Motion to Modify Order on Self Surrender Date. Loera stated that "[a]n amended voluntary self-surrender date is crucial to the medical wellbeing of Defendant that after a first colorectal surgery which required careful recovery and follow up testing, Defendant now has a tentative surgery scheduled for September 16, 2016." Sixth Unopposed Motion to Modify Order on Self Surrender Date ¶ 5, at 2. Loera further argued that, "[b]ecause the District Court has enlarged the date for the sentencing there is ample time to have the surgery performed and to achieve recovery prior to sentencing scheduled for November 22, 2016." Sixth Unopposed Motion to Modify Order on Self Surrender Date ¶ 7, at 2. Magistrate Judge Lynch granted Sixth Unopposed Motion to Modify Order on Self Surrender Date, stating that "the United States Marshals Service in the Central District of California is ordered to accept Defendant Loera's self-surrender date and take him into custody on October 31, 2016." Sixth Amended Order on Defendant Jason Loera's Self-Surrender at 2, filed September 1, 2016 (Doc. 151).

On September 9, 2016, Andrew F. Selph, Senior United States Probation Officer, presented a Petition for Action on Conditions of Pretrial Release, filed September 9, 2016 (Doc. 152)("Petition for Action on Conditions of Pretrial Release"). Probation Officer Selph alleged that, according to Global Positioning System (GPS) data, on September 8, 2016, Loera

"travelled to a McDonald's Restaurant with a Playland . . . and remained at that location between 12:09 and 13:32 without the knowledge or authorization of U.S. Pretrial Services."  Petition for Action on Conditions of Pretrial Release ¶ 1, at 1.  Probation Officer Selph stated that "[t]his conduct is in violation of the conditions of [Loera's] June 21, 2013 Order Setting Conditions of Release."  Petition for Action on Conditions of Pretrial Release ¶ 1, at 1.  Probation Officer Selph "pray[ed] that the Court will order a warrant for the Defendant's arrest."  Petition for Action on Conditions of Pretrial Release at 1.

Loera was arrested on October 6, 2016.  See Unopposed Motion to Vacate and Continue Sentencing Hearing ¶ 2, at 1, filed November 7, 2016 (Doc. 160)("Unopposed Motion to Vacate and Continue").  The following day, Magistrate Judge Lynch "found that the Defendant Jason Loera violated his conditions of release" and "ordered that the conditions of release previously imposed are hereby revoked."  Order at 1, filed October 7, 2016 (Doc. 159)("Revocation Order").  On November 7, 2016, Loera filed his Unopposed Motion to Vacate and Continue, seeking to continue his sentencing hearing, because Psychologist Moss Aubrey had yet to compile and present his evaluations of Loera to defense counsel, rendering "the sentencing date set for November 22, 2016 . . . not achievable."  Unopposed Motion to Vacate and Continue ¶ 10, at 2; See Unopposed Motion to Vacate and Continue ¶¶ 4-9, at 1-2.  The Court granted Loera's Unopposed Motion to Vacate and Continue, ordering "that the sentencing date of November 22, 2016, is hereby vacated, and that the sentencing hearing in this matter will be reset for January 24, 2017 at 9:00 a.m."  Order Vacating Sentencing Date at 1, filed November 14, 2016 (Doc. 161).

On January 10, 2017, Loera filed another Unopposed Motion to Vacate and Continue Sentencing Hearing, filed January 10, 2017 (Doc. 162)("Second Unopposed Motion to Vacate

and Continue Sentencing Hearing"). Loera stated that, "[b]ased on the content to Dr. Aubrey's report, it is necessary for defense counsel to analyze in detail the findings, and meet with Defendant Loera to review the report, and to obtain his input." Second Unopposed Motion to Vacate and Continue Sentencing Hearing ¶ 6, at 2. Loera further averred that, "based on scheduling issues caused from the Christmas and New Year's holidays, a meeting with defendant could not be arranged to review this report." Second Unopposed Motion to Vacate and Continue Sentencing Hearing ¶ 7, at 2. In the Order Vacating Sentencing Date, filed January 23, 2017 (Doc. 166)("Second Order Vacating Sentencing Date"), the Court granted Loera's Second Unopposed Motion to Vacate and Continue Sentencing Hearing. See Second Order Vacating Sentencing Date at 1. The Court vacated the January 24, 2017, sentencing date and reset the sentencing hearing for March 13, 2017. See Second Order Vacating Sentencing Date at 1.

1. **Loera's Motion.**

On January 10, 2017, Loera filed the Motion, requesting that the Court reconsider the conditions of his detention as well as his request for medical services. See Motion at 1. Loera alleges that, after he was taken into custody, he has been detained in CCA Estancia and the Cibola County Detention Center, which, according to Loera, "are ill equipped to provide fundamental and constitutionally adequate medical services and take care of the health needs of an individual such as Defendant who has an open abdominal exit requiring use of an ileostomy bag which must be changed on a regular basis." Motion ¶ 13, at 3. Loera states that he requires nutritional supplements, like Gatorade, "which neither Center has been willing to provide." Motion ¶ 15, at 3. He alleges that he has "experienced alarming weight loss," because of a "lack of proper nutrition." Motion ¶ 21, at 4. Loera also states that, at Cibola County Detention Center, "he is being deprived of sufficient supplies of ileostomy bags, and he must clean the exit

area and change the bag in an unclean common area with a lack of sanitary conditions and complete lack of privacy." Motion ¶ 16, at 3. For example, Loera alleges that, "as of the time of the filing of this motion," while incarcerated at Cibola County Detention Center, he "has not been provided clean clothing for over three weeks . . . ." Motion ¶ 20, at 3. Loera states that he was transferred to Cibola County Detention Center after lodging several complaints at CCA Estancia, see Motion ¶ 22, at 4, but complains that Cibola County Detention Center not only "has no law library resources," Motion ¶ 23, at 4, but also is unable to provide for his health needs, see Motion ¶ 13, at 3. Loera "requests transfer to a qualified federal medical Center, or in the alternative to the La Posada Halfway House and requests that conditions of release be set in a manner that Defendant could obtain needed medical treatment." Motion ¶ 24, at 4. See Motion at 5.

Loera argues that, pursuant to 18 U.S.C. § 3143, the Court should release him so that he can obtain "complex surgery . . . to reconnect his colon and removal of the need for an ileostomy bag." Motion at 4. Loera "maintains that he is not a flight risk or a danger to the community." Motion at 5. He stresses that "the Court could establish conditions of release that would allow for proper monitoring and still allow Defendant to receive proper medical care." Motion at 5.

Loera additionally raises an argument under the Eighth Amendment. See Motion at 5. He states that "[p]rison officials have shown a deliberate indifference to Defendant's medical condition in violation of Defendant's Eight Amendment protections . . . ." Motion at 5 (citing Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)). Loera hangs this claim on his allegation that "[t]he facilities where Defendant has been held, CCA Estancia and presently CCFD, have been unable or unwilling to provide the basic medical services required for Defendant." Motion at 5.

## 2.     **The Plaintiff United States of America's Response.**

The United States responds to the Motion.  See United States' Sealed Response in Opposition to Defendant's Motion Requesting Medical Services and Reconsideration of Detention (Doc. 163), filed January 24, 2017 (Doc. 167)("Sealed Response").  The United States opposes Loera's requests that the Court: (i) order proper medical services, (ii) reconsider Loera's detention, and (iii) release Loera to La Posada Halfway House.  Sealed Response at 1.  The United States accordingly requests that the Court deny the Motion.  See Sealed Response at 2.

The United States provides a background of factual allegations to support its argument.  See Sealed Response at 2-6.  The United States alleges that Loera was arrested in California on May 30, 2013, at which time he was already using an ileostomy bag.  See Sealed Response at 2.  In California, the Honorable Stephen J. Hillman, United States Magistrate Judge for the United States District Court for the Central District of California, fashioned Loera's conditions of release.  See Sealed Response at 2.  The Honorable Alan C. Torgerson, United States Magistrate Judge for the United States District Court for the District of New Mexico, adopted the conditions of release that Magistrate Judge Hillman imposed, which allowed Loera "to work, obtain medical care, and attend religious services."  Sealed Response at 2.

The United States asserts that, only after Loera pled guilty on April 22, 2016, did he schedule a surgery to reconnect his bowels and dispense with his ileostomy bag.  See Sealed Response at 2.  Loera did not have that surgery until June 3, 2016.  See Sealed Response at 2.  The United States did not oppose Loera's six motions that his self-surrender date be continued so that he could undergo a second operation.  See Sealed Response at 3.  The United States notes that, after the revocation of Loera's conditions of release, he has been housed at two state correctional facilities under a United States Marshals Service contract.  See Sealed Response at

3.  While at these state correction facilities, the United States asserts, Loera voluntarily moved to have his sentencing date continued.  See Sealed Response at 3.

Next, the United States stresses that the two state correctional facilities at which Loera has been housed "are providing adequate medical treatment to Defendant Loera."  Sealed Response at 3.  The United States adverts to an email from Clinical Nurse Supervisor Brinda Cobb, at the CCA Torrance County Detention Center, which states that Center personnel ordered ostomy supplies and provided those supplies to Loera on November 23, 2016.  See Sealed Response at 3 (citing Email from Brinda Cobb to Marcus Malone at 1 (sent January 3, 2017), filed January 4, 2017 (Doc. 167-1)("January 4, 2017, Cobb Email")).  The United States indicates that Loera was transferred to Cibola County Detention Center on December 7, 2017, because of Center inmate levels at the CCA Torrance County Detention Center, and not because of Loera's attempt to secure medical or legal services.  See Sealed Response at 4.

The United States maintains that, after the Cibola County Detention Center received Loera, Lucero, a Cibola County Detention Center Certified Physician's Assistant, submitted "Loera's request for a surgical consult for colostomy take-down procedure to the U.S. Marshalls Service."  Sealed Response at 4 (citing Email from Michelle Lucero to Marcus Malone at 1 (sent January 2, 2017), filed January 24, 2017 (Doc. 167-2)("January 2, 2017, Lucero Email"); Email from Michelle Lucero to Marcus Malone at 1 (sent January 9, 2017), filed January 24, 2017 Doc. 167-3)("January 9, 2017, Lucero Email")).  The United States emphasizes that, according to Lucero, "CCDC has provided the necessary equipment needed for his ileostomy care," Sealed Response at 5, and that "nothing in the guiding literature mentions anything about requiring a 'sterile' environment for cleaning and changing of his ileostomy bag," Sealed Response at 5.  See January 9, 2017, Lucero Email at 1 ("His ostomy site is 6 months old and therefore, a 'sterile

environment' is no more a factor than changing an infant's diaper in a sterile environment."). In response to Loera's allegation of weight loss, see Motion ¶ 21, at 4, the United States counters that Loera is obese and could benefit from weight loss, see Sealed Response at 5 (citing Michelle Lucero's Cibola County Detention Center, Initial Chronic Clinic Notes at 3 (taken December 8, 2016), filed January 24, 2017 (Doc. 167-6)).

The United States also states that the United States Marshals Service denied Loera's request for a surgical consult, because "'[t]akedown of the ileostomy bag is not urgent, and especially in view of his upcoming sentencing this could be addressed once [Loera] gets to his long-term BOP destination, rather than in short-term USMS custody.'" Sealed Response at 6 (first alteration original, second alteration added)(quoting Lakeisha Hicks, DPN, RN Email to Marcus Malone at 1 (sent January 10, 2017), filed January 24, 2017 (Doc. 167-4)("January 10, 2017, Hicks Email")). The United States alleges that, according Lakeisha Hicks, a nurse consultant at the United States Public Health Service, Prisoner Operations Division, Loera's ileostomy-takedown procedure "'could readily be addressed at his long-term BOP destination, and would be much better to address there for purposes of continuity of care.'" Sealed Response at 6 (quoting January 10, 2017, Hicks Email at 1).

The United States pivots to its legal argument and parses Loera's motion to reconsider release from his constitutional claim regarding the insufficiency of medical care. See Sealed Response at 8-11. First, the United States argues that "Loera's bases for release do not amount to 'exceptional circumstances.'" Sealed Response at 9 (quoting 18 U.S.C. § 3145(c)). The United States stresses that, in light of United States v. Rodella, 101 F. Supp. 3d 1075, 1133 (D.N.M. 2015)(Browning, J.), the Court should deny Loera's Motion, because "Loera's medical providers . . . appear to be responding appropriately, providing adequate care, and frequently

monitoring his health." Sealed Response at 9. The United States maintains that "Loera's bare allegations, supported mainly by his own notes, are not persuasive." Sealed Response at 9. The United States also emphasizes that Loera's compliance with his conditions of release, before he violated those same conditions, is not an exceptional circumstance that warrants his release from detention. See Sealed Response at 9-10.

Responding to Loera's Eighth Amendment claim, the United States "requests that this Court reject Defendant's allegations." Sealed Response at 10. The United States notes that Loera "wants immediate, elective medical surgery to correct a condition he has lived with for over four year[s]," but argues that the Eighth Amendment does not entitle him "to the medical care of his choice." Sealed Response at 10. The United States asserts that, according to "the medical professionals tasked with overseeing Defendant Loera's care," the ileostomy-takedown procedure that Loera wants is "not necessary at this time." Sealed Response at 10. The United States also maintains that Loera's medical providers "are carefully evaluating his health, responding to his medical needs, and providing the necessary supplies for him to maintain his ileostomy bag." Sealed Response at 10 (emphasis in original).

In support of its argument, the United States adverts to Kirk v. Flores, 660 F. App'x 579 (10th Cir. 2016), for the proposition that an inmate's disagreement with the course of medical care which a detention center provides does not "'state a constitutional violation.'" Sealed Response at 10 (quoting Kirk v. Flores, 660 F. App'x at 582 (citing Gee v. Pacheco, 627 F.3d 1178, 1192 (10th Cir. 2010)). Moreover, the United States asserts, "medical negligence doesn't qualify as a constitutional violation." Sealed Response at 11 (citing Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999)). The United States concludes that like the Tenth Circuit in Kirk v. Flores, 660 F. App'x at 582, the Court should reject Loera's constitutional

claim and deny the Motion.  <u>See</u> Sealed Response at 11 (citing <u>Kirk v. Flores</u>, 660 F. App'x at 582).  The United States accordingly requests that Loera "remain in the custody of the U.S. Marshals Service pending sentencing."  Sealed Response at 11.

**3.      Loera's Reply.**

Loera replies to the United States' Response.  <u>See</u> Reply in Support of Opposed Motion Requesting Medical Services and Reconsideration of Conditions of Detention, filed February 7, 2017 (Doc. 170)("Reply").  In the Reply, Loera maintains his contention "that he has not and cannot receive proper medical care for his complex medical condition while in custody at either the Torrance County Correction Center or the Cibola County Detention Center."  Reply at 1. Loera concedes that "the Court cannot order the United States Marshalls Service where to hold Defendant while awaiting sentencing."  Reply at 1-2.  Loera requests, however, that the Court "reinstate Defendant's conditions of release to allow Defendants to obtain his required follow-up surgery while awaiting sentencing."  Reply at 2.

Loera first replies to the United States' contention that the detention facilities provide Loera with proper medical supplies.  <u>See</u> Reply at 2.  Loera posits that a review of the United States' concessions, as well as Loera's deteriorating condition, "makes it clear that the medical services provided are severely lacking."  Reply at 2.  Loera states, for example, that "it took a month and a half" for CCA Torrance County "to receive the proper medical supplies to serve Defendant."  Reply at 2 (citing Response at 3 (quoting January 4, 2017, Cobb Email at 1)). Loera also states that, after he "was transferred to Cibola County, . . . when UNMH made a request for an appointment to examine Defendant the appointment was not scheduled and did not occur."  Reply at 2.  Loera argues that Physician's Assistant Lucero "felt without foundation that Defendant could be maintained at the Center," Reply at 2, and emphasizes that the United States

did not "set forth any of the PA's qualifications to support the medical determinations being made," Reply at 3.

Loera adds that, even though he now "has the proper materials to take care of himself," he lacks "sanitary conditions in which to change his ileostomy bag as needed." Reply at 3. Loera states that he must change his ileostomy in the "POD," the sinks of which are "contaminated with spittle and blood and there are no real disinfectant cleaning supplies offered to Defendant to utilize . . . ." Reply at 3. Loera further alleges that when he "arrived at Torrance County Detention Center in October he weighed 270 pounds, 40 pounds more than he does now." Reply at 3. Loera also indicates that the United States Marshal Service rejected his request for medical care without consulting his surgeon, Dr. Barnjian. See Reply at 3.

Turning to Loera's Eighth Amendment claim, Loera relies on Thompson v. Gibson, 289 F.3d 1218 (10th Cir. 2002), to argue that his medical need is serious. See Reply at 3 (citing Thompson v. Gibson, 289 F.3d at 1222). Loera explains that he requires a follow-up surgery, because an "ileostomy bag is attached in a way that bypasses the large intestine and colon and limits the absorption of liquids through the large intestine and colon," whereas a colostomy bag, which he had before his first surgery, "does not limit the absorption of nutrients through the large intestine . . . ." Reply at 4. Loera then relies on Estelle v. Gamble, 429 U.S. 97 (1976), for the proposition that, to state a cognizable constitutional claim, "'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Reply at 4 (quoting Estelle v. Gamble, 429 U.S. at 106). Loera states that he "has clearly established a medical need and the lack of proper medical care" that "satisfies the requirements for deliberate indifference." Reply at 4.

Regarding his request for reconsideration of his conditions of release, Loera emphasizes that "the Court previously found that exceptional circumstances existed based on the Defendant's need for the follow-up surgical procedure . . . ." Reply at 5. Loera stresses that fact distinguishes his case from United States v. Rodella, 101 F. Supp. 3d 1075 (D.N.M. 2015)(Browning, J.), on which the United States relies. See Reply at 5 (citing United States v. Rodella, 101 F. Supp. 3d at 1075). Loera also emphasizes that he "had not been found to be either a flight risk or a danger to the community," underscoring that he "was allowed to travel from Los Angeles, California to Albuquerque, New Mexico unescorted and unmonitored on at least four separate occasions." Reply at 5.

Loera also challenges the basis of the revocation of his conditions of release. See Reply at 5. Loera states that, as the Petition for Action on Conditions of Pretrial Release ¶ 1, at 1, reports, he had permission to leave his home for a dental appointment. Loera alleges that he parked near the vicinity of a McDonald's restaurant to attend his dental appointment, had car trouble, and remained within the McDonald's vicinity "until he could obtain a jump-start." Reply at 6. Loera concedes that "the GPS tracking is consistent with his car location," and that "he did not call his PO regarding his delay and car trouble," but alleges that "he never set foot in McDonald's or the play land . . . ." Reply at 6. Loera requests that the Court "modify his conditions of release to allow him to return to California to have his follow up colorectal surgery." Reply at 6.

### 4. <u>Motions to Continue</u>.

Both parties moved to continue the hearing on the Motion. See Unopposed Motion to Continue the March 1, 2017 Motion Hearing Regarding the Opposed Motion Requesting Medical Services and Reconsideration of Detention (Doc. 163), filed February 27, 2017 (Doc.

174); Unopposed Motion to Continue the March 13, 2017 Sentencing Hearing, filed March 6, 2017 (Doc. 175); Unopposed Motion to Continue the March 13, 2017 Motion Hearing Regarding the Opposed Motion Requesting Medical Services and Reconsideration of Detention (Doc. 163), filed February 27, 2017 (Doc. 177); Unopposed Motion to Continue the March 20, 2017 Motion Hearing Regarding the Opposed Motion Requesting Medical Services and Reconsideration of Detention (Doc. 163), filed March 16, 2017 (Doc. 182); Unopposed Motion to Continue the April 6, 2017 Motion Hearing Regarding the Opposed Motion Requesting Medical Services and Reconsideration of Detention (Doc. 163), filed April 3, 2017 (Doc. 185).  The Court granted each of these unopposed motions.  See Order of Continuance of Motion Hearing Currently Set for March 1, 2017, filed March 6, 2017 (Doc. 176); Order of Continuance of Sentencing Hearing Currently Set for March 13, 2017, filed March 10, 2017 (Doc. 178); Order of Continuance of Motion Hearing Currently Set for March 13, 2017, filed March 15, 2017 (Doc. 179); Order of Continuance of Motion Hearing Currently Set for March 20, 2017, filed March 20, 2017 (Doc. 184); Order of Continuance of Motion Hearing Currently Set for April 6, 2017 on Defendant's Opposed Motion Requesting Medical Services and Reconsideration of[]Detention, filed April 18, 2017 (Doc. 189).

**5.     United States' Supplement.**

On April 26, 2017, the United States filed United States' Sealed Supplement to its Sealed Response in Opposition to Defendant's Motion Requesting Medical Services and Reconsideration of Detention, filed April 26, 2017 (Doc. 192)("Sealed Supplement").  In the Sealed Supplement, the United States attaches "medical records and correspondence related to Defendant Loera's medical care while in U.S. Marshal Custody."  Sealed Supplement at 1.  The United States provides the Court this material in anticipation of the April 28, 2017, hearing.  See

Sealed Supplement at 1. The United States notes that, at the hearing, it intends "to present the live testimony of Physician's Assistant Michelle Lucero, Cibola County Detention Center, as well as the telephonic testimony of Dr. Steven Wolf, M.D., U.S. Public Health Service, to discuss the medical care Defendant Loera has received." Sealed Supplement at 1.

> ### 6. **The Hearing.**

The Court held an evidentiary hearing the afternoon of April 28, 2017. See Tr. at 1:1-2 (Court). The United States called Lucero as its first witness. See Tr. at 3:23-25 (Lucero). Since August 2013, Lucero has worked as a Physician Assistant at the Cibola County Detention Center. See Tr. at 4:6-10 (Lucero). Lucero is the primary care provider at Cibola County Detention Center. See Tr. at 6:7 (Lucero). Lucero stated that Cibola County Detention Center has "a contract with the U.S. Marshal's Service and . . . accept[s] whatever detainees they send . . . ." Tr. at 7:17-18 (Lucero). Lucero also stated that she is familiar with Loera. See Tr. at 8:10 (Lucero). Upon Loera's arrival at Cibola County Detention Center, Lucero knew that Loera had an ileostomy and that "there is maintenance that has to be done for a condition like that." Tr. at 11:1 (Lucero).

Lucero testified that, after her initial evaluation of Loera, Lucero attempted to obtain Loera's California medical records, because Loera had disclosed to Lucero "that the plan was to eventually do the [ileostomy] take down after a certain amount of time." Tr. at 11:23 (Lucero)(alteration added). Lucero also testified that Loera "stressed that he did want to have that procedure done . . . [and] his other concerns . . . for nutritional deficiency and needed to have Ensure supplement drinks, [and Gatorade] for electrolyte imbalances . . . ." Tr. at 12:11-15 (Lucero)(alterations added). Lucero stated that she told Loera that the ileostomy take down "would probably be considered an elective procedure" and that she could not "approve that kind

of surgical procedure," but would have "to submit the request through the U.S. Marshal service." Tr. at 12:22-25 (Lucero).

Lucero sent Loera's request for an ileostomy take down procedure to the United States Marshal's Service, but indicated that she "did feel that it was elective because he was stable and this was his request." Tr. at 13:22-24 (Lucero). Lucero testified that, as time passed, Loera had complaints related to his abdominal pain that she "couldn't prove or disprove." Tr. at 14:1 (Lucero). As a result, Lucero sent a second request for a take-down procedure to the U.S. Marshal's Service, emphasizing "the need for having a surgical consultant have him evaluated." Tr. at 14:5-6 (Lucero). Lucero also stated that she "suspected a lot of his discomfort was probably [the result of] a lot of scar tissue from his previous surgeries," and noted that "that's a very difficult thing to address because if you were to go back in and cut out that scare tissue, per se, you're just going to develop more because that's part of the healing process, is developing a scar." Tr. at 16:3-6 (Lucero).

Lucero testified that Loera made sick-call requests. See Tr. at 17:13 (Lucero). Lucero stated that she saw Loera in clinic on December 8, 2016, because Loera had complained of a leaking ileostomy bag, the need for a replacement bag, and the need of a sanitary location to change the ileostomy bag. See Tr. at 17:17-19 (Lucero). Lucero testified that, on December 12, 2017, a nurse saw Loera, and provided Loera with a new ileostomy bag, and "an antifungal powder that he typically uses with the bag to adhere it to help minimize the risk of infection or irritation." Tr. at 17:22-25 (Lucero).

Lucero indicated that Loera and she "were at an impasse between how [Lucero] felt it should be done and how [Loera] felt it should have been done." Tr. at 18:16-17 (Lucero)(alterations added). With respect to the changing of an ileostomy bag, Lucero stated:

> I wouldn't consider it any different than changing a child's diaper. It's, yes, you have feces that you're dealing with, you need to wash your hands, you need to use soap and water, but it's not a sterile procedure. It's not -- when you go into surgery, you're having to do a sterile procedure. This isn't anything that's sterile. You should be clean about it, you should wash your hands before and after, but there's nothing markedly beyond that that needs to be executed.

Tr. at 18:19-19:2 (Lucero). Lucero also noted that Loera had expressed a primary concern "for nutritional compromise and electrolyte balance." Tr. at 19:24-15 (Lucero). Lucero stated that she assured Loera that "his B12 and folate were normal, that his iron levels were normal . . . ." Tr. at 20:4-5 (Lucero). Lucero stated that, based on Loera's labs, "there still wasn't any sign that he needed to have any type of additional supplementation other than the dietary meals that have been provided from the Center." Tr. at 21:3-6 (Lucero).

Lucero testified that she sent Loera's California medical records to the University of New Mexico and requested that the University of New Mexico determine whether Loera's ileostomy takedown procedure is elective. See Tr. at 22:25-23:8 (Lucero); id. at 23:20-22 (Lucero). Lucero averred that an attending physician and a nurse-practitioner at the University of New Mexico responded to Lucero's request, but did not specifically answer the questions she had posed. See Tr. at 24:4-15 (Lucero). Lucero then explained that she provided only objective, measurable information to the University of New Mexico and that she had indicated that she was sorry she was unable to provide more. See Tr. at 24:20-22 (Lucero). Lucero then testified as to the objective facts regarding Loera's medical condition:

> The only thing I can provide is what I see, what my labs show, what my vital signs show. He has lost some weight since he had been with us. It's been a good thing because he was already overweight. We have a body mass index scale that we usually will evaluate people. He had lost weight. That is a good thing for him because he also has a hernia associated with his [ileostomy] and it's not uncommon for obese people to have hernias that they incur with situations like this.

Tr. at 25:6-14 (Lucero). Lucero made clear, however, that she was not in a position to stop Loera's request, because she is neither a surgeon nor a gastroenterologist. See Tr. at 25:21-24 (Lucero). Lucero then testified as to the medical care that Loera is receiving at the Cibola County Detention Center:

> We have been extending medical standard care that we would to anybody else in the community. Now privileges he may [have] be[en] used to having at home are a little different. There is a difference between what is medically necessary and a comfort issue. He is getting what is medically necessary.

Tr. at 26:15-19 (Lucero).

On cross examination, Lucero conceded that she has a supervising physician and must write prescriptions under a supervising physician's authority. Tr. at 27:16-23 (Walz, Lucero). Lucero also conceded that she never requested that her supervising physician examine or otherwise treat Loera. Tr. at 28:7-14 (Walz, Lucero). Nor has Lucero ever discussed with her supervising physician any aspect of Loera's treatment or care. See Tr. at 29:22-24 (Walz, Lucero). Lucero also conceded that she lacks specialized training in gastroenterology, radiology, or surgery. See Tr. at 30:1-11 (Walz, Lucero). Lucero further conceded that she has never been qualified as an expert on the standard of care with respect to the treatment of inmates. See Tr. at 30:12-19 (Walz, Lucero). Lucero also admitted that inmates at the Cibola County Detention Center infrequently have ileostomy bags. See Tr. at 31:17-23 (Walz, Lucero). Although Lucero conceded that she generally does not treat inmates with ileostomy bags, she is "not incapable of treating it." Tr. at 32:3 (Lucero). Lucero then testified as to the conditions under which Loera changes his ileostomy bag. See Tr. at 34:15-36:21 (Walz, Lucero). Lucero stated that, if Loera thought another inmate spit or urinated in the communal sink, then Loera "can clean the sink [after] somebody uses it and clean it again after he uses it." Tr. at 35:24-36:1 (Lucero).

Lucero then testified regarding whether she thought Loera's request for surgery was appropriate:

> The first time I didn't feel that it was appropriate. The second time when he was pressing his abdominal pain issues, I pressed for him to have the consult so that we could get a better idea of the ideology of his abdominal pain. When he went to his March 1st consult, they then requested a CT scan and a gastro graph and study . . . .

Tr. at 38:21-39:2 (Lucero). Lucero then conceded that she does not know the etiology of the Loera's abdominal pain, because the appropriate radiology studies have not been performed. See Tr. at 39:4-7 (Walz, Lucero). Lucero also acknowledged that, if Loera were housed at a long-term Center, while in the United States Marshals Service's custody, his surgery might be reconsidered. Tr. at 39:20-23 (Lucero). Lucero testified that her last visit with Loera was on March 17, 2017, at which she informed him that, after his UNM consult, UNM had requested a gastrographic study and CT scan. See TR. at 49:11-49:23 (Lucero).

The United States then called Dr. Stephen Wolf as a witness. See Tr. at 50:16-51:4 (Houghton, Wolf). Dr. Wolf is a career United States Public Health Service physician and has worked in that capacity for twenty-five years. See Tr. at 52:10-12 (Wolf). Dr. Wolf testified that, since 2007, he has been assigned to the United States Marshals Service as the medical director for prisoner operations. See Tr. at 52:24-25 (Wolf). Dr. Wolf indicated that the United States Public Health Service is "responsible for prisoner healthcare while prisoners are in their federal proceedings." Tr. at 53:17-18 (Wolf). He further stated that, in his position, when making decisions about care, "we must look at how long an individual will be in our custody." Tr. at 53:14-15 (Wolf). Dr. Wolf noted that "a lot of [prisoner] requests are best addressed in a long-term setting." Tr. at 53:24-25 (Wolf). Dr. Wolf explained:

> The standard of care we provide is basically the community standard of care. We receive a lot of requests from jails all over the country and many of the requests

would be for things that might be considered desirable but aren't medically necessary. And, therefore, we have to make decisions whether, you know, to approve care on at that basis. But we attempt in every respect to follow standards of care in the community. There are times when we will deviate, but that's because of the fact that an individual may be leaving our custody very shortly and, therefore, something that we might normally approve we would not approve because of the fact that they're being released from custody, or they're being transferred to their long-term institution where it would be more appropriate to do that. In that respect, I mentioned earlier, we do differ from, say, an insurance company because we're adding another decision factor, which is how long do we have this individual in our custody.

Tr. at 55:4-19 (Wolf). Accordingly, Dr. Wolf testified "a surgery that has more risk of complications is a surgery that we would generally defer until an individual gets to a long-term destination." Tr. at 55:25-56:1 (Wolf).

Dr. Wolf then directed his attention to Loera's request. See 56:13-59:14 (Wolf). Dr. Wolf testified:

[W]e received a request initially, I believe it was in late December or maybe early January 2017 . . . for him to be sent for an evaluation by a general surgeon for consideration of reversal of his [ileostomy], meaning to take it down and put his plumbing back together. And it -- the request indicated that it was at the prisoner's request. . . . It was not at the request of the healthcare provider at the jail. And we get these all the time. We get requests that are from the provider because they think it's necessary, but many providers will also send us requests that are really the prisoner's request, not their own, but they feel under obligation . . . to forward that request to the U.S. Marshal's [sic] for us to adjudicate.

Tr. at 56:13-57:2 (Wolf). Dr. Wolf then explained why his agency denied Loera's request:

[W]e made a decision to deny that request because it -- we determined that it was not medically necessary to do this while in the short term custody of the U.S. Marshals. And by that, I mean that while a prisoner is undergoing their Federal Court proceedings, unless it's expected to be protracted and drawn out over years, which some are, . . . we generally feel those should be addressed when a person is in a long-term setting, either back in the community or at the federal Bureau of Prisons, if it needs to be addressed at all.

Tr. at 57:5-13 (Wolf). Dr. Wolf then emphasized that the request was Loera's and that Dr. Wolf is sufficiently familiar with ileostomy procedures to know that they "are not typically emergency

procedures or even urgent procedures, but generally meaning that they can be done at a mutual time convenience . . . ." Tr. at 57:17-19 (Wolf). "Therefore," Dr. Wolf concluded, "we denied it." Tr. at 57:20 (Wolf).

Dr. Wolf then testified that, in early 2017, he received a second request "specifying that Mr. Loera was complaining of decreased output from his [ileostomy] site and was having abdominal pain." Tr. at 58:1-4 (Wolf). Dr. Wolf averred that Loera's reported symptoms were new. <u>See</u> Tr. at 58:4 (Wolf). Dr. Wolf stated that his office approved Loera's second request for a surgeon's consultation, <u>see</u> Tr. at 58:7-8 (Wolf), and that Dr. Wolf asked the surgeon to address whether Loera's ileostomy take-down procedure was urgent or could be deferred, <u>see</u> Tr. at 58:10-11 (Wolf). Dr. Wolf stated that, in the response, the surgeon, Dr. Ray, did not address this question. <u>See</u> Tr. at 58:16. Dr. Wolf averred: "I happen to know that generally speaking there is not any urgency, but I wanted to have [Dr. Ray] opine on that issue and he did not." Tr. at 58:21-22 (Wolf).

Dr. Wolf next testified that he received two more requests "for specific procedures that Dr. Ray wanted to do in anticipation of doing the [ileostomy] reversal. One was for a CAT scan and one was for a gastro-graphing study and these are basically studies that you do in preparation for surgery." Tr. at 58:23-59:2 (Wolf). Dr. Wolf stated that he deferred those requests until the Court made a decision whether the United States Public Health Service was "going to be obligated to do this surgery." Tr. at 59:4-5 (Wolf). Dr. Wolf explained that Ray's request for a CAT scan and one was for a gastro-graphing study are currently pending "and so the decision really rests with the decision of the Court as to whether these studies will be done, because those studies will need to be done if we're going to be ordered to do the surgery." Tr. at 59:11-14 (Wolf).

Dr. Wolf pivoted to Ray's examination of Loera, the findings of which Dr. Ray shared with Dr. Wolf.  See Tr. at 60:3-61:18 (Wolf).  According to Dr. Ray's findings, there was no report of pain; the site whether Loera changed his ileostomy bag was clean and uninfected; and there was a hernia near to that site, which could be addressed at the time of the ileostomy take-down procedure.  See Tr. at 60:7-13 (Wolf).  Dr. Wolf again stated that Dr. Ray's recommendations for follow-up tests "were solely based on the need to get those tests if surgery was going to go forward."  Tr. at 60:22-24 (Wolf).

Dr. Wolf then spoke as to circumstances that would render an ileostomy take-down procedure urgent:

> [T]here's standard signs and symptoms that any clinician knows to look for with a strangulation of a hernia, which is a severe nuisance, severe pain, possible evidence of inflammation, redness or swelling at the site, fever, and nausea, vomiting.  These are signs potentially of an acute abdominal process that would warrant urgent intervention.  By the way, hernias of this type very rarely strangulate, meaning very rarely do they get stuck in a way that strangles the intestinal contents in them, which leads to the death of the intestinal contents, and the potential infection and emergency need for surgery.

Tr. at 61:4-14 (Wolf).  Dr. Wolf made clear that, at the time of Loera's examination, his hernia did not exhibit these conditions, and the ileostomy site was "reduceable, meaning that you could press on it and . . . [that is] one thing you want to see."  Tr. at 61:17-18 (Wolf).  Dr. Wolf explained the risks of surgical complications of the surgery that Loera requests:

> The concern would be that an operation now might just go fine, but it might not.  And the complications can ensue, could ensue very rapidly thereafter or there may be development of scarring and fibrosis that could lead to obstruction . . . you can get leakage.  These things might develop after he leaves our custody and goes to the federal Bureau of Prisons and then they would have an individual who is in their hands, not in the hands of the surgeon who treated him, and has to deal with the complications.  This is never desirable.  Conversely, when we operate on someone or approve surgery on someone who would otherwise not stay in our custody for very long after surgery, but then develops a complication, we become the, if you will, long-term custodian as a consequence of that until the situation is stabilized, and we've seen this happen.  You know, our role really is to take care

of prisoners while -- provide them with necessary care while they're in our custody, no less and no more. And to defer care that could be done in a long-term setting . . . .

Tr. at 62:19-63:12 (Wolf).

Dr. Wolf testified that he did not have any concerns about the care that Loera is receiving at Cibola County Detention Center. See Tr. at 64:12 (Wolf). Dr. Wolf stated that the care of Loera's ileostomy "has been good." Tr. at 64:13 (Wolf). Dr. Wolf then reiterated that patients frequently care for changing their ileostomy bags at home, "keeping it clean, wiping it, using soap and water, keeping the site clean. It's not sterile procedure." Tr. at 64:17-18 (Wolf). Dr. Wolf stated that "there was no evidence of inflammation, redness or infection." Tr. at 64:24 (Wolf). Dr. Wolf also averred that he did not have any concerns about Loera, his condition, and his safety in remaining a temporary detention Center while awaiting sentencing and ultimate transfer to the Bureau of Prisons. See Tr. at 65:13-17 (Houghton, Wolf). Dr. Wolf explained that Loera "is getting appropriate care." Tr. at 65:19 (Wolf). Dr. Wolf elaborated:

> The records I've reviewed, the clinic records from Cibola County indicates that they have a well-set up system, they have standardized chronic care form. It's a good form. I don't know if PA Lucero wrote it but it's a good form. . . . Very well organized. The care he's receiving is good. . . . This is very, very routine care. Patients do this at home and so -- and there really aren't very many concerns that I'm aware of that he's had.

Tr. at 65:19-66:3 (Wolf).

On cross-examination, Dr. Wolf reiterated that Loera has been in the United States Marshal's Service's custody since September, 2016, which amounts to "'not even a year." Tr. at 70:10 (Wolf). Dr. Wolf again stated that, if Loera's "court case were expected to drag out indefinitely . . . and he was planning to stay with us, you know, it wouldn't really -- there wouldn't be any discussion here." Tr. at 70:14 (Wolf). Dr. Wolf explained:

> [A] year is sort of an arbitrary time frame, but sort [of a] reasonable one . . . . [T]he times we won't do it is when a person's been in our custody for a year, but we then learn that sentencing is coming up, you know, in a week or two. We don't use this as an arbitrary set point. It's just a helpful set point.

Tr. at 71:15-20 (Wolf).

The Court then invited Loera to argue in support of the Motion. See Tr. at 73:10-11 (Court). Loera stated that he filed the Motion based on a "legitimate concern," noting that Loera has to change his ileostomy bag in a common sink area. Tr. at 73:16 (Walz). Loera then stated that he is "not going to go back and try to relitigate" whether Loera violated his conditions of release. Tr. at 74:6-7 (Walz). Loera demanded that "the Bureau of Prisons proceed with this surgical procedure, and that's what we want." Tr. at 74:16-17 (Walz). Loera emphasized, however, that "we don't want to reach that critical point where Mr. Loera's life's in danger. And he does complain of abdominal pain and has and it still hasn't been addressed . . . or resolved." Tr. at 75:17-20 (Walz). Loera concluded that he has shown that his concerns are legitimate. See Tr. at 76:2-3 (Walz).

The Court then invited the United States' response. See Tr. at 76:6 (Court). The United States argued that "the testimony the Court's heard and the record before it reflect a very conscientious medical care provider at Cibola County." Tr. at 77:18-20 (Houghton). The United States asked the Court "to make findings that the care Mr. Loera is receiving at Cibola County has been adequate and it's constitutional care." Tr. at 77:24-78:1 (Houghton). The United States also pressed that "none of this rises to the level of exceptional circumstances that would warrant releasing Defendant Loera pending a sentencing that is going to happen within the month." Tr. at 78:13-15 (Houghton)

After hearing testimony and argument, the Court expressed that it was "fairly comfortable after going through the medical records[9] that [Loera] was getting the care that was necessary and there doesn't seem to be a problem there."  Tr. at 79:9-11 (Court).  The Court stated that "the Center is providing adequate constitutional care and Dr. Wolf gives me some assurance of that."  Tr. at 79:24-25 (Court).  The Court concluded:

> The solution is not to delay further getting records from the past or putting Mr. Loera into the community to try to get this done once again, but the solution is to get him to a long-term Center, so that they can make judgments about him without all the complications . . . .  We don't have a set time frame we can present to a medical doctor and say here's how much longer he's going to be in this detention Center and here's how long he's going to be in a prison Center.
>
> So after carefully reviewing the medical services he's receiving and I am not convinced that he's being -- I'm convinced that he's receiving adequate care, constitutional care, think the best thing to do is to get him into Bureau of Prisons as quickly as possible, so that they can begin to look at him as a more normal patient than one that's in a detention Center.

Tr. at 80:12-20 (Court).  The Court continued:

> I don't see exceptional circumstances here.  I have an opinion[10] out that I've tried to carefully define for ourselves, and anybody who reads it, what exceptional circumstances entail.  I have indicated that I think it's largely defined by what it is not and have listed out a number of things that it is not, and so without trying to define when a medical condition would rise to the point of exceptional care that we would pull them out of the care of the Marshals and the detention Center and putting them into the private sector, I don't think that this one rises to it.  It seems to me that he's getting adequate constitutional care, the procedure is not medically necessary in the short term and I think we can proceed to sentencing and not delay things further by releasing him and putting him into the community as was done in 2016.

Tr. at 81:2-15 (Court).  The Court then stated its holding:

---

[9]The Court referenced its review of the Sealed Supplement, in which the United States attaches "medical records and correspondence related to Defendant Loera's medical care while in U.S. Marshal Custody."  Sealed Supplement at 1.

[10]See  United States v. Lopez, 184 F. Supp. 3d 1139, 1142-49 (D.N.M. 2016)(Browning, J.).

So I'm going to deny the motion requesting medical services outside of the detention Center and I am also denying the motion for reconsideration. . . . I have reconsidered the conditions of detention, so I did reconsider them, but I'm not going to grant Mr. Loera's request for release to have this medical procedure done.

Tr. at 81:16-21 (Court).

## LAW REGARDING PRETRIAL DETENTION

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 through 3150, a court may detain a defendant pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence. See 18 U.S.C. § 3142(f); United States v. Cisneros, 328 F.3d 610, 616 (10th Cir. 2003). "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f)(2)(alteration added). See United States v. Hernandez, 778 F. Supp. 2d 1211, 1219-28 (D.N.M. 2011)(Browning, J.)(holding that the Confrontation Clause did not apply to the defendant's pre-trial decision hearing). To determine whether pretrial detention is warranted, the judicial officer must consider the statutory factors that 18 U.S.C. § 3142(g) lists:

(g) **Factors to be considered.** -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g).

When a defendant is charged with certain crimes, however, a presumption arises that the defendant is a flight risk and a danger to the community. See 18 U.S.C. § 3142(e)(3); United States v. Villapudua–Quintero, 308 F. App'x 272, 273 (10th Cir. 2009)(unpublished)(per curiam)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders). 18 U.S.C. § 3142(e)(3)(A) provides that a presumption of detention arises when "there is probable cause to believe that the person committed" certain drug offenses, specifically "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46." 18 U.S.C. § 3142(e)(3)(A). The United States Court of Appeals for the Tenth Circuit has explained that

"[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more." United States v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993). Accord United States v. Holguin, 791 F. Supp. 2d 1082, 1088 (D.N.M. 2011)(Browning, J.). "'Once the presumption is invoked, the burden of production shifts to the defendant.'" United States v. Holguin, 791 F. Supp. 2d at 1087 (quoting United States v. Stricklin, 932 F.2d 1353, 1354-55 (10th Cir. 1991)).

To determine whether there are conditions that will reasonably assure the defendant's appearance and the community's safety, a court must consider: (i) the nature and circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the defendant's history and characteristics, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual that release would pose. See 18 U.S.C. § 3142(g). "Should the defendant satisfy his or her burden of production under 18 U.S.C. § 3142(f), the United States must then show by a preponderance of the evidence that the defendant presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger to the community." United States v. Holguin, 791 F.Supp.2d at 1087 (citing United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.")). Notably, however, even if the defendant meets his or her burden of production under 18 U.S.C. § 3142(f), "the presumption remains a factor for consideration by the district court in determining whether to release or detain." United States v. Stricklin, 932 F.2d at 1355. Accord United States v. Mercedes, 254 F.3d at 436; United States v.

Ramos, No. CR 15-3940 JB, 2016 WL 9021831, at *13-14 (D.N.M. Dec. 30, 2016)(Browning, J.).

## LAW REGARDING THE DISTRICT COURT'S STANDARD OF REVIEW OF A MAGISTRATE JUDGE'S DETENTION ORDER OR RELEASE ORDER

Section 3145(a) of Title 18 of the United States Code provides that a "court having original jurisdiction over the offense" may review a Magistrate Judge's detention order or release order. 18 U.S.C. § 3145(a)-(b). "The standard of review for the district court's review of a Magistrate Judge's detention or release order under § 3145(a) is de novo." United States v. Cisneros, 328 F.3d at 616 n.1. "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the proper pretrial detention or conditions for release." United States v. Rueben, 974 F.2d 580, 585-86 (5th Cir. 1992). See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir. 1985)(stating that a district court's review of a Magistrate Judge's order setting bond is de novo); United States v. Ramos, 2016 WL 9021831, at *15.

## LAW REGARDING RELEASE PENDING SENTENCING

Under 18 U.S.C. § 3143(a)(2), the Court "shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained." 18 U.S.C. § 3143(a)(2). When a defendant pleads guilty to those crimes, this mandatory detention provision applies, unless: (i) the United States recommends that no sentence of imprisonment should be imposed; and (ii) the Court finds by clear-and-convincing evidence that the defendant is neither a flight risk nor a danger to the community. See 18 U.S.C. §§ 3143(a)(2)(A)(ii), (B). Offenses falling under 18 U.S.C. § 3142(f)(1)(A) through (C) include cases that involve:

(A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

18 U.S.C. § 3142(f)(1).

If the defendant cannot meet § 3143's requirements, the only way a defendant may remain out of custody pending sentencing is by showing that there are "exceptional reasons why detention would not be appropriate," and by showing by clear-and-convincing evidence that he or she is not a flight risk or a danger to the community. 18 U.S.C. § 3145(c). Section 3145(c) provides:

(c)     Appeal from a release or detention order. -- An appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by the provisions of section 1291 of title 28 and section 3731 of this title. The appeal shall be determined promptly. A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).[11] Accordingly, in addition to showing that the defendant poses no danger to the community or flight risk, a defendant covered by § 3143(b) must show that there are

---

[11]Notably, § 3145(c) refers expressly only to appeals from a release or detention order. See 18 U.S.C. § 3145(c). The Tenth Circuit has decided, however, that a district court may apply this subsection even when there is no appeal of a detention order. See United States v. Jones, 979 F.2d 804, 806 (10th Cir. 1992)(per curiam)(citing United States v. Herrera-Soto, 961 F.2d 645, 647 (7th Cir. 1992)(per curiam); United States v. DiSomma, 951 F.2d 494, 496 (2d Cir. 1991); United States v. Carr, 947 F.2d 1239, 1240 (5th Cir. 1991)(per curiam))("All the other circuits that have addressed the issue have ruled that the 'exceptional reasons' provision does apply to district courts. We now join those circuits and hold that a district court may

exceptional reasons that make the person's detention inappropriate.  See 18 U.S.C. § 3145(c);

United States v. Jones, 979 F.2d at 805.  A defendant bears the "burden of proof to clearly show

exceptional circumstances" when seeking release pursuant to 18 U.S.C. § 3145(c).  United States

v. Rodella, 101 F. Supp. 3d 1075, 1133 (D.N.M. 2015)(Browning, J.)(citing 18 U.S.C. § 3145(c)

and United States v. Bonczek, 2009 WL 2924220, at *2 (S.D.N.Y. 2009)(Crotty, J.)).

    Sections 3143 and 3145 do not define the phrase "exceptional reasons."  18 U.S.C.

§§ 3143, 3145.  See United States v. Jager, 2011 WL 831279, at *18 (D.N.M. 2011)(Browning,

J.)("Section 3143 does not define 'exceptional reasons.'").  In determining what is exceptional

under § 3145(c), courts have closely analyzed the "only useful historical document" on the issue:

a letter from the Department of Justice to Illinois Senator Paul Simon, the provision's sponsor.

The Crawford Letter "propos[es] the 'exceptional reasons' provision and suggest[s] two

hypothetical situations where it might apply."  United States v. DiSomma, 951 F.2d at 497-98

(alterations added)(citing Letter from Assistant Attorney General Carol T. Crawford to the

Honorable Paul Simon (July 26, 1989)("Crawford Letter")).  See United States v. Garcia, 340

F.3d 1013, 1016-17 (9th Cir. 2003)(same).  The two situations in the Crawford Letter are:

> [F]irst, an elderly man with lifelong community ties, [who was] convicted under
> the federal murder statute of the mercy killing of his wife, challenges the

---

consider whether exceptional reasons exist to release a defendant under 18 U.S.C. § 3145(c)."_
(citations omitted).  Once a jury has found a defendant guilty of an offense that triggers the
§ 3143(a)(2)'s provisions, a court may, under § 3145(c), order a defendant's release if a court
finds that the defendant is not a danger or a flight risk, and there exists exceptional reasons to
justify release.  See 18 U.S.C. § 3145(c); United States v. Peterson, 185 F.3d 875, 1999 WL
407493, at *1 (10th Cir. 1999)(table decision)(unpublished); United States v. Kinslow, 105 F.3d
555, 556-57 (10th Cir. 1997)(stating that a defendant who sought release pending sentencing for
a crime of violence must show by clear-and-convincing evidence that he was "not likely to flee
or pose a danger to any other person or the community," and by "making a clear showing of
exceptional reasons why his detention would not be appropriate"); United States v. Jager, 2011
WL 831279, at *18 (D.N.M. 2011)(Browning, J.)("Once a court finds that a defendant meets the
criteria of § 3143(a)(2), a court may order a defendant's release if a court finds that the defendant
is not a danger and there exists exceptional circumstances to justify release.").

> applicability of that statute to mercy killings, a question of first impression in the circuit. The second example posited a seriously wounded drug dealer whose appeal raised a novel search and seizure issue which could change the outcome of his trial.

United States v. DiSomma, 951 F.2d at 497-98. As a whole, the Crawford Letter suggests that "exceptional reasons exist where, due to a truly unusual circumstance or combination of circumstances, it would be unreasonable, despite the general policy favoring incarceration contained in section 3145(c), to order a particular defendant to be incarcerated pending [sentencing or] appeal." United States v. Garcia, 340 F.3d at 1017.

Case law interpreting § 3145(c)'s provision has generally adhered to the Crawford Letter's principles. See United States v. Wages, 271 F. App'x 726, 727 (10th Cir. 2008)(per curiam)(unpublished). The Tenth Circuit has stated that "a unique combination of circumstances giving rise to situations that are out of the ordinary" must exist. United States v. Wages, 271 F. App'x at 727. It noted that "exceptional reasons" means "being out of the ordinary: uncommon, rare." United States v. Wages, 271 F. App'x at 727. See United States v. DiSomma, 951 F.2d 494, 497 (2d Cir. 1991)(stating that exceptional circumstances are "a unique combination of circumstances giving rise to situations that are out of the ordinary," and finding that a defendant's status as a student, as employed, or as a first-time offender did not constitute exceptional circumstances). Courts also generally agree that "a case by case evaluation is essential," United States v. Wages, 271 F. App'x at 727, and that the district court has "broad discretion . . . to consider all the particular circumstances of the case before it," United States v. Garcia, 340 F.3d at 1016-17 (observing that a "wide range of factors may bear upon the analysis"). Accordingly, the "Tenth Circuit . . . refrains from placing contours around the outer limits of the circumstances that may constitute 'exceptional reasons,' while finding that

particular circumstances fail to meet that exception." United States v. Westover, 2003 WL 22953091, at *1 (D. Kan. 2003)(Crow, J.)(quoting 18 U.S.C. § 3145(c)).

Following the Tenth Circuit's approach, the Court similarly provides guidance regarding what is "exceptional" by cataloguing what is not exceptional under § 3145(c). The Court draws from its own experience sentencing criminal defendants in defining what is exceptional. The District of New Mexico sees more felony cases than any other federal district in the country, and more criminal cases than most courts in the country.[12] See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2017, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing the District of New Mexico as having the third highest number of criminal cases involving felony defendants in the nation, after Texas' Southern and Western Districts); Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2014 and 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables. After sentencing so many defendants and listening to their stories, the Court has some thoughts about what is not exceptional. It is difficult to describe "exceptional" in the abstract without a finite context: it is, however, easier to say what is not "exceptional."

First, the aberrant nature of the criminal offense does not constitute an exceptional circumstance. Specifically, a lack of criminal history is not exceptional. See United States v. Wages, 271 F. App'x at 728; United States v. Lea, 360 F.3d 401, 403-04 (2d Cir.

---

[12]During the 12 month period ending March 31, 2017, 4,173 felony cases were filed in the District of New Mexico. See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2017, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables ("Criminal Filings"). Only Texas' Southern and Western Districts, with 5,615 and 5,604, respectively, saw more criminal filings. See Criminal Filings at 1.

2004)(concluding that "[t]here is nothing 'exceptional' about . . . being a first-time offender"); United States v. Larue, 478 F.3d 924, 925 (8th Cir. 2008)(per curiam)(finding nothing exceptional about a lack of criminal history); United States v. Ganadonegro, 2012 WL 1132166, at *5-6 (D.N.M. 2012)(Browning, J.)(same). Similarly, complying with investigators and police is usually not exceptional under § 3145(c). See United States v. Jager, 2011 WL 831279, at *4 (D.N.M. 2011)(Browning, J.)(finding it unexceptional that a defendant "complied with investigators," and disclosed "his involvement with child pornography, allowing the investigators to search and seize his computer, and admitting that he had received and stored child pornography"); United States v. Douglas, 824 F. Supp. 98, 99 (N.D. Tex. 1993)(Means, J.)(finding no exceptional reasons based upon "an agreement to cooperate with the government and testify at the trial," which subjected the defendant "to potential retaliation from his co-defendants"). Cf. United States v. Carretero, 1999 WL 1034508, at *8 (N.D.N.Y. 1999)(Sharpe, M.J.)(denying release, but stating that the court would not "foreclose the possibility that active cooperation which benefits the government, the defendants, and the societal goal of drug eradication may constitute an exceptional circumstance in an appropriate case"). Likewise, complying with pretrial release conditions and appearing at all court proceedings is not exceptional. See United States v. Larue, 478 F.3d at 925; United States v. Little, 485 F.3d 1210, 1210-11 (8th Cir. 2007)(stating that full compliance with pretrial release conditions and timely appearance at all court proceedings are not exceptional reasons). Finally, the defendant's commitment to avoiding crime in the future by undergoing treatment is insufficient. See United States v. Jager, 2011 WL 831279, at *19 ("Jager's participation in treatment is unexceptional."); United States v. Green, 250 F. Supp. 2d 1145, 1151 (E.D. Mo. 2003)(Webber, J.)("[I]t would be unfortunate for this Court to pronounce that achieving success in a drug rehabilitation program is

an extraordinary or unique occurrence.")). In sum, a demonstrated history of complying with one's responsibilities and abiding by the law do not make a defendant's situation exceptional.

Second, the defendant's physical conditions, unless extremely irregular, will not often constitute an exceptional circumstance. See United States v. Wages, 271 F. App'x at 727 (finding it unexceptional where the defendant was fifty-three years old, used a wheelchair, needed a special mattress to avoid pain, and had a limited ability to hear); United States v. Brown, 368 F.3d 992, 993 (8th Cir. 2004)(per curiam)(concluding that the defendant's need to undergo treatment for depression was not exceptional); United States v. Rodella, 101 F. Supp. 3d 1075, 1130 (D.N.M. 2015)(Browning, J.)(concluding that the defendant's "poor health," even when combined with his need to provide for his family, was not "sufficiently exceptional to warrant release" when the defendant's health had not deteriorated since he had been imprisoned); United States v. Mellies, 496 F. Supp. 2d 930, 936-37 (M.D. Tenn. 2007)(Higgins, J.)(concluding that the defendant's need to continue extensive dental treatment was not exceptional); United States v. Lieberman, 496 F. Supp. 2d 584 (E.D. Pa. 2007)(Robreno, J.)(holding that the availability of experimental treatment in China for paralysis resulting from being shot by cohort during robbery was not exceptional). Notably, defendants can often continue treatment for most physical ailments in prison. See United States v. Rodella, 101 F. Supp. 3d at 1130 (noting that the "medical staff at any federal BOP Center can handle Rodella's health issues"); United States v. Rodriquez, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999)(Potter, J.)(noting that treatment is available in prison). After dealing with many defendants with physical and mental problems, the Court has a high degree of confidence in the Bureau of Prisons' ability to deal well with most defendants and with most mental problems.

Third, the nature of the underlying crime is rarely exceptional.  It is not exceptional that the defendant poses little future danger to the community.  See United States v. Rodella, 101 F. Supp. 3d at 1134-35 ("If a low risk of future violence was sufficient to warrant release of a violent offender, then every defendant who is convicted of a crime of violence would be released as long as he or she met § 3143(a)(2)(B)'s requirements, making § 3145(c)'s exceptional-circumstance's requirement meaningless."); United States v. Koon, 6 F.3d 561, 564 (9th Cir. 1993)(Rymer, J., concurring in the order denying the petition for rehearing en banc)(ruling that danger to the community is a predicate condition of § 3143(a)(1) and thus does not establish an "exceptional reason" absent some other factor making it extraordinary).  The Court concludes that the better rule is to release a violent offender only when the violent act itself is exceptional, such that the defendant "may not be the type of violent person for whom Congress intended the mandatory detention rule."  United States v. Garcia, 340 F.3d at 1019.  The Court has previously opined on what acts may be exceptional:

> The Ninth Circuit gives three examples: (i) a violent act that did not involve any specific intent; (ii) a violent act that did not involve a threat or injury; and (iii) a mercy killing.  See United States v. Garcia, 340 F.3d at 1019.  Each of these examples are exceptional and do not involve defendants who would normally be considered violent.  If a defendant commits a violent act, but not with a specific intent, the defendant may not be a violent person and did not intend to commit the violent act.  Similarly, if a person committed a violent act that did not involve a threat or injury, the act may not truly be considered violent, considering no violence was done to another.  Additionally, a person who commits a mercy killing does not do so out of spite or ill will toward the victim, but out of compassion and a desire to help.  At least one district court has noted that a possessor of child pornography's action was exceptional when the defendant's action appeared to be "an aberrational act" that involved "a one-time out-of-character incident, precipitated by large quantities of pain medications [the defendant] was taking for a series of medical conditions" and when the defendant "stopped viewing such images a substantial time prior to the FBI discovering the images."  United States v. Syzmanski, No. CR 08–0417, 2009 WL 1212249, at *2-3 (N.D. Ohio Apr. 30, 2009)(Zouhary, J.).  Each of these examples involve a crime that is rare, uncommon, or out of the ordinary when compared with similar violent crimes.

United States v. Rodella, 101 F. Supp. 3d at 1134-35.  Nonetheless, the offense's nature, without more, is not usually sufficient to constitute an exceptional reason under § 3145(c).  It is merely one factor that courts should consider when determining whether exceptional reasons exist.

Notably, however, the act's nature might produce other consequences that weigh on exceptionality.  For instance, the crime for which a defendant is imprisoned might subject him or her to mistreatment in prison.  The United States Court of Appeals for the Eighth Circuit has held that the underlying crime's nature does not usually present an exceptional circumstance, even when it might subject the defendant to mistreatment in jail.  See United States v. Brown, 368 F.3d at 993 ("[W]e do not see how Brown's case is 'clearly out of the ordinary, uncommon, or rare' when compared to every other defendant convicted of offenses involving the sexual exploitation of children.").  The Eighth Circuit noted, however, that it was only speculation whether the defendant's conviction might subject him to mistreatment and observed that the defendant "was not convicted of child abuse."  368 F.3d at 993.  Similarly, when a defendant did not present any evidence that his safety was in jeopardy, other than a few threats from inmates who were physically separated from the defendant, the Court concluded that the situation was not exceptional.  See United States v. Rodella, 101 F. Supp. 3d at 1136 (noting that "[i]ncarceration is inherently dangerous").

Fourth, detention's effect on the defendant's employment or status as a student does not make the situation exceptional.  See United States v. Lea, 360 F.3d at 403-04 (concluding that "[t]here is nothing 'exceptional' about going to school").  Detention prevents every defendant from maintaining employment.  Fifth, a defendant's prior military service is not usually an exceptional circumstance.  See United States v. Jager, 2011 WL 831279, at *18-19.  Moreover, even when detention affects a defendant's eligibility for lifelong disability benefits resulting

from military service, the situation may be unexceptional.  See United States v. Jager, 2011 WL 831279, at *18-19 ("If, however, Jager is taken into custody immediately after sentencing, . . . Jager will be ineligible for a disability rating and lifelong disability benefits.").  The Court found such a situation unexceptional when the defendant would still be "eligible for Veteran's Administration medical benefits and disability benefits until he is taken into custody after sentencing."  United States v. Jager, 2011 WL 831279, at *17.

Finally, detention's effect on a defendant's family, without more, is often insufficient.  See United States v. Velarde, 555 F. App'x 840, 841 (10th Cir. 2014)(per curiam)(stating that "the cases establish that mere personal reasons, including caring for a family or gainful employment, are not 'exceptional'").  The Tenth Circuit has explained that "familial hardship and disruption to an individual's educational or professional affairs are the natural, if unfortunate, consequences of finding oneself at the mercy of the criminal justice system."  United States v. Velarde, 555 F. App'x at 841.  Accordingly, detention's effect on the defendant's reputation, and his or her family's reputation, is not exceptional.  See United States v. Ganadonegro, 2012 WL 1132166, at *5-6 (finding it unexceptional that detention would impair the defendant's and the defendant's family's reputation).  Likewise, detention's effect on a defendant's ability to care for his or her family, without more, is not usually exceptional.  See United States v. Wages, 271 F. App'x at 727 (finding it unexceptional where the defendant, who was middle-aged and suffered from his own physical ailments, had to care for his elderly mother); United States v. Rodella, 101 F. Supp. 3d at 1136-37 (finding it unexceptional when detention would place a strain on the defendant's mother, his wife, and his grown children); United States v. Wright, 2009 WL 87604, at *3 (D. Utah 2009)(Stewart, J.)(holding that a defendant's need to care for his elderly mother, who suffered from emphysema, was not an

exceptional reason); United States v. Mellies, 496 F. Supp. 2d at 937 (concluding that the defendant's need to care for his aging parents, who suffered from various medical problems, was not exceptional); United States v. Green, 250 F. Supp. 2d at 1150-51 (finding it unexceptional that detention would prevent the defendant from being able to provide for his nine children); United States v. Lippold, 175 F. Supp. 2d 537, 540 (S.D.N.Y. 2001)(Sweet, J.)(finding it unexceptional that the defendant would be unable to care for his "three young children whom he supports financially," including his seven-month old son suffering from Bell's Palsy); United States v. Burnett, 76 F. Supp. 2d 846, 849 (E.D. Tenn. 1999)(noting that "incarceration regrettably inflicts family hardship on many, if not most, defendants," and that "personal family hardships are very common and occur in a great number of cases"); United States v. Scott, No. 1:95-CR-80-1, 1995 WL 723752, at *2 (E.D. Tex. Nov. 22, 1995)(Hines, M.J.)(concluding that the need to assist an infirm parent, including contributions from employment, were not exceptional); United States v. Mahabir, 858 F. Supp. 504, 506-07 (D. Md. 1994)(Legg, J.)(concluding that incarceration's disruption of the family was unexceptional); United States v. Taliaferro, 779 F. Supp. 836, 838 (E.D. Va. 1992)(Smith, J.)(concluding that it was unexceptional that the defendant's daughter was in the midst of a difficult pregnancy).

Although Congress' mandate may produce unfortunate family situations, such is the case with every defendant facing a custodial sentence. There may be situations, however, that produce unusually severe effects on the defendants and their families. When these situations combine with the various other factors listed above, an exceptional circumstance may arise. Accordingly, when "detention imposes an unusually harsh effect of a personal nature not ordinarily experienced by an individual facing incarceration," United States v. Green, 250 F. Supp. 2d at 1150, combined with other factors that make the situation truly unusual, the

circumstance may truly be exceptional, see United States v. Reyes, 9 F. Supp. 3d 1196, 1213 (D.N.M. 2014)(Browning, J.)(finding it exceptional, when the "United States suggested that it would not oppose release if the Court were to find exceptional circumstances," that the defendant "has a new, young child for whom she must care," coupled with her good performance on pretrial release, but noting that "it might come to a different decision if it had more time to consider the issue").  The Court concludes that an exceptional family situation may arise "when the defendant is raising small children by himself or herself, and the children have special needs for which only the defendant can provide."  United States v. Rodella, 101 F. Supp. 3d at 1137. Without such unusual circumstances, the Court will not find an exceptional reason to release the defendant pending sentencing under § 3145(c).  See United States v. Lopez, 184 F. Supp. 3d 1139, 1142-49 (D.N.M. 2016)(Browning, J.).

## LAW REGARDING CHALLENGES TO FEDERAL PRISONERS' CONDITIONS OF CONFINEMENT

As a general rule, federal prisoners can challenge their conditions of confinement only pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971)("Bivens").[13]    See United States v. Garcia, 470 F.3d 1001, 1003 (10th

---

[13]In Bivens, the Supreme Court recognized that citizens may obtain money damages for injuries suffered as a result of federal agents' violation of the Fourth Amendment. See 403 U.S. at 395-97.  "In Bivens -- proceeding on the theory that a right suggests a remedy -- this Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'"  Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)(quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001)).  Copar Pumice Co., Inc. v. Morris, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, *13 (D.N.M. 2009)(Browning, J.)(noting that, in Bivens, the Supreme Court held that, "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'")(quoting Bivens, 403 U.S. at 396-97). Bivens suits are the "federal analog" to suits brought against state officials under 42 U.S.C. § 1983.  Ashcroft v. Iqbal, 556 U.S. at 675-76.  Unlike suits under § 1983, however, Bivens does not allow a plaintiff to seek equitable relief -- he or she may only seek damages for alleged constitutional violations, and must look to other areas of the law to receive equitable relief for his

Cir. 2006)("Because Appellants' claims were raised in motions filed in their respective criminal cases and not in civil rights complaints comporting with the requirements of Bivens, they were properly denied by the district court."); Palma-Salazar v. Davis, 677 F.3d 1031, 1035 (10th Cir. 2012)("[A] prisoner who challenges the conditions of his confinement must do so through a civil rights action."); Boyce v. Ashcroft, 251 F.3d 911, 918 (10th Cir.)(holding that federal prisoners must use Bivens to challenge their conditions of confinement), vacated on other grounds, 268 F.3d 953 (10th Cir. 2001).

Federal pretrial detainees may challenge their conditions of confinement by filing Bivens actions against United States Marshals. See, e.g., Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994); Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). The Tenth Circuit has not squarely addressed whether federal pre-trial detainees may challenge their conditions of confinement through a motion in their criminal cases -- without bringing separate civil suits. The general rule, however, is that a defendant must file a separate civil action to challenge his

_____

or her injuries. See Bivens, 403 U.S. at 410 (Harlan, J., concurring)("For people in Bivens' shoes, it is damages or nothing.").

> [T]he decision whether to recognize a Bivens remedy may require two steps. In the first place, there is the question whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. . . . But even in the absence of an alternative, a Bivens remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation."

Wilkie v. Robbins, 551 U.S. 537, 550 (2007)(quoting Bush v. Lucas, 462 U.S. 367, 378 (1983)). "In sum, the concept of 'special factors counselling hesitation in the absence of affirmative action by Congress has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent." Schweiker v. Chilicky, 487 U.S. 412, 423 (1988). See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 921 F. Supp. 2d 1137, 1176-77 (D.N.M. 2013)(Browning, J.), on reconsideration in part, 58 F. Supp. 3d 1191 (D.N.M. 2014).

conditions of confinement.  See United States v. Wade, No. 307-CR-00111-RRB-JDR, 2009 WL

3837151, at *1 (D. Alaska 2009)(Roberts, M.J.)("Any claims concerning the conditions of

confinement cannot be brought in the federal criminal case."); United States v. Luong, No. CR

99-433WBSGGH, 2009 WL 2852111, at *1 (E.D. Cal. 2009)(Shubb, J.)("[T]he proper

procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file

a civil suit against the relevant parties pursuant to 42 U.S.C. § 1983, rather than a motion in his

criminal case."); Merryfield v. Kansas, No. 09-3140-RDR, 2009 WL 3125470, at *3 (D. Kan.

2009)(Crow, J.).[14]

This general rule prevents prisoners and pretrial detainees from effectively bypassing the

Prison Litigation Reform Act's ("PLRA"), 42 U.S.C. § 1997e, exhaustion requirements, which

apply to pretrial detainees and detainees awaiting sentencing.[15]  See 28 C.F.R. § 551.100; Falcon

---

[14]Another line of cases declines to grant any form of civil relief within a criminal case.  In
United States v. Christy, 883 F. Supp. 2d 1040 (D.N.M. 2012)(Browning, J.), a criminal
defendant requested that the Court open an investigation into alleged prosecutorial misconduct.
See 883 F. Supp. 2d at 1050.  The Court noted that, to the extent that the defendant sought
damages, he should file a separate civil lawsuit:

> While there is not an absolute bar against a criminal defendant seeking relief that
> could be afforded in a civil suit as part of a criminal proceeding, see In re Special
> Grand Jury 89-2, 450 F.3d 1159, 1167 (10th Cir. 2006)(stating that "a motion for
> return of property under Fed. R. Crim. P. 41(g) is civil rather than criminal"), it is
> an unusual practice that can be highly disruptive and that courts generally
> discourage.

United States v. Christy, 883 F. Supp. 2d at 1050.  The Court acknowledged that it is
occasionally "more efficient to permit a criminal defendant to seek civil relief in a criminal case,
such as when a prisoner seeks the return of property seized from him under rule 41 of the Federal
Rules of Criminal Procedure."  883 F. Supp. 2d at 1052.  The Court nonetheless dismissed the
case without granting any relief or converting it into a civil action.  See 883 F. Supp. 2d at 1053.
It cited the vague nature of the defendant's requests and the likelihood that qualified immunity
would bar his claims.  See 883 F. Supp. 2d at 1053.

[15]Few cases have directly addressed whether the PLRA's exhaustion requirements apply
to pre-sentencing inmates under United States Marshals Service's control, but within state

v. U.S. Bureau of Prisons, 852 F. Supp. 1413, 1423 (S.D. Ill. 1994)(Stiehl, J.), aff'd, 52 F.3d 137 (7th Cir. 1995).  As one district court explained:

> Defendant claims he is exempt from the exhaustion requirement because it does not apply to pretrial detainees challenging detention in a criminal proceeding. Defendant's argument is unavailing.  The Supreme Court, in holding that the PLRA's exhaustion requirement applies to "all inmate suits about prison life," did not distinguish between pretrial and post-trial detainees.

United States v. Khan, 540 F. Supp. 2d 344, 349 (E.D.N.Y. 2007)(Irizarry, J.)(citations omitted).

In United States v. Antonelli, 371 F.3d 360 (7th Cir. 2004), for example, the United States Court of Appeals for the Seventh Circuit determined that the defendant's filing "is not a motion in the 1978 criminal case but in actuality a separate, unrelated civil action raising a facial challenge to a BOP policy."  371 F.3d at 361.  It explained that "[t]he PLRA first mandates that inmates exhaust their administrative remedies before bringing a civil action challenging prison conditions, which is what Antonelli's 'motion' does."  371 F.3d at 361.  It condemned the defendant's attempt to "evade[]" the PLRA's "significant procedural restraints and potential consequences."  371 F.3d at 361.

The primary exception to this general rule that a defendant must file a separate civil action to challenge his conditions of confinement applies when a condition of confinement

---

prisons.  At least one case analyzed a similar situation without mentioning exhaustion.  See Bradley v. Stephens, No. 14-2093-JDT-CGC, 2015 WL 4620515, at *3 (W.D. Tenn. July 31, 2015)(Todd, J.).  The majority of cases, however, have applied the PRLA's exhaustion requirement to these inmates.  See Muhammad v. U.S. Marshal Serv., No. CIV 07-27 ERIE, 2009 WL 335189, at *5 (W.D. Pa. Feb. 10, 2009)(Cohill, J.)(determining whether PLRA-type administrative procedures were available to a federal pretrial detainee held at a county prison Center); Roberts v. Cty. of Mahoning, 495 F. Supp. 2d 670, 674 (N.D. Ohio 2005)(Dowd, J.)("The Plaintiffs exhausted all administrative remedies prior to filing this lawsuit as a proposed class action."); Williams v. Silliman, No. 9:11-CV-1477, 2014 WL 991876, at *2 (N.D.N.Y. Mar. 13, 2014)(Peebles, M.J.)("I recommend that plaintiff's motion be denied, and that plaintiff's remaining retaliation claim be dismissed based upon his failure to exhaust available administrative remedies before commencing suit."); Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708424, at *5 (W.D.N.Y. June 16, 2014)(Acara, J.)(dismissing complaint based on failure to exhaust administrative remedies).  The Court agrees that the majority's approach is sound.

interferes with a pretrial detainee's access to counsel in a criminal case.  See United States v. Wade, 2009 WL 3837151, at *1 ("With the exception of the limited jurisdiction to hear argument on whether the conditions prevent him from assisting his counsel in his defense, this Court will not consider a motion regarding a request for a change in the conditions of his confinement."); United States v. Luong, 2009 WL 2852111, at *1 ("Defendant's requests are not the first instances in which he has filed papers in this criminal case challenging the conditions of his confinement. . . .  Such filings may be appropriate in a criminal proceeding where defendant's conditions of confinement affect his ability to consult with counsel or exercise other trial rights.").  See also Falcon v. U.S. Bureau of Prisons, 52 F.3d 137, 139 (7th Cir. 1995)("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, Judge Moreno has the statutory authority to protect Falcon's access to counsel."); United States v. Martinez-Hernandez, No. 3:15-CR-00075 JAF, 2015 WL 6133050, at *8 (D.P.R. Oct. 15, 2015)(Fuste, J.)("A pretrial detainee may challenge conditions of his confinement that affect his right to counsel before the judge presiding over the underlying criminal case.").

In United States v. Folse, No. CR 15-2485 JB, 2016 WL 3996386, at *15-20, 19 (D.N.M. June 15, 2016), the Court concluded that this rule is sound.  There, the Court explained:

> A defendant attempting to prepare for trial should be able to secure his or her access to counsel without filing a civil suit.  This is particularly important where the defendant has court-appointed counsel, because it would be extraordinarily difficult for him or her to file a pro se civil suit solely to prepare for trial.  The delay required to satisfy the PLRA's exhaustion requirements alone could cripple a detainee's trial preparations.

United States v. Folse, 2016 WL 3996386, at *17.

Furthermore, the Court has only located three cases granting relief unrelated to the right to counsel.  First, the Court granted this relief in one unpublished opinion.  See United States v.

Daprano, No. CR 04-2040 JB/KBM, Order, filed August 24, 2007 (Doc. 166)("Order"). In that case, an inmate had a dental condition requiring that his teeth be removed and replaced. See Order at 1. The inmate's federal case took longer than expected, and the inmate's condition deteriorated to the point where he would "suffer permanent damage" absent "immediate replacement." Order at 1-2. The United States Marshals Service pulled inmates' teeth, but refused to replace them, preferring instead to assign the responsibility to the Bureau of Prisons. See Order at 1. The prisoner thus could have had his teeth pulled, but could not replace them, because he was not yet in the Bureau of Prison's custody. See Order at 1. The Court thus required the United States Marshals Service, "under the unique circumstances of this case," to replace the inmate's teeth. Order at 2.

Second, the Honorable Todd Campbell, United States District Judge for the Middle District of Tennessee, confronted a similar situation in United States v. Williams, No. 3:09-0090, 2009 WL 4824940, at *1 (M.D. Tenn. Oct. 26, 2009). Judge Campbell received a letter from the criminal defendant in one of his cases complaining about his conditions of confinement in a state Center, presumably operated pursuant to an inter-governmental agreement with the United States Marshals' Service. See 2009 WL 4824940, at *1. Judge Campbell summarized the defendant's requests:

> [T]he Defendant requests that the Court order that he be moved to another Center or released on bond. Alternatively, Defendant requests that the Court order the United States Marshals Service to act to ensure that the Defendant and other pretrial detainees are not being treated punitively and inhumanely while held in the custody of the federal government and order an investigation into the Robertson County Jail conditions.

2009 WL 4824940, at *1 (citations omitted). Judge Campbell agreed to hold an evidentiary hearing, but limited it to "allegations that have affected Defendant Williams personally, identified in his brief as inadequate nutrition, hygiene, and medical care." 2009 WL 4824940, at

*1. Judge Campbell explained that the defendant's conditions of confinement were "relevant in this criminal case because those conditions can impede his ability to assist in his defense." 2009 WL 4824940, at *2.

Judge Campbell subsequently ordered the United States Marshals' Service to transfer the defendant to a different Center, on the grounds that the first detention Center violated the defendant's right to adequate nutrition. See 2009 WL 4824940, at *2. He explained that

> the Court has the authority under the Bail Reform Act, 18 U.S.C. § 3141, *et seq.,* to make decisions regarding the detention or release of individuals awaiting trial and/or imposition or execution of sentence. *See also* 28 U.S.C. § 1651; 28 U.S.C. § 1361. The Court's decision, however, is informed by, though not controlled by, the standards set forth by the federal courts in civil cases brought by state and federal inmates raising constitutional challenges to conditions of confinement. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520 . . . (1979)(Standards used to evaluate challenges by pretrial detainees to conditions of confinement based on Fifth Amendment Due Process Clause); *Farmer v. Brennan*, 511 U.S. 825 . . . (1994)(Standards used to evaluate challenges by convicted prisoners to conditions of confinement based on Eighth Amendment Cruel and Unusual Punishment Clause).

2009 WL 4824940, at *2.

Third, the Honorable Marcia S. Krieger, United States District Judge for the District of Colorado, found a different way to grant limited relief in United States v. Ramirez-Robles, No. CR.A. 06CR00485MSK, 2007 WL 2021852 (D. Colo. July 11, 2007)(Krieger, J.). The pretrial detainee in that case alleged that both of his eyes began to bleed, and moved for an order to show cause why the court should not hold the United States Attorney General and the Bureau of Prisons' Director in contempt for violating his detention order. See 2007 WL 2021852, at *1. The United States responded that the Court "lacks jurisdiction to consider the matter, which can only be raised in a civil lawsuit." 2007 WL 2021852, at *2. Although Judge Krieger recognized that she could not order the "provision of particular medical treatment" in a criminal case, she

ordered that the pretrial detainee receive a medical evaluation.  2007 WL 2021852, at *2.  She

cited 18 U.S.C. §§ 3145 and 3553(a) to explain her decision:

> The Defendant was detained pursuant to 18 U.S.C. § 3142(g) after the
> Magistrate Judge determined that there were no conditions of release that will
> reasonably assure the Defendant's appearance.  Among the factors the Magistrate
> Judge was required to consider was the Defendant's physical condition. 18 U.S.C.
> § 3142(g)(3)(A).  If the Defendant believes that the detention order was
> improvidently entered in that it failed to take into account a serious medical
> condition, or that his medical condition has worsened since the detention order
> was issued, then it is within the purview of this Court to review it.  *See* 18 U.S.C.
> § 3145.  In order for this Court to conduct such review, a medical evaluation
> diagnosing the Defendant's ailments, specifying the treatment he needs, and
> identifying what treatment he will receive and when is essential.
>
> In addition, with regard to the offense charged in this case, the Defendant
> has entered a guilty plea and is scheduled to be sentenced in August.  Under 18
> U.S.C. § 3553(a), one of the factors the Court must consider in sentencing the
> Defendant is "the need for the sentence imposed . . . to provide the defendant with
> needed . . . medical care[.]"  This requires an accurate assessment of what the
> Defendant's current medical condition is, what treatment he needs, and whether
> and where he can receive such treatment while incarcerated.  Upon receipt of this
> information, defense counsel may desire to file a motion for a non-guideline
> sentence.

United States v. Ramirez-Robles, 2007 WL 2021852, at *2.  By noting that the Court could

discontinue the defendant's detention, see 2007 WL 2021852, at *3, and suggesting that a failure

to provide medical care could lead to a lower sentence, see 2007 WL 2021852, at *2, Judge

Krieger effectively suggested -- without an express command -- that the United States provide

better medical care for the pretrial detainee.

These cases notwithstanding, the Court follows the general rule that a defendant must file

a separate civil action, such as a Bivens action, to address his or her conditions of confinement,

unless the challenged condition of confinement interferes with a pretrial detainee's access to

counsel in a criminal case.  See United States v. Folse, 2016 WL 3996386, at *15-20.  In United

States v. Folse, Folse -- who was under the United States Marshals Service's custody and was

detained at the Penitentiary of New Mexico -- alleged violations of his constitutional rights related to solitary confinement, pretrial privileges, cleanliness, shackles, telephone access, and diet. See 2016 WL 3996386, at *19. The Court held that Folse "must pursue these claims through a civil rights action," because "none of these issues [(i)] 'prevent him from assisting his counsel in his defense,'" 2016 WL 3996386, at *19 (alteration added)(quoting United States v. Wade, 2009 WL 3837151, at *1) or (ii) "significantly 'affect his ability to consult with counsel or exercise other trial rights,'" United States v. Folse, 2016 WL 3996386, at *19 (quoting United States v. Luong, 2009 WL 2852111, at *1).

## LAW REGARDING THE EIGHTH AMENDMENT

When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force. Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)). "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999). An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a

substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.")(quoting <u>Verdecia v. Adams</u>, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." <u>Helling v. McKinney</u>, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." <u>Helling v. McKinney</u>, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." <u>Helling v. McKinney</u>, 509 U.S. at 36. The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson v. McMillian</u>, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action."). The Tenth Circuit has noted that, "in <u>Hudson</u>, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" <u>United States v. LaVallee</u>, 439 F.3d 670, 688 (10th Cir. 2006). Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." <u>United States v. LaVallee</u>, 439 F.3d at 688. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of

force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). Thus, to establish excessive force in violation of the Eight Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury." United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court addressed whether a plaintiff could assert both Eighth Amendment violations and substantive due-process violations in the same suit against government officials alleging that they engaged in physically abusive conduct. See 490 U.S. at 394-95. More specifically, it held that, when a specific constitutional

amendment provides "an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," courts should analyze all constitutional claims under that amendment's standards rather than under "the more generalized notion of 'substantive due process.'" 490 U.S. at 395. The Supreme Court gave as an example for this principle "the Eighth Amendment's ban on cruel and unusual punishments," because it is one of the "two primary sources of constitutional protection against physically abusive governmental conduct." 490 U.S. at 395. The Supreme Court later clarified that its holding in Graham v. Connor "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997). To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 843-844 (1998)("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit.")(quoting U.S. CONST. amend. IV).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments." 83 F.3d at 1202. In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more

generalized provisions of substantive due process." 83 F.3d at 1202 (citing <u>Berry v. City of</u> <u>Muskogee</u>, 900 F.2d 1489, 1493 (10th Cir. 1990)). Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory. <u>See</u> <u>Riddle v. Monragon</u>, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment."). <u>See also</u> <u>Salazar v. San Juan Cty.</u> <u>Det. Ctr.</u>, No. CIV 15-0417 JB/LF, 2016 WL 335447, at *30-32 (D.N.M. Jan. 15, 2016)(Browning, J.).

## ANALYSIS

The heart of Loera's Motion is a request that the Court reconsider Loera's detention and release him into the community so that he may undergo ileostomy reversal surgery. <u>See</u> Reply at 6. Under 18 U.S.C. § 3145(c), "exceptional reasons" do not justify the Court releasing Loera from detention at Cibola County Detention Center pending sentencing. Furthermore, based on the record evidence and hearing testimony, the United States Public Health Service should not provide Loera with an ileostomy reversal surgery while Loera is in the United States Marshals Service's custody. The procedure that Loera requests is best handled once Loera is transferred to the Bureau of Prisons' custody.

Loera also makes use of his Motion to reconsider his conditions of release to assert an Eighth Amendment deliberate-indifference claim. <u>See</u> Motion at 5; Reply at 4. He may not do so. Loera may not allege a constitutional claim of deliberate indifference in a motion brought under 18 U.S.C. § 3145(c). Even if Loera has alleged his constitutional claim under the proper procedural vehicle, Loera does not suffer deliberate indifference in violation of the Eighth Amendment. Accordingly, the Court will deny the Motion.

# I.  LOERA HAS NOT SHOWN EXCEPTIONAL REASONS TO JUSTIFY HIS RELEASE PENDING SENTENCING.

On October 7, 2016, Magistrate Judge Lynch concluded that Loera violated the conditions of his release and, consequently, revoked Loera's previously imposed conditions of release.  See Revocation Order at 1.  Loera requests that the Court reconsider his conditions of detention and place him "in a halfway house such as La Posada[16] and allow [him] to seek medical services at an appropriate hospital such as UNMH."  Motion at 5.  Alternatively, Loera "requests that the Court modify his conditions of release to allow him to return to California to have his follow up colorectal surgery."  Reply at 6.

The Court may review the conditions of Loera's detention.  See 18 U.S.C. § 3145(b).  Further, the Court's review of Loera's detention is de novo.  See United States v. Ramos, 2016 WL 9021831, at *15.  "'When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the proper pretrial detention or conditions for release.'"  United States v. Ramos, 2016 WL 9021831, at *15 (quoting United States v. Rueben, 974 F.2d at 585-86).

Under 18 U.S.C. § 3145(c), the Court may release Loera from detention, under appropriate conditions, if Loera clearly shows that (i) he is not likely to flee; (ii) he does not pose a danger to any other person or the community; and (iii) there are "exceptional reasons" why his

---

[16]Loera refers to La Posada Halfway House, which is a "[h]olding Center for people that are coming out of federal prison or are going into federal prison."  Behavioral Health Collaborative Network of Care, New Mexico, http://newmexico.networkofcare.org/mh/services/agency.aspx?pid=AlternativeHouseIncLaPosadaHalfwayHouse_1446_2_0 (last viewed June 19, 2017).  La Posada Halfway House is located at 2206 4th St NW, Albuquerque, NM 87102.  See Behavioral Health Collaborative Network of Care, New Mexico, http://newmexico.networkofcare.org/mh/services/agency.aspx?pid=AlternativeHouseIncLaPosadaHalfwayHouse_1446_2_0 (last viewed June 19, 2017).

detention "would not be appropriate." 18 U.S.C. § 3145(c). See United States v. Kinslow, 105 F.3d at 556-57 (stating that a defendant who sought release pending sentencing for a crime of violence must show by clear-and-convincing evidence that he was "not likely to flee or pose a danger to any other person or the community," and by "making a clear showing of exceptional reasons why his detention would not be appropriate"); United States v. Jager, 2011 WL 831279, at *18 ("Once a court finds that a defendant meets the criteria of § 3143(a)(2), a court may order a defendant's release if a court finds that the defendant is not a danger and there exists exceptional circumstances to justify release.").

Sections 3143 and 3145 do not define the phrase "exceptional reasons." 18 U.S.C. §§ 3143, 3145. See United States v. Jager, 2011 WL 831279, at *18 ("Section 3143 does not define 'exceptional reasons.'"). The Tenth Circuit has stated, however, that "a unique combination of circumstances giving rise to situations that are out of the ordinary" must exist. United States v. Wages, 271 F. App'x at 727. It noted that "exceptional reasons" means "being out of the ordinary; uncommon, rare." United States v. Wages, 271 F. App'x at 727. See United States v. DiSomma, 951 F.2d at 497 (stating that exceptional circumstances are "a unique combination of circumstances giving rise to situations that are out of the ordinary"). Further, courts generally agree that "a case by case evaluation is essential," United States v. Wages, 271 F. App'x at 727, and that the district court has "broad discretion . . . to consider all the particular circumstances of the case before it," United States v. Garcia, 340 F.3d at 1016-17 (observing that a "wide range of factors may bear upon the analysis"). Accordingly, the "Tenth Circuit . . . refrains from placing contours around the outer limits of the circumstances that may constitute 'exceptional reasons,' while finding that particular circumstances fail to meet that exception."

United States v. Westover, 2003 WL 22953091, at *1 (D. Kan. 2003)(Crow, J.)(quoting 18 U.S.C. § 3145(c)).

In light of this limited guidance, the Court has previously provided "guidance regarding what is 'exceptional' by cataloguing what is not exceptional under § 3145(c)." United States v. Lopez, 184 F. Supp. 3d at 1146 (emphasis in original)(quoting 18 U.S.C. § 3145(c)). See United States v. Lopez, 184 F. Supp. 3d at 1146 ("After sentencing so many defendants and listening to their stories, the Court has some thoughts about what is not exceptional. It is difficult to describe 'exceptional' in the abstract without a finite context: it is, however, easier to say what is not 'exceptional.'")(quoting 18 U.S.C. § 3145(c)). Specifically, the Court has provided guidance regarding what is and is not exceptional pertaining to a defendant's physical conditions. See United States v. Lopez, 184 F. Supp. 3d at 1146. In this vein, the Court has stated:

> [T]he defendant's physical conditions, unless extremely irregular, will not often constitute an exceptional circumstance. See United States v. Wages, 271 F. App'x at 727 (finding it unexceptional where the defendant was fifty-three years old, used a wheelchair, needed a special mattress to avoid pain, and had a limited ability to hear); United States v. Brown, 368 F.3d 992, 993 (8th Cir. 2004)(per curiam)(concluding that the defendant's need to undergo treatment for depression was not exceptional); United States v. Rodella, 101 F. Supp. 3d 1075, 1130 (D.N.M. 2015)(Browning, J.)(concluding that the defendant's "poor health," even when combined with his need to provide for his family, was not "sufficiently exceptional to warrant release" when the defendant's health had not deteriorated since he had been imprisoned); United States v. Mellies, 496 F. Supp. 2d 930, 936-37 (M.D. Tenn. 2007)(Higgins, J.)(concluding that the defendant's need to continue extensive dental treatment was not exceptional); United States v. Lieberman, 496 F. Supp. 2d 584 (E.D. Pa. 2007)(Robreno, J.)(holding that the availability of experimental treatment in China for paralysis resulting from being shot by cohort during robbery was not exceptional). Notably, defendants can often continue treatment for most physical ailments in prison. See United States v. Rodella, 101 F. Supp. 3d at 1130 (noting that the "medical staff at any federal BOP Center can handle Rodella's health issues"); United States v. Rodriquez, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999)(Potter, J.)(noting that treatment is available in prison). After dealing with many defendants with physical and mental problems, the Court has a high degree of confidence in the Bureau of Prisons' ability to deal well with most defendants . . . .

United States v. Lopez, 184 F. Supp. 3d at 1146.

In light of this guidance, and on this record, the Court concludes that Loera has not demonstrated "exceptional reasons" that justify his release from detention pending sentencing. 18 U.S.C. § 3145(c). Loera argues that the Court should release him from detention so that he can obtain "complex surgery . . . to reconnect his colon and removal of the need for an ileostomy bag," Motion at 4 (alterations added), because Cibola County Detention Center is unable to provide for his health needs, see Motion at 3; Reply at 1. Specifically, Loera supports his arguments with allegations that: (i) Cibola County Detention Center lacks sanitary conditions that he requires to change his ileostomy bag; (ii) that he has lost forty pounds since he was placed under federal custody in October 2016; and (iii) that the United States Marshals Service rejected his request for medical care without consulting his personal surgeon, Dr. Barnjian. See Reply at 3.

The Court concludes that Loera's arguments and allegations do not amount to "exceptional reasons" that ground his release from detention pending sentencing. Although it is not common for a federal detainee awaiting sentencing to have an ileostomy bag, Loera's ileostomy is not an "exceptional reason" that warrants his release from custody so that Loera can undergo a ileostomy take-down procedure. 18 U.S.C. § 3145(c). Based on the record evidence and hearing testimony, the Court concludes that, at this time, an ileostomy reversal is not medically necessary. See Tr. at 57:5-13 (Wolf); id. at 64:13 (Wolf); id. at 64:24 (Wolf). The United States Public Health Service denied Loera's first request for a surgical consult for an ileostomy take-down procedure, because the agency "determined that it was not medically necessary to do this while in the short term custody of the U.S. Marshals." Tr. at 57:5-13 (Wolf). The Court recognizes that Loera has a hernia relating to the ileostomy and, furthermore, that

certain circumstances relating to a strangulation of a hernia render an ileostomy take-down procedure urgent.  See Tr. at 61:4-14 (Wolf).  The Court also recognizes that "hernias of [the type that Loera exhibits] very rarely strangulate, meaning very rarely do they get stuck in a way that strangles the intestinal contents in them, which leads to the death of the intestinal contents, and the potential infection and emergency need for surgery."  Tr. at 61:4-14 (Wolf).  Further, Loera does not urgently require an ileostomy take-down procedure.  With respect to his ileostomy, Dr. Wolf testified that "there was no evidence of inflammation, redness or infection." Tr. at 64:24 (Wolf).  At the time of Loera's examination, his hernia did not exhibit these conditions, and the ileostomy site was "reduceable, meaning that you could press on it," and Dr. Wolf noted that this was a positive indication.  Tr. at 61:17-18 (Wolf).  Accordingly, based on the record evidence and hearing testimony, Loera's request for an ileostomy take-down procedure is not medically necessary and, consequently, does not constitute an "exceptional reason" that justifies his release from detention.  18 U.S.C. § 3145(c).

Moreover, the Court concludes that the conditions at Cibola County Detention Center, as they pertain to Loera's need to change his ileostomy bag, do not provide an "exceptional reason" justifying Loera's release.  18 U.S.C. § 3145(c).  Loera does not require a sterile environment to change his ileostomy bag.  See Tr. at 18:19-19:2 (Lucero)("[I]t's not a sterile procedure.  It's not -- when you go into surgery, you're having to do a sterile procedure.  This isn't anything that's sterile.  You should be clean about it, you should wash your hands before and after, but there's nothing markedly beyond that that needs to be executed."); id. at 64:17-18 (Wolf)(alteration added)(stating that caring for an ileostomy is "not sterile procedure").  Rather, Loera requires soap and water to change his ileostomy bag, but "nothing markedly beyond that."  Tr. at 18:19-

19:2 (Lucero). Patients frequently care for and change their ileostomy bags at home, "keeping it clean, wiping it, using soap and water, keeping the site clean." Tr. at 64:17-18 (Wolf).

Furthermore, the Court credits Dr. Wolf's testimony that Cibola County Detention Center's care of Loera's ileostomy "has been good." Tr. at 64:13 (Wolf). Dr. Wolf does not have any concerns about the care that Loera is receiving at Cibola County Detention Center. See Tr. at 64:12 (Wolf). Dr. Wolf does not have any concerns about Loera, his condition, and his safety in remaining in a temporary detention Center while awaiting sentencing and ultimate transfer to the BOP. See Tr. at 65:13-17 (Houghton, Wolf). The Court also concludes that, Lucero, the primary care provider at Cibola County Detention Center, see Tr. at 6:7 (Lucero), is capable of caring for Loera's ileostomy while the Cibola County Detention Center houses Loera pending sentencing, see Tr. at 32:3 (Lucero).

The Court takes seriously Loera's allegation that he has lost weight since entering federal custody, and his concern "for nutritional compromise and electrolyte balance." Tr. at 19:24-15 (Lucero). The Court does not conclude, however, Loera's weight loss and concern for his nutrition, given his ileostomy, to be an exceptional reason warranting release. The Court credits Lucero's testimony that Loera's "B12 and folate were normal, that his iron levels were normal," Tr. at 20:4-5 (Lucero), and that, based on Loera's laboratory test results, there "wasn't any sign that he needed to have any type of additional supplementation other than the dietary meals that have been provided from the Center," Tr. at 21:3-6 (Lucero). In short, Loera "is getting appropriate care." Tr. at 65:19 (Wolf).

The Court reiterates the conclusions it reached at the hearing: exceptional reasons do not justify releasing Loera into the community so that he can receive an ileostomy reversal. Rather, the Court concludes that the best thing for Loera's health is to transfer his custody to the Bureau

of Prisons, which is best capable of providing for Loera's care. The surgery that Loera requests entails risks of surgical complications that "could ensue very rapidly thereafter or there may be development of scarring and fibrosis that could lead to obstruction . . . [or] leakage." Tr. at 62:19-63:12 (Wolf)(alteration added). If Loera underwent surgery while in the custody of the United States Marshals Service, these complications "might develop after [Loera] . . . goes to the federal Bureau of Prisons and then they would have an individual who is in their hands, not in the hands of the surgeon who treated him, and has to deal with the complications." Tr. at 62:19-63:12 (Wolf)(alteration added). Conversely, if Loera underwent surgery and developed complications while in the United States Marshals Service's custody, the United States Marshals Service would become the "long-term custodian as a consequence of that until the situation is stabilized . . . ." Tr. at 62:19-63:12 (Wolf)(alteration added). Accordingly, the Court concludes that exceptional reasons do not justify either releasing Loera into the community to receive an ileostomy reversal or mandating that the United States Marshals Service provide Loera with this treatment. Rather, facts and testimony which the Court has before it counsel that the best thing for Loera is to be taken into the Bureau of Prisons' custody, which can provide for his care. As the Court stated at the hearing,

> the solution is to get him to a long-term Center, so that they can make judgments about him without all the complications . . . . We don't have a set time frame we can present to a medical doctor and say here's how much longer he's going to be in this detention Center and here's how long he's going to be in a prison Center.

> So after carefully reviewing the medical services he's receiving and I am not convinced that he's being – I'm convinced that he's receiving adequate care, constitutional care, think the best thing to do is to get him into Bureau of Prisons as quickly as possible, so that they can begin to look at him as a more normal patient than one that's in a detention Center.

Tr. at 80:12-20 (Court)(alteration added).

The Court also notes that Loera has compounded his problems by his own actions. First, the Motion is the first time the Court has had his detention before it. Loera went to the Magistrate Judges -- not to the Court -- to get released pending sentencing. The United States did not oppose his requests. If Loera had gone immediately into custody after he pled guilty, the would not be in the present situation. Second, Loera continues to seek continuances of his sentencing. If Loera would just let the Court sentence him, he would go to a Bureau of Prison Center to get long-term medical care. The solution is not further delay, but a proper sentencing.

## II. LOERA MAY NOT ASSERT AN EIGHTH AMENDMENT CLAIM IN HIS § 3145 MOTION.

The Court turns to Loera's argument, made in his § 3145 motion to reconsider release, that "[p]rison officials have shown a deliberate indifference to [his] medical condition in violation of [his] Eighth Amendment protections to prohibition to cruel and unusual punishment." Motion at 5. The Court rejects Loera's deliberate-indifference claim, because he may not assert that claim in his § 3145 motion that the Court reconsider his detention. Loera's § 3145 motion to reconsider release is not the appropriate procedural vehicle by which to assert his Eighth Amendment challenge to the treatment of his ileostomy. The Tenth Circuit has made clear that a "prisoner who challenges the conditions of his confinement must do so through a civil rights action" -- i.e., either a Bivens or a § 1983 action. Palma-Salazar v. Davis, 677 F.3d at 1035. See United States v. Garcia, 470 F.3d at 1003 ("Because Appellants' claims were raised in motions filed in their respective criminal cases and not in civil rights complaints comporting with the requirements of Bivens, they were properly denied by the district court."); Boyce v. Ashcroft, 251 F.3d at 918 (holding that federal prisoners must use Bivens to challenge their conditions of confinement), vacated on other grounds, 268 F.3d 953. Accordingly, the Court rejects Loera's

Eight Amendment deliberate-indifference claim, because Loera asserts this claim in his § 3145 motion and does not assert this claim by filing a separate civil rights action.

The Court notes that the circumstances surrounding Loera's detainment create a wrinkle in the Court's analysis of his Eighth Amendment challenge to the conditions of his confinement. Loera has been in the United States Marshals Service's custody since September, 2016, see Tr. at 70:10 (Wolf), but Cibola County Detention Center, which has a contract with the United States Marshals Service to accept federal detainees, currently houses Loera. See Tr. at 7:17-11:1 (Lucero). In other words, Loera is a federal inmate in the United States Marshals Service's care, but he is held in a state-run correctional Center. Furthermore, Loera's care has been managed both by Lucero, a Physician's Assistant working at Cibola County Detention Center, and Dr. Wolf, who works for the United States Public Health Service.

Accordingly, the Court pauses to explain that the appropriate civil rights action -- i.e., whether Loera should assert his deliberate indifference claim in the vehicle of a § 1983 action or a Bivens suit -- is defendant-specific.

> Whether suits brought by a federal inmate against employees at a local correctional Center housing federal prisoners pursuant to contract with the federal government should be brought under *Bivens v. Six Unknown Agents,* 403 U.S. 388 (1971) or 42 U.S.C. § 1983 . . . [depends] on the federal or state status of the *defendant* rather than the federal or state status of the *plaintiff.*

Dushane v. Sacramento Cty. Jail, No. 2:13-CV-2518 EFB P, 2014 WL 3867468, at *2 (E.D. Cal. Aug. 6, 2014)(Brennan, M.J.)(alterations added)(emphasis in original)(citing Henderson v. Thrower, 497 F.2d 125, 125-26 (5th Cir. 1974)(per curiam)). In other words, the proper procedural action in this context depends upon whether the defendant is a federal or state agent: Bivens is the appropriate vehicle to assert a constitutional violation against federal officials, whereas a suit under 42 U.S.C. § 1983 is appropriate where the official is a state agent. Compare

Bivens, 403 U.S. at 389, 395-96 (holding that a damages suit may be pursued against a federal

agent for violation of a constitutional right), with 42 U.S.C. § 1983 (authorizing damages suits

for violation of federal rights against individuals whose authority derives from state law).  "Thus,

a federal inmate being housed in a city [or county] jail under a contract between the federal

government and the city could sue jail staff under § 1983 because the defendants interacted with

the federal inmates pursuant to authority granted by the city (and derived from the state)."

Dushane v. Sacramento Cty. Jail, 2014 WL 3867468, at *2 (alteration added)(citing Henderson

v. Thrower, 497 F.2d at 125-26).[17]  See Bradley v. St. Clair Cty. Jail, No. 13-CV-01309-JPG,

---

[17]The Court agrees that whether a federal inmate's civil rights suit is properly asserted under Bivens or 42 U.S.C. § 1983 depends on the federal or state status of the defendant.  In this way, the remedy for the alleged violation of federal right is tied to the specific agents responsible for the violation.  In Henderson v. Thrower, 497 F.2d at 125-26, the United States Court of Appeals for the Fifth Circuit held that a federal prisoner who was temporarily placed in the custody of a Mobile, Alabama city jail could assert a § 1983 against various city jail officials.  See 497 F.2d at 125,  The Fifth Circuit explained:

> In Tolbert v. Bragan, 451 F.2d 1020 [(5th Cir. 1971)], this Court upheld the right of an individual convicted for violation of federal law and housed temporarily in a county jail to challenge the conduct of his keepers in a suit under § 1983.  In determining the question of the defendants' liability for jailhouse care, we concentrated, not on the particular circumstances which brought the plaintiff under state control, but rather on the fact of that control and the manner of its exercise.

> It does not appear from the brief statement of facts in Tolbert that the prisoner's lodging in that case as in the case at bar, had been provided under the formal arrangements with local officials permitted by 18 U.S.C. § 4002.  However, the existence of such a contract between the City of Mobile and the federal government neither requires nor permits deviation from the Tolbert line here.  As the Supreme Court pointed out in Logue v. United States, these agreements between the Bureau of Prisons and state officials, though imposing an obligation on the national government to inspect the state facilities to insure proper conditions, in no way authorize federal interference with the operation of the prisons or jails.  Control of the inmates, state and federal, rests in the local authorities.  Defendants in this action -- the warden, associate warden, prison physician, and jailors -- supervised and treated all prisoners in the Mobile City Jail by virtue of the positions conferred on them by the city, a creature of the State

2014 WL 303054, at *2 (S.D. Ill. Jan. 28, 2014)(Gilbert, J.)("Although Plaintiff has always been in the custody of the U.S. Marshal, a housing contract between the Marshals Service and a county jail does not automatically federalize the jail employees.")(citing <u>Belbachir v. County of McHenry</u>, 726 F.3d 975, 978 (7th Cir. 2013)).

The Court further notes that, because the inquiry whether Loera should assert an Eighth Amendment claim in the vehicle of a § 1983 action or a <u>Bivens</u> suit is a defendant-specific inquiry, the inquiry is also fact-intensive. <u>Bivens</u> actions are not available against agencies of the federal government. <u>See</u> <u>Fed. Deposit Ins. Corp. v. Meyer</u>, 510 U.S. 471, 483-86 (1994). Therefore, to assert a <u>Bivens</u> action, Loera must predicate his Eighth Amendment claim on factual allegations regarding a federal agent's specific conduct. <u>See</u> <u>Fed. Deposit Ins. Corp. v. Meyer</u>, 510 U.S. at 483-86. <u>Cf</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Moreover, it is insufficient to simply ground a <u>Bivens</u> action on the fact that Loera is a federal inmate housed in a state detention Center. <u>See</u> <u>Henderson v. Thrower</u>, 497 F.2d at 126 ("[A]greements between the Bureau of Prisons and state officials . . . in no way authorize federal interference with the operation of the prisons or jails. Control of the inmates, state and federal, rests in the local authorities."); <u>cf.</u> <u>Logue v. United States</u>, 412 U.S. 521, 530 (1973) ("The Court

---

of Alabama. They cannot now escape liability under § 1983 on the basis of plaintiff's peculiar [federal] status.

<u>Henderson v. Thrower</u>, 497 F.2d at 125-26 (alteration added). The Court concludes that the Fifth Circuit's reasoning is sound: a state official that violates a federal right cannot escape liability under § 1983 because the plaintiff is a federal inmate; a federal official that violates a federal right of a federal inmate housed in a state Center cannot escape liability under <u>Bivens</u> because the plaintiff is housed in a state Center. Accordingly, to afford an adequate remedy for the violation of a federal right, whether a federal inmate's civil rights suit is properly asserted under <u>Bivens</u> or 42 U.S.C. § 1983 depends on the federal or state status of the defendant.

of Appeals' conclusion that the deputy marshal had no authority to control the activities of the sheriff's employees is supported by both the enabling statute and the contract actually executed between the parties.").

Loera relies on Hunt v. Uphoff, 199 F. 3d 1220, to bolster his Eighth Amendment challenge.  See Motion at 5.  In Hunt v. Uphoff, the Tenth Circuit reviewed an appeal taken from a district court order dismissing a verified civil rights complaint, which alleged the denial of medical care by prison officials in violation of the Eighth Amendment.  See 199 F. 3d at 1222.  While Loera accurately distills the law concerning deliberate indifference in violation of a prisoner's Eighth Amendment rights from Hunt v. Uphoff, he disregards a fundamental procedural distinction in his argument: the plaintiff in Hunt v. Uphoff asserted his constitutional claim by filing a civil suit under § 1983.  See 199 F. 3d at 1222.  Accordingly, the Court denies Loera's Eighth Amendment claim, because Loera's constitutional allegation of prison officials' deliberate indifference to his medical needs must be properly raised in a separate civil action and not injected into his criminal case via a § 3145 motion.

The Court has recognized one exception to the general rule that federal prisoners can challenge their conditions of confinement only by filing a separate civil rights action.  See United States v. Garcia, 470 F.3d at 1003.  The Court will consider "argument on whether the conditions prevent him from assisting his counsel in his defense, this Court will not consider a motion regarding a request for a change in the conditions of his confinement."  United States v. Wade, 2009 WL 3837151, at *1.  Loera does not contend that the conditions of confinement, as they relate to his medical condition, are preventing him from "assisting his counsel in his defense." United States v. Wade, 2009 WL 3837151, at *1.  The Court has not been presented with evidence that Loera's conditions of confinement, as they relate to his medical condition, are

preventing him from "assisting his counsel in his defense." United States v. Wade, 2009 WL

3837151, at *1. Accordingly, Loera's constitutional allegation of prison officials' deliberate

indifference to his medical needs must be properly raised in a separate civil action.

### III. LOERA'S EIGHTH AMENDMENT CLAIM LACKS A SOUND BASIS IN THE FACTS AND IN THE APPLICABLE LAW, BECAUSE CIBOLA COUNTY DETENTION CENTER AND THE UNITED STATES MARSHALS SERVICE PROVIDE LOERA WITH CONSTITUTIONALLY ADEQUATE CARE FOR HIS ILEOSTOMY.

Even if Loera had properly asserted his Eighth Amendment claim in a separate civil

suit,[18] his challenge lacks a sound basis in the facts and the applicable law. In his Motion, Loera

correctly paraphrases the Tenth Circuit's position in Hunt v. Uphoff, 199 F.3d at 1224,

concerning the standard by which prison official's treatment of a prisoner's medical needs runs

afoul of the guarantees that the Eighth Amendment affords. Loera states:

> Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act deliberately and indifferently to serious medical needs of prisoners in their custody. This is true whether the indifference is manifested by prison doctors responding to the prisoner's needs or by guards intentionally delaying or denying access to medical care that has been prescribed.

---

[18]The Court, in considering the merits of Loera's Eighth Amendment claim, also notes that Loera must exhaust his administrative remedies as the PLRA requires. See 42 U.S.C. § 1997e(a). The PLRA states that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional Center until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's requirement that an inmate exhaust all available administrative remedies before initiating suit is 'mandatory,' whether or not such remedies 'meet federal standards.'" Purkey v. CCA Det. Ctr., 263 F. App'x 723, 725 (10th Cir. 2008)(quoting Woodford v. Ngo, 548 U.S. 81 (2006)). "This 'exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Purkey v. CCA Det. Ctr., 263 F. App'x at 725 (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)). The parties present no evidence that Loera used the Cibola County Detention Center's administrative procedure to remedy his complaints. Loera's failure to exhaust this administrative process presents another reason to deny his Motion.

Motion at 5 (citing <u>Hunt v. Uphoff</u>, 199 F.3d at 1224). The Tenth Circuit's position in <u>Hunt v. Uphoff</u>, largely tracks <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), the Supreme Court's watershed case concerning prison officials' deliberate-indifference violations of prisoners' Eighth Amendment rights. Under this standard, however, Loera's deliberate-indifference claim lacks a sound basis in the case's facts and in the applicable law.[19]

Loera relies on <u>Thompson v. Gibson</u>, 289 F. 3d at 1222, to argue that his medical need is serious. <u>See</u> Reply at 3 (citing <u>Thompson v. Gibson</u>, 289 F. 3d at 1222). In <u>Thompson v. Gibson</u>, the Tenth Circuit rejected a prisoner's appeal, in which the prisoner asserted that officials at the Oklahoma State Penitentiary had violated his Eighth Amendment rights by subjecting him to cruel-and-unusual punishment through their deliberate indifference to the prisoner's serious medical need for adequate portions of food. <u>See</u> <u>Thompson v. Gibson</u>, 289

---

[19]The Court notes, in passing, that Loera's deliberate-indifference claim, as argued, would fail to meet the pleading requirements under rule 12(b)(6) of the Federal Rules of Civil Procedure. Loera's allegation fails to implicate a specific prison official or officials, as he asserts merely that "[p]rison officials have shown a deliberate indifference to [his] medical condition." Motion at 5 (alterations added). At trial, Lucero testified that she is the primary care provider at Cibola County Detention Center, and has provided medical care and responded to Loera's medical concerns since he was transferred there. <u>See</u> Tr. at 4:6-50:5 (Court, Lucero). The United States Public Health Service, however, has also responded to Loera's medical requests -- specifically, it denied Loera's first request but then approved his second request for a surgical consultation. <u>See</u> Tr. at 57:5-58:8 (Wolf). Dr. Wolf, a United States Public Health Service physician, balked at the prospect of carrying out further studies to inform the surgical consultation, ultimately deferring to the Court to a render a decision whether the United States Marhals Service would be obligated to perform Loera's ileostomy take-down procedure. <u>See</u> Tr. at 59:4-5 (Wolf). Because Loera does not allege either of these individuals or any other individuals, for that matter, as Defendants in his Eighth Amendment challenge, the allegation would fail to clear rule 12(b)(6)'s hurdle to "state a claim upon which the relief can be granted." Fed. R. Civ. P. 12(b)(6). <u>See also</u> <u>Pena v. Greffet</u>, 922 F. Supp. 2d 1187, 1217 (D.N.M. 2013)(Browning, J.)(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 556 (2007)("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). <u>Cf</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675 ("Because vicarious liability is inapplicable to <em>Bivens</em> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

F.3d at 1218-20 (10th Cir. 2002).  The Tenth Circuit in <u>Thompson v. Gibson</u> stated, in regard to his Eight Amendment claim:

> Mr. Thompson contends that the Defendants are deliberately indifferent (subjective component) to his serious medical needs (objective component) in failing to provide him with double portions of food. *See Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). One doctor approved double portions on September 21, 1998; another doctor discontinued them on December 12, 1998.  A medical need is serious if it has been diagnosed by a doctor, or if it would be obvious to a layperson that doctor intervention was needed. *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000) (quotations omitted). While the need for a special diet that is medically necessary could be the objective basis for a claim, *see Byrd v. Wilson,* 701 F.2d 592, 594-95 (6th Cir. 1983), Mr. Thompson has failed to come forward with a genuine issue of material fact concerning his Eighth Amendment claim.
>
> The *Martinez* report establishes that the Center is providing Mr. Thompson a nutritionally adequate diet. . . . The fact that Mr. Thompson was provided double portions for a temporary period at most establishes a medical difference of opinion, which is not actionable under the Eighth Amendment. *See Estelle,* 429 U.S. at 106; *Olson v. Stotts,* 9 F.3d 1475, 1477 (10th Cir. 1993).

<u>Thompson v. Gibson</u>, 289 F.3d at 1222.

While the Court agrees that Loera has special needs in regard to his medical condition, the Court concludes that Loera does not sufficiently distinguish his Eight Amendment challenge from that of the prisoner in <u>Thompson v. Gibson</u>, which the Tenth Circuit rejected.  Loera argues that he requires a follow-up surgery to install a colostomy bag, which he had before his first surgery, because a colostomy bag "does not limit the absorption of nutrients through the large intestine," as opposed to an ileostomy bag, which "limits the absorption of liquids through the large intestine and colon," and which he has now.  Reply at 4.  Dr. Wolf explained that the United States Public Health Service denied Loera's first request for a surgical evaluation, because it was "not medically necessary to do . . . while in the short term custody of U.S. Marshals," and, further, that such a medical request "should be addressed when a person is in a long-term setting, either back in the community or at the federal Bureau of Prisons, if it needs to

be addressed at all." Tr. at 57:5-13 (Wolf). Dr. Wolf granted Loera's second surgical consultation request, but then expressed hesitation in proceeding with the studies that Dr. Ray requested, deferring the requests until the Court made a decision regarding the United States Marshals Service's obligation to perform Loera's surgery. See Tr. at 59:4-5 (Wolf). Dr. Wolf testified that he did not have concerns about the care Loera is receiving at Cibola County Detention Center and, further, that the care of Loera's ileostomy "has been good." Tr. at 64:12-13 (Wolf). Dr. Wolf also testified as to the circumstances that would render an ileostomy take-down procedure urgent and concluded that his own findings showed that the procedure in Loera's case was not urgent. See Tr. at 61:4-14 (Wolf). Again, the Court credits Dr. Wolf's testimony.

Far from the deliberate indifference of prison officials that Loera alleges, the evidentiary record demonstrates that medical care providers have consistently attended to Loera's medical condition in ways that comport with the Eighth Amendment's guarantees. The United States Public Health Service's rejection of Loera's first request and tentative approval of his second request for a surgical consultation signal evolving medical opinions in response to Loera's medical needs and requests, and not deliberate indifference. See Thompson v. Gibson, 289 F.3d at 1222 ("The fact that Mr. Thompson was provided double portions for a temporary period at most establishes a medical difference of opinion, which is not actionable under the Eighth Amendment."). The Court's review of the record and the hearing testimony establishes that the prison officials charged with providing medical care for Loera have continuously responded to his requests and overall have provided adequate constitutional medical care. Accordingly, even if Loera had properly asserted his Eighth Amendment claim in a separate civil suit, his challenge lacks a sound basis in the facts and the applicable law.

**IT IS ORDERED** that Defendant's Opposed Motion Requesting Medical Services and Reconsideration of Conditions of Detention, filed January 10, 2017 (Doc. 163) is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Dean S. Tuckman
Stephen R. Kotz
Kristopher N. Houghton
Cynthis L. Weisman
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

David C. Serna
David C. Serna Attorney at Law
Albuquerque, New Mexico

-- and --

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for the Defendant*